**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DEUTSCHE BANK TRUST COMPANY
AMERICAS,

                          Plaintiff,

    v .

RADO LIMITED PARTNERSHIP,

                          Defendant.

Case No. 1:18-cv-06768

## ANSWER AND COUNTERCLAIMS

       Defendant Rado Limited Partnership ("Rado"), by and through its undersigned counsel, Malecki Law, hereby respectfully submits its Answer to the Complaint of Deutsche Bank Trust Company Americas ("Deutsche Bank") and Counterclaims against Deutsche Bank, responding and alleges as follows:

### NATURE OF THE ACTION

       1.      Defendant denies the allegations contained in paragraph 1.

       2.      Defendant admits the allegations contained in paragraph 2.

       3.      Defendant denies the allegations contained in paragraph 3, except admits that Haberer had a limited power of attorney for the Rado account and Haberer purported to work for Biscayne Capital, S.A.

       4.      Defendant denies knowledge or information sufficient to form a basis to admit or deny the allegations contained in paragraph 4.

       5.      Defendant denies knowledge or information sufficient to form a basis to admit or deny the allegations contained in paragraph 5.

6.     Defendant denies knowledge or information sufficient to form a basis to admit or deny the allegations contained in paragraph 6.

7.     Defendant does not have knowledge and information sufficient to admit or deny the allegations contained in paragraph 7 but admits that "securities and cash were transferred into the Custody Account and were subsequently liquidated or applied to offset the deficit. As a result, the deficit was reduced to $2,557,267.72."

8.     Defendant denies the allegations contained in paragraph 8.

## JURISDICTION AND VENUE

9.     Defendant admits the allegations contained in paragraph 9.

10.    Defendant admits the allegations contained in paragraph 10.

11.    Defendant admits the allegations contained in paragraph 11.

## PARTIES

12.    Defendant admits the allegations contained in paragraph 12.

13.    Defendant admits the allegations contained in paragraph 13.

## FACTUAL ALLEGATIONS

**The Custody Agreement and Related Documents**

14.    Defendant admits the allegations contained in paragraph 14.

15.    Defendant denies the allegations contained in paragraph 15.

16.    Defendant states in response to paragraph 16 that the document in its entirety speaks for itself.

17.    Defendant states in response to paragraph 17 that the document in its entirety speaks for itself.

18.     Defendant states in response to paragraph 18 that the document in its entirety speaks for itself.

19.     Defendant admits the allegations contained in paragraph 19 alleging that "Rado, on its own, engaged Biscayne Capital S.A. ("Biscayne") as its independent investment advisor and, in 2012, provided Fernando Haberer-Bergson, on behalf of Biscayne, with a limited power of attorney" and states in response to the remainder of the paragraph that the documents referenced in their entirety speak for themselves.

20.     Defendant states in response to paragraph 20 that the document in its entirety speaks for itself.

21.     Defendant states in response to paragraph 21 that the document in its entirety speaks for itself.

22.     Defendant states in response to paragraph 22 that the document in its entirety speaks for itself.

23.     Defendant states in response to paragraph 23 that the document in its entirety speaks for itself.

24.     Defendant states in response to paragraph 18 that the document in its entirety speaks for itself.

**January 2018 Transactions**

25.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 25.

26.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 26.

27.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 27, except admits that Plaintiff delivered funds.

28.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 28.

29.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 29.

30.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 30.

31.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 31.

32.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 32.

33.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 33 and states that the account statements speak for themselves.

34.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 34.

35.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 35.

36.     Defendant admits the allegations in paragraph 36.

37.     Defendant admits the allegations contained in paragraph 37.

## CLAIM FOR RELIEF
### Count One: Breach of Contract

38.     Defendant repeats and realleges each of the responses set forth in the foregoing paragraphs as if fully set forth herein.

39.     Defendant denies the allegations contained in paragraph 39.

40.     Defendant denies the allegations contained in paragraph 40.

41.     Defendant denies the allegations contained in paragraph 41.

42.     Defendant denies the allegations contained in paragraph 42.

43.     Defendant denies the allegations contained in paragraph 43.

### AFFIRMATIVE DEFENSES

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

44.     The Statement of Claim fails to state a claim upon which relief may be granted.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE

45.   Rado acted in good faith and did not directly or indirectly induce the acts alleged to have constituted Deutsche Bank's alleged damages.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

46.   Deutsche Bank's claims are barred by applicable equitable principles of laches, estoppel, waiver and/or ratification.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

47.   Deutsche Bank failed to take timely and appropriate action to mitigate such damages.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

48.   If any damage or loss was sustained by Deutsche Bank, this damage or loss was caused or contributed to by Deutsche Bank's own actions, fault, and/or lack of due diligence.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

49.   Deutsche Bank acted in reckless disregard of facts of which it knew or should have known and failed to exercise the required care and diligence.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

50.   Deutsche Bank's claims should be barred by the doctrine of *in pari delicto*, unclean hands.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

51.   If Deutsche Bank be entitled to any recovery, such recovery is diminished by the proportion of Deutsche Bank's culpable conduct which caused the damages.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

52.   Deutsche Bank engaged in willful blindness and cannot recover damages.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

53.   Rado did not violate or breach any legal duties owed to any party.

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE

54.   The alleged damages, if any were sustained, were the proximate result of the acts and/or omissions of parties over which Rado exercised no control.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

55.   Rado is entitled to an offset.

## AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE

56.   Rado's requirement to pay is excused due to the illegality of the transaction.

## AS AND FOR A FOURTEENTH AFFIRMATIVE DEFENSE

57.     Deutsche Bank failed to act in good faith and fair dealing.

## AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE

58.     Rado reserves the right to assert and pursue additional defenses, including any that may become known through discovery or otherwise and may amend its answer with counterclaims.

## COUNTERCLAIMS
## COUNTER-STATEMENT OF FACTS

**Summary & the Parties**

59.   This case is about Deutsche Bank essentially signing a blank check to Biscayne with Rado's name on it, without any realistic inquiry, safeguards or limitations, wiping out Rado's account and then asking Rado to reimburse it for its precarious extension of credit to pay a thief.

60.   Rado is a New Zealand company owned by the Diego Trust (the "Trust"). The Trust was created by Amicorp Trustees (New Zealand) Limited (Trustee) through Diego Romay's parents with the aid of lawyers and accountants after the sale of a family business, in smart family planning.   The Trust was established to benefit Diego Romay and Diego's descendants, his wife and three children.

61. Mr. Romay's parents also created trusts for each of Mr. Romay's three siblings. Those trusts were intended to hold a family portfolio, but only Diego Romay and his sister Mirta Romay were affected as beneficiaries of the trusts by this fraud perpetuated by Fernando Haberer and others.

62.  When Mr. Romay's father died in 2015, there was a mandate after he passed away to distribute 50% of the assets of the Diego Trust, which was used to fund the Diego II Trust to benefit Diego Romay's descendants.

63.  Diego Romay also was the settlor of the Docil Trust to benefit his descendants, his wife and three children. The Docil Trust holds an underlying company named Clodi Holdings Ltd., which opened an account with Haberer at Insight Securities funded with cash and securities, mostly legitimate.

64.  Fernando Haberer was an investment advisor associated with Biscayne Capital, S.A.  Haberer is the brother of Mirta Romay's son-in-law, Paco Haberer, married to her daughter.  Mirta Romay is Mr. Romay's sister.  Haberer used his position of trust with the Romay family to gain control of investment accounts that were held within the Romay family trust structures.

### Deutsche Bank's Assistance to Biscayne in Unloading *SEC Cease-and-Desist Related Notes*

65.  Haberer sought out and befriended, personally and/or professionally, the Romay family for their money, as well as service providers who were willing to ignore red flags relating to the investment activity that he planned to conduct in the accounts he managed and to assist in perpetrating his scheme to loot accounts.   By means of these relationships, Haberer was able to persuade the institutions to overlook numerous and stark indications of fraud and looting.

66.  In 2011, Deutsche Bank opened a custody account for Rado.  Reynaldo Figueredo Deutsche Bank Primary Officer for the Rado Account.  Fernando Haberer was listed on account opening documents as an agent for the Rado account.

67.  Mr. Haberer had a relationship with a company called Biscayne Capital International LLC ("Biscayne"), which in May 2016 was the subject of an SEC Order and

Cease-And-Desist Proceedings relating to its role in owning, creating and improperly selling what are now essentially worthless proprietary products.  Mr. Haberer caused Rado to invest – without Rado's knowledge or consent – in notes issued by the same proprietary product issuers included in the SEC Order, including SG Strategic Income, Ltd. and GMS Global Market Step Up Note, Ltd., as well as other issuers beneficially owned by the Biscayne principals.  ("***SEC Cease-and-Desist Related Notes***"). A copy of the SEC Order is annexed as Exhibit A (the "SEC Order").

68.   Upon information and belief, after the issuance of the SEC Order, Biscayne and the Biscayne principals continued their fraud with the assistance of Deutsche Bank.  Upon information and belief, Deutsche Bank was undeterred by the SEC Order or the expressed concerns of Deutsche Bank Switzerland, which were substantial enough to result in the forced closings of Biscayne accounts there.  Deutsche Bank, specifically Mr. Figueredo, actively sought out Biscayne's business and it was transferred to him with the knowledge of Pascal Landrove, Managing Director, Head of Deutsche Bank Latam Miami and the assistance of Pascal Russo, Director and Head of Deutsche Bank Financial Intermediaries Geneva.

69.   Upon information and belief, after the closing of Biscayne's accounts held by Deutsche Bank Switzerland, now at Deutsche Bank in the United States, Biscayne continued the scheme of the primary business that was the subject of the SEC Order, including now the out-and-out theft of Rado assets and the assets of others.

70.   Had Deutsche Bank exercised reasonable care in fulfilling its contractual duties, its rudimentary inquiry would have uncovered that Fernando Haberer, the Investment Advisor, had an association with Biscayne.

71.   In breach of Mr. Haberer's fiduciary duties to Rado, Haberer caused Rado to invest millions of dollars in the *SEC Cease-and-Desist Related Notes*.  The Rado Account initially held a conservative investment portfolio, but by early 2018 it was almost completely invested in the *SEC Cease-and-Desist Related Notes*.

72.  The beneficial owners of Rado were unaware that the Rado account had been almost completely invested in the *SEC Cease-and-Desist Related Notes* because they were given falsified account statements by Haberer.

73.  Deutsche Bank rendered substantial assistance in Haberer's role in the fraudulent scheme and breach of its fiduciary duty to Rado, allowing Haberer to engage in excessive trading in the Rado Account, reaching several times the market value of a portfolio in illiquid and/or worthless/near worthless *SEC Cease-and-Desist Related Notes.*  Deutsche Bank extended credit for far in excess of the market value of the portfolio or the value of the *SEC Cease-and-Desist Related Notes, which* should have had no marginable value as collateral for any account.

74.  These acts did not "keep and protect" Rado's assets in the same manner as the Bank keeps and protects its own similar property as required by the agreements between the parties.

75.  The indicia of fraud surrounding the Rado account were abundant.  First, Deutsche Bank knew that Biscayne and the Biscayne principals were the subject of the SEC Order.  This fact alone caused other rule compliant institutions to reject maintaining accounts involving Biscayne.

76.  Second, Deutsche Bank knew that Fernando Haberer worked with  Biscayne and was an agent for that account.

77.  Third, Deutsche Bank knew that Biscayne was on both sides of the Rado account transactions, acting on the one hand with Mr. Haberer as investment advisor to order trades and on the other hand with Biscayne as a counterparty to the trades, just as in the SEC Order.

78.  Fourth, Deutsche Bank knew that the Rado account was a trust account with the attendant requirements and obligations to beneficiaries.

79.  Fifth, Deutsche Bank knew that the Rado account was investing primarily in illiquid *SEC Cease-and-Desist Related Notes* issued by proprietary product issuers beneficially owned by the Biscayne principals.

80.  Sixth, Deutsche Bank knew that the value of transactions in the Rado account far exceeded the value of the account, as well as the securities it was extending credit on, yet still extended credit.  The extension of credit may as well have been $150,000,000 because the Rado account was wiped out and Deutsche Bank seemed to impose no limits or safeguards for Rado or itself on the extension of credit.

81.  Finally, Deutsche Bank knew that Haberer and Biscayne had ordered trades that would cause the Rado account to be overdrawn by over $12 million.

82.  Despite all of this knowledge, Deutsche Bank allowed Biscayne to be an approved counterparty for trades with the Rado account and allowed Haberer and Biscayne to repeatedly cause Rado to invest in *SEC Cease-and-Desist Related Notes*, ultimately draining the Rado account of assets and leaving it with an overdraft of over $12 million, as a result of the blank check Deutsche Bank extended in the Rado account.

83.  Haberer used fraudulent means to conceal these investments from the Romay family, including creating fictitious statements.  These statements showed that the accounts were

invested in liquid, reputable securities, mostly highly rated bonds issued by companies whose stock traded on reputable exchanges.

84.   These investments were made without ever advising the Romay family of what was being done and without ever considering that these *SEC Cease-and-Desist Related Notes* were manifestly against the investment mandates as well as the interests of the Romay family, and that these *SEC Cease-and-Desist Related Notes* were in reality nothing more than theft.

85.   Haberer completely abandoned his obligations to the Romay family and Deutsche Bank aided and abetted his breaches.

86.   When the scheme was about to collapse, Mr. Haberer stole over $6 million in assets by transferring the assets of various Romay family members and others, including Clodi assets, using forged documents to transfer assets to Rado at Deutsche Bank to cover the overdraft that was generated. Deutsche Bank did not seem to care where the money was coming from and apparently did nothing to reasonably inquire.

87.   The *SEC Cease-and-Desist Related Notes* were worthless, or virtually so, and the trusts would <u>not have allowed</u> these purchases. Deutsche Bank did not know its customers or review any documents relating to the boundaries of the trusts or the account investment management mandates.

88.   These *SEC Cease-and-Desist Related Notes* should have raised red flags at every level, even without suitability obligations on Deutsche Bank, since firms are required to know and supervise every transaction as well as every customer, including every person holding a power of attorney, to insure its facilities are not being used for a fraud.  Every financial institution must know its customer.

89.   Deutsche Bank allowed its facilities to aid and abet a fraudulent enterprise.

12

**Deutsche Bank's Creation of the Rado Overdraft to Aid Transactions in the**
*SEC Cease-and-Desist Related Notes*

90.   In January 2018, several unfunded, large purchases of $12 million of ***SEC Cease-and-Desist Related Notes*** in the Rado Account caused a substantial overdraft and debit, initially over $12 million.

91.   The overdraft was generated because Deutsche Bank allowed Haberer to cause the Rado Account to purchase securities on credit without proof of ability to pay for the trades, knowing that the Rado Account had insufficient value to otherwise cover the purchases.

92.   Deutsche Bank then hid the overdraft, extending credit for months and not contacting the beneficial owners.  That silence alone materially assisted Biscayne in its fraud.

93.   Fearing that the scheme would be exposed, Haberer scrambled to cover the overdraft. In March 2018, Haberer arranged to transfer millions of dollars in cash and securities from several unwitting sources that had no responsibilities or desire cover the overdraft in any way.  In particular, in addition to the approximately $6 million worth of securities transferred from the Clodi account on March 8 and March 15, 2018.  Then on March 15 and March 16, 2018, there was a transfer of approximately $2.5 million worth of securities from two other separately owned accounts also controlled by Haberer using similarly suspicious transfer instructions purported to be for the benefit of other clients, but actually funding Rado.

94.   Undoubtedly, the pressure at the Deutsche Bank branch carrying the Rado account was high and compliance, supervisory, and account representative judgment was compromised. Deutsche Bank received millions of dollars in securities were being transferred into the Rado Account from several different accounts of different clients with different names during a roughly two-week period, but apparently made no inquiry as to the sources of the funds.  This was out of character for the Rado Account, but Deutsche Bank asked no questions and rubber-

stamped the infusion of cash and securities to relieve pressure at the branch, by taking care of the bulk of their $12 million debt problem.

95.   Diego Romay, as one of the beneficial owners of Rado, was eventually notified in May 2018, **roughly five months later**, by Deutsche Bank of the remaining overdraft in the Rado Account.  Mr. Romay requested from Deutsche Bank copies of the account statements, and only then did he learn that the account for which he had been receiving doctored statements had been filled with the ***SEC Cease-and-Desist Related Notes*** and that he and his family members had been victims of the scheme.

96.   Deutsche Bank gave substantial assistance in the thefts from the Rado account and was plainly a proximate cause of Rado's losses because of its weak compliance, relationship with Haberer, and refusal to follow industry rules and standards in order to foster its business.  Mr. Haberer, Biscayne and others could not have looted the Rado account without Deutsche Bank's assistance.

97.   Per the agreements between Rado and Deutsche Bank, Deutsche Bank agreed that it would "keep and protect, in the same manner as the Bank keeps and protects its own similar property, the securities, cash or other financial assets you deposit in your Account(s) and any dividends, interest or other distributions received on those assets of from their sale or other disposition (collectively, the "Property")."  Deutsche Bank did not protect the account in the same manner it would protect its own assets, as by limited example, Deutsche Bank would not essentially write a blank check to a tarnished counterparty for worthless or near-worthless ***SEC Cease-and-Desist Related Notes*** from its own account.

98.   Per the agreements between the parties, Deutsche Bank agreed that it "may decline to execute or settle a purchase order if the Bank is not satisfied, in the Bank's sole judgement,

that you will have sufficient available funds or credit in your Account." Deutsche Bank never satisfied itself that there were sufficient funds available to settle the $12 million order but in an act of gross negligence, recklessness, and/or fraudulent conduct extended credit anyway.

99. Per the agreements between the parties, Deustche Bank indicated that "[t]o help fight … money laundering activities, DBTCA obtains, verifies and records information that identifies each person who, or entity that, opens an account with the Firm including the authorized signors for the entity. This procedure was established under the USA Patriot Act, with which all financial services organizations must comply." Deutsche Bank made no effort to verify information about Haberer and Biscayne.

100. Deutsche Bank agreed to maintain appropriate policies, procedures and practices in the course of and in its role in maintaining custodial duties to Rado. Rado maintained a loss resulting from its inadequate internal processes, systems failure, or failure to comply with applicable laws or regulations. These types of errors and failures are often evidence of a gap between applicable written internal policies and procedures, regulations or contractual agreements and the actual execution of those written guidelines.

101. Good faith and fair dealing requires that activities engaged in, per contractual obligations, be compliant with all relevant laws, rules, and industry practices and standards; Deutsche Bank failed to follow basic know your customer, anti-money laundering, and identity theft rules, amongst others.

102. Relevant U.S. Office of the Comptroller of the Currency guidance requires that custodians should establish strong risk-based internal controls to protect assets held off-premises, which Deutsche Bank failed to adhere to.

103. Deutsche Bank allowed Rado to experience serious compliance related risk of loss from the failure of an individual or group within Deutsche Bank to comply with applicable laws or regulations, such as anti-money laundering, U.S. economic sanctions, antitrust or antifraud requirements, amongst others.

104. Deutsche Bank recklessly and in breach of the parties' agreements funneled Rado's money to the scheme operator while allegedly ignoring clear signs that they were dealing with a thief, purporting to be a fiduciary while breaching every fiduciary duty and engaging in a massive fraud, all aided by Deutsche Bank.

## FIRST COUNTERCLAIM
### (Breach of Contract)

105. Rado repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

106. Deutsche Bank breached the Custody Agreement and all related incorporated rules and laws by failing to keep and protect Rado's assets as it would its own.

107. Deutsche Bank breached the Custody Agreement and all related incorporated rules and laws by failing to know its customer, failing to know the transactions being facilitated through its facilities,  and accepting assets and extending excessive credit to the Rado account beyond its ability to cover and beyond the value of the ***SEC Cease-and-Desist Related Notes,*** which should never have been permitted to be purchased.

108. Deutsche Bank has failed to perform all of the conditions required of it under the Agreements between the parties.

109. The credit upon which Deutsche Bank brings this action was corrupted after being extended when Deutsche Bank was on actual or constructive notice of the presence of ***SEC Cease-and-Desist Related Notes*** which were not properly available as collateral for a loan. Had

Deutsche Bank acted properly, the ***SEC Cease-and-Desist Related Notes*** would not have come into the account.

110. As a result of Deutsche Bank's failures and breaches, Rado has been damaged in an amount to be determined at trial, but in no event less than $8,000,000, plus applicable pre-judgment interest at the New York statutory rate of nine percent dating from June 14, 2018.

## SECOND COUNTERCLAIM
### (Aiding and Abetting the Breach of a Fiduciary Duty)

111. Rado repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

112. Deutsche Bank had actual knowledge or engaged in conscious avoidance of Haberer's breach of his fiduciary duty to Rado, knowing and/or consciously avoiding confirming facts that demonstrated the fraudulent nature of the endeavor it substantially furthered.

113. Deutsche Bank caused the risk of loss and Rado's damages by Deutsche Bank's knowledge of the scheme, as well as failure to know its customer and properly monitor and oversee a third party's exercise of such discretion, particularly where there was indicia of a breach of fiduciary duty and fraud.

114. The obvious signs of fraud were present and Deutsche Bank knew or in the reasonable exercise of due diligence could have readily discovered the scheme.

115. Rado will show that there was a (1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the Plaintiff knowingly induced or participated in the breach; and (3) Defendant suffered actual damages as a result of the breach.

## THIRD COUNTERCLAIM
### (Aiding and Abetting Fraud)

116. Rado repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

117. Rado will show: (1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud.

118. Rado has alleged a strong inference of actual knowledge of the underlying harm, or the conscious avoidance of the same such that it can almost be said that Deutsche Bank actually knew, suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge.

119. As an aider and abettor Deutsche Bank consciously avoided confirming facts and was willfully blind that, if known, would have demonstrated the fraudulent nature of the endeavor it substantially furthered.

120. Haberer caused Rado to invest millions of dollars in the *SEC Cease-and-Desist Related Notes*. The Rado Account initially held a conservative investment portfolio, but by early 2018 it was almost completely invested in the *SEC Cease-and-Desist Related Notes*, as well as funded by Mr. Haberer's theft from third-parties for which Deutsche Bank looked the other way.

### DEMAND FOR A JURY TRIAL

121. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Rado demands a trial by jury of this action.

## PRAYER FOR RELIEF

**WHEREFORE,** Rado prays for relief and judgment, as follows:

(A)  Deutsche Bank's claims be denied in their entirety;

(B)  Awarding to Rado actual damages, including interest, to be
established at trial;

(C)  Awarding to Rado reasonable costs and expenses incurred
in this action, including counsel fees; and

(D)  Such further relief as the Court deems appropriate.


Dated:        September 12, 2018
              New York, New York


                                        **MALECKI LAW**

                              By:  */s/ Jenice L. Malecki*
                                   _____
                                   Jenice L. Malecki
                                   11 Broadway
                                   Suite 715
                                   New York, NY 10004
                                   (212) 701-3000
                                   *Attorneys for Defendant*
                                   *Rado Limited Partnership*