**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DEUTSCHE BANK TRUST COMPANY
AMERICAS,

               Plaintiff,

    v.

RADO LIMITED PARTNERSHIP,

               Defendant.

Case No. 1:18-cv-06768 (DLC)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF/COUNTERCLAIM DEFENDANT'S MOTION TO DISMISS COUNTERCLAIMS

CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Plaintiff and*
*Counterclaim Defendant Deutsche*
*Bank Trust Company Americas*

Of Counsel:

David G. Januszewski
Sesi V. Garimella

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

LEGAL STANDARDS ......................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

I.    RADO FAILS TO STATE A CLAIM FOR BREACH OF THE CUSTODY
      AGREEMENT ............................................................................................................. 7

      A.    The Custody Agreement Imposes No Duty on Deutsche Bank to Monitor Rado's
            Investment Decisions ....................................................................................... 8

      B.    The Custody Agreement Imposes No Duty on Deutsche Bank to Monitor Rado's
            Selection of an Independent Investment Advisor ............................................ 9

II.   RADO HAS NOT STATED AN AIDING AND ABETTING CLAIM ............................. 10

      A.    Rado Fails to Adequately Allege that Deutsche Bank Had Knowledge of Haberer's
            Alleged Fraud or Breach of Fiduciary Duty .................................................. 11

      B.    Rado Fails to Allege that Deutsche Bank Provided Substantial Assistance to Haberer's
            Alleged Fraud or Breach of Fiduciary Duty .................................................. 12

CONCLUSION.................................................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong* v. *McAlpin*,
    699 F.2d 79 (2d Cir. 1983)..................................................................................12

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)...........................................................................................6

*Atlas Partners, LLC* v. *STMicroelectronics, International N.V.*,
    2015 WL 4940126 (S.D.N.Y. Aug. 10, 2015) ...................................................7

*ATSI Communications, Inc.* v. *Shaar Funds, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)................................................................................ 6-7

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 544 (2007)...........................................................................................6

*Bernard National Loan Investors, Ltd.* v. *Traditions Management, LLC*,
    688 F. Supp. 2d 347 (S.D.N.Y. 2010)...............................................................7

*Crane Co.* v. *Coltec Industries, Inc.*,
    171 F.3d 733 (2d Cir. 1999)...............................................................................7

*Cromer Financial Ltd.* v. *Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001)................................................... 10-11, 13

*Eastern Conintental Mining & Development Ltd.* v. *Signet Group LLC*,
    2013 WL 6503526 (S.D.N.Y. Dec. 9, 2013) ....................................................8

*GFE Global Financial & Engineering Ltd.* v. *ECI Ltd. (USA), Inc.*,
    291 F.R.D. 31 (E.D.N.Y. 2013) ..................................................................... 8-10

*JP Morgan Chase Bank* v. *Winnick*,
    2005 WL 2000107 (S.D.N.Y. Aug. 16, 2005) .................................................11

*Kolbeck* v. *LIT America, Inc.*,
    939 F. Supp. 240 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998) ................11

*Lynn* v. *McCormick*,
    2017 WL 6507112 (S.D.N.Y. Dec. 18, 2017) ..................................................6

*Mazzaro de Abreu* v. *Bank of America Corp.*,
    525 F. Supp. 2d 381 (S.D.N.Y. 2007)...............................................................13

*Musalli Factory For Gold & Jewellry* v. *JPMorgan Chase Bank, N.A.*,
   261 F.R.D. 13 (S.D.N.Y. 2009) ............................................................................12

*Renner* v. *Chase Manhattan Bank*,
   2000 WL 781081 (S.D.N.Y. June 16, 2000) ........................................................12

*Revonate Manufacturing, LLC* v. *Acer America Corp.*,
   2013 WL 342922 (S.D.N.Y. Jan.18, 2013) ...........................................................6

*RLI Insurance Co.* v. *King Sha Group*,
   598 F. Supp. 2d 438 (S.D.N.Y. 2009)..................................................................7n

*Ryan* v. *Hunton & Williams*,
   2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ....................................................13

*Silverman Partners, L.P.* v. *First Bank*,
   687 F. Supp. 2d 269 (E.D.N.Y. 2010) .................................................................10

**Treatises**

5B Charles Alan Wright and Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed.
   2004) ......................................................................................................................6

Plaintiff/Counterclaim-Defendant Deutsche Bank Trust Company Americas ("Deutsche Bank") respectfully submits this memorandum of law in support of its motion to dismiss the counterclaims filed by Defendant/Counterclaim-Plaintiff Rado Limited Partnership ("Rado") (Dkt. 20), pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Earlier this year, Rado breached its obligations to Deutsche Bank under the terms of a custody agreement with the bank.  Rado utilized the custody account to facilitate its investment trading activities.  As a result of certain trades conducted by Rado, the custody account was left with a deficit of more than $2.5 million.  Now, rather than pay the amounts due to cover the shortfall, Rado seeks to blame Deutsche Bank for its trading losses, losses caused, according to Rado's own allegations, by Rado's independent investment advisor.  Faced with Deutsche Bank's straightforward breach of contract claim, Rado counters with three claims: breach of contract, aiding and abetting the investment manager's fraud, and aiding and abetting the investment manager's breach of fiduciary duty.  Each of these claims directly contravenes the plain terms of the parties' contractual agreement, which explicitly holds Rado responsible for the acts of its own agents or advisors and further requires Rado to cover any deficits or other shortfalls in the custody account.

Rado's aiding and abetting claims also fail for the independent reason that they do not adequately plead either Deutsche Bank's actual knowledge of, or substantial assistance to, the investment manager's underlying wrongful conduct.  Instead, Rado's counterclaims rest on conclusory allegations concerning what Deutsche Bank did (or did not do) and Rado's own self-serving speculation about what Deutsche Bank should have done to protect Rado from its own decisions.  None of this is sufficient to state a claim against Deutsche Bank.

## STATEMENT OF FACTS

Rado is a limited partnership organized under the laws of New Zealand.  Answer and Counterclaims ("CC") ¶¶ 13, 60.  Rado is owned by the Diego Trust, a trust set up for the benefit of Diego Romay and his family.  CC ¶ 60.  In 2011, Rado opened the custody account (the "Rado Account" or "Custody Account") with Deutsche Bank that is the subject of this action. Compl.¶ 2; CC ¶ 66.

### *The Custody Agreement*

The terms and conditions governing the Rado Account are set forth in the March 2011 agreement between Rado and Deutsche Bank (the "Custody Agreement").  Compl. ¶ 14; CC ¶ 14.  Under the terms of the Custody Agreement, which is governed by New York law, Deutsche Bank's sole responsibilities were to "receive, keep and protect" the securities, cash or other financial assets held in the Rado Account; "as custodian, to maintain financial assets (within the meaning of the New York Uniform Commercial Code)"; and to provide certain execution services in connection with the Account.   Compl. ¶¶ 10, 15.  Specifically, the Custody Agreement provided that upon instructions from Rado or its advisor, Deutsche Bank would "buy or sell, for [Rado's] Account and ***at [Rado's] sole risk***, securities or other financial instruments and any foreign currency needed to complete [the] transactions."  Compl. ¶ 16 (emphasis added).

The Custody Agreement also provided that Deutsche Bank would have no role in selecting investments for the Rado Account or otherwise advising Rado with respect to the Account:

- Rado was responsible for making "[its] own investment decisions for the Account, based on information [it] obtain[ed] on [its] own or the advice of [its] Advisor or other professional advisors and experts [it] select[ed]";

- Deutsche Bank was "***not responsible for advising [Rado] about securities or other investments***," nor was Deutsche Bank "responsible for determining the suitability of any

investment" for the account, "***regardless of any information [Deutsche Bank] has about [Rado] or the investment or its issuer***."

Compl. ¶ 17 (emphasis added). In addition, the Custody Agreement provided that Rado would be liable to Deutsche Bank for any overdrafts or deficits in the Rado Account:

- . . . "[Rado] agree[s] to indemnify and hold the Bank harmless for any losses, costs or expenses the Bank incurs if [Rado] fail[s] to furnish immediately available funds when required to pay for [Rado's] transactions and expenses";

- Rado agreed to "***indemnify and hold the Bank harmless against any Liabilities***" resulting from "***any act, omission* or insolvency *by [Rado] or [Rado's] attorneys, agents, custodians, receivers, successors or Advisors***" or from "any act, omission, lack of authority or incapacity of any broker-dealer, or any Advisor," where "Liabilities" is defined to include "all taxes, charges, claims, fees, damages, actions, losses and liabilities, including, without limitation, all fees and disbursements of counsel, court costs and any other costs or expenses incurred in connection with any dispute, controversy or proceeding"; and

- "Any Property, together with property in any other account [Rado has] with [Deutsche Bank], shall be security for [Rado's] obligations to [Deutsche Bank] under this Agreement and for any loans, overdrafts or other credit extended to [Rado]."

Compl. ¶ 18 (emphasis added).

### *The 2012 Power of Attorney*

After entering into the Custody Agreement, Rado engaged Biscayne Capital S.A. ("Biscayne") as its independent investment advisor. Compl. ¶ 19; *see* CC ¶¶ 64-65, 67. In 2012, Rado executed a limited power of attorney in favor of Biscayne's agent Fernando Haberer-Bergson ("Haberer") (the "2012 POA"). Compl. ¶ 19. Haberer was related by marriage to the Romay family (the family that settled the Diego Trust, the trust that owns Rado). CC ¶¶ 60, 64. Rado engaged Haberer (through Biscayne) on the basis of this relationship. CC ¶¶ 64-65.

The 2012 POA designated Haberer as Rado's "agent and attorney" in connection with the Rado Account and authorized Haberer to "buy, sell and trade in securities" and other financial instruments for the Rado Account. Compl. ¶¶ 3, 19; CC ¶¶ 66. The 2012 POA further specified that Rado would:

-3-

- Indemnify Deutsche Bank and hold it harmless from any claims arising in connection with the 2012 POA; and

- "[P]ay [Deutsche Bank] promptly on demand any and all losses and liabilities arising [from the 2012 POA] or from any action taken or not taken by [Deutsche Bank] in reliance [thereon][.]"

Compl. ¶ 20.

### The 2016 Power of Attorney

In February 2016, Rado executed a revised Partnership Authorization, which included another limited power of attorney in favor of Haberer (the "2016 POA"). Compl. ¶ 21. In multiple places, the 2016 POA authorized Deutsche Bank to rely on Haberer's instructions with respect to the Rado Account. For example, the 2016 POA specified that Deutsche Bank:

- "may conclusively assume that all actions taken and instructions given by each of the "Authorized Signer(s)" (of which Haberer was one) "have been properly taken or given pursuant to authority vested in such Authorized Signer(s)[.]"; and

- "may rely conclusively on the instructions of the Authorized Signer(s) in every respect unless or until the Bank receives written notification of the revocation and has had reasonable time to act on such notice."

Compl. ¶¶ 21-22. The 2016 POA also reaffirmed that Rado would "indemnify and hold [Deutsche Bank] harmless from all costs, expenses (including reasonable attorneys' fees) and liability related to or arising from actions taken by any Agent that relate to this authorization, and to pay [Deutsche Bank] promptly on demand any and all losses and liabilities arising on any action taken or not taken in reliance on this authorization." Compl. ¶ 23.

### The January 2018 Transactions

In January 2018, Rado, through Haberer, informed Deutsche Bank that Rado had entered into various transactions for the purchase of securities totaling approximately $12 million. Compl. ¶ 25. Haberer then instructed Deutsche Bank to settle the transaction using the assets in the Rado Account. Compl. ¶ 7. While the Custody Account did not hold enough cash to cover

the purchases, Rado, through Haberer, entered into various offsetting transactions for the sale of securities, which would generate sufficient cash to cover the foregoing purchases.  Compl. ¶ 26. Pursuant to Haberer's instructions, Deutsche Bank delivered funds from the Rado Account to settle Rado's purchases.  Compl. ¶ 27.  The securities purchases were completed on January 22, 2018.  Compl. ¶ 28.  Deutsche Bank was later informed that the offsetting transactions for the sale of securities had not been completed, leaving the Rado Account with a more than $12 million deficit.  *Id.*; *see* CC ¶ 90.  Haberer subsequently arranged to have various securities and cash delivered into the Rado Account in order to pay down this deficit.  Compl. ¶ 32; *see* CC ¶ 93.  Pursuant to the terms of the Custody Agreement, Deutsche Bank liquidated the securities and applied the proceeds together with the cash to offset a portion of the Rado Account's deficit. Compl. ¶¶ 33-34.   Deutsche Bank then commenced the instant action to enforce the Custody Agreement and recover the outstanding portion of the deficit of $2,557,267.72.  Compl. ¶ 42.

### Rado's Counterclaims

Rado's counterclaims allege that Rado's losses in connection with the Custody Account were the result of a fraudulent scheme perpetrated by Haberer.  *See* CC ¶ 65.  Specifically, Rado alleges that Haberer was associated with a separate Biscayne entity, Biscayne Capital International LLC ("Biscayne International") that in 2016 was the subject of an SEC Cease-and-Desist Order (the "SEC Order") for having failed to adequately disclose conflicts of interest arising from its role in connection with the sale of various securities.  Rado CC ¶ 67; *see also* Rado CC at Exhibit A.

Rado further alleges that in the wake of the SEC Order, Deutsche Bank's affiliate, Deutsche Bank Switzerland, closed certain accounts associated with Biscayne International, prompting Haberer to continue the fraudulent scheme through a separate entity, Biscayne Capital

S.A.  Rado CC ¶¶ 68-69.  With respect to the claims here, Rado alleges that Haberer caused Rado to invest in a series of illiquid securities, and hid the transactions from Rado through a series of falsified account statements (Rado CC ¶¶ 71-72), ultimately draining the Custody Account and leaving it in a deficit (Rado CC ¶ 82).

Rado further alleges that Deutsche Bank participated in Haberer's misconduct by failing to safeguard the assets in the Custody Account (Rado CC ¶¶ 70, 74), and allowing the Account to incur a deficit in connection with the purchase of illiquid securities (Rado CC ¶ 73).  Rado asserts claims against Deutsche Bank for breach of the Custody Agreement (Count I); aiding and abetting Haberer's alleged breach of fiduciary duty (Count II); and aiding and abetting Haberer's alleged fraud (Count III).

## LEGAL STANDARDS

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint," *Revonate Manufacturing, LLC* v. *Acer America Corp.*, 2013 WL 342922, at *2 (S.D.N.Y. Jan.18, 2013) (citation and internal quotation marks omitted), which requires that the complaint "state a claim to relief that is plausible on its face," *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).  While the Court must accept as true all well-pleaded allegations, it need not accept legal conclusions or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  In deciding a Rule 12(b)(6) motion, the Court may consider extrinsic documents as part of the pleadings where they are (1) attached to the complaint; (2) incorporated into the complaint by reference; or (3) integral to the complaint. *Lynn* v. *McCormick*, 2017 WL 6507112, at *3 (S.D.N.Y. Dec. 18, 2017) (citations omitted).  Where a party's allegations are contradicted by documents on which the claim is based, the documents control and contrary allegations should be given no weight. *ATSI*

*Communications, Inc.* v. *Shaar Funds, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); 5B Charles Alan Wright and Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004).

## ARGUMENT

I.   **RADO FAILS TO STATE A CLAIM FOR BREACH OF THE CUSTODY AGREEMENT**

Rado's breach of contract claim, which is premised on the theory that Deutsche Bank somehow breached its obligation to "keep and protect" assets in the Rado Account, is contrary to the unambiguous terms of the Custody Agreement.  *See Crane Co.* v. *Coltec Industries, Inc.*, 171 F.3d 733, 737 (2d Cir. 1999) (citations omitted) (court may dismiss a breach of contract claim on a motion to dismiss where "the parties' intent is unambiguously conveyed by the plain meaning of the agreement").  The intent of the parties "is generally discerned from the four corners of the document" and "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation."  *Bernard National Loan Investors, Ltd.* v. *Traditions Management, LLC*, 688 F. Supp. 2d 347, 361 (S.D.N.Y. 2010) (citations and internal quotation marks omitted).  Accordingly, a claim must be dismissed where the relevant terms of the contract unambiguously show that the claimant is not entitled to relief. *Atlas Partners, LLC* v. *STMicroelectronics, International N.V.,* 2015 WL 4940126, at *12 (S.D.N.Y. Aug. 10, 2015).

Here, Rado alleges that Deutsche Bank breached the Custody Agreement by failing to "keep and protect Rado's assets" as it would its own.  Specifically, Rado alleges that Deutsche Bank (1) extended excessive credit to the Rado Account; and (2) failed to "know its customer" and the "transactions being facilitated through its facilities."  (CC ¶ 107).  Neither of these

theories survives against the backdrop of the Custody Agreement's unambiguous terms, which strictly circumscribe Deutsche Bank's contractual duties with respect to the Rado Account.[1]

### A.     The Custody Agreement Imposes No Duty on Deutsche Bank to Monitor Rado's Investment Decisions

Rado's theory of breach rests on the faulty premise that Deutsche Bank's duties as a nondiscretionary custodial bank extended beyond merely holding the account assets and carrying out the instructions of Rado or its authorized agent (in this case, Haberer).  But as the plain terms of the Custody Agreement make clear, Deutsche Bank had no obligation to monitor the account, its transactions, or the actions of Rado's independent investment advisor.  Compl. ¶¶ 15-18; *Eastern Continental Mining & Development Ltd.* v. *Signet Group LLC*, 2013 WL 6503526, at *3 (S.D.N.Y. Dec. 9, 2013) (agreement must be read as a whole to avoid rendering certain provisions superfluous).  Instead, both the Custody Agreement and the Powers of Attorney permitted Deutsche Bank to rely upon Haberer's instructions with respect to the Account.  *See, e.g.*, Compl. ¶ 22 (permitting Deutsche Bank to "***rely conclusively*** on the instructions of the Authorized Signer(s) ***in every respect***") (emphasis added); *see also* Compl. ¶ 18 (Rado is obligated to indemnify Deutsche Bank for any act or omission by Rado's agents or advisors).

These terms of the Custody Agreement undercut any allegation that Deutsche Bank breached its obligations to "keep and protect" Rado's assets by failing to monitor Haberer's investment decisions.  No provision of the Custody Agreement gave rise to such an obligation. *GFE Global Financial & Engineering Ltd.* v. *ECI Ltd. (USA), Inc.*, 291 F.R.D. 31, 34 (E.D.N.Y. 2013) ("To plead the breach element, plaintiff must identify a particular provision of the contract

---

[1]     To the extent that Rado's counterclaims can be read to allege that Deutsche Bank acted negligently in performance under the Custody Agreement, or owed Rado any type of extra-contractual duty, this conclusion is firmly rebutted by applicable law.  *See RLI Insurance Co.* v. *King Sha Group*, 598 F. Supp. 2d 438, 444 (S.D.N.Y. 2009) ("New York does not recognize a cause of action for the negligent performance of a contract.").

that has been contravened.") (citation omitted).  On the contrary, Rado's attempt to tacitly

expand the scope of Deutsche Bank's contractual duties contradicts the plain language of the

agreement, which specified in multiple places that Rado was responsible for its own trading

activity.  *See, e.g.*, Compl. ¶ 16 (Deutsche Bank would "buy or sell" for the Rado Account "*at*

*[Rado's] sole risk*") (emphasis added); Compl. ¶ 17 (Rado was responsible for making "[its] own

investment decisions for the Account").  Indeed, the Custody Agreement went even further and

affirmatively disclaimed any responsibility by Deutsche Bank to advise Rado as to transactions

concerning the Custody Account.  Compl. ¶ 17 (Deutsche Bank was not responsible for

"determining the suitability of any investment" for the Rado Account "regardless of any

information [Deutsche Bank] ha[d] about [Rado] or the investment or its issuer.").

    Nor can Rado allege that Deutsche Bank permitted Haberer to exceed the limits of his

authority by overdrawing the Account because the Custody Agreement expressly contemplated

such an event and further specified that Rado would be responsible for any overdrafts or deficits.

*See, e.g.*, Compl. ¶ 18 ("Any Property, together with property in any other account [Rado has]

with [Deutsche Bank], shall be security for [Rado's] obligations to [Deutsche Bank] under this

Agreement and for any loans, overdrafts or other credit extended to [Rado].").

**B.    The Custody Agreement Imposes No Duty on Deutsche Bank to Monitor
Rado's Selection of an Independent Investment Advisor**

    Rado may not premise a breach on allegations that Deutsche Bank failed to uncover a

relationship between Haberer and the Biscayne entity that was subject to an SEC Cease-and-

Desist Order.  Rado CC ¶ 70.  Here again, Rado fails to identify any contractual duty of

Deutsche Bank to monitor Rado's selection of an independent investment advisor[2] or the

---

[2]    Rado's suggestion that Deutsche Bank facilitated Rado's decision to appoint Haberer, on
behalf of Biscayne, as its investment advisor and agent with respect to the Rado Account
does not, even if taken as true, change the outcome.  *See* Rado CC ¶ 68 (alleging

counterparties with which that advisor transacted.  *See GFE Global Financial & Engineering Ltd.*, 291 F.R.D. at 34; *see also* Rado CC ¶ 19 (admitting that "Rado, on its own, engaged Biscayne Capital S.A. as its independent investment advisor and . . . . provided [Haberer] on behalf of Biscayne, with a limited power of attorney").

Rado's conclusory allegation that Deutsche Bank violated its internal "know your customer" practices does nothing to bridge this gap.  *See* Rado CC ¶ 107.  Even if Rado could adequately plead such a violation (which it cannot), it fails to plead any basis for extending any such duty to identify or monitor customer transactions in favor of *Rado*.  *See, e.g.*, *Silverman Partners, L.P.* v. *First Bank*, 687 F. Supp. 2d 269, 282 (E.D.N.Y. 2010) ("know your customers" internal practices are intended to protect banks and the general public from harm and did not support claims by borrowers for harm done by co-borrowers).  Regardless, because the Biscayne entity subject to the relevant SEC Order was neither Deutsche Bank's customer nor the intermediary responsible for managing the Custody Account, Rado has alleged no basis for an obligation by Deutsche Bank to discover a connection to the Rado Account.[3]

## II.    RADO HAS NOT STATED AN AIDING AND ABETTING CLAIM

For each of its two aiding and abetting claims, Rado must allege that Deutsche Bank (1) had knowledge of Haberer's underlying misconduct; and (2) substantially assisted in such misconduct.  *See, e.g.*, *Cromer Financial Ltd.* v. *Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) (Cote, J.) (claims for aiding and abetting fraud require plaintiffs to plead facts showing (i)

---

"Deutsche Bank . . . actively sought out Biscayne's business").  As Rado admits in its Answer, the decision to engage Biscayne and execute a power of attorney in favor of Haberer was Rado's and Rado's alone.  Rado CC ¶ 19.  As Rado also admits, it was Haberer's relationship with the Romay family that facilitated his engagement by Rado. CC ¶ 64.

[3]    Despite Rado's transparent attempt to conflate Biscayne Capital S.A. (the investment advisor that Rado itself engaged) with Biscayne Capital International LLC (the subject of the SEC Cease-and-Desist Order), these entities are separate.

the existence of a fraud; (ii) actual knowledge by defendant of the fraud; and (iii) substantial

assistance by defendant to the commission of the fraud); *see also id.* (claims for aiding and

abetting a breach of fiduciary duty require plaintiffs to plead facts showing (i) the existence of a

fiduciary relationship; (ii) a breach by the fiduciary of its obligations; and (iii) knowing

inducement or participation by defendant in the breach).  Rado's counterclaims fail to adequately

allege either the knowledge or the substantial assistance prongs common to both of the aiding

and abetting claims.

### A.   Rado Fails to Adequately Allege that Deutsche Bank Had Knowledge of Haberer's Alleged Fraud or Breach of Fiduciary Duty

Rado's failure to adequately plead actual knowledge of the underlying misconduct dooms

both of its aiding and abetting claims.  *See JP Morgan Chase Bank* v. *Winnick*, 2005 WL

2000107, at *3 n.4 (S.D.N.Y. Aug. 16, 2005).  Rado's counterclaims rest on bare allegations of

what Deutsche Bank "knew."  *See, e.g.*, Rado CC ¶ 76 (alleging Deutsche Bank "knew" Haberer

worked with Biscayne); ¶ 77 (alleging Deutsche Bank "knew" Biscayne was the counterparty

from whom Haberer was purchasing the illiquid securities); ¶ 80 (alleging Deutsche Bank

"knew" that the relevant securities were illiquid).  These conclusory allegations, however, find

no support from any specific factual allegations as to Deutsche Bank.  *Cromer*, 137 F. Supp. 2d

at 468 ("General, conclusory allegations need not be credited . . . when they are belied by the

more specific allegations in the complaint.") (citation omitted).

The only *fact* that Rado pleads in support of the knowledge requirement is that Deutsche

Bank's affiliate, Deutsche Bank Switzerland, closed certain accounts related to the *separate*

Biscayne entity that was subject to the SEC Cease-and-Desist Order.  Rado CC ¶ 68.  At best,

this allegation amounts to little more than an argument that Deutsche Bank had constructive

knowledge that Haberer was associated with another entity's wrongdoing.[4]  This is plainly

insufficient.  *See also Kolbeck* v. *LIT America, Inc.*, 939 F. Supp. 240, 245-46 (S.D.N.Y. 1996)

(constructive knowledge of the underlying wrongdoing is insufficient to plead a claim for aiding

and abetting liability), *aff'd*, 152 F.3d 918 (2d Cir. 1998).

Rado also suggests that Deutsche Bank "failed to inquire" as to the source of the funds

that were subsequently transferred into the Rado Account in order to offset a portion of the

account deficit.  Rado CC ¶ 94.  Nowhere however, does Rado identify any duty on the part of

Deutsche Bank to investigate the source of these funds.   Indeed, courts routinely hold that

allegations of a failure to inquire (even in the presence of "red flags") are insufficient to state a

claim where knowledge is required.  *Kolbeck*, 939 F. Supp. at 246-47 (absent a fiduciary duty

"failure to investigate . . . is not enough to support a claim for aiding and abetting"); *see also*

*Renner* v. *Chase Manhattan Bank*, 2000 WL 781081, at *8 (S.D.N.Y. June 16, 2000) ("[W]hat

[defendant] should have known is irrelevant.  The law is only interested in what he actually

knew.").

**B.    Rado Fails to Allege that Deutsche Bank Provided Substantial Assistance to
       Haberer's Alleged Fraud or Breach of Fiduciary Duty**

To adequately allege substantial assistance to an underlying fraud or breach of fiduciary

duty, Rado must show that Deutsche Bank engaged in some affirmative act in furtherance of the

underlying misconduct.  *Musalli Factory For Gold & Jewellry* v. *JPMorgan Chase Bank, N.A.*,

261 F.R.D. 13, 25 (S.D.N.Y. 2009).  Here, where Deutsche Bank owed no direct duty to Rado

outside of the contract, inaction, or even passive assistance, does not satisfy the substantial

assistance prong.  *See Armstrong* v. *McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) ("[W]e are not

prepared to hold that a broker who merely executes an investment manager's orders for improper

---

[4]    Notably, however, Haberer was neither a subject of nor even mentioned anywhere in the
      SEC Order.

purchases or sales can be held liable as an aider and abettor of the investment manager"); *Ryan* v. *Hunton & Williams*, 2000 WL 1375265, at \*10 (E.D.N.Y. Sept. 20, 2000) (bank's failure to "shut down the accounts sooner or to inform the plaintiffs about the suspected fraud" did not constitute substantial assistance to investor's Ponzi scheme).

At base, Rado alleges that Deutsche Bank rendered substantial assistance to Haberer by permitting him to "engage in excessive trading in the Rado Account" and extending credit to the Rado Account to cover the purchase of certain illiquid securities.  Rado CC ¶ 73.  But because these allegations reflect conduct that falls squarely within the scope of Deutsche Bank's authority under the Custody Agreement (*see supra* Part I), they cannot satisfy the substantial assistance prong here.  *See, e.g., Mazzaro de Abreu* v. *Bank of America Corp.*, 525 F. Supp. 2d 381, 390 (S.D.N.Y. 2007) (usual banking services in accordance with the terms of a bank's loan agreement did not constitute "substantial assistance" even where "participants in fraudulent scheme used accounts at a bank to perpetrate it"); *see also Cromer*, 137 F.Supp.2d at 471 ("A failure to enforce margin requirements, or continuing to execute trades despite ... violations" of "its own institutional rules" does "not constitute substantial assistance").

Nor does Rado satisfactorily allege that Deutsche Bank affirmatively "concealed" Haberer's purported fraud.  At most, Rado alleges that Deutsche Bank dealt directly with Haberer and Biscayne regarding the Custody Account's deficit, rather than communicating directly with Rado.  Rado CC ¶ 95; *see also* Compl. ¶ 31.  This is neither unusual nor suspect in light of the Powers of Attorney, which expressly authorized Haberer to act as Rado's agent with respect to the Custody Account.  Notably, Rado nowhere alleges that it ever sought information from Deutsche Bank concerning the Custody Account, or that Deutsche Bank ever declined to provide such information upon request.

## **CONCLUSION**

Rado's Counterclaims should be dismissed.


Dated:   October 17, 2018
         New York, New York

CAHILL GORDON & REINDEL LLP


By:   /s/ David G. Januszewski
      David G. Januszewski
      Sesi V. Garimella
80 Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Plaintiff and Counterclaim Defendant
Deutsche Bank Trust Company Americas*

-14-