**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DEUTSCHE BANK TRUST COMPANY
AMERICAS,

                    Plaintiff,

     v.

RADO LIMITED PARTNERSHIP,

                   Defendant.

Case No. 1:18-cv-06768 (DLC)


# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF/COUNTERCLAIM DEFENDANT'S MOTION TO DISMISS AMENDED COUNTERCLAIMS


CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Plaintiff and*
*Counterclaim Defendant Deutsche*
*Bank Trust Company Americas*

Of Counsel:

David G. Januszewski
Sesi V. Garimella

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 2

    The Custody Agreement ................................................................................................. 2

    The 2012 Power of Attorney .......................................................................................... 3

    The 2016 Power of Attorney .......................................................................................... 4

    The January 2018 Transactions ...................................................................................... 5

    Rado's Counterclaims ..................................................................................................... 5

LEGAL STANDARDS ......................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

I.     RADO FAILS TO STATE A CLAIM FOR BREACH OF THE CUSTODY
       AGREEMENT ........................................................................................................... 7

       A.     DBTCA Adhered to its Obligations Under the Custody Agreement ..................... 8

       B.     DBTCA Had No Duty to Monitor, Supervise, or Offer Advice
             Regarding Rado's Investments ................................................................................. 9

       C.     DBTCA Properly Extended Credit to the Rado Account ................................... 10

       D.     The Custody Agreement Imposes No Duty on DBTCA to Monitor
             Rado's Selection of an Independent Investment Advisor .................................... 12

       E.     Rado's Account Statement Allegations State No Breach of Contract
             Claim ...................................................................................................................... 13

II.    RADO HAS NOT STATED AN AIDING AND ABETTING CLAIM ......................... 14

       A.     Rado Fails to Adequately Allege that DBTCA Had Knowledge of
             Haberer's Alleged Fraud or Breach of Fiduciary Duty ....................................... 14

       B.     Rado Also Fails to Allege that DBTCA Provided Substantial
             Assistance to Haberer's Alleged Fraud or Breach of Fiduciary Duty ................. 16

III.    RADO'S GROSS NEGLIGENCE CLAIM FAILS ........................................................ 18

    A.    Rado's Claim for Gross Negligence is Duplicative of its Breach of
        Contract Claim ................................................................................................ 18

    B.    Rado Cannot State a Claim for Gross Negligence ................................................. 20

CONCLUSION................................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Telephone & Telegraph Co.* v. *City of New York*,
    83 F.3d 549 (2d Cir. 1996)................................................................20

*Armstrong* v. *McAlpin*,
    699 F.2d 79 (2d Cir. 1983)................................................................16

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009).........................................................................7

*Atlas Partners, LLC* v. *STMicroelectronics, International N.V.*,
    2015 WL 4940126 (S.D.N.Y. Aug. 10, 2015)..........................................8

*ATSI Communications, Inc.* v. *Shaar Funds, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)................................................................7

*In re Bayou Hedge Fund Litigation*,
    534 F.Supp.2d 405 (S.D.N.Y. 2007)...................................................21

*Beddall* v. *State Street Bank & Trust Co.*,
    137 F.3d 12 (1st Cir. 1998)............................................................20n

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 544 (2007).........................................................................6

*Berliner Handels-Und Frankfurter Bank, New York Branch* v. *Coppola*,
    214 A.D.2d 426 (1st Dep't 1995) .....................................................11

*Bernard National Loan Investors, Ltd.* v. *Traditions Management, LLC*,
    688 F. Supp. 2d 347 (S.D.N.Y. 2010)..................................................7

*Chambers* v. *Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)..........................................................14n

*See In re Citigroup, Inc.*,
    2011 WL 744745 (S.D.N.Y. Mar. 1, 2011), *aff'd sub nom. Finn* v. *Barney*, 471 F. App'x 30
    (2d Cir. 2012)...............................................................................6n

*City of New York* v. *611 West 152nd St.*,
    273 A.D.2d 125 (2000) ...................................................................19

*Clark–Fitzpatrick, Inc.* v. *Long Island Rail Road Co.*,
    70 N.Y.2d 382 (1987) ....................................................................18

*Colnaghi, U.S.A., Ltd.* v. *Jewelers Protection Services, Ltd.*,
   81 N.Y.2d 821 (1993) ...............................................................................................18

*Crane Co.* v. *Coltec Industries, Inc.*,
   171 F.3d 733 (2d Cir. 1999) ......................................................................................7

*Cromer Financial Ltd.* v. *Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001) ..............................................................15, 17

*In the Matter of the Estate of Ray*,
   874 N.Y.S.2d 891 (N.Y. Sur. Ct. Kings Cty. 2009) .................................................13

*Eurycleia Partners, LP* v. *Seward & Kissel, LLP*,
   46 A.D.3d 400 (1st Dep't 2007) ...............................................................................20

*GFE Global Financial & Engineering Ltd.* v. *ECI Ltd. (USA), Inc.*,
   291 F.R.D. 31 (E.D.N.Y. 2013) ............................................................................9, 12

*Iconix Brand Group, Inc.* v. *Bongo Apparel, Inc.*,
   2008 WL 2695090 (S.D.N.Y. July 8, 2008) ............................................................19

*JP Morgan Chase Bank* v. *Winnick*,
   2005 WL 2000107 (S.D.N.Y. Aug. 16, 2005) .........................................................14

*Kinsey* v. *Cendant Corp.*,
   2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005) .........................................................21

*Kolbeck* v. *LIT America, Inc.*,
   939 F. Supp. 240 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998) ........... 16-17

*Lamm* v. *State Street Bank & Trust*,
   749 F.3d 938 (11th Cir. 2014) ...........................................................................10, 22

*Lerner* v. *Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006) ...............................................................................15, 21

*Long Island Lighting Co.* v. *Stone & Webster Engineering Corp.*,
   839 F. Supp. 183 (E.D.N.Y. 1993) ..........................................................................19

*Lynn* v. *McCormick*,
   2017 WL 6507112 (S.D.N.Y. Dec. 18, 2017) ...........................................................7

*Maltese* v. *Westinghouse Electric Corp.*,
   89 N.Y.2d 955 (1997) ...............................................................................................20

*Manhattan Motorcars, Inc.* v. *Automobili Lamborghini, S.p.A.*,
   244 F.R.D. 204 (S.D.N.Y. 2007) .............................................................................18

*Matkin* v. *Fidelity National Bank*,
2002 WL 32060182 (D.S.C. July 11, 2002) ........................................20n

*Mazzaro de Abreu* v. *Bank of America Corp.*,
525 F. Supp. 2d 381 (S.D.N.Y. 2007)..........................................17

*Musalli Factory For Gold & Jewellry* v. *JPMorgan Chase Bank, N.A.*,
261 F.R.D. 13 (S.D.N.Y. 2009) ......................................... 15-17

*Norwest Mortgage, Inc.* v. *Dime Savings Bank of N.Y.*,
280 A.D.2d 653 (2d Dep't 2001) ..........................................21

*Olson* v. *Sovereign Bancorp, Inc.*,
2012 WL 642543 (D. Mass. Feb. 28, 2012) ..................................20n

*Puerto Rico Telephone Co., Inc.* v. *SprintCom, Inc.*,
662 F.3d 74 (1st Cir. 2011)..........................................14

*Regent Insurance Co.* v. *Storm King Contracting, Inc.*,
2008 WL 563465 (S.D.N.Y. Feb. 27, 2008).....................................20

*Renner* v. *Chase Manhattan Bank*,
2000 WL 781081 (S.D.N.Y. June 16, 2000) ....................................16

*Revonate Manufacturing, LLC* v. *Acer America Corp.*,
2013 WL 342922 (S.D.N.Y. Jan.18, 2013) ....................................6

*Rotterdam Ventures, Inc.* v. *Ernst & Young LLP*,
300 A.D.2d 963 (3d Dep't 2002)..........................................21

*Ryan* v. *Hunton & Williams*,
2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ..................................17

*Silverman Partners, L.P.* v. *First Bank*,
687 F. Supp. 2d 269 (E.D.N.Y. 2010) ......................................13

*Sutton Park Development Corp. Trading Co. Inc.* v. *Guerin & Guerin Agency Inc.*,
297 A.D.2d 430 (3d Dep't 2002) ..........................................18

*Szulik* v. *State Street Bank & Trust Co.*,
935 F. Supp. 2d 240 (D. Mass. 2013) ......................................10

**Treatises**

5B Charles Alan Wright and Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004) ..........................................................................7

Scott and Ascher on Trusts § 2.3.4.1 (5th ed. 2008)..................................20n

Plaintiff/Counterclaim-Defendant Deutsche Bank Trust Company Americas ("DBTCA") respectfully submits this memorandum of law in support of its motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the amended counterclaims filed by Defendant/Counterclaim-Plaintiff Rado Limited Partnership ("Rado") (Dkt. 29).

## PRELIMINARY STATEMENT

Earlier this year, Rado breached its obligations to DBTCA under the terms of a custody agreement with the bank.  Rado had opened and for several years used the custody account to facilitate its investment trading activities.  In early 2018, as a result of certain trades conducted by Rado, the custody account was left with a deficit of more than $2.5 million.  Now, rather than pay the amount contractually due to cover the shortfall, Rado seeks to blame DBTCA for its own trading losses—losses caused, according to Rado's own allegations, by Rado's independent investment advisor.  Faced with DBTCA's straightforward breach of contract claim in this action, Rado has countered with four claims: breach of contract, aiding and abetting the investment manager's fraud, aiding and abetting the investment manager's breach of fiduciary duty, and gross negligence.  Each of these claims directly contravenes the plain terms of the parties' contractual agreement, which explicitly holds Rado responsible for the acts of its own agents or advisors and further requires Rado to cover any deficits or other shortfalls in the custody account.

Rado's tort claims suffer from other defects that provide additional and independent bases for their dismissal.  The aiding and abetting claims do not adequately plead either DBTCA's actual knowledge of, or substantial assistance to, the investment manager's underlying wrongful conduct.  Instead, Rado's counterclaims rest on conclusory allegations concerning what DBTCA did (or did not do) and Rado's own self-serving speculation about what DBTCA should have done to protect Rado from its own decisions.  Rado's claim for gross negligence fares no

better.  This claim, which is duplicative of Rado's breach of contract claim, is barred by New York's economic loss doctrine.  Regardless, Rado's failure to sufficiently allege any basis for either an intentional or reckless breach of DBTCA's narrowly defined duties as a non-discretionary custodian defeats this claim as well.

## STATEMENT OF FACTS

Rado is a limited partnership organized under the laws of New Zealand.  Amended Answer and Counterclaims ("ACC") ¶ 13.  Rado is owned by the Diego Trust, a trust set up for the benefit of Diego Romay and his family.  ACC ¶ 60.  In 2011, Rado opened the custody account (the "Rado Account" or "Custody Account") with DBTCA that is the subject of this action.  Compl.¶ 2; ACC ¶ 94.

### *The Custody Agreement*

The terms and conditions governing the Rado Account are set forth in the March 2011 agreement between Rado and DBTCA (the "Custody Agreement").  Compl. ¶ 14; ACC ¶ 14. Under the terms of the Custody Agreement, which is governed by New York law, DBTCA's sole responsibilities were to "receive, keep and protect" the securities, cash or other financial assets held in the Rado Account; "as custodian, to maintain financial assets (within the meaning of the New York Uniform Commercial Code)"; and to provide certain execution services in connection with the Account.  Compl. ¶¶ 10, 15.  Specifically, the Custody Agreement provided that upon instructions from Rado or its advisor, DBTCA would "buy or sell, for [Rado's] Account and ***at [Rado's] sole risk***, securities or other financial instruments and any foreign currency needed to complete [the] transactions."  Compl. ¶ 16 (emphasis added).

The Custody Agreement also provided that DBTCA would have no role in selecting investments for the Rado Account or otherwise advising Rado with respect to the Account:

- Rado was responsible for making "[its] own investment decisions for the Account, based on information [it] obtain[ed] on [its] own or the advice of [its] Advisor or other professional advisors and experts [it] select[ed]";

- DBTCA was "**not responsible for advising [Rado] about securities or other investments**," nor was DBTCA "responsible for determining the suitability of any investment" for the account, "**regardless of any information [DBTCA] has about [Rado] or the investment or its issuer**."

Compl. ¶ 17 (emphasis added). In addition, the Custody Agreement provided that Rado would

be liable to DBTCA for any overdrafts or deficits in the Rado Account:

- . . . "[Rado] agree[s] to indemnify and hold the Bank harmless for any losses, costs or expenses the Bank incurs if [Rado] fail[s] to furnish immediately available funds when required to pay for [Rado's] transactions and expenses";

- Rado agreed to "**indemnify and hold the Bank harmless against any Liabilities**" resulting from "**any act, omission** or insolvency **by [Rado] or [Rado's] attorneys, agents, custodians, receivers, successors or Advisors**" or from "any act, omission, lack of authority or incapacity of any broker-dealer, or any Advisor," where "Liabilities" is defined to include "all taxes, charges, claims, fees, damages, actions, losses and liabilities, including, without limitation, all fees and disbursements of counsel, court costs and any other costs or expenses incurred in connection with any dispute, controversy or proceeding"; and

- "Any Property, together with property in any other account [Rado has] with [DBTCA], shall be security for [Rado's] obligations to [DBTCA] under this Agreement and for any loans, overdrafts or other credit extended to [Rado]."

Compl. ¶ 18 (emphasis added).

In addition to the foregoing, the Custody Agreement precludes liability for even the

limited contractual duties described above absent DBTCA's "gross negligence, willful

misconduct or breach of an express undertaking in this Agreement." Compl. Ex. A (Custody

Agreement) at 8.

### The 2012 Power of Attorney

After entering into the Custody Agreement, Rado engaged Biscayne Capital S.A.

("Biscayne Capital") as its independent investment advisor. Compl. ¶ 19; *see* ACC ¶¶ 19; 64. In

2012, Rado executed a limited power of attorney in favor of Biscayne Capital's agent Fernando

Haberer-Bergson ("Haberer") (the "2012 POA").  Compl. ¶ 19; ACC ¶ 19.  Haberer was related

by marriage to the Romay family (the family that settled the Diego Trust, the trust that owns

Rado).  ACC ¶¶ 65, 75.  Rado engaged Haberer (through Biscayne Capital) on the basis of this

relationship.  ACC ¶¶ 63, 65.

The 2012 POA designated Haberer as Rado's "agent and attorney" in connection with the

Rado Account and authorized Haberer to "buy, sell and trade in securities" and other financial

instruments for the Rado Account.  Compl. ¶¶ 3, 19; ACC ¶¶ 97.  The 2012 POA further

specified that Rado would:

- Indemnify DBTCA and hold it harmless from any claims arising in connection with
  the 2012 POA; and

- "[P]ay [DBTCA] promptly on demand any and all losses and liabilities arising [from
  the 2012 POA] or from any action taken or not taken by [DBTCA] in reliance
  [thereon] [.]"

Compl. ¶ 20.

### *The 2016 Power of Attorney*

In February 2016, Rado executed a revised Partnership Authorization, which included

another limited power of attorney in favor of Haberer (the "2016 POA").  Compl. ¶ 21.  In

multiple places, the 2016 POA authorized DBTCA to rely on Haberer's instructions with respect

to the Rado Account.  For example, the 2016 POA specified that DBTCA:

- "may conclusively assume that all actions taken and instructions given by each of the
  "Authorized Signer(s)" (of which Haberer was one) "have been properly taken or
  given pursuant to authority vested in such Authorized Signer(s)[.]"; and

- "may rely conclusively on the instructions of the Authorized Signer(s) in every
  respect unless or until the Bank receives written notification of the revocation and has
  had reasonable time to act on such notice."

Compl. ¶¶ 21-22.  The 2016 POA also reaffirmed that Rado would "indemnify and hold

[DBTCA] harmless from all costs, expenses (including reasonable attorneys' fees) and liability

4

related to or arising from actions taken by any Agent that relate to this authorization, and to pay [DBTCA] promptly on demand any and all losses and liabilities arising on any action taken or not taken in reliance on this authorization."  Compl. ¶ 23.

### The January 2018 Transactions

In January 2018, Rado, through Haberer, informed DBTCA that Rado had entered into various transactions for the purchase of securities totaling approximately $12 million. Compl. ¶ 25.  Haberer then instructed DBTCA to settle the transactions using the assets in the Rado Account.  Compl. ¶ 7.  While the Custody Account did not hold enough cash to cover the purchases, Rado, through Haberer, entered into various offsetting transactions for the sale of securities, which would generate sufficient cash to cover the foregoing purchases.  Compl. ¶ 26. Pursuant to Haberer's instructions, DBTCA delivered funds from the Rado Account to settle Rado's purchases.  Compl. ¶ 27.  The securities purchases were completed on January 22, 2018. Compl. ¶ 28.  DBTCA was later informed that the offsetting transactions for the sale of securities had not been completed, leaving the Rado Account with a deficit of more than $12 million.  *Id.* Haberer subsequently arranged to have various securities and cash delivered into the Rado Account in order to pay down this deficit.  Compl. ¶ 32; *see* ACC ¶ 128.  Pursuant to the terms of the Custody Agreement and in accordance with Haberer's instructions, DBTCA liquidated the securities and applied the proceeds together with the cash to offset a portion of the Rado Account's deficit.  Compl. ¶¶ 33-34.  DBTCA then commenced the instant action to enforce the Custody Agreement and recover the outstanding deficit of $2,557,267.72.  Compl. ¶ 42.

### Rado's Counterclaims

Rado's counterclaims allege that Rado's losses in connection with the Custody Account were the result of a fraudulent scheme perpetrated by Haberer.  *See, e.g.*, ACC ¶¶ 65, 98.

Specifically, Rado alleges that Haberer was associated with a separate Biscayne entity, Biscayne Capital International LLC ("Biscayne International") that in 2016 was the subject of an SEC Cease-and-Desist Order (the "SEC Order") for having failed to adequately disclose conflicts of interest arising from its role in connection with the sale of various securities.  ACC ¶¶ 80, 97; *see also* May 27, 2016 SEC Order, https://www.sec.gov/litigation/admin/2016/ia-4399.pdf.[1]

Rado further alleges that in the wake of the SEC Order, DBTCA's affiliate, Deutsche Bank Switzerland, closed certain accounts associated with Biscayne International, prompting Haberer to continue the fraudulent scheme through a separate entity, Biscayne Capital S.A. ACC ¶¶ 91, 102.  With respect to the claims here, Rado alleges that Haberer caused Rado to invest in a series of illiquid securities ultimately draining the Custody Account and leaving it in a deficit.  ACC ¶ 105.  Rado further alleges that DBTCA participated in Haberer's misconduct by failing to monitor Haberer's investment practices (ACC ¶¶ 118, 121, 177, 189) and by permitting the Custody Account to incur a deficit (ACC ¶¶ 105, 127).  Rado asserts claims against DBTCA for breach of the Custody Agreement (Count I); aiding and abetting Haberer's alleged breach of fiduciary duty (Count II); aiding and abetting Haberer's alleged fraud (Count III); and gross negligence (Count IV).

## LEGAL STANDARDS

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint," *Revonate Manufacturing, LLC* v. *Acer America Corp.*, 2013 WL 342922, at *2 (S.D.N.Y. Jan.18, 2013) (citation and internal quotation marks omitted), which requires that the complaint "state a claim to relief that is plausible on its face," *Bell Atlantic Corp.* v.

---

[1]     It is appropriate for the Court to consider the content of the SEC Order, which is publicly available and upon which Rado's counterclaim complaint relies heavily.  *See In re Citigroup, Inc.*, 2011 WL 744745, at *5 (S.D.N.Y. Mar. 1, 2011), *aff'd sub nom. Finn* v. *Barney*, 471 F. App'x 30 (2d Cir. 2012).

*Twombly*, 550 U.S. 544, 570 (2007).  While the Court must accept as true all well-pleaded allegations, it need not accept legal conclusions or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  In deciding a Rule 12(b)(6) motion, the Court may consider extrinsic documents as part of the pleadings where they are (1) attached to the pleading; (2) incorporated into the pleading by reference; or (3) integral to the pleading.  *Lynn* v. *McCormick*, 2017 WL 6507112, at *3 (S.D.N.Y. Dec. 18, 2017) (citations omitted).  Where a party's allegations are contradicted by documents on which the claim is based, the documents control and contrary allegations should be given no weight.  *ATSI Communications, Inc.* v. *Shaar Funds, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); 5B Charles Alan Wright and Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004).

## ARGUMENT

### I.   RADO FAILS TO STATE A CLAIM FOR BREACH OF THE CUSTODY AGREEMENT

Rado's breach of contract claim, which is premised on the theory that DBTCA somehow breached its obligation to "keep and protect" assets in the Rado Account, is contrary to the unambiguous terms of the Custody Agreement.  *See Crane Co.* v. *Coltec Industries, Inc.*, 171 F.3d 733, 737 (2d Cir. 1999) (citations omitted) (the court may dismiss a breach of contract claim on a motion to dismiss where "the parties' intent is unambiguously conveyed by the plain meaning of the agreements").  The intent of the parties "is generally discerned from the four corners of the document" and "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation."  *Bernard National Loan Investors, Ltd.* v. *Traditions Management, LLC*, 688 F. Supp. 2d 347, 361 (S.D.N.Y. 2010) (Cote, J.) (citations and internal quotation marks omitted).  Accordingly, a claim must be dismissed where the relevant terms of the contract unambiguously show that the

claimant is not entitled to relief.  *Atlas Partners, LLC* v. *STMicroelectronics, International N.V.,* 2015 WL 4940126, at *12 (S.D.N.Y. Aug. 10, 2015).

### A.    DBTCA Adhered to its Obligations Under the Custody Agreement

Rado's breach of contract claim rests on the faulty premise that DBTCA's duties as a nondiscretionary custodial bank extended beyond merely holding the account assets and carrying out the instructions of Rado or its authorized agent (in this case, Haberer).  As the plain terms of the Custody Agreement demonstrate, DBTCA owed to Rado only those limited duties set forth in the contract.  Compl. ¶ 15 (defining DBTCA's "*sole*" duties under the Custody Agreement as to "receive, keep and protect" the assets; "as custodian, to maintain financial assets"; and to provide certain execution services) (emphasis added); *see also* Compl. ¶¶ 16-18 (expressly limiting DBTCA's discretion and authority under the agreement); Compl. Ex. A (Custody Agreement) at 20 ("This Agreement (including the other documents referred to in this Agreement) *reflects the entire agreement* between you and the Bank with respect to the subject matter hereof and shall be binding upon you . . . .") (emphasis added).

Constrained by these limited contractual duties, Rado attempts to seize upon DBTCA's obligation to "keep and protect" the account assets as the basis for a variety of extra-contractual breaches, including DBTCA's:

- Alleged failure to monitor Haberer's trading activity in the Rado Account (ACC ¶¶ 164, 169);

- Decision to extend credit to the Rado Account rather than immediately reverse the securities purchases following the failed offsetting sales (ACC ¶¶ 165, 167-68);

- Alleged failure to alert Rado to the connection between Haberer and Biscayne (ACC ¶ 164); and

- Alleged provision of insufficient account statements (ACC ¶ 112).

None of these theories of breach survives against the backdrop of the Custody Agreement's unambiguous terms, which strictly circumscribe DBTCA's contractual duties with respect to the Rado Account.

**B.    DBTCA Had No Duty to Monitor, Supervise, or Offer Advice Regarding Rado's Investments**

The plain terms of the Custody Agreement undercut any allegation that DBTCA breached its obligations to "keep and protect" Rado's assets by failing to supervise or investigate Haberer's investment decisions before executing transactions as instructed.  No provision of the Custody Agreement gave rise to such an obligation.  *GFE Global Financial & Engineering Ltd.* v. *ECI Ltd. (USA), Inc.*, 291 F.R.D. 31, 34 (E.D.N.Y. 2013) ("To plead the breach element, plaintiff must identify a particular provision of the contract that has been contravened.") (citation omitted).  On the contrary, the Custody Agreement specified in multiple places that Rado was solely responsible for its own trading activity.  *See, e.g.*, Compl. ¶ 16 (DBTCA would "buy or sell" for the Rado Account "***at [Rado's] sole risk***") (emphasis added); Compl. ¶ 17(A) (Rado was responsible for making "[its] own investment decisions for the Account").  Indeed, the Custody Agreement went even further and affirmatively disclaimed any responsibility by DBTCA to advise Rado as to transactions concerning the Custody Account.  *See* Compl. ¶ 17(B) (DBTCA was not responsible for "determining the suitability of any investment" for the Rado Account "***regardless of any information [DBTCA] ha[d] about [Rado] or the investment or its issuer***.") (emphasis added); *see also* Compl. Ex. A (Custody Agreement) at 7 ("The Bank will have ***no obligation to review any transaction*** made or Property received on the instructions of such broker-dealers or broker-dealers engaged by your Advisor.") (emphasis added).

Courts considering the roles of similar non-discretionary custodial banks have concluded that no duty to monitor or supervise transactions exists in the face of such strictly defined

contractual duties.  *See, e.g.*, *Szulik* v. *State Street Bank & Trust Co.*, 935 F. Supp. 2d 240, 260 (D. Mass. 2013) ("[P]laintiffs' assertion that State Street was obligated to question or investigate such transactions before disbursing the plaintiffs' funds is belied by the express language of the Custody Account Agreements[,]" which authorized a third party, not State Street, "to make investment decisions for their accounts."); *see also Lamm* v. *State Street Bank & Trust*, 749 F.3d 938, 948 (11th Cir. 2014) (custodian bank with "no discretionary role in investing" and which was "fully authorized to rely on [investment firm's] instructions" had "no duty to monitor the transactions made by or on behalf of [account holder] or to scrutinize the form in which they are submitted.").  Here, as in both *Szulik* and *Lamm*, the operative documents (the Custody Agreement and Power of Attorney) permitted DBTCA to rely upon Haberer's instructions with respect to the Account.  *See, e.g.*, Compl. ¶ 22 (permitting DBTCA to "***rely conclusively*** on the instructions of the Authorized Signer(s) ***in every respect*** . . . .") (emphasis added); *see also* Compl. ¶ 18 (B) (Rado is obligated to indemnify DBTCA for any act or omission by Rado's agents or advisors); *see also* Compl. Ex. A (Custody Agreement) at 7 ("***The person giving the Bank the instructions shall have sole responsibility*** for ensuring that it does not violate applicable laws, rules or orders that apply to you or your Account.") (emphasis added).[2]

## C.    DBTCA Properly Extended Credit to the Rado Account

Rado's attempt to premise a breach on DBTCA's extension of credit to the Rado Account also fails.  As an initial matter, nothing in the Custody Agreement limited DBTCA's authority to disburse funds without having immediately received offsetting assets in exchange.  On the contrary, the agreement expressly contemplated that the account might become overdrawn, and

---

[2]    Nor may Rado claim that DBTCA's reliance on Haberer's instructions was unauthorized in some way.  While its counterclaim includes vague references to a conversation in which the DBTCA employee assigned to the Rado Account suggested that existing powers of attorney would need to be retired (ACC ¶ 92), Rado does not (and cannot) allege that this ever occurred.

that Rado would be solely liable for the resulting deficit or extension of credit.  *See, e.g.*,
Compl. ¶ 18(C) ("Any Property, together with property in any other account [Rado has] with
[DBTCA], shall be security for [Rado's] obligations to [DBTCA] under this Agreement and for
any loans, overdrafts or other credit extended to [Rado].");  Compl. Ex. A (Custody Agreement)
at 6 ("You agree to indemnify and hold [DBTCA] harmless for any losses, costs or expenses the
Bank incurs if you fail to furnish immediately available funds when required to pay for your
transactions and expenses.").  Moreover, as Rado itself concedes, DBTCA previously extended
credit to the Custody Account without incident.  *See* ACC ¶ 105.   Indeed, it would be illogical to
impute to DBTCA an unstated requirement permitting disbursements solely under circumstances
where DBTCA received property in exchange, as Rado put itself and Haberer, not DBTCA, in
charge of managing the investments.  *See supra* Part I.B.  Similarly, because Rado authorized
DBTCA to rely solely on Haberer's directions with respect to the Custody Account, DBTCA
was also under no obligation to reverse the successful purchases following the failed sales.

Rado's oblique references to certain rules and regulations concerning margin lending do
not change this outcome.  ACC ¶¶ 123-25 (alleging violations of Federal Reserve Board
Regulations U and T).  Even if Rado could adequately allege a violation of these regulations
(which it cannot)[3], Rado has nevertheless identified no basis for implying a private right of
action permitting Rado to enforce them.  *See, e.g.*, *Berliner Handels-Und Frankfurter Bank, New*

---

[3]     For example, both Regulations U and T, which place restrictions on the issuance of credit
for the purpose of purchasing or carrying certain securities, also provide for an exception
in the case of certain good-faith conduct by the lender, like that by DBTCA here.  12
C.F.R. § 221.117; *see also* 12 C.F.R. § 220.6.  Moreover, the securities purchases that
gave rise to the overdraft in the Custody Account were not purchases of "margin stock"
subject to Regulation U, and DBTCA is not a broker or dealer subject to Regulation T.
UCC 8-504, which describes certain duties of a securities intermediary to maintain
financial assets, also has no bearing on this inquiry, as the rule only purports to set forth
the standards for maintaining assets in the absence of another agreement (in this case, the
Custody Agreement).  N.Y. U.C.C. Law § 8-504.

*York Branch* v. *Coppola*, 214 A.D.2d 426, 427 (1st Dep't 1995) (no private right of action for violation of margin rules).  Rado also cannot claim that the Custody Agreement confers an independent right upon Rado to enforce these rules, because the scope of that agreement is subject to a merger clause.  *See* Compl. Ex. A (Custody Agreement) at 20.  Indeed, even the OCC Handbook, upon which Rado relies as a basis for asserting some type of extra-contractual obligation, explains that "[a] custody relationship is **contractual**, and **services performed for a customer may vary**."  Custody Handbook at 1 (emphasis added).[4]

### D.   The Custody Agreement Imposes No Duty on DBTCA to Monitor Rado's Selection of an Independent Investment Advisor

Rado also may not premise a breach on allegations that DBTCA failed to alert Rado to a connection between Haberer and the Biscayne entity that was subject to an SEC Cease-and-Desist Order.  Rado ACC ¶ 169.  Here again, Rado fails to identify any contractual duty of DBTCA to monitor Rado's selection of an independent investment advisor[5] or the counterparties with which that advisor transacted.  *See GFE Global Financial & Engineering Ltd.*, 291 F.R.D. at 34; *see also* Rado ACC ¶ 19 (admitting that "Rado, on its own, engaged Biscayne Capital S.A. as its independent investment advisor and . . . . provided [Haberer] on behalf of Biscayne, with a limited power of attorney").

Rado's conclusory allegation that DBTCA violated its internal "know your customer" practices does nothing to bridge this gap.  *See* Rado ACC ¶ 172.  Even if Rado could adequately

---

[4]   *See* https://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/custody-services/pub-ch-custody-services.pdf.

[5]   Rado's suggestion that Deutsche Bank facilitated Rado's decision to appoint Haberer, on behalf of Biscayne, as its investment advisor and agent with respect to the Rado Account does not, even if taken as true, change the outcome.  *See* ACC ¶ 85 (alleging "Deutsche Bank . . . actively sought out Biscayne's business").  As Rado admits in its Answer, the decision to engage Biscayne and execute a power of attorney in favor of Haberer was Rado's and Rado's alone.  ACC ¶ 19.  As Rado also admits, it was Haberer's relationship by marriage with the Romay family that led to his engagement by Rado.  ACC ¶ 65.

plead such a violation (which it cannot), it fails to plead any basis for extending any such duty to identify or monitor customer transactions in favor of *Rado*. *See, e.g.*, *Silverman Partners, L.P.* v. *First Bank*, 687 F. Supp. 2d 269, 282 (E.D.N.Y. 2010) ("know your customers" internal practices are intended to protect banks and the general public from harm and did not support claims by borrowers for harm done by co-borrowers). Regardless, because the Biscayne entity subject to the relevant SEC Order was neither DBTCA's customer nor the intermediary responsible for managing the Custody Account, Rado has alleged no basis for any obligation by DBTCA to uncover a connection to the Rado Account.[6]

### E.     Rado's Account Statement Allegations State No Breach of Contract Claim

To the extent Rado seeks to premise its breach of contract claim on vague allegations that DBTCA provided insufficient account statements, this too fails. Rado claims that the relevant account statements were "incomplete and inaccurate" because they did not reflect certain trades which had not yet cleared. ACC ¶ 112. Regardless of whether the account statements reflect any error (which they do not), Rado has waived any claims arising from the statements. As the Custody Agreement itself sets forth, in order to preserve any claim arising from the account statements, Rado was required to object to those statements, in writing, within 30 days of receipt of the statement. Custody Agreement at 5 ("If you have objections to an Account Statement; you will provide them to the Bank in writing within thirty (30) days after the date of the Account Statement. If you do not do so, it will be agreed that you have no objections to the Account Statement . . . ."). Courts do not hesitate to enforce such provisions. *See In the Matter of the Estate of Ray*, 874 N.Y.S.2d 891, 894 (N.Y. Sur. Ct. Kings Cty. 2009) (account statement claims

---

[6]     Despite Rado's transparent attempt to conflate Biscayne Capital S.A. (the investment advisor that Rado itself engaged) with Biscayne Capital International LLC (the subject of the SEC Cease-and-Desist Order), these entities are separate and distinct.

time-barred where terms and conditions required account holder to provide "notification of any errors, discrepancies or irregularities within 60 days of the mailing or transmission of the monthly statement"); *see also In Puerto Rico Telephone Co., Inc.* v. *SprintCom, Inc.*, 662 F.3d 74, 95-96 (1st Cir. 2011) (enforcing similar waiver provision where failure to timely object caused invoice to be "deemed correct" and "binding upon billed party"). In any event, Rado's admission that it received falsified accounts statements from Haberer (ACC ¶ 149) defeats any argument that Rado's losses arose from its reliance on the account statements issued by DBTCA.

## II.   RADO HAS NOT STATED AN AIDING AND ABETTING CLAIM

For each of its two aiding and abetting claims, Rado must allege that DBTCA (1) had knowledge of Haberer's underlying misconduct; and (2) substantially assisted in such misconduct. *See, e.g.*, *Cromer Financial Ltd.* v. *Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) (Cote, J.) (claims for aiding and abetting fraud require plaintiffs to plead facts showing (i) the existence of a fraud; (ii) actual knowledge by defendant of the fraud; and (iii) substantial assistance by defendant to the commission of the fraud); *see also id.* (claims for aiding and abetting a breach of fiduciary duty require plaintiffs to plead facts showing (i) the existence of a fiduciary relationship; (ii) a breach by the fiduciary of its obligations; and (iii) knowing inducement or participation by defendant in the breach). Rado's counterclaims fail to adequately allege either the knowledge or the substantial assistance prongs common to both of the aiding and abetting claims.

### A.   Rado Fails to Adequately Allege that DBTCA Had Knowledge of Haberer's Alleged Fraud or Breach of Fiduciary Duty

Rado's failure to adequately plead actual knowledge of the underlying misconduct dooms both of its aiding and abetting claims. *See JP Morgan Chase Bank* v. *Winnick*, 2005 WL 2000107, at *3 n.4 (S.D.N.Y. Aug. 16, 2005). Rado's counterclaims rest on bare allegations of

14

what DBTCA "knew or should have known."  *See, e.g.*, ACC ¶ 114 (alleging DBTCA was on "***inquiry notice***" that Haberer was engaging in misconduct following a prior failed transaction) (emphasis added); ACC ¶ 134 (DBTCA "knew or ***should have known***" that Haberer allegedly converted funds in order to cover the deficit in the Rado Account) (emphasis added); ACC ¶ 147 (alleging DBTCA should have made "***reasonable inquiries***" to discover an alleged diversion of funds from the Rado Account) (emphasis added); ACC ¶ 173 (alleging DBTCA "was on actual ***or constructive notice***" of Haberer's investment in notes previously identified by the SEC as being subject to conflicts of interest") (emphasis added).  These conclusory allegations are plainly insufficient to plead actual knowledge of Haberer's alleged wrongdoing.  *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir. 2006) (dismissing claims for aiding and abetting fraud based on failure to plead actual knowledge with particularity under Federal Rule of Civil Procedure 9(b)); *Musalli Factory For Gold & Jewellry* v. *JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 23 (S.D.N.Y. 2009) (dismissing aiding and abetting breach of fiduciary duty claims based, in part, on failure to plead actual knowledge and noting that while Rule 9(b) did not apply to this claim "plaintiff must nonetheless allege some facts in non-conclusory terms[,] to show knowing participation by defendants in the alleged breach").

The only *facts* that Rado pleads in support of the knowledge elements are that:

- An unidentified Deutsche Bank entity and/or Reynaldo Figueredo (the Deutsche Bank employee assigned to the Custody Account) previously provided services to one or more of the 40 separate Biscayne entities and interacted with Fernando Haberer (ACC ¶¶ 67-69, 79); and

- DBTCA's affiliate, Deutsche Bank Switzerland, closed certain accounts related to Biscayne Capital International LLC, the entity subject to the SEC Cease-and-Desist Order (ACC ¶¶ 85, 90).

At best, these allegations amount to little more than an argument that DBTCA had constructive knowledge that Haberer was associated with another entity's wrongdoing.[7]  But allegations of constructive knowledge cannot sustain Rado's pleading burden.  *See also Kolbeck* v. *LIT America, Inc.*, 939 F. Supp. 240, 245-46 (S.D.N.Y. 1996) (constructive knowledge of the underlying wrongdoing is insufficient to plead a claim for aiding and abetting liability), *aff'd*, 152 F.3d 918 (2d Cir. 1998).

Nor can Rado satisfy the knowledge requirement by alleging that DBTCA should have investigated Haberer's conduct.  As explained above, DBTCA had no duty to conduct such an investigation.  *See supra* Part I.B.  Courts routinely hold that allegations of a failure to inquire (even in the presence of "red flags", which are not adequately alleged here) are insufficient to state a claim where knowledge is required.  *Kolbeck*, 939 F. Supp. at 246-47 (absent a fiduciary duty, "failure to investigate . . . is not enough to support a claim for aiding and abetting"); *see also Renner* v. *Chase Manhattan Bank*, 2000 WL 781081, at *8 (S.D.N.Y. June 16, 2000) ("[W]hat [defendant] should have known is irrelevant.  The law is only interested in what he actually knew.").

### B.    Rado Also Fails to Allege that DBTCA Provided Substantial Assistance to Haberer's Alleged Fraud or Breach of Fiduciary Duty

To adequately allege substantial assistance of an underlying fraud or breach of fiduciary duty, Rado must show that DBTCA engaged in some affirmative act in furtherance of the underlying misconduct.  *Musalli*, 261 F.R.D. at 25.  Here, where DBTCA owed no direct duty to Rado outside of the Custody Agreement, inaction, or even passive assistance, cannot satisfy the substantial assistance prong.  *See Armstrong* v. *McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) ("[W]e are not prepared to hold that a broker who merely executes an investment manager's orders for

---

[7]    Notably, however, Haberer was neither a subject of nor even mentioned anywhere in the SEC Order.  *See* SEC Order, https://www.sec.gov/litigation/admin/2016/ia-4399.pdf.

improper purchases or sales can be held liable as an aider and abettor of the investment manager"); *Ryan* v. *Hunton & Williams*, 2000 WL 1375265, at *10 (E.D.N.Y. Sept. 20, 2000) (bank's failure to "shut down the accounts sooner or to inform the plaintiffs about the suspected fraud" did not constitute substantial assistance to investor's Ponzi scheme).

At base, Rado alleges that DBTCA rendered substantial assistance to Haberer by permitting him to "engage in excessive trading in the Rado Account" and extending credit to the Rado Account to cover the purchase of certain illiquid securities. Rado ACC ¶ 160. But because these allegations reflect conduct that falls squarely within the scope of DBTCA's authority under the Custody Agreement (*see supra* Part I), they cannot constitute substantial assistance here. *See, e.g., Mazzaro de Abreu* v. *Bank of America Corp.*, 525 F. Supp. 2d 381, 390 (S.D.N.Y. 2007) (usual banking services in accordance with the terms of a bank's loan agreement did not constitute "substantial assistance" even where "participants in fraudulent scheme used accounts at a bank to perpetrate it"); *see also Cromer*, 137 F.Supp.2d at 471 ("A failure to enforce margin requirements, or continuing to execute trades despite . . . violations" of "its own institutional rules" does "not constitute substantial assistance").

Nor does Rado satisfactorily allege that DBTCA affirmatively "concealed" Haberer's purported fraud. At most, Rado alleges that DBTCA dealt directly with Haberer and Biscayne regarding the Custody Account's deficit, rather than communicating directly with Rado. *See* ACC ¶¶ 137-38; *see also* Compl. ¶ 31. This is neither unusual nor suspect in light of the Powers of Attorney, which expressly authorized Haberer to act as Rado's agent with respect to the Custody Account. Notably, Rado nowhere alleges that it sought information from DBTCA concerning the Custody Account prior to April 2018, or that DBTCA declined to provide such information upon request.

III.    **RADO'S GROSS NEGLIGENCE CLAIM FAILS**

Rado's new claim for gross negligence is a transparent attempt to sidestep the Custody Agreement's exculpatory provisions, which bar Rado's claims here.  The law is clear, however, that plaintiffs may not simply repackage breach of contract claims into tort claims.  *Clark–Fitzpatrick, Inc.* v. *Long Island Rail Road Co.*, 70 N.Y.2d 382 (1987) (a "simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated").  Nor can simply labeling a claim as "gross negligence" elevate what is, at best, a claim for simple negligence into something more.  *Colnaghi, U.S.A., Ltd.* v. *Jewelers Protection Services, Ltd.*, 81 N.Y.2d 821, 823 (1993) ("[F]ailure to wire a skylight, while perhaps suggestive of negligence or even "gross negligence" as used elsewhere, does not evince the recklessness necessary to abrogate [plaintiff's] agreement to absolve [defendant] from negligence claims"); *Sutton Park Development Corp. Trading Co. Inc.* v. *Guerin & Guerin Agency Inc.*, 297 A.D.2d 430, 431 (3d Dep't 2002) (dismissing a claim for gross negligence because "[n]otably missing from this complaint are any factual averments alleging conduct of such aggravated character") (citations omitted).  These defects compel dismissal of Rado's gross negligence claim.

A.    **Rado's Claim for Gross Negligence is Duplicative of its Breach of Contract Claim**

Rado's claim for gross negligence, which merely seeks to repackage its breach of contract claim, is barred by New York's economic loss rule.  *See Manhattan Motorcars, Inc.* v. *Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 220 (S.D.N.Y. 2007) ("economic loss" rule provides that "[i]f the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort") (citations and quotation marks omitted).  This rule bars recovery in tort of purely economic damages where, as here, there is a contract between the parties governing the

subject matter of the dispute and plaintiffs have failed to identify any duty separate from the

contractual duties. *See, e.g., Iconix Brand Group, Inc.* v. *Bongo Apparel, Inc.*, 2008 WL

2695090, at *4 (S.D.N.Y. July 8, 2008) ("Merely charging a breach of a 'duty of due care,'

employing language familiar to tort law, does not, without more, transform a simple breach of

contract into a tort claim."); *Long Island Lighting Co.* v. *Stone & Webster Engineering Corp.*,

839 F. Supp. 183, 187 (E.D.N.Y. 1993) (plaintiffs cannot avoid the economic loss rule "simply

by casting [their] contract claims in tort garb"); *see also City of New York* v. *611 West 152nd St.*,

273 A.D.2d 125, 126 (1st Dep't 2000) ("[C]laims based on negligent or grossly negligent

performance of a contract are not cognizable").

    Rado's claim for gross negligence hinges solely upon its allegation that DBTCA "failed

to adequately monitor and respond to red flags and suspicious activity within Rado's account,"

which Rado claims fell outside "the standard of care that custodians owe their customers." ACC

¶ 189. The substance of this claim restates Rado's breach of contract claim, which alleges, *inter

alia*, that DBTCA "recklessly and in a grossly negligent manner failed to protect the [Rado]

account in the same manner it would protect its own assets (ACC ¶ 167); "recklessly and in a

grossly negligent manner made no effort to verify information about the transactions at issue"

(ACC ¶ 169); and failed to "exercise due care in accordance with reasonable commercial

standards to obtain and maintain Rado's financial assets . . . ." (ACC ¶ 171). Consistent with

these allegations, Rado's amended counterclaims are devoid of any allegation that DBTCA owed

a duty to Rado that was not specified in the Custody Agreement.[8] This is fatal to Rado's gross

---

[8]    Rado's attempts to mischaracterize the Custody Account as "basically a trust account" (ACC ¶ 106) do no support the existence of any extra-contractual duty. As a custodial bank, any duty DBTCA owed to Rado was largely ministerial and not fiduciary in nature. Scott and Ascher on Trusts § 2.3.4.1 (5th ed. 2008) (in custodial relationship "[a]s to matters involving discretion, such as decisions to buy or sell, the bank acts only at the

negligence claim, as Rado cannot transform the alleged breach of such contractual duties into tort claims. *Regent Insurance Co.* v. *Storm King Contracting, Inc.*, 2008 WL 563465, at \*6 (S.D.N.Y. Feb. 27, 2008) ("New York courts and federal courts applying New York law have uniformly preserved this distinction [between tort and contract damages] 'to prevent contract law from drowning in a sea of tort.'"). Rado, as a consequence, must assert any claims arising from either party's contractual rights and responsibilities under contract—not tort—law.

### B.    Rado Cannot State a Claim for Gross Negligence

Rado's claim for gross negligence also fails on its merits. Under New York law, a prima facie case of negligence requires a plaintiff to show a duty to the plaintiff and a breach of that duty. *Eurycleia Partners, LP* v. *Seward & Kissel, LLP*, 46 A.D.3d 400, 402 (1st Dep't 2007). To constitute gross negligence, however, the breach of duty must be intentional and "of an unreasonable character in disregard of a *known or obvious risk* that was so great as to make it highly probable that harm would follow and has done so with conscious indifference to the outcome." *Maltese* v. *Westinghouse Electric Corp.*, 89 N.Y.2d 955, 957 (1997) (emphasis added). In other words, Rado was required to plead facts supporting the conclusion that the causal relationship between DBTCA's alleged misconduct and Rado's eventual losses "evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *American Telephone & Telegraph Co.* v. *City of New York*, 83 F.3d 549, 556 (2d Cir. 1996).

---

customer's direction"); *Beddall* v. *State Street Bank & Trust Co.*, 137 F.3d 12, 20 (1st Cir. 1998) ("Without more, mechanical administrative responsibilities (such as retaining assets and keeping a record of their value) are insufficient to ground a claim for fiduciary status."). As explained above, DBTCA had no discretion to make independent decisions regarding the management of the Custody Account. *Olson* v. *Sovereign Bancorp, Inc.*, 2012 WL 642543, at \*1 (D. Mass. Feb. 28, 2012) (custody agreement "on its own terms, certainly did not make" the custodian bank a fiduciary and limited the bank's obligations to those of a "passive custodian"); *Matkin* v. *Fidelity National Bank*, 2002 WL 32060182 at \*4 (D.S.C. July 11, 2002) ("[C]ustodial agreement limited Defendant's obligations and duties to Plaintiff.").

Rado pleads nothing of the sort here.  Instead, it relies upon conclusory and insufficient allegations that DBTCA "demonstrated reckless disregard for Rado's assets" (ACC ¶ 146) or that DBTCA was "grossly negligent and willfully reckless" (ACC ¶ 114).  *See Kinsey* v. *Cendant Corp.*, 2005 WL 1907678, at *7 (S.D.N.Y. Aug. 10, 2005) ("[C]onclusory allegation that Defendants 'acted recklessly and/or with conscious disregard' . . . does not meet the standard required to adequately plead a gross negligence claim.").  Nor can Rado's bare allegation that the "reasonable exercise of due diligence" would have prevented its losses (ACC ¶ 178) support its claim for gross negligence.  As described above, under the Custody Agreement, DBTCA had no duty conduct any diligence concerning either Haberer or his investment decisions.  *See supra* Part I.B; *see also In re Bayou Hedge Fund Litigation*, 534 F.Supp.2d 405, 417 (S.D.N.Y. 2007) ("failure to conduct due diligence is not the same thing as knowing of or closing one's eyes to a known "danger," or participating in the fraud"); *Rotterdam Ventures, Inc.* v. *Ernst & Young LLP*, 300 A.D.2d 963, 965 (3d Dep't 2002) ("To the extent that plaintiffs allege that the subject transactions at least should have placed defendant on notice of a potential problem, this constitutes nothing more than an allegation of ordinary negligence").

Instead, DBTCA's duties to Rado were similar to those of a depository bank, which New York courts have determined "has no [general] duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation." *Lerner*, 459 F.3d at 287 (quoting *Norwest Mortgage, Inc.* v. *Dime Savings Bank of N.Y.*, 280 A.D.2d 653, 654 (2d Dep't 2001); *see also Lamm*, 749 F.3d at 947 (custodian banks with no discretion to invest a customer's assets have no independent duty to supervise transactions on a customer's account).

21

## <u>CONCLUSION</u>

Rado's Amended Counterclaims should be dismissed.

Dated:     December 5, 2018
           New York, New York

CAHILL GORDON & REINDEL LLP


By:    /s/ David G. Januszewski
       David G. Januszewski
       Sesi V. Garimella
80 Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Plaintiff and Counterclaim Defendant
Deutsche Bank Trust Company Americas*
