**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEUTSCHE BANK TRUST COMPANY AMERICAS,<br><br>                Plaintiff,<br><br>v .<br><br>RADO LIMITED PARTNERSHIP,<br><br>                Defendant. | Case No. 1:18-cv-06768 |

## AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendant Rado Limited Partnership ("Rado"), by and through its undersigned counsel, Malecki Law, hereby respectfully submits its Answer to the Complaint of Deutsche Bank Trust Company Americas ("Deutsche Bank") and Counterclaims against Deutsche Bank, responding and alleges as follows:

### NATURE OF THE ACTION

1.      Defendant denies the allegations contained in paragraph 1.

2.      Defendant admits the allegations contained in paragraph 2.

3.      Defendant denies the allegations contained in paragraph 3, except admits that Haberer had a limited power of attorney for the Rado account and Haberer purported to work for Biscayne Capital, S.A.

4.      Defendant denies knowledge or information sufficient to form a basis to admit or deny the allegations contained in paragraph 4.

5.      Defendant denies knowledge or information sufficient to form a basis to admit or deny the allegations contained in paragraph 5.

1

6.     Defendant denies knowledge or information sufficient to form a basis to admit or deny the allegations contained in paragraph 6.

7.     Defendant does not have knowledge and information sufficient to admit or deny the allegations contained in paragraph 7 but admits that "securities and cash were transferred into the Custody Account and were subsequently liquidated or applied to offset the deficit. As a result, the deficit was reduced to $2,557,267.72."

8.     Defendant denies the allegations contained in paragraph 8.

## JURISDICTION AND VENUE

9.     Defendant admits the allegations contained in paragraph 9.

10.     Defendant admits the allegations contained in paragraph 10.

11.     Defendant admits the allegations contained in paragraph 11.

## PARTIES

12.     Defendant admits the allegations contained in paragraph 12.

13.     Defendant admits the allegations contained in paragraph 13.

## FACTUAL ALLEGATIONS

**The Custody Agreement and Related Documents**

14.     Defendant admits the allegations contained in paragraph 14.

15.     Defendant denies the allegations contained in paragraph 15.

16.     Defendant states in response to paragraph 16 that the document in its entirety speaks for itself.

17.     Defendant states in response to paragraph 17 that the document in its entirety speaks for itself.

2

18.     Defendant states in response to paragraph 18 that the document in its entirety speaks for itself.

19.     Defendant admits the allegations contained in paragraph 19 alleging that "Rado, on its own, engaged Biscayne Capital S.A. ("Biscayne") as its independent investment advisor and, in 2012, provided Fernando Haberer-Bergson, on behalf of Biscayne, with a limited power of attorney" and states in response to the remainder of the paragraph that the documents referenced in their entirety speak for themselves.

20.     Defendant states in response to paragraph 20 that the document in its entirety speaks for itself.

21.     Defendant states in response to paragraph 21 that the document in its entirety speaks for itself.

22.     Defendant states in response to paragraph 22 that the document in its entirety speaks for itself.

23.     Defendant states in response to paragraph 23 that the document in its entirety speaks for itself.

24.     Defendant states in response to paragraph 18 that the document in its entirety speaks for itself.

**January 2018 Transactions**

25.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 25.

26.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 26.

27.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 27, except admits that Plaintiff delivered funds.

28.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 28.

29.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 29.

30.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 30.

31.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 31.

32.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 32.

33.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 33 and states that the account statements speak for themselves.

34.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 34.

35.     Defendant denies knowledge and information sufficient to form a belief as to the allegations in paragraph 35.

36.     Defendant admits the allegations in paragraph 36.

37.     Defendant admits the allegations contained in paragraph 37.

## CLAIM FOR RELIEF
### Count One: Breach of Contract

38.     Defendant repeats and realleges each of the responses set forth in the foregoing paragraphs as if fully set forth herein.

39.     Defendant denies the allegations contained in paragraph 39.

40.     Defendant denies the allegations contained in paragraph 40.

41.     Defendant denies the allegations contained in paragraph 41.

42.     Defendant denies the allegations contained in paragraph 42.

43.     Defendant denies the allegations contained in paragraph 43.

### AFFIRMATIVE DEFENSES

### <u>AS AND FOR A FIRST AFFIRMATIVE DEFENSE</u>

44.     The Complaint fails to state a claim upon which relief may be granted.

### <u>AS AND FOR A SECOND AFFIRMATIVE DEFENSE</u>

45.  Rado acted in good faith and did not directly or indirectly induce the acts alleged to have constituted Deutsche Bank's alleged damages.

### <u>AS AND FOR A THIRD AFFIRMATIVE DEFENSE</u>

46.  Deutsche Bank's claims are barred by applicable equitable principles of laches, estoppel, waiver and/or ratification.

### <u>AS AND FOR A FOURTH AFFIRMATIVE DEFENSE</u>

47.  Deutsche Bank failed to take timely and appropriate action to mitigate such damages.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

48.   If any damage or loss was sustained by Deutsche Bank, this damage or loss was caused or contributed to by Deutsche Bank's own actions, fault, and/or lack of due diligence.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

49.   Deutsche Bank acted in reckless disregard of facts of which it knew or should have known and failed to exercise the required care and diligence.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

50.   Deutsche Bank's claims should be barred by the doctrine of *in pari delicto*, unclean hands.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

51.   If Deutsche Bank be entitled to any recovery, such recovery is diminished by the proportion of Deutsche Bank's culpable conduct which caused the damages.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

52.   Deutsche Bank engaged in willful blindness and cannot recover damages.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

53.   Rado did not violate or breach any legal duties owed to any party.

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE

54.   The alleged damages, if any were sustained, were the proximate result of the acts and/or omissions of parties over which Rado exercised no control.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

55.   Rado is entitled to an offset.

## AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE

56.   Rado's requirement to pay is excused due to the illegality of the transaction.

6

## AS AND FOR A FOURTEENTH AFFIRMATIVE DEFENSE

57. Deutsche Bank failed to act in good faith and fair dealing.

## AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE

58. Rado reserves the right to assert and pursue additional defenses, including any that may become known through discovery or otherwise and may amend its answer with counterclaims.

## COUNTERCLAIMS
## COUNTER-STATEMENT OF FACTS

### Summary and Parties

59. This case is about Deutsche Bank Trust Company Americas essentially signing a blank check to Biscayne with Rado's name on it, without any commercially reasonable inquiry, safeguards or limitations, let alone a care about the illegality of the transactions, which wiped out Rado's account. Deutsche Bank then asked Rado to reimburse it for its precarious extension of credit to pay a thief, who Deutsche Bank had been doing significant business with for years in numerous capacities.

60. Rado is a New Zealand company owned by the Diego Trust (the "Trust"). The Trust was a product of smart family planning by Diego Romay's parents with the aid of lawyers and accountants after the sale of a family business. The Trust was established to benefit Diego Romay and Diego's descendants, his wife and three children.

61. Mr. Romay's parents also created trusts for each of Mr. Romay's three siblings. Those trusts were intended to hold a family portfolio, but only Diego Romay and his sister Mirta Romay were affected by this fraud as beneficiaries of the trusts. This fraud was perpetuated by Fernando Haberer, aided by Deutsche Bank and others.

7

62. When Mr. Romay's father died in 2015, there was a mandate after he passed away to distribute 50% of the assets of the Diego Trust, which was used to fund the Diego II Trust to benefit Diego Romay's descendants.

63. Diego Romay also was the settlor of the Docil Trust to benefit his descendants, his wife and three children. The Docil Trust holds an underlying company named Clodi Holdings Ltd., which opened an account with Haberer at Insight Securities funded with cash and securities, mostly legitimate investments.

64. Fernando Haberer was an investment advisor associated with a number of Biscayne entities and investment accounts. Haberer had a history of dealing with Deutsche Bank in relation to the Biscayne businesses in which he had significant roles.

65. Haberer is also the brother of Mirta Romay's son-in-law, Paco Haberer, married to her daughter, Mr. Romay's niece. Mirta Romay is Mr. Romay's sister. Haberer used his position of trust with the Romay family to gain control of investment accounts that were held within the Romay family trust structures.

### Deutsche Bank, Biscayne and the Regulators: Background Information

66. Deutsche Bank is a New York banking corporation and a U.S. insured depository institution subsidiary of Deutsche Bank AG. It engages in financial services businesses that focus primarily on providing transaction banking and wealth management services to select corporations, financial institutions and high-net-worth individuals and families.

67. Deutsche Bank had a longstanding relationship with Biscayne Capital Holdings and its affiliates, as well as Fernando Haberer. It also had a relationship with another company, Madison Assets, all of whom participated in the looting of the client accounts managed by Biscayne and Haberer, aided by Deutsche Bank and others.

8

68.   A web of related Biscayne entities controlled by the same directors (including at times Haberer) shared addresses with 40 related companies.  Biscayne acted through several corporate entities, including Biscayne Capital Ltd., currently in liquidation, and Biscayne Capital International, LLC ("BCI"), now a defunct Florida company (collectively "Biscayne").

69.   Over the years, Deutsche Bank carried the accounts of Biscayne as an entity, as well as accounts for many of its clients.  It also dealt with Haberer directly on Biscayne related matters.

70.   Deutsche Bank is an institution with significant and repeated Anti-Money Laundering ("AML") issues contemporaneous to the facts of this case.

71.   As reported widely abroad and in the US, Deutsche Bank admitted in a June 5, 2018 report to the European Central Bank that it had problems determining where its customers' money came from.

72.   In 2017, Deutsche Bank paid over $700 million in fines because of its "widespread and well-known weaknesses in its KYC [Know Your Customer] processes," including $425 million to the New York State Department of Financial Services.  It was alleged that Deutsche Bank facilitated suspicious trades because "it made for easy commissions."

73.   In 2017, the US Federal Reserve Bank also fined Deutsche Bank $41 million and ordered a Cease and Desist for AML concerns.

74.   In 2016, Deutsche Bank was on notice that accounts at Deutsche Bank were tied to alleged money laundering and bribery in an account of former Petroecuadorian employees.  The same Deutsche Bank  account was apparently also later also used to loot clients' accounts by Haberer, Madison Assets and Biscayne.

75.   Haberer gained the confidence of the Romay family because his brother married into the family.   He also sought out and befriended service providers who were willing to ignore red flags in the investment activity that he conducted in the accounts he managed, in order to assist in perpetrating his scheme to loot accounts.   By means of these relationships, Haberer was able to persuade the institutions to overlook numerous and stark indications of fraud and looting.

76.   Reynaldo Figueredo was a FINRA licensed registered representative  at Deutsche Bank as well as a Primary Officer for the bank.  Reynaldo Figueredo, who was active in the South American investment advisor community, and who had developed relationships with Biscayne investment advisors, served as the relationship manager for these accounts.

77.   Mr. Figueredo was aware of Biscayne's business practices, issues and business model, which he witnessed firsthand.  He aided Biscayne financial advisors in distributing notes issued by Biscayne-controlled entities to investors throughout Argentina, Ecuador and Uruguay.

78.   On May 27, 2016, Biscayne was the subject of an SEC Order and Cease-And-Desist Proceedings relating to its role in owning, creating and improperly selling what are now essentially worthless proprietary products, including SG Strategic Income, Ltd. and GMS Global Market Step Up Note, Ltd, some of the same securities at issue herein.

79.   At or about the time of this SEC investigation, Biscayne had a hard time finding brokerage firms willing to work with it.  It was asked to leave Raymond James, where it previously had customer accounts.  Many other brokerage firms including, but not limited to Insight Securities and Pershing (who also clears for Deutsche Bank) also expressed concerns

relating to dealing with professionals linked to Biscayne at or around this time and declined to do and/or continue to do business with them.

### Biscayne's SEC Cease & Desist Order

80.  As publicly disclosed on or about  May 27, 2016, the SEC proceedings arose out of the failure of Biscayne Capital International, LLC ("BCI"), formerly a U.S. registered investment adviser, to disclose facts giving rise to multiple conflicts of interest and other material information under the Investment Advisers Act of 1940 in connection with the recommendation and sale of securities issued by private offshore investment companies under common beneficial ownership with BCI to non-U.S. clients (hereinafter the illiquid proprietary Biscayne-related securities at issue will be referred to as "***SEC Cease-and-Desist-Related Notes***").

81.  The SEC investigation found  that BCI willfully violated Sections 206(1) and 206(2) of the Advisers Act, which make it unlawful for any investment adviser, directly or indirectly, to (1) "employ any device, scheme, or artifice to defraud any client or prospective client" or (2) "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." (hereinafter "SEC Cease and Desist Order").

82.  It is routine that during an SEC investigation, brokerage firms holding assets for clients of the subject entity (i.e., Biscayne) receive subpoenas, causing inquiry notice for the brokerage firm in terms of knowing its customer. Deutsche Bank was doing business with Biscayne before, during and after the SEC Cease and Desist Order, as well as the investigation leading up to it.

83.   Pursuant to the SEC Cease and Desist Order, BCI was censured and  ordered to "cease and desist from committing or causing any violations and any future violations of Sections 206(1), 206(2), 206(4) and 207 of the Advisers Act and Rule 206(4)-7 promulgated thereunder."

84.   Following the SEC Cease and Desist Order, Biscayne continued the scheme, turning its attention to South American investors.  By this point the ***SEC Cease-and-Desist-Related Notes*** had devolved into a Ponzi scheme. Numerous actions and investigations have ensued.

### **Deutsche Bank is Recklessly Undeterred by Biscayne's SEC Cease and Desist Order**

85.   After the issuance of the SEC Order, Biscayne and the Biscayne principals continued their fraud with the assistance of Deutsche Bank, when many other brokerage firms would not work with them.  Deutsche Bank was clearly undeterred by the SEC Order or expressed concerns of Deutsche Bank AG in Switzerland.  Deutsche Bank, specifically Mr. Figueredo, actively sought out Biscayne's business and it was transferred to him from Deutsche Bank AG with the knowledge of Pascal Landrove, Managing Director, Head of Deutsche Bank LatAm Miami and the assistance of Pascal Russo, Director and Head of Deutsche Bank Financial Intermediaries Geneva.

86.   Deutsche Bank used two relevant teams at the institution to aid these wrongdoers, the Financial Intermediaries Team (FIM) and the External Asset Management & Private Banking team (EAM), amongst others.

87.   In or about 2016, Pablo L. Perrotta and others at Biscayne arranged a series of meetings with Deutsche Bank, including meetings recommended by the Directors of EAM, to

carry out Biscayne's relationship with Deutsche Bank. Deutsche Bank's commercial compliance and credit operations of EAM were involved.

88. For obvious pecuniary reasons, Reynaldo Figueredo wanted to take over the Biscayne book of business from Switzerland and bring it to the US for several months amidst internal bank disputes.

89. Deutsche Bank earned a percentage of the assets under management, irrespective of debt. For example, in February 2018, when the Rado account was more than $12 million in debit, Deutsche Bank took a monthly fee of $1,789.97 based on the $8.5 million in assets (presumably the market value of the portfolio without considering the transactions that had not cleared). The fee was based on the assets, while the cash position on January 31, 2018 was a negative $12,306,100.51. We see this repeated on a monthly basis. For Deutsche Bank, assisting the account accumulate debt did not negatively affect its fees.

90. Mr. Perrotta also arranged a call with the head of Deutsche de FIM, Tracy Clark, relating to FIM LatAm issues. In the US, the FIM committee initially decided not to move forward with Biscayne. Deutsche Bank AG in Switzerland gave Biscayne until the end of October 2016 to close the accounts and migrate them out of Deutsche Bank. However, the accounts that were open in Deutsche Bank in the US with Reynaldo Figueredo were under scrutiny, yet allowed to stay open.

91. Pablo L. Perrotta, of Biscayne, emailed with Reynaldo Figueredo, of Deutsche Bank, as well as Fernando Haberer and others in May 2016 to coordinate with him relating to a letter Biscayne received from Deutsche Bank Switzerland that requested a forced closing date for accounts of October 30, 2016. Figueredo aided in the process of advancing the migration of client trust accounts to his book of business.

13

92.  By December 2016, Figueredo confirmed in an email he would be the relationship manager for the Biscayne accounts, but that existing powers of attorney had to be retired. Haberer's power of attorney in this case was dated February 10, 2016.  A question remains as to whether it was retired as directed or not, and if not, why not.

93.  Deutsche Bank and Figueredo directly dealt with Haberer when it dealt with Biscayne as a client as well as when it dealt with Biscayne as a relationship of Deutsche Bank, in addition to dealing with Biscayne in the Rado and other client accounts.

### Opening of the Rado Account

94.  In 2011, Deutsche Bank opened a custody account for Rado. Rado paid Deutsche Bank a percentage of the assets under management, excluding debt for the calculation, as described above. The more assets, the more money Deutsche Bank received.

95.  The Rado account at Deutsche Bank was not a one-off account of a customer with an investment advisor that happened to use Deutsche Bank as an unwitting custodian.  This was no ordinary custodial relationship.  Other Biscayne clients and Biscayne itself had accounts at and business relationships with Deutsche Bank.

96.  Reynaldo Figueredo was listed on the Rado statements as a  Deutsche Bank Primary Officer for the Rado account; he was also a FINRA licensed registered representative. Despite the filing of these counterclaims and other cases in FINRA Arbitration well over 30 days ago, Deutsche Bank has made no reporting to FINRA on Mr. Figueredo's Central Registration Depository records for his license as required by FINRA  rules.

97.  Fernando Haberer was listed on account opening documents in 2011.  In February 2016, Haberer became an agent for the Rado account, with a limited power of attorney, in his role at Biscayne.  It was clear to Deutsche Bank for whom Haberer worked for in the Rado

account, as he listed his Biscayne email address of <u>fernando.haberer@biscaynecapital.net</u>. It is unknown if his power of attorney was retired as Figueredo indicated Biscayne powers would need to be.

98. Mr. Haberer caused Rado to invest – without Rado's knowledge or consent – in *SEC Cease-and-Desist-Related Notes* issued by the same proprietary product issuers included in the SEC Order, including SG Strategic Income, Ltd. and GMS Global Market Step Up Note, Ltd., as well as other issuers beneficially owned by the Biscayne principals.

99. As Deutsche Bank was well aware, Biscayne was approved by Deutsche Bank as a counter-party to many trades in the *SEC Cease-and-Desist-Related Notes* in the Rado account, more than any other counterparty in the relevant contemporaneous time period. Deutsche Bank's records and dealings with Biscayne, a discretionary advisor, clearly showed that Biscayne was violating the SEC Cease and Desist Order. There could be no other conclusion to draw from the activity that Deutsche Bank transacted for Biscayne.

100. Biscayne did not cease and desist from the conduct described in the SEC Order and failed to disclose conflicts of interest and the nature of the *SEC Cease-and-Desist-Related Notes* it was peddling. Deutsche Bank knowingly assisted in this conduct and also did not disclose its relationships with Biscayne to Rado.

101. In breach of Mr. Haberer's fiduciary duties to Rado, Haberer caused Rado to invest millions of dollars in the illiquid *SEC Cease-and-Desist Related Notes*. The Rado account initially held a conservative investment portfolio, but by early 2018 it was almost completely invested in the *SEC Cease-and-Desist Related Notes*.

102. After the closing of Biscayne's accounts held by Deutsche Bank Switzerland, now at Deutsche Bank in the United States, Biscayne continued the scheme of the primary business

that was the subject of the SEC Order, including now the out-and-out theft of Rado assets and the assets of others.

### Deutsche Bank's Creation of the Rado Overdraft to Aid Transactions in the *SEC Cease-and-Desist-Related Notes*

103. Deutsche Bank failed to properly execute its role as custodian to Rado and aided and abetted the breaches of fiduciary duty and fraud of Haberer in many ways, as well as breached its contractual obligations, engaged in gross negligence, willful misconduct and actions done in a commercially unreasonable matter violating laws, rules and regulations applicable to the business it was executing. There were also conflicts of interest at Deutsche Bank and Biscayne, with Biscayne on multiple sides of transactions.

104. The Rado account had a rough average balance of $8.5 million during the contemporaneous relevant time period in 2017 and 2018.

105. In January 2018, several unfunded, large purchases of $12 million of *SEC Cease-and-Desist-Related Notes* in the Rado account caused a substantial overdraft and debit, initially over $12 million. An example of a prior overdraft of about $15,000 in April 2017 pales in comparison, but more in line with what one might expect in an account of that size.

106. At least as early as December 29, 2017, Deutsche Bank was on notice and well aware that sales of illiquid *SEC Cease-and-Desist-Related Notes* in the Rado account were failing in what was basically a trust account in its trust company. This was a red flag warranting at least an independent inquiry, as failed transactions are signs of things like Ponzi schemes and breaches of duties. Here the scheme was ending.

107. On December 22, 2017, sale trades were entered on roughly $3 million in illiquid *SEC Cease-and-Desist-Related Notes* in the Rado account. The clearance date of the sale trade was set on December 28, 2017, six days later.

108. On the seventh day, December 29, 2017, Deutsche Bank was on notice that the December 22, 2017 sales were reversed. That trade appeared for the first time on Rado's January 2018 statement, which came out in February 2018. The statement stated "REVERSED ENTRY POSTED ON 12/29/18" referring back to the 12/22/18 trade in the same CUSIP.

109. On January 2, 2018, additional sale trades were entered for the same securities, roughly $3 million in illiquid *SEC Cease-and-Desist-Related Notes* in the Rado account. The clearance date of the sale trade was set on January 5, 2018, three days later.

110. Notwithstanding Deutsche Bank's notice in December 2017 and January 2018 that sales were failing, on January 4, 2018, six calendar days/four business days after the first $3 million failed sales, Deutsche Bank executed purchases and paid roughly $5.5 million for more illiquid *SEC Cease-and-Desist-Related Notes*. Instead of contacting the trustee or beneficiary, DB reached out to Biscayne and Haberer, ignoring clear red flags and signs of wrongdoing, accommodating the wrongdoer, not the account owner.

111. The clearance date of the $5.5 million January 4, 2018 purchase transactions was uncharacteristically and unnecessarily set for an accelerated clearance date of January 5, 2018, just one day later, faster than any other trade in the account. Rather than wait to see if the second attempt at sales of  $3 million of *SEC Cease-and-Desist-Related Notes* cleared that same day, Deutsche Bank steamed forward with reckless abandon.

112. On January 5, 2018, Deutsche Bank was on notice that the January 2, 2018 sale transactions also failed in the Rado account. However, unlike what happened in December and January, where the statement stated: "REVERSED ENTRY POSTED ON 12/29/18," the apparent failed January 4, 2018 sales transactions were not reported as such on Rado's January, February, March or April monthly statements, despite the statement in Plaintiff's complaint

that the trades were cancelled on April 27, 2018. No sales of securities offset the $12 million in purchases that are recorded on the Transaction Summary page of the January account. There is also no cash added. In short, the statements are incomplete and inaccurate.

113. On January 5, 2018, despite being on notice that $6 million in sales transactions in illiquid **SEC Cease-and-Desist-Related Notes** in the Rado account (which generally had an average equity of approximately $8.5 million) had failed in both December and January, Deutsche Bank did not reverse the then $5.5 million in purchase transactions. Instead, as stated in its complaint, Deutsche Bank alleges that the extended settlements on the failed sales were extended to January 29, 2018 and then February 12, 2018.

114. This was already not the actions of a commercially reasonable custodian following accepted industry practices and rules, it was grossly negligent and willfully reckless. It was especially not commercially reasonable and especially reckless and grossly negligent given what Deutsche Bank actually knew about Biscayne, the securities at issue and what was clearly the breach of a fiduciary duty. No alternative explanation is plausible and inquiry notice was triggered by the first failed transactions.

115. But it gets worse. Instead of reversing the $5.5 million of purchases for which all of the corresponding sales had failed, on January 11, 2018, Deutsche Bank brings out its blank check and executes more than double the amount of new purchases despite no cleared sales and no money coming into the account. Thirteen calendar days/eight business days after the first $3 million in failed sales transactions and six calendar days/four business days after the second set of $3 million of failed sales transactions, Deutsche Bank executes roughly $7 million in additional purchases of **SEC Cease-and-Desist-Related Notes** in the Rado account.

116. Interestingly, the $7 million in purchases from January 11, 2018, did not have the one-day clearance as the January 4, 2018 transactions did in the same *SEC Cease-and-Desist-Related Notes*.  With no discernable rhyme or reason, the second set of purchases of $7 million (after the $6 million in failed sales transactions) had a clearance date of six days, on January 16, 2018.   Those trades are also never funded and never reversed.

117. As a result of the events between December 29 and January 16, 2018, the Rado account, previously worth about $8.5 million is $12 million in deficit, owning $20.5 million in illiquid *SEC Cease-and-Desist-Related Notes* tied to Biscayne was wiped out.

118. Even custodians need to know their customer and monitor accounts to prevent frauds from happening and to prevent aiding such frauds.  Per the Office of the Comptroller of the Currency's ("OCC") Handbook for Custody Services (January 2002), which is intended as specific guidance for this specialized asset management business (which is not simply a banking relationship).  The OCC Handbook is clear on the requirements of custodians relating to certain expected transactions and the credit requirements:

> Account Acceptance and Monitoring
> The account acceptance process is the first step in risk management. The risks associated with an individual account should be addressed prior to acceptance.  **A custodian's acceptance process "should provide an adequate review of the customer's needs and wants**.  During the acceptance process, the custodian should also assess whether its duties are within its capabilities, **are lawful**, and can be performed profitably.
>
> Procedures
> A properly documented account acceptance process will provide sufficient information for the bank to make an informed decision.  **Risk-based procedures should provide sales personnel with "front-end guidance" related to the review and acceptance of new accounts, and should include a bank's requirements related to customer due diligence and required documentation**.

Assessment of New Business
The due diligence process should ensure that the services the customer wants the custodian to perform are legal (in the relevant jurisdictions) and within the custodian's capabilities. **The account acceptance process should include an assessment of the proposed relationship including a review of the** ***products and services*** **needed by the customer, likely transactions (type and volume), and customer information necessary to facilitate custody transactions** (such as tax information related to foreign tax relief). **The due diligence process should include a review for compliance with anti-money laundering rules** Please refer to the "Bank Secrecy Act/Anti-Money Laundering" booklet of the Comptroller's Handbook for further information.

**When accepting new business the bank should consider the operational needs of the account**. The bank should consult all applicable departments As of May 17, 2012, this guidance applies to federal savings associations in addition to national banks.* Custody Services Comptroller's Handbook 8 (including legal, accounting, operations, **credit**, and compliance) to determine whether it has the capacity to serve the customer without incurring unreasonable costs.

Id. at 7-8, emphasis added.

119.    Per the OCC's Handbook for Custody Services (January 2002), trade compliance is also an important part of being a custodian and the industry standards are set out, including reversals of transactions that are not funded:

Trade Compliance
Trade compliance is the internal control process used by custodians to manage trade transactions. In this process, **the custodian determines that the customer's account has the securities on hand to deliver for sales, that the customer's account has adequate cash or forecasted cash for purchases, that trades are properly matched or DK'd, and that the depository's settlement instructions agree with the custodian's SMAC system. A national bank using a properly executed trade compliance system may prevent failed trades and needless reversals of transactions**.

* * * *

**Contract provisions should provide for reversal of the transaction if the trade fails or a specified amount of time passes.**

* * * *

20

> Contractual Settlement
> An arrangement whereby the customer is credited with the sale proceeds on the contractual settlement date regardless of whether the proceeds have been received. In the case of purchases, the customer's account will be debited on the contractual settlement date regardless of whether the securities have been received. **If the securities or proceeds have not been received by an agreed upon date, the transaction typically will be reversed**….

Id. at 4, 19, and 72, emphasis added.

120.  Deutsche Bank failed to follow accepted industry practices in an account that should have been under heightened scrutiny. It acted in a commercially unreasonable manner and was grossly negligent and reckless. Systems are supposed to be in place to prevent these types of situations.  The Securities Movement and Control (SMAC) system mentioned above is critical, as according to the OCC Custody Services Handbook, it is:

> Securities Movement and Control (SMAC)
> A written or computerized set of rules designed to ensure the safe movement of certificates or book-entry securities. **Computerized SMAC systems are used as a control for book-entry securities and to monitor the purchases and sales of physical securities from the time a trade is executed until the securities arrive at the bank or leave it, or until the securities are transferred on the books of the depository**. SMAC systems will generally contain security master files and client master files.

Id. at 84, emphasis added.

121.  Deutsche Bank's Trade Compliance and SMAC was grossly negligent. Deutsche Bank did not have an adequate control process for failed trades, which were not appropriately processed and monitored.

122.  Rado had the right to expect in law and in contract that Deutsche Bank would not allow its fiduciary advisor to violate the law, thereby its duties, and that any such violations would be stopped and either reported to the beneficial owner or refused to be executed or reversed. Instead, Deutsche Bank knowingly aided in the breaches of contract, fiduciary duties and the law.

21

123.     FINRA, the SEC and the OCC routinely provide guidance on schemes and issues with powers of attorney and discretionary fiduciaries.  Deutsche Bank was on notice of wrongdoing and had a duty to inquire and, if appropriate, take action.  Instead, Deutsche Bank did nothing except facilitate a brazen fraud to convert assets to a wrongdoer, while Deutsche Bank was earning money off of the victim – also its client.

124.     Deutsche Bank allowed a common custodial scheme of free-riding to flourish in the Rado account.  If the money is not in the account when the securities are delivered in a Delivery Versus Payment (DVP) transaction, the bank that completes the transaction creates a temporary overdraft and an extension of credit that is subject to the margin requirements in Regulation U (12 CFR 221).

125.     Deutsche Bank violated freeriding rules, Regulation T (12 CFR 220).  Credit lines should be considered for any account that engages in this activity, but there were no credit lines for the Rado account, no credit limits, no rational plan, strategy or agreement for the extension of such a large amount of credit. Moreover, the overdraft process at a bank must consider free riding and a process for identifying credit limits for overdrafts, which was not done here.

126.     There is no exemption in Regulation U for trust activities in a bank or other financial institution.  Any extension of credit in the course of settling customer securities transactions must comply with all of the provisions of Regulation U.  This includes the requirement that all extensions of credit that are secured by marginable stock be within the 50% margin limit set by Regulation U. In the Rado account, the extension of credit was 143% of the value of the account.  The ***SEC Cease-and-Desist-Related Notes*** were not marginable stock.

127. Deutsche Bank failed to follow strict mandates relating to the extension of credit in the purchase of securities, then allowed millions of dollars in debt to sit on the books of the account for roughly four months, not contacting the beneficial owners.  But it gets worse, Deutsche Bank next permitted other people's money to be used to cure the problem, which never would have happened if it had properly reversed the $12 million in purchases and the account was not in deficit.

## Other People's Money

128. Haberer scrambled to cover the overdraft as the scheme collapsed, fearing that the scheme would be exposed to Rado at some point, and this scrambling was made possible by Deutsche Bank, which illegally gave Haberer uncharacteristically and unprecedented long periods of time to come up with money for the purchases.  In March 2018, Haberer arranged to transfer millions of dollars in cash and securities from several unwitting other clients that had no responsibilities or desire to cover the overdraft in any way.

129. Deutsche Bank had an obligation under Anti-Money Laundering rules, referenced in the contracts between the parties, to know the sources of funds coming into the account, but failed to do so.

130. In March 2018, 27 assets were transferred into the Rado account through other institutions and other people's accounts, including assets and accounts funneled through a company called Madison Assets, an entity that had a relationship with and often cleared through Deutsche Bank.

131. In April 2018, further cash receipts of $1.6 million from other peoples' accounts are received, to cover the overdraft.  This is in addition to the approximately $6 million worth of securities transferred from the Clodi account on March 8 and March 15, 2018.  Then on

March 15 and March 16, 2018, there was a transfer of approximately $2.5 million worth of securities from two other separately owned accounts also controlled by Haberer using similarly suspicious transfer instructions purported to be for the benefit of other clients, but actually funding Rado.

132. Undoubtedly, the pressure to cover the $12 million extended credit at the Deutsche Bank branch carrying the Rado account was high and compliance, supervisory, and account representative judgment was compromised.

133. Haberer engaged in a sloppy and brazen scheme to steal money and transfer it between multiple financial institutions, including Deutsche Bank, Insight Securities, Pershing (which clears for Deutsche Bank Securities), Madison Assets (with accounts at Deutsche Bank), and others.

134. Deutsche Bank is liable for the fiduciary's diversion because it participated in the diversion, acquiring an advantage and/or benefit directly from or through the diversion, joining in the diversion when it knew or should have known of the nature of the funds it received.

135. The facts are such that it should have put a reasonable manager, supervisor or compliance person at Deutsche Bank on inquiry, and required him or her  to make an investigation, the result of which would have revealed the true situation of converted funds.

136. This activity, the infusions of cash and credit overdraft was all out of character for the Rado account, but Deutsche Bank asked no questions and rubber-stamped the infusion of cash and securities to relieve pressure at the branch, by taking care of the bulk of its $12 million debt problem. This reckless conduct done to generate commissions and fees is similar to conduct Deutsche Bank has paid in fines to regulators for failing to know the sources of funds and customers, as mentioned above.

### Deutsche Bank Contacted the Beneficiary of Rado Roughly Months Later

137. Deutsche Bank gave Haberer every opportunity to abscond with the money, while keeping Rado and Mr. Romay in the dark.

138. Diego Romay, as one of the beneficial owners of Rado, was eventually notified in April 2018 by Deutsche Bank regarding the overdraft in the Rado Account, roughly four to five months after the first failed sale transaction in December.

139. Mr. Romay requested from Deutsche Bank copies of the account statements, and only then did he learn that the account for which he had been receiving doctored statements had been filled with the *SEC Cease-and-Desist-Related Notes* and that he and his family members had been victims of the scheme.

### Conclusion

140. Deutsche Bank gave substantial assistance in the thefts from the Rado account and was plainly a proximate cause of Rado's losses because of its weak compliance and relationship with Haberer.  Deutsche Bank failed and refused to follow industry rules and standards in order to foster its business.  Mr. Haberer, Biscayne and others could not have looted the Rado account without Deutsche Bank's assistance.

141. Deutsche Bank contractually agreed to maintain appropriate policies, procedures and practices in the course of and in its role in maintaining custodial duties to Rado. Rado maintained a loss resulting from its inadequate internal processes, systems failure, or failure to comply with applicable laws or regulations. These types of errors and failures are often evidence of a gap between applicable written internal policies and procedures, regulations or contractual agreements and the actual execution of those written guidelines.

142.   Relevant U.S. Office of the Comptroller of the Currency guidance requires that custodians should establish strong risk-based internal controls to protect assets held off-premises, which Deutsche Bank failed to adhere to.

143. Deutsche Bank allowed Rado to experience serious compliance related risk of loss from the failure of an individual or group within Deutsche Bank to comply with applicable laws or regulations, such as anti-money laundering, trade/credit regulation, or antifraud requirements, amongst others.

144. Deutsche Bank recklessly and in breach of the parties' agreements funneled Rado's money to the scheme operator while ignoring clear signs that it was dealing with a thief, purporting to be a fiduciary, but breaching every fiduciary duty and engaging in a massive fraud.

145. Banks do have a duty to safeguard trust funds deposited with them when confronted with clear evidence indicating that those funds are being mishandled. A bank may not be ignorant of facts clearly disclosed in the transactions of its customers with the bank and it may not close its eyes to the clear implications of such facts, as Deutsche Bank did. By ignoring the above stated facts and their necessary implications, the bank became a guilty participant in wrongful conduct and became liable as a joint wrongdoer.

146. Deutsche Bank's conduct demonstrated reckless disregard for Rado's assets. Deutsche Bank was not a mere passive custodian, Deutsche Bank had a relationship with Biscayne that it continued to cultivate for its own profit motive, as well as acted in its own self-interest when the overdraft was created.

147. Deutsche Bank was grossly negligent for failing to investigate the failed sales (which were essentially in the same ***SEC Cease-and-Desist-Related Notes*** that were being

bought), extending money for the purchases and looking the other way at suspicious transactions by a conflicted advisor with whom it had a longstanding relationship. Deutsche Bank was on notice and knew that a diversion of funds and legitimate securities was occurring in the account and looked away when it should have made reasonable inquiries and reversed the purchase transactions.

148. By ignoring evidence of wrongdoing, and allowing it to continue, Deutsche Bank allowed itself to become a conduit for the wrongful activities and a guilty participant and wrongdoer. Had Deutsche Bank acted immediately as soon as the sales transactions failed, Rado's funds could have been protected by reversing the purchases. Deutsche Bank had actual knowledge of wrongdoing, both the improper purchases and failed sales with Biscayne and/or its other clients as counterparties. Deutsche Bank engaged in willful misconduct.

149. The beneficial owners of Rado were unaware that the Rado account had been almost completely invested in the ***SEC Cease-and-Desist-Related Notes*** because they were given falsified account statements by Haberer. Rado would not be the first client to receive falsified documents in a scheme and FINRA, the SEC and the OCC rules and related laws provide measures institutions must take to avoid frauds such as those that happened here, which Deutsche Bank failed to follow.

150. Despite all of its knowledge as detailed above, Deutsche Bank allowed Biscayne to be an approved counterparty for trades with the Rado account and allowed Haberer and Biscayne to repeatedly cause Rado to invest in ***SEC Cease-and-Desist-Related Notes***, ultimately draining the Rado account of assets and leaving it with an overdraft of over $12 million, as a result of the blank check Deutsche Bank extended in the Rado account.

151. The ***SEC Cease-and-Desist-Related Notes*** were worthless, or virtually so, and the trusts would <u>not have allowed</u> these purchases. Deutsche Bank did not know its customers or review any documents relating to the boundaries of the trusts or the account investment management mandates.

152. These ***SEC Cease-and-Desist-Related Notes*** should have raised red flags at every level, even without suitability obligations on Deutsche Bank, since firms are required to know and supervise every transaction as well as every customer, including every person holding a power of attorney, to insure its facilities are not being used for a fraud. Every financial institution must know its customer.

153. The indicia of fraud surrounding the Rado account were abundant. First, Deutsche Bank knew that Biscayne and the Biscayne principals were the subject of the SEC Order. This fact alone caused other rule compliant institutions to reject maintaining accounts involving Biscayne.

154. Second, Deutsche Bank knew that Fernando Haberer worked with Biscayne and was an agent for that account.

155. Third, Deutsche Bank knew that Biscayne was on both sides of the Rado account transactions, acting on the one hand with Mr. Haberer as investment advisor to order trades and on the other hand with Biscayne as a counterparty to the trades, just as in the SEC Order.

156. Fourth, Deutsche Bank knew that the Rado account was a trust account with the attendant requirements and obligations to beneficiaries.

157. Fifth, Deutsche Bank knew that the Rado account was investing primarily in illiquid ***SEC Cease-and-Desist-Related Notes*** issued by proprietary product issuers beneficially owned by the Biscayne principals.

158. Sixth, Deutsche Bank knew that the value of transactions in the Rado account far exceeded the value of the account, as well as the securities it was extending credit on, yet still extended credit.  The extension of credit may as well have been a billion dollars because the Rado account was wiped out and Deutsche Bank seemed to impose no limits or safeguards for Rado or itself on the extension of credit. Deutsche Bank violated Regulations U and T, permitting free-riding.

159. Finally, Deutsche Bank knew that Haberer and Biscayne had ordered trades that would cause the Rado account to be overdrawn by over $12 million.

160. Instead of following sound laws, rules and practices, Deutsche Bank rendered substantial assistance in Haberer's role in the fraudulent scheme and breach of its fiduciary duty to Rado, allowing Haberer to engage in excessive trading in the Rado Account, reaching several times the market value of a portfolio in illiquid and/or worthless/near worthless ***SEC Cease-and-Desist-Related Notes.***  Deutsche Bank extended credit for far in excess of the market value of the portfolio or the value of the ***SEC Cease-and-Desist-Related Notes****, which* should have had no marginable value as collateral for any account.

161. Deutsche Bank allowed its facilities to aid and abet a fraudulent enterprise and it is not an isolated incident.

### FIRST COUNTERCLAIM
### (Breach of Contract)

162. Rado repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

163. Deutsche Bank breached the Custody Agreement and all related incorporated rules and laws by failing to keep and protect Rado's assets as it would its own.

29

164. Deutsche Bank breached the Custody Agreement and all related incorporated rules and laws by failing to know its customer, failing to know the transactions being facilitated through its facilities, and accepting assets and extending excessive credit to the Rado account beyond its ability to cover and beyond the value of the *SEC Cease-and-Desist Related Notes,* which should never have been permitted to be purchased.

165. For several months, because of Biscayne's and Haberer's relationship with Figueredo and Deutsche Bank, Deutsche Bank extraordinarily and recklessly extended credit deadlines in the Rado account rather than reversing trades that Biscayne pushed through to loot the account and off-load worthless and illiquid proprietary products that it should not have been selling in the US.

166. Deutsche Bank has failed to perform all of the conditions required of it under the Agreements between the parties.

167. Per the agreements between Rado and Deutsche Bank, Deutsche Bank agreed that it would "keep and protect, in the same manner as the Bank keeps and protects its own similar property, the securities, cash or other financial assets you deposit in your Account(s) and any dividends, interest or other distributions received on those assets of from their sale or other disposition (collectively, the "Property")." Deutsche Bank recklessly and in a grossly negligent manner failed to protect the account in the same manner it would protect its own assets. By limited example and as more fully explained above, Deutsche Bank would not essentially write a blank check to a tarnished counterparty for worthless or near-worthless illiquid *SEC Cease-and-Desist Related Notes* from its own account with no way to pay for the trades after experiencing contemporaneous failed sales sufficiently in advance to stop the transactions.

168. Per the agreements between the parties, Deutsche Bank agreed that it "may decline to execute or settle a purchase order if the Bank is not satisfied, in the Bank's sole judgement, that you will have sufficient available funds or credit in your Account." After days, weeks and months of failed sales, Deutsche Bank recklessly and in a grossly negligent manner never satisfied itself that there were sufficient funds available to settle the full $12 million order, mostly generated <u>after</u> early failed sales, but in an act of gross negligence, recklessness, and/or fraudulent conduct extended credit anyway.

169. Per the agreements between the parties, Deutsche Bank indicated that "[t]o help fight … money laundering activities, DBTCA obtains, verifies and records information that identifies each person who, or entity that, opens an account with the Firm including the authorized signors for the entity. This procedure was established under the USA Patriot Act, with which all financial services organizations must comply." Deutsche Bank recklessly and in a grossly negligent manner made no effort to verify information about the transactions at issue, Biscayne- Deutsche Bank's client, Biscayne – Rado's advisor, and Rado – essentially a trust account.

170. Per the agreements between the parties, Deutsche Bank indicated that "[t]he Bank may effect orders to buy and sell securities, other financial instruments or foreign currency for your Account in any commercially reasonable manner the Bank deems appropriate." As described above, Deutsche Bank did not execute or settle the transactions in the Rado account 2018 in any commercially reasonable manner.

171. Deutsche Bank did not exercise due care in accordance with reasonable commercial standards to obtain and maintain Rado's financial assets as UCC 8-504 mandates.

172. Good faith and fair dealing requires that activities engaged in, per contractual obligations, be compliant with all relevant laws, rules, and industry practices and standards; Deutsche Bank failed to follow basic know your customer, anti-money laundering, identity theft rules, and trade/credit regulation amongst others.

173. The credit upon which Deutsche Bank brings this action was corrupted after being extended when Deutsche Bank was on actual or constructive notice of the presence of ***SEC Cease-and-Desist-Related Notes*** which were not properly available as collateral for a loan. Had Deutsche Bank acted properly, the ***SEC Cease-and-Desist-Related Notes*** would not have come into the account.

174. As a result of Deutsche Bank's failures and breaches, Rado has been damaged in an amount to be determined at trial, but in no event less than $8,500,000, plus applicable pre-judgment interest at the New York statutory rate of nine percent dating from June 14, 2018.

## SECOND COUNTERCLAIM
### (Aiding and Abetting the Breach of a Fiduciary Duty)

175. Rado repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

176. Deutsche Bank had actual knowledge or engaged in conscious avoidance of Haberer's breach of his fiduciary duty to Rado, knowing and/or consciously avoiding confirming facts that demonstrated the fraudulent nature of the endeavor it substantially furthered.

177. Deutsche Bank caused the risk of loss and Rado's damages by Deutsche Bank's knowledge of the scheme, as well as failure to know its customer and properly monitor and oversee a third party's exercise of such discretion, particularly where there was indicia of a breach of fiduciary duty and fraud.

178. The obvious signs of fraud were present and Deutsche Bank knew or in the reasonable exercise of due diligence could have readily discovered the scheme.

179. The overdraft of over $12.5 million in an account that had previously had an average account net worth of just $8.5 million was clearly not the act of a prudent fiduciary, reckless and not in accord with the "needs and wants" of the client.

180. Deutsche Bank was willing to bend the rules for Biscayne and Haberer to the detriment of Rado, Deutsche Bank paid for purchases that benefited Haberer and Biscayne with no funds available to clear them, leaving Rado holding the bag despite knowing that the Rado account was a trust account with conservative objectives and that the investment advisor was a fiduciary with discretionary power that was intentionally violating implied and written investment guidelines.

181. Rado will show that there was a (1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the Plaintiff knowingly induced or participated in the breach; and (3) Defendant suffered actual damages as a result of the breach.

182. Deutsche Bank possessed superior knowledge, not readily available to Rado, and knew that Rado acted on the basis of mistaken knowledge that its fiduciary was respecting its fiduciary and legal responsibilities, which is was not. Haberer (1) breached his fiduciary of obligations to Rado by virtue of the above conduct, (2) Deutsche Bank knowingly induced or participated in the breach, and (3) Rado suffered damage as a result of the breach to the tune of not less than $8,500,000.

## THIRD COUNTERCLAIM
### (Aiding and Abetting Fraud)

183. Rado repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

184. Rado will show: (1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud.

185. Rado has alleged a strong inference of actual knowledge of the underlying harm, or the conscious avoidance of the same such that it can be said that Deutsche Bank actually knew, suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge.

186. As an aider and abettor Deutsche Bank consciously avoided confirming facts and was willfully blind that, if known, would have demonstrated the fraudulent nature of the endeavor it substantially furthered.

187. Haberer caused Rado to invest millions of dollars in the ***SEC Cease-and-Desist-Related Notes***.  The Rado account initially held a conservative investment portfolio, but by early 2018 it was almost completely invested in the ***SEC Cease-and-Desist-Related Notes***, as well as funded by Mr. Haberer's theft from third-parties for which Deutsche Bank looked the other way.

### FOURTH COUNTERCLAIM
### (Gross Negligence)

188. Rado repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

189. Deutsche Bank failed to adequately monitor and respond to red flags and suspicious activity within Rado's account.

190. Deutsche Bank utterly failed in its duty of care to Claimant.  Respondents' failure to fulfil its duty was unreasonable and not within the standard of care that custodians owe their customers.

191. Deutsche Bank's misconduct rises to the level of gross negligence, willful misconduct and reckless indifference to the rights of others.  The conduct shows a failure to use even slight care or conduct that is so careless as to show complete disregard for the rights and safety of others and severe deviation from reasonable care.

192. Even if Deutsche Bank complied with certain relevant laws and regulations, that does not insulate it from liability if it fails to act objectively reasonably. *See* Restatement (Second) of Torts § 288C (1965) ("Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions.")

193. Deutsche Bank did not take precautions the facts warranted after being on notice of potential and actual wrongdoing.

## DEMAND FOR A JURY TRIAL

194. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Rado demands a trial by jury of this action.

## PRAYER FOR RELIEF

**WHEREFORE,** Rado prays for relief and judgment, as follows:

(A)   Deutsche Bank's claims be denied in its entirety;

(B)   Awarding to Rado actual damages of not less than $8,500,000, including interest, to be established at trial;

(C)   Awarding to Rado reasonable costs and expenses incurred in this action, including counsel fees; and

(D)   Such further relief as the Court deems appropriate.

Dated: November 9, 2018
       New York, New York

                                          **MALECKI LAW**

                                  By: */s/ Jenice L. Malecki*
                                       _____
                                       Jenice L. Malecki
                                       11 Broadway
                                       Suite 715
                                       New York, NY 10004
                                       (212) 701-3000
                                       *Attorneys for Defendant/*
                                       *CounterClaimant*
                                       *Rado Limited Partnership*