# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEUTSCHE BANK SECURITIES, INC.,

                Plaintiff,

     v.

MARIA DE LOS ANGELES APARAIN
BORJAS and BRALISOL ASSOCIATES
LTD.,

                Defendants.

Case No.:   18-cv-10191

## DECLARATION OF DAVID G. JANUSZEWSKI IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

DAVID G. JANUSZEWSKI declares as follows:

1.    I am admitted to the Bar of this Court and am a member of the law firm of Cahill Gordon & Reindel LLP, attorneys for Plaintiff Deutsche Bank Securities, Inc. ("DBSI") in the above-captioned action. I submit this declaration in support of DBSI's Motion for a Preliminary Injunction.

2.    On August 7, 2018, Defendants commenced an arbitration proceeding against DBSI before the Financial Industry Regulatory Authority ("FINRA"), styled *Maria De Los Angeles Aparain Borjas and Bralisol Associates, Ltd.* v. *Carlos Javier Legaspy, et al.*, FINRA Case No. 18-02781. Attached as **Exhibit 1** is a true and correct copy of Defendants' Statement of Claim in that action.

3.    DBSI has conducted a reasonable search of its account records and is aware of no account that either Defendant has held or holds with DBSI or DBSI's affiliate, Deutsche Bank Trust Company Americas.

4.      Attached as **Exhibit 2** is a true and correct copy of Defendants' October 11, 2018 Reply to Counterclaims and Third Party Claims and First Amendment to Statement of Claim.

5.      Attached as **Exhibit 3** is a true and correct copy the complaint filed in the action *Deutsche Bank Trust Company Americas* v. *Rado Limited Partnership*, No. 18-cv-06768 (S.D.N.Y.) (DLC).

6.      Attached as **Exhibit 4** is a true and correct copy of DBSI's September 7, 2018 Letter to the FINRA Director.

7.      Attached as **Exhibit 5** is a true and correct copy of Defendants' September 7, 2018 Letter to the FINRA Director.

8.      Attached as **Exhibit 6** is a true and correct copy of Defendants' September 11, 2018 Letter to the FINRA Director.

9.      Attached as **Exhibit 7** is a true and correct copy of DBSI's September 18, 2018 letter to the FINRA Director.

10.     Attached as **Exhibit 8** is a true and correct copy of Defendants' September 19, 2018 Letter to the FINRA Director.

11.     Attached as **Exhibit 9** is a true and correct copy of DBSI's September 28, 2018 Letter to the FINRA Director.

12.     Attached as **Exhibit 10** is a true and correct copy of the FINRA Director's October 11, 2018 decision denying DBSI's request to decline FINRA's arbitration forum.

13.     Attached as **Exhibit 11** is a true and correct copy of Rule 12200 of the FINRA Code of Arbitration Procedure for Customer Disputes, available at

2

http://finra.complinet.com/en/display/display.html?rbid=2403&element_id=4106 (last visited October 29, 2018).

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      November 2, 2018

David G. Januszewski

3

EXHIBIT 1

## BEFORE FINRA DISPUTE RESOLUTION, INC.

| | |
|---|---|
| *In the Matter of the Arbitration Between* | |
| MARIA DE LOS ANGELES APARAIN BORJAS and BRALISOL ASSOCIATES, LTD., | FINRA No. 18- |
| Claimants, | **STATEMENT OF CLAIM** |
| against- | |
| CARLOS LEGASPY, INSIGHT SECURITIES, INC., PERSHING, LLC and DEUTSCHE BANK SECURITIES, INC., Respondents. | |

This **firm** represents Maria De Los Angeles Aparain Borjas and Bralisol Associates Ltd. ("Ms. Aparain", "Bralisol" or "Claimants") to recover damages caused by the recklessness, negligence, aiding and abetting fraud, and breach of contract and industry rules by the Respondents CARLOS LEGASPY, INSIGHT SECURITIES, INC., PERSHING, LLC and DEUTSCHE BANK SECURITIES, INC., ("Legaspy", "InSight", "Pershing" , "DBSI" or  collectively "Respondents"). As will be described below, because **of** the age of certain Claimants, expedited treatment is requested. The Claimants (including the owners of Bralisol) live in multiple locations, including New York City, and request that the hearing take place in New York City, NY.

### INTRODUCTION

Ricardo Jaime Levi (owner **of** Bralisol) ("Mr. Levi"), Ms. Aparain, **and** many other relatives, including Mr. Levi's son-in-law (Diego Alejandro Saul Romay), were working with an unregistered advisor, Fernando Haberer, for their accounts at InSight, cleared through Pershing.   On or after May 17, 2018, Ricardo Levi (owner of Bralisol), Ms. Aparain and her partner Roberto Teofilo Levi ("RT Levi", also Ricardo Levi's brother) were told by Mr. Romay that his accounts at InSight were emptied and **he** believed they had a problem too.

After the fact, Mr. Romay communicated with Carlos Legaspy from Insight, who sent Mr. Romay by email Bralisol's and Ms. Aparain's transfer documents with the forged signatures, despite regulation SP privacy requirements. This exchange prompted Mr. Romay to visit Mr. Levi to tell them what he learned, who in turn called his brother RT Levi. At that time, none of the family members were receiving monthly statements from InSight/Pershing, instead, they were receiving consolidated statements from Mr. Haberer, ultimately hiding the fraud. Pro Advisors LLC (for Maria) and Total Advisors LLC (for Bralisol) had limited powers of attorney to give InSight trading instructions but did not include disbursements or transfers out of the firm.

Mr. Levi, RT Levi and Ms. Aparain began to investigate and shockingly learned that their accounts were pilfered, and their securities had been illicitly transferred out without their knowledge or consent. It was discovered that in just the last two weeks in March 2018, very large assets (roughly $2.4 million for the claimants jointly, more for others not a party to this action of over $6 million or more), were transferred out of their (and others') accounts at InSight, clearing through Pershing on a "fully disclosed basis", to DBSI, also clearing through Pershing on a "fully disclosed basis".

Deutsche Bank is an institution with significant and repeated Anti-Money Laundering ("AML") issues. As reported widely abroad and in the US, Deutsche Bank admitted in a June 5, 2018 report to the European Central Bank that it had problems determining where its customers' money came from. https://www.businessinsider.com/deutsche-bank-anti-money-laundering-report-2018-8. See Exhibit A. In 2017, Deutsche Bank paid over $700 million in fines because of its "widespread and well-known weaknesses in its KYC [Know Your Customer] processes," including $425 million to the New York State Department of Financial Services. Id. See also https://www.dfs.ny.gov/about/ea/ea170130.pdf Exhibit B. It was alleged that DB facilitated suspicious trades because "it made for easy commissions." In 2017, the US Federal Reserve Bank also fined Deutsche Bank $41 million and ordered a Cease and

Desist for AML concerns. www.federalreserve.gov/newsevents/pressreleases/files/enf20170530a1.pdf.
See Exhibit C.

Apparently, the assets illicitly transferred **to at DBSI** were done **in** DBSI's own interest, **in an**
attempt to wipe out **a** massive negative-balance (over $12 million) in an account in the name of Rado
Limited Partnership ("Rado"), which is essentially beneficially owned by Mr. Romay, another victim
wiped out by the scheme. Rado and other clients of InSight were the victims of a fraudulent scheme that
straddled Insight and **DBSI** – both of whom cleared **on a** "fully disclosed basis" through Pershing. **It**
was every investor's worst, modern-day nightmare.

**In** short, Mr. Haberer **had an** illicit relationship with **a** company **called** Biscayne Capital
International LLC, which in May 2016 was the subject **of** an SEC Order and Cease-And-Desist
Proceedings relating to their roles in owning, creating and improperly selling what are now essentially
worthless proprietary products **in** the following companies: "SG Strategic Income LTD", "GMS Global
Step Up Note, Ltd." and others. ("Worthless Securities"). See Exhibit **D**. Apparently, purported
"trading" in these Worthless Securities occurred in the Rado accounts at Deutsche Bank, as well as other
accounts at InSight (not Claimants' accounts) and Deutsche Bank, as held at Pershing. These Worthless
securities should have raised red flags at every level, since firms are **required to** know and supervise
every transaction as well as every customer, including every person holding **a** power of attorney,[1]
irrespective **of** whether a recommendation was made and particularly where a debt relationship exists

---

[1] The sudden and unusual activity on all sides of these accounts, including Rado, should have
flagged Respondents to detect and stop the suspicious transactions in the account, which took place in
roughly a two-week window. Every brokerage firm has basic obligations to know their customer,
including every person holding a power of attorney. FINRA Rule 2090, as well as know the
transactions per FINRA Rule 3110(b)(2) (Review of Member's Investment Banking and Securities
Business), which requires a firm to have supervisory procedures for the review by a registered principal,
evidenced in writing, of all transactions relating to the firm's investment banking or securities business.

3

and foreign actors in foreign places like the Cayman Islands are involved.[2]   To this date, Claimants do not know if Francisco Neri who signed the powers of attorney is a real person and he has **never been** discussed with Claimants by Mr. Haberer or Mr. Legaspy.

Claimants investigated and later confirmed that the fraudulent transfers occurred through electronically and/or otherwise forged documents, mis-matched instructions, powers of attorney and other non-matching forms. *The instructions for each account were delivered by an email with no person's name associated with it, only a "back office" of "Pro Advisors," even though Total Advisors were supposed to be the account advisors.* Behind the scenes, as will be described below, Carlos Legaspy and Fernando Harberer were texting each other about the transfer, to make sure it went through. At that **time**, Mr. Haberer was not a person with authority mentioned on any documents relating to the Claimants at InSight, Pershing **or DBSI,** that took in "other people's money" **to** satisfy a debit on **their** books and pay themselves in the process.

Pershing was the clearing firm for both InSight and Deutsche Bank **and** was on all sides of these accounts being illicitly pooled by Mr. Haberer and others to cover other misdeeds.  Deutsche Bank took the money of the Claimants into the Rado account and with those funds paid itself a fee for its services and management of the Claimants funds and securities now in **the Rado** account, the account ultimately settling in a negative balance.

**The** paperwork "supporting" these transfers **are a** nightmare of mismatches and forgeries. Because Pershing was on a "fully disclosed basis." Pershing had **all** these mismatched documents[3] and had an obligation **to** review them.  In fact, we know they even had emails (that they gave to Claimants when Claimants were investigating what happened) **that there** were issues with "free delivery" if the accounts were not transferred in whole.  See Exhibit E.  Even though that **the** accounts were not

---

[2] This was unknown to Claimants, who had no presence in the Cayman Islands.
[3] Claimants received the documents after the fact during their investigation as to what happened.

completely transferred. the odd partial transfers of 80-90% of the accounts went through as "free delivery" and Pershing had all the back and forth regarding these mis-matched, uncharacteristic and ill documented transfers.

All the Respondents missed many red flags including but not limited to: (1) transfers in large amounts from several customers. (2) securities subject of a fraudulent scheme that was the subject of an SEC Cease and Desist Order in accounts at Respondents. (3) people with colorful histories from non-registered entities. (4) persons that are tied to internationally questionable activity and several foreign entities in the Cayman Islands and other countries that should be subject to heightened scrutiny. DBSI and Pershing, in addition, should have seen red flags relating to extraordinary large transactions beginning in the Rado account January 2018 and extraordinary debt mounting, 143% of the account asset value creating negative equity.

InSight. DBSI and Pershing shockingly missed many red flags and could have taken the simplest of steps to prevent this theft and fraudulent scheme. Its many failures included a complete abrogation of the firm's legal duties to uphold its contractual, supervisory, compliance, and statutory obligations to the customer, and to protect Claimants accounts from a foreseeable type of misconduct. This was not a complex, hidden fraud. Respondents should have easily detected and prevented it by following the law and common industry practices but failed to follow either.

Moreover, given the entities and individuals involved, in addition to the failure to know their customer per FINRA Rule 2090, persons holding the power of attorney and the transaction per FINRA Rule 3110(b)(2), Respondents failed to heed FINRA anti-money laundering and identity theft rules, guidelines and notices, including but not limited to FINRA Rules 3110 (Supervision), 3120 (Supervisory Controls), 3310 (Anti-Money Laundering). 11720 (Stolen Securities). 11721 (Obligations of Members Who Discover Securities in Their Possession to Which They Are Not Entitled). 2111 (Suitability and

5

Fair Dealing), 2340 (Customer Account Statements) and, of course, 2010 (Good Faith And Fair Dealing); Regulatory Notices 09-64 (Customer Assets Verification of Instructions to Transmit or Withdraw Assets from Customer Accounts), 08-69 (Fair and Accurate Credit Transactions Act of 2003), 12-05 (Customer Account Protection) and 10-19 (Consolidated Reports).

These rules apply to both introducing brokers (InSight and DBSI), as well as clearing firms (Pershing). Identity theft and theft by electronic means is a serious topic and FINRA has repeatedly fined introducing and clearing firms for failing to follow the rules. (See by *limited example* the fine of $1 million by FINRA against E*TRADE for failing to monitor suspicious trades and the $550,000 fine against Aegis Capital relating to foreign accounts annexed as Exhibits F and G). As described herein, the applicable securities laws require firms to have policies in place to not only detect and prevent frauds resulting from theft, money laundering and identity theft, but also to respond and assist a customer to mitigate the impact of the misconduct. SEC Regulation S-ID, 17 CFR 248.201(d)(2). This Panel will learn how difficult each of the Respondents made it for the victims of this fraud to get information about the transactions, despite the notation on the monthly statements they ultimately received from Insight/Pershing that said that one could call either firm if there were a problem.

This case is about non-delegable duties of each Respondent to know their customer, every person holding a power of attorney, and to know the transactions happening in their brokerage firm to avoid fraud and report suspicious activity, plain and simple. Brokerage firms have the responsibility to be the gatekeeper and not allow facilities to be used for fraud, especially not with so many red flags flying.

6

## PARTIES

## I. CLAIMANTS

### a. MARIA DE LOS ANGELES APARAIN BORJAS

Maria De Los Angeles Aparain Borjas, is 54 years old. She is a partner of Roberto Teofilo Levi who is 73 years old, and they have two children. Roberto Teofilo Levi ("RT Levi") is a beneficial owner and has a power of attorney ("POA") of her account, who is the brother of Ricardo Jaime Levi (owner of Bralisol).

### b. BRALISOL ASSOCIATES LTD.

Bralisol Associates Ltd. was created by Ricardo Jaime Levi, (76 years old this August), on the advice of Fernando Haberer. Mr. Levi owns Bralisol, along with his ex-wife/partner, Susana Siganevich, 66 years old, and his four daughters Stephanie Levi, Jesica Levi, Veronica Levi and Cynthia Levi (married to Mr. Romay, who is also a victim).

## II. RESPONDENTS

### A. CARLOS LEGASPY

Carlos Legaspy is a FINRA registered person and the President and an owner of Insight Securities. He was the point of contact for the Claimants after the theft occurred. Mr. Legaspy interacted with Fernando Haberer and knew that a number of accounts (not Claimants) with Worthless Securities had transferred into InSight from Raymond James within a window of time.

### B. INSIGHT SECURITIES, INC.

Respondent Insight Securities, Inc. is a FINRA registered broker-dealer located in Highland Park, Illinois. When the Claimants received the InSight/Pershing statements after the fact, they had no financial advisor listed on the statements during, but it said "Chicago Institutional Team" on the statements, until the month of the wrongdoing, where it switched to the "Miami Institutional Team."

7

InSight cleared through Pershing LLC on a "fully disclosed basis." InSight has filed a declaratory action in Federal Court in Illinois to determine relative liability between it, Deutsche Bank Securities, Inc., and other entities for other victims.

### C. PERSHING LLC

Respondent Pershing is a FINRA registered broker-dealer located in New Jersey. It was a clearing firm for both InSight Securities and Deutsche Bank, on both sides of the subject transfers.

### D. DEUTSCHE BANK SECURITIES, INC. ("DBSI")

Respondent Deutsche Bank Securities, Inc. is in New York and part of an international financial institution. It has 263 regulatory events, 2 civil events and 12 reported arbitration. It also cleared through Pershing LLC on a "fully disclosed basis." DBSI's affiliate Deutsche Bank Wealth Management has filed an action in New York Federal Court, Southern District, against Rado for the debit balance. As described above, Deutsche Bank has become a haven for and frequently used by money launderers, the institution having numerous regulatory issues in the hundreds of millions and even billions of dollars around the world.

## III.   RELEVANT THIRD PARTIES

### A. BISCAYNE CAPITAL INTERNATIONAL, LLC

Biscayne Capital International, LLC is a formerly FINRA Registered brokerage firm and SEC Registered Investment Advisor, which was the subject of a Cease and Desist Order by the SEC in 2016:

"These proceedings arise out of the failure of Biscayne Capital International, LLC ("BCI"), formerly a U.S. registered investment adviser, to disclose facts giving rise to multiple conflicts of interest and other material information under the Investment Advisers Act of 1940 (the "Advisers Act") in connection with the recommendation and sale of securities issued by private offshore investment companies under common beneficial ownership with BCI (hereinafter "Proprietary Products") to non-U.S. clients between August 2010 and March 2012 (the "Relevant Period"). Three BCI principals – Roberto G. Cortes ("Roberto Cortes"), Ernesto H. Weisson ("Weisson") and Juan C. Cortes ("Juan Cortes") (collectively "the Primary BCI Principals"2 ) – formed entities that issued the Proprietary Products primarily for the purpose of financing South Bay

8

Holdings, LLC ("South Bay"), a Florida-based residential real estate developer, which itself was beneficially owned by Roberto Cortes and Weisson. In turn, South Bay was the majority beneficial owner of BCI during the Relevant Period."

Upon information and belief, Claimants and others' money was used to finance some of the same investments and repay other investors with "other people's money." Securities relating to this SEC Order are the same names as some of the investments in the Rado account, funded in part illicitly with Claimants' assets.

## B. FERNANDO HABERER

Fernando Haberer is a formerly registered person. For six months in 1998, he worked for RD Capital Group, Inc. in Puerto Rico and for just over six months in 2009-2010, he worked at Latam Investments LLC. In Miami, Florida. On his FINRA BrokerCheck, it indicates a relationship with Biscayne Capital, using an address in Uruguay, in which he said he would "guide investors with their portfolio of Latin American Bonds and Securities." Mr. Haberer is not licensed and not a registered investment advisor. He doesn't appear on any of the documents at InSight, although he texts with Insight's President, Mr. Legaspy, instructing him to be ready for the transfer. Insight and Deutsche Bank should have done due diligence on him but did not. Claimants thought he was their advisor, although he had no power of attorney and was not listed on any documents in the Claimants' files at InSight or Pershing.

## C. FRANCISCO NERI

Francisco Neri is listed on Powers of Attorney for Claimants at Insight for Total Advisors and Pro Advisors, but Claimants have never heard of nor spoken to anyone with this name.

## D. PRO ADVISORS, SPAIN AND CAYMAN ISLANDS

An entity by the name of Pro Advisors is listed on transfer instructions and on Ms. Aparain's Power of Attorney, but Claimants have never heard of nor spoken to anyone from this company.

## E. TOTAL ADVISORS, CAYMAN ISLANDS

An entity by the name of Total Advisors is listed on Investment Advisory contracts and on Bralisol's Power of Attorney signed by Francisco Neri, but Claimants believed this company was employing Fernando Haberer, who they believed would be their Power of Attorney.   At all times, Claimants were unaware this entity was in the Cayman Island.

## F. "MADISON ADVISORS"

An entity by the name of Madison Advisors is listed on transfer instructions, but Claimants have never heard of nor spoken to anyone from this company.   Again, no name is given, but there is a mention that if there are questions to contact: to contact@madisonadvisors.com. There is a company named Madison Assets LLC in liquidation in the Cayman Islands which comes up when you put MadisonAdvisors.com in the internet.

## G. REYNALDO FIGUEREDO

Reynaldo Figueredo is a FINRA licensed registered representative at Deutsche Bank Securities Inc. and was the account representative on the Rado account where Claimants' assets wound up, clear up his account's as well as Deutsche Bank's and Pershing's debt problem with the Rado account and from which account a substantial fee was taken after Claimants' funds arrived at DBSI.

10

## IV. STATEMENT OF FACTS & SPECIFIC MISCONDUCT

### A. The Set Up at InSight/Pershing

Maria De Los Angeles Aparain Borjas, her partner RT Levi, and Mr. Levi became acquainted with Fernando Haberer, because he was a remote relative. Mr. Levi was told by Mr. Haberer well into their longstanding relationship to set up the Bralisol company after opening an account at Pershing, in roughly November or December 2016. Mr. Haberer was the brother of the husband of Mr. Romay's (Rado) niece Aneli Tobi. Later, they were told that InSight was involved.

Mr. Levi used Fernando Haberer as an investments advisor for many years without any issues and trusted him, both as a professional and an in-law. Mr. Levi generally gave Mr. Haberer instructions on what to buy and sell. Ms. Aparain and RT Levi had only started using Mr. Haberer less than a year before the bad acts. Both Mr. Levi and Ms. Aparain thought that Mr. Haberer had authorization to effect securities transactions (only) in their account at InSight/Pershing, but actually a person named Francisco Neri purporting to be at "both" "Pro Advisors" in Spain and "Total Advisors" in the Cayman Islands held the Power of Attorney (which document they received when demanded after the fact during their investigation). The simple fact that his information spans two companies in two countries for the same clients, related, working with Mr. Haberer itself should have been a red flag.

Both Claimants InSight/Pershing account statements were only sent to the same non-customer address. For Mr. Levi, there is a request to use a PO Box, but no such request for Ms. Aparain's account, yet the account statements go to the same place nonetheless. FINRA Rule 2340 Customer Account Statements, which requires that the customer receive not less than every calendar quarter a statement of account, including a statement to review the account statement for discrepancies so that they can report any discrepancies. It specifies (emphasis added) that "[i]n the case where the customer's account is serviced by both an introducing and clearing firm, each general securities member must

11

include in the advisory a reference that such reports be made to both firms)." Moreover, FINRA Regulatory Notice 10-19 Consolidated Reports reminds members:

> Many firms, as a service to their customers, provide documents that consolidate information regarding a customer's various financial holdings.1.... FN1 This reporting is most commonly issued by firms that maintain an affiliated investment adviser or by registered representatives who also provide investment advisory services to their customers.

In this case, it was an outside advisor, more expediently requiring statements to the client. The notice goes on to say: "[b]eyond the obvious concern regarding the use of account information for fraudulent activity, even well-intentioned but incautious consolidated reporting could result in customers being misled or confused..." That should have been considered when assessing these suspicious transactions.

Unfortunately, Claimants **trusted** Mr. Haberer and signed powers sent to them by email from Mr. Haberer that had only Insight's name filed in and apparently Mr. Neri's name was added after the forms were signed. No one contacted Claimants as the accounts were opened and on-boarded to InSight, nor did anyone contact them when their assets were "off-boarded" to DBSI. It likewise seems hard to believe that **DBSI**, Pershing and/or InSight spoke to each other about these odd transfers. Respondents took no steps to satisfy FINRA's "know your customer" rules, which are designed to protect both the customer and the firm. Claimants never heard of Mr. Neri, purporting to be an investment advisor at "Pro Advisors" in Spain and in the Cayman Islands and "Total Advisors" in the Cayman Islands. Regardless, the powers of attorney were "limited", i.e., there could not be disbursements by the **POA** holder. Mr. Levi, who owns Bralisol, was a senior citizen, as was his brother, who was a beneficial owner of María's account as well, in just 2017. FINRA warned firms that transactions with powers of attorneys must be highly scrutinized. See Regulatory Notice 17-11, Financial Exploitation of Seniors.[4]

---

[4] "The rule has a broad definition of "financial exploitation." Specifically, financial exploitation would include: (A) the wrongful or unauthorized taking, withholding, appropriation, or use of a specified adult's funds or securities; or (B) any act or omission taken by a person, including through the use of a power of attorney, guardianship, or any other authority,

Claimants were never contacted for verbal, mail, email or text confirmation (or otherwise) relating to the improper transfers. Claimants were never advised that any other accounts may have been set up in their names. Claimants were never advised that they would have any relationship with Madison Advisors or Deutsche Bank before the transfers at issue and their documents at InSight and Pershing clearly reflect that fact.

At InSight, Claimants' only point of contact when the account was active was Mr. Haberer, (after they discovered the fraud it was Carlos Legaspy), but they learned after the fact that their InSight/Pershing statements (which were not going to their address from inception) reflected the "Chicago Institutional Team" through the end of February 2018, and in March 2018, when the wrongful conduct occurred, the account statements reflected the "Miami Institutional Group."

The signatures on the documents provided to Claimants some before and some after-the-fact by InSight are extremely troubling.

In Ms. Aparain's account, the New Account Forms mention Pro Advisors in the Cayman Islands, the POA is with ProAdvisors by Francisco Neri in Spain (no zip code), but the filed consulting agreement is with Total Advisors in the Cayman Islands (with mis-matched titles).

Bralisol's account has some more consistency on the Power of Attorney and Advisory contract both with "Total Advisors", but on Mr. Levi's documents, a telephone number is listed that is not his and attempts at calling it shows that it does not exist.

---

regarding a specified adult, to: (i) obtain control, through deception, intimidation or undue influence, over the specified adult's money, assets or property; or (ii) convert the specified adult's money, assets or property."

## B. The Fraudulent Scheme

### a. Large Debit Problems at Deutsche Bank/Pershing

In March 2018, Mr. Haberer, with the coordinated help of many people and entities, including InSight, Pershing and DBSI, transferred over $12,000,000 of Worthless Securities (with no funds to pay for them) into the Rado account (unknown to Mr. Romay who also received fictitious statements). At the time, the account had existing positions valued at only $8,000,000, so the purported $20,000,000 in securities immediately causing a negative cash position of over $12,000,000, 143% of the account. Apparently to cure that debit/overdraft/margin at Deutsche Bank cleared through Pershing, Mr. Haberer with the help of InSight, Pershing, DBSI and others started transferring in "other people's money" to cover it. The debit and sudden influx of money could not have gone unnoticed by these major institutions. Notwithstanding, the Rado account was wiped out, and Claimants' accounts were pilfered in the mix. When things started unraveling, Mr. Haberer indicated that he had "bad people" after him and would make it right, but, of course, he did not. Mr. Legaspy confirmed that the assets were transferred to DBSI.

### b. Forged Transfer Instructions

On March 15, 2018, "instructions" in both Ms. Aparian's and Bralisol's accounts were given from an email by a no-named-person at backoffice@pro-advisors.net. (See Exhibits H and I) and referenced for questions to reach out to contact@madisonadvisors.com. "Madison Advisors" had no relation to the Ms. Aparain or Bralisol. In the case of Bralisol, the purported "instructions" also references a "Global Plus Acct", also not a known relation to the Claimants. They mention that the transfers were "FFC" to other accounts, typically a banking term, "for further credit", when wiring money. This is not common in transferring securities. Based on InSight's filing in Federal court, other

14

such forged instructions **for** other victims also were made to the tune of $6.1 million on March 8 **and** 15, 2018.

The "instructions" **for** Ms. Aparain **to** transfer assets **to** Deutsche **Bank** were forged, either manually or electronically.

The instructions for Bralisol were forged, either manually or electronically. In any case, he had no documents with **Pro Advisors**, who purportedly emailed **the** forged **and** improper instructions **to** transfer money to Deutsche Bank.

The "instructions" were *apparently* followed by texts between **Mr.** Legaspy and Mr. Haberer, as well as a woman named Veronica Harbide (who Claimants do not know), as follows in translation:

> 03/16/2018
> Veronica harbide
> Caerlos, good morning. We have sent 2 partial transfers to the accounts QGU033450
> and $#@ Dhimitri is indicating that they can't do it unless the client withdraws all
> funds | 9:54am
>
> Fernando haberer
> They're two Argentinean brothers without "props" of mine. They are opening other
> accounts that's why is partial. Please approve. Thank you. | 9:57am
>
> Carlos legaspy
> Approved | 10:16am
>
> Fernando haberer
> Thank you! | 10:18am

See Exhibit **J** translated **and** untranslated (which Claimants obtained after the fact **from** Mr. Legaspy when he was questioned **for** documents).[5] **Even** Pershing questioned the transfers **in an email.** See Exhibit E.

This was done with **the** specific blessing of Mr. Legaspy **in** texts and emails, without even **a call,** text or email to the owners of the account about what clearly was **a** suspicious transaction. Mr. Legaspy was on notice that Mr. Haberer took liberties in client accounts and should have shut him down long before the events that happened, **as** he now **has** done. After what *appears to be* **an** email exchange and

---

[5] The veracity of this document will need to be examined at the hearing in this matter.

conversation between Mr. Legaspy and Mr. Haberer in late 2016, **Mr.** Legaspy criticizes **Mr.** Haberer for doctoring instructions. Mr. Legaspy shows his knowledge of the scheme stating in the email:

I am writing to you through this email because the other one is monitored. These two cases **are** serious since they erode trust. I describe them below:

Devonshire Holdings International Ltd. QGU-▮▮▮ received two transfers of 250,000 each from Credit Suisse from an account under the name of Irene and Ernesto Anahuati.

As a backup we were presented with a contract between "Devonshire Holdings Limited" and the Anahuati's. Let's ignore for a moment that the contract missed the "International", indicates in "Exhibit A" that for services related to a renewable energy project will be paid $700 thousand USD in three payments of $ 250 thousand (with 50 thousand left over).

An Internet site for Devonshire Holdings is presented, which is clone word for word from the Bizcayne Capital site, where it is said that it offers private banking services, not advice for energy projects. To aggravate the matter even more, the signatures are a crude "copy paste".

Another similar case but now for an outflow of resources is the account QGU-▮▮▮ Felix London. The signatures are obviously extracted from another document.

I ask you to please inform your FAs that this behavior is not acceptable, we are not new in this, and we would not like to have to do "call backs" directly to the client to verify asset movements. If we find out, the regulators can do it too.

Let's talk tomorrow.

See Exhibit K.[6]  Further, on May 17 and 30, 2018, Mr. Legaspy spoke with and emailed with Mr. Romay regarding transfers to **Deutsche Bank** from Bralisol's and Ms. Aparain's accounts when Mr. Romay first discovered the fraud and reported it to his family.  See Exhibit L (original text and translated in color).

Interestingly, **just** after the fraudulent transfers, but before Mr. Levi was aware of the situation, Mr. Haberer asked Mr. Levi for money.  InSight/Pershing went through an elaborate process at InSight to transfer money from Bralisol's account to Mr. Haberer, he indicated he needed $1,654 to may his annual maintenance expense.  The scrutiny that the $1,654 transfer went through was much higher than that of the millions of dollars that got transferred to DBSI in the blink of an **eye** with mis-matched forms.  See **Exhibit** M. Likewise, on May 5, 2018, unaware of the theft, Mr. Levi tried **to** purchase new

---

[6] The veracity of this document will need to be examined at the hearing in this matter.

bonds in his InSight account for Bralisol and Mr. Haberer confirmed the purchase in an email, but they were never purchased because the funds were already gone.

Likewise, unaware of the fraud, RT Levi questioned Mr. Haberer about online access around March 19, 2018, which he never received. He asked for statements with positions for his accountant, but also got the run-around on that. In April 2018, RT Levi thought they were purchasing bonds, which Mr. Haberer confirmed, but never happened.

It is not reasonable under FINRA and SEC rules for firms to take email instructions relating to millions of dollars from no-name third parties, some clearly and completely unrelated to the account, without contacting the client. This stands true even if the email purported to have a scanned copy of a not guaranteed/notarized "signed" document. Moreover, if someone is acting with a purported power of attorney, a firm must at least determine if the proper person is acting and that the documents all relate to the same entities in the same countries, which is the most basic failure here. It is more shocking that a person without written authorization to transfer money could text the owner of a brokerage firm to push instructions through, but that seems to have happened.    If even modest safeguards (instead of an inappropriate "sense of familiarity") on these large transactions were taken, this would have been stopped. There was no Know Your Customer due diligence exercised with respect to any of these accounts by any of these Respondents.

FINRA has also repeatedly reminded firms of their supervisory duty to protect investor assets, and specifically with respect to the risks associated with the fraudulent transfer or withdrawal of funds FINRA Regulatory Notice 09-64 states (footnotes omitted, emphasis added):

> NASD Rule 3012 (Supervisory Control System) and Incorporated NYSE Rule 401 (Business Conduct) require all firms to establish, maintain and enforce written supervisory control policies and procedures that, among other things, include procedures that are reasonably designed to review and monitor the transmittal of funds (e.g., wires or checks) or securities. . . .The policies and procedures a firm establishes under these rules

must include "a means or method of customer confirmation, notification or follow up that can be documented." . . . .

These rules apply to both clearing and introducing firms. While firms may allocate responsibility for complying with particular requirements between the clearing and introducing firms, both firms must have policies and procedures in place to ensure that their respective responsibilities are met. For example, the firms may agree that the introducing firm is responsible for verifying a customer's identity. However, the clearing firm must still have adequate policies and procedures to review and monitor disbursements it makes to third-party accounts, outside entities or an address other than the customer's primary address. . . . .

Additionally, a firm's policies and procedures should include procedures that are reasonably designed to, among other things:

➤ Verify that any third party who purports to be acting on behalf of a customer, including any family member, third-party investment advisor or money manager, has been authorized by the customer to take the action in question. Typically, this requires firms to verify that a valid power of attorney has been executed by the customer and that actions taken by the third party are within the scope of the authority conveyed.

➤ Verify the identity of a person who appears in person to receive assets and who claims to be the customer.

➤ Adequately document the steps taken to verify the information listed above and maintain that documentation in accordance with applicable books and records requirements.

➤ Identify and respond to red flags or suspicious activity.
. . . . While firms' procedures must be designed to detect and respond to unusual or suspicious activity, firms must also take into account that fraudulent activity can often flourish when employees fall into a sense of familiarity or routine that can be exploited either by other employees or third parties. Therefore, firms must train their employees to follow all applicable policies and procedures rigorously, even in what appear to be routine situations. . . . . In addition, firms should closely monitor the use of standing instructions, including standing letters of authorization. Parameters for the instructions should be clear and the authorization kept current. . . . .

FINRA Regulatory Notice 12-05 further states:

"The policies and procedures a firm establishes under these rules must include 'a means or method of customer confirmation, notification or follow up that can be documented." p. 2.

"Among other things, FINRA recommends that such policies and procedures should:

- include a method for verifying that the email was in fact sent by the customer; and

- be designed to identify and respond to "red flags," including transfer requests that are out of the ordinary, requests that funds be transferred to an unfamiliar third party account,[7] or requests that indicate urgency or otherwise appear designed to deter verification of the transfer instructions." P.2

Because of the negligence and failure to follow important FINRA Rules and guidelines around suspicious transactions, the fraudulent scheme flourished and "instructions" on Ms. Aparain's account resulted in $762,968.41 worth of transfers to Deutsche Bank ultimately resulting in a transfer to the Rado account to satisfy a margin debt for which she had no responsibility and did not authorize. With the same negligence and failures to follow important FINRA Rules and guidelines, "instructions" on Bralisol's account resulted in $1,623,484.61 worth of transfers to Deutsche Bank ultimately resulting in a transfer to the Rado account to satisfy a margin debt for which Bralisol had no responsibility and did not authorize.

---

[7] FINRA adds a footnote here as follows: "In this regard, firms might consider having customers indicate in writing parties to whom they might make transfers as a check against unfamiliar third party transfers."

## CAUSES OF ACTION

All brokerage firms are required to **know their customers, including** every person with a power of attorney. FINRA **Rule** 2090. Know Your Customer ("Every member shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer **and** concerning the authority of each person acting **on** behalf of such customer.")

All brokerage firms are also **required to know every transaction** per FINRA Rule 3110/3120; FINRA Rule 3110(b)(2) (Review of Member's Investment Banking and Securities Business) is based on NASD Rule 3010(d)(1), requires a firm to have supervisory procedures for the review by a registered principal, evidenced in writing, of all transactions relating **to the firm's** investment banking or securities business. A firm holding **and** managing the transaction **of** securities cannot become a facilitator **for** fraud.

From an AML perspective, firms are **required to be** skeptical when dealing with foreign accounts and foreign advisors/powers of attorney ("POA"), because of international money laundering and money going out **of** various countries and the US, beyond SEC control. https://www.sec.gov/about/offices/ocie/amlsourcetool.htm

## I.    BREACH OF CONTRACT

### A.    Common Law

Claimants entered **into** various written and implied contracts with Respondents. These contracts provided that the Respondents would supply brokerage services in a legal, ethical and professional manner in accordance with applicable statutes, rules and regulations of the securities industry, including the FINRA Rules. In transacting business with the Claimants, Respondents, *inter alia*, **agreed,** contracted and undertook expressly and/or impliedly:

20

1. To observe faithfully the statutes, laws, **rules and** regulations of the **federal** and state authorities and of the self-regulatory organizations and markets of which they are members;

2. To deal with Claimants fairly and honestly and in complete good **faith;**

3. To act in the best interest of Claimants;

4. To render truthful, accurate, complete and honest services and statements and not to mislead Claimants;

5. To keep and carefully maintain Claimants' funds and properties, including protecting his assets by knowing the customer, monitoring Claimants' account for red flags and suspicious activity that could compromise his account security, verifying changes to account information by notifying and checking with Claimants, and actively assisting Claimants after the breach to his account by either reimbursing his lost funds or mitigating the loss by providing him with help or resources to do so, including but not limited to reviewing and preserving insurance policies that could cover the loss, referring Claimants to the FTC's identity theft hotline or other available help resources, and preventing any future debt collection or other automatic withdrawals from the account; and

6. To provide truthful, accurate and complete information to Claimants concerning his account.

With respect to all of the above, Respondents breached its agreements with Claimants. Amongst other breaches herein alleged, Respondents failed to prevent withdrawals from Claimants' accounts and suspicious transactions. Despite Claimants asking Respondents to remedy even this smaller part of the injustice, the firm failed to act.

The law in force at the time of the contract is part of the contract. *See Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F.Supp 1529, 1541 (S.D.N.Y. 1983). The failure to comply with self-regulatory organization rules (such as FINRA) is a breach of contract where the agreement provides for compliance. *See Komanoff v. Mabon, Nugent & Co.*, 884 F.Supp. 848, 859–60 (S.D.N.Y 1995); *see also, Rolf v. Blyth Eastman Dillion & Co.*, 424 F.Supp. 1021 (S.D.N.Y. 1977). Respondents unquestionably breached its express contracts with Claimants.

## B.    Violation of Industry Rules

In addition to Respondents' violations of statutory law, Respondents further breached its contract with Claimants by violating other FINRA rules it agreed to and was obligated to follow.

### 1.    FINRA Rule 2010 - Commercial Honor and Good Faith

Pursuant to the FINRA Rules, Respondents was required in its dealings with Claimants to "observe high standards of commercial honor and just and equitable principles of trade." FINRA Rule 2010. FINRA Rule 2111 makes clear that "[i]mplicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing." Respondents failed to comply with industry rules, guidance and best practice to protect Claimants' assets from theft and was negligent in monitoring for and responding to suspicious activity relating to and within his account. Objectively, it cannot be said that Respondents dealt fairly with Claimants, and in failing to do so caused substantial losses to Claimants.

Respondents' representatives further failed to assist Claimants in any way after he had reported the account breach.

### 2.  FINRA Rule 2090 - Know Your Customer

Firms have an obligation to protect investors not just at account opening, but throughout the life of the account. FINRA Rule 2090, otherwise known as the "Know Your Customer" rule, requires that every firm "shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer." *See* FINRA Rule 2090 (emphasis added).

Pursuant to Regulatory Notice 14-10 from March 2014, FINRA's guidance to member firms is explicit that this continuing obligation to maintain the investor's account is not limited to just a

22

customer's account objectives and risk tolerances, **but also** the customer's personal account and contact information:

> Similarly, with respect to changes of customer account information, a firm must have procedures to monitor all changes of customer account information and not only address and investment objective changes. Examples of other changes to customer account information would include, without limitation, changes to a customer's name, marital status, telephone, email or other contact information.[8]

Respondents violated FINRA **Rule** 2090 because **it failed** to know **its** customer and **use** reasonable diligence in the maintenance of Claimants' accounts. In fact, Respondents exercised **no** diligence at all. **The** firm also failed to act with respect **to the irregular** and suspicious account transactions, which occurred so close in time to the changes of his account information.

### 3. FINRA Rule 3110 – Supervision

FINRA Rule 3110 requires that each member **firm** "shall establish **and** maintain **a** system **to** supervise the activities of each associated person that **is** reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules." Subsection 3110(c)(2)(A) specifically requires **that** the system of supervision and the business **in** which it engages be regularly inspected and reviewed for supervisory policies and procedures concerning:

> (i)   Safeguarding of customer funds and securities;
>
> (ii)   Maintaining books and records;
>
> (iii)   Supervision of supervisory personnel;
>
> (iv)   Transmittal of funds (e.g., wires or checks, etc.) or securities from customers to third party accounts; from customer accounts to outside entities (e.g., banks, investment companies, etc.); from customer accounts to locations other than a customer's primary residence (e.g., post office box, "in care of" accounts, alternate

---

[8] FINRA Regulatory Notice 14-10 – Consolidated Supervision Rules – SEC Approves New Supervision Rules, at: http://www.finra.org/sites/default/files/NoticeDocument/p465940.pdf. **p.** 10.

address, etc.); and between customers **and** registered representatives, including the hand-delivery of checks; and

(v)    Changes to customer account information, including address **and** investment objectives changes and <u>validation</u> of such changes.

FINRA Rule 3110(c)(2)(A)(i)-(v).

Thus, like its violation of FINRA's Know Your Customer **rule**, Respondents similarly violated FINRA Rule 3110 by failing to supervise the changes **to** Claimants' account and failing **to** reasonably validate the changes to **his** online customer information.

## 4.    Rules and Related Guidance involving AML, Suspicious Transactions & Theft

Respondents failed to heed FINRA carrying/custodial, anti-money laundering and identity theft rules, guidelines and notices that would have stopped this conduct in its tracks, including but not limited to FINRA Rules 3120 (Supervisory Controls), 3310 (Anti-Money Laundering[9]), 11720 (Stolen Securities), 11721 (Obligations of Members Who Discover Securities in Their Possession to Which They Are Not Entitled), 4311 (Carrying Agreements), 2111 (Suitability's Fair Dealing requirements) and 2340 (Customer Account Statements).

Respondents also failed to heed important FINRA Industry Guidelines, **such as** Regulatory Notices 09-64 (Customer Assets Verification of Instructions **to** Transmit or Withdraw Assets from Customer Accounts), 08-69 (Fair and Accurate Credit Transactions Act **of** 2003), 12-05 (Customer Account Protection) **and** 10-19 (Consolidated Reports).

---

[9] FINRA Rule 3310 (AML Requirements):

(f) Include appropriate risk-based procedures for conducting ongoing customer due diligence, to include, but not be limited to:

    (i) Understanding the **nature and purpose** of customer **relationships** for the purpose of developing a customer risk profile; and

    (ii) Conducting ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and **update customer information**. For purposes of paragraph (f)(ii), customer information shall include information regarding **the** beneficial owners **of** legal entity customers (as defined in **31 CFR** 1010.230(e)).

All these rules apply to both introducing brokers (InSight and DBSI), as well as clearing firms (Pershing).

## II.   COMMON LAW AND STATUTORY FRAUD: AIDING AND ABETTING

Respondents acted as a co-conspirator to the fraud perpetuated on Claimants. To the extent Respondents deny actual knowledge, it was willfully/recklessly ignorant of Haberer's conduct, allowing it to continue under the guise of legitimacy, and thus aided and abetted the fraudulent scheme.

Respondents had the responsibility to not effect any fraudulent transactions, but was without adequate policies and procedures in place, so its practices and courses of business which operated as a breach of such responsibility.

Respondents, directly and indirectly, defrauded Claimants through the use of the mails and other means and instrumentalities of interstate commerce and in connection with the transfer of securities.

The Claimants justifiably relied upon all statements and representations made to them by Respondents as to their expertise and their ability to custody Claimants accounts.

Aiding and Abetting liability can be found by third parties in cases involving Ponzi schemes. In *Coquina Invs. v. Rothstein*, 10-60786-Civ, 2012 U.S. Dist. LEXIS 139947 (S.D. Fl. Sept. 28, 2012), the court denied the defendants' post-trial motion for a new trial, citing the defendant bank's knowledge of the presence of red flags in the plaintiff's case and ignoring such red flags. In *Arreola v. Bank of America, N.A.*, CV-11-06237, 2012 U.S. Dist. LEXIS 144765 (C.D. Ca. Oct. 5, 2012), a case involving a Ponzi scheme where the scheme targeted working class, Spanish-speaking families and encouraged them to use the equity in their homes to invest in fraudulent notes carrying high rates of return, the court denied the defendant's motion to dismiss, holding that the bank had actual knowledge of and ignored red flags that were present, instead choosing to enjoy the benefits of the financial relationship.

25

Here, Respondents similarly acted only upon its self-interest in the presence of red flags to the detriment of Claimants, who it knew were relying upon them. Such conduct was the direct and proximate cause of damages to Claimants.

## III. BREACH OF FIDUCIARY DUTY

Respondents owed Claimant a fiduciary duty, and that duty was breached, for the reasons described above. Respondents as Claimant's agents, owed a common law fiduciary duty of care, a duty of loyalty, a duty to account, a duty of obedience, and a duty of disclosure as well as a duty to act in the highest good faith toward their public customer. Under applicable principles of New York Agency Law, an agent does not have title to a principal's property and is subjected to the control of the principal. Moreover, "[s]ecurities dealers owe a special duty of fair dealing to their clients." *SEC v. Hasho*, 784 F. Supp. 1059, 1107 (S.D.N.Y 1992).

Respondents had an obligation to Claimant but instead operated for their own personal benefit to Claimant's detriment.

### Aiding and Abetting Breach of Fiduciary Duty

Respondents induced and/or participated in the breach of a fiduciary duty to Claimant. Accordingly, Respondents aided and abetted the breach of that fiduciary duty. As a result, Respondents are liable to Claimant for the losses incurred. *See, Kaufman v. Cohen*, 307 A.D.2d 113 (1st Dep't 2003).

### IV. NEGLIGENCE

As a registered FINRA member firm, Respondents had the duty to abide by the FINRA Rules in servicing Claimants' account. Industry rules, including those of FINRA and the SEC, set forth the standard of care used by securities industry professionals and the duty of care owed by Respondents to Claimants. *Remington v. Newbridge Sec. Corp.*, 2013 U.S. Dist. LEXIS 79082, at *18-19 (S.D. Fla. June 5, 2013) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F. Supp. 1224, 1228

(D.D.C. 1988) (stating that broker dealers are under "a duty to act in accordance with the standard of care used by other professionals in the community."); *see also, Miley v. Oppenheimer & Co. Inc.*, 637 F.2d 318, 333 (5th Cir. 1981).

Respondents owed Claimants a duty of care and failed to act accordingly. **Failure to** abide by and comply with SEC, FINRA, and other regulatory rules may provide evidence of breach of the duty of care owed to customers by a broker dealer. Respondents failed to adequately monitor and respond to red **flags** and suspicious activity within Claimants' account, failing even to perform a simple check of comparing information on multiple forms. Respondents failed to contact Claimants at prior phone numbers, or even send **a simple email** to the original email address, which **had been on file** with Respondents. Thus, Respondents utterly failed in its duty of care to Claimants. Respondents' **failure to** fulfil its duty was unreasonable **and** not within **the** standard **of** care that broker dealers owe their customers.

The burden of proving good faith **is** placed upon Respondents and **the** various control persons and thus, at a minimum, Respondents must establish that there was no negligence **in** its supervision. *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir. 1980), *cert. denied*, 449 U.S. **1011** (1980). Entities and persons who control the broker dealer **are** held liable under the Exchange Act, Section 20(a). Furthermore, FINRA **Rule** 3110 specifically requires firms to adopt and comply with procedures concerning transmittals of customer funds, which include **a** means **of customer** confirmation, notification, and determining the authenticity of the transmittal instructions.

Here, Respondents have the burden to establish that there was no negligence in **its** supervision and that it a) has a system of reasonable supervision and b) complied with it. Despite the unusual account activity and red flags, **no** person or supervisor from Respondents **ever** contacted Claimants to

confirm, notify, or verify the authenticity of the account changes and the wire transfer instructions in or relating to his account.

By virtue of the foregoing conduct of Respondents, Respondents failed to supervise Claimants' account and violated FINRA and other industry rules and is liable for the same. As a result thereof, Respondents are liable for any resulting losses suffered by Claimants.

## DAMAGES

### I. COMPENSATORY DAMAGES

Respondents' improper conduct caused the losses which constitute the damages in this case in an amount of no less than $ $762,968.41 plus lost interest, dividends and appreciation for Ms. Aparain's account and $1,623,484.61 plus lost interest, dividends and appreciation for Bralisol's account.[10]

### II. ATTORNEY'S FEES AND COSTS ARE APPROPRIATE

It is well recognized that an arbitrator has the authority to grant legal fees. *See, e.g., Synergy Gas Co. v. Sasso*, 853 F.2d 59 (2d Cir. 1988), *cert. denied*, 488 U.S. 994 (1988). In addition, it has been consistently held that where the Submission Agreements of each of the parties incorporate the Statement of Claim, if the Statement of Claim requests attorney's fees, it constitutes the agreement of the parties to empower the arbitrators to decide the issue of attorneys' fees. *See, e.g., First Interregional Equity Corp. v. Haughton*, 842 F.Supp. 105 (S.D.N.Y. 1994); *U.S. Offshore, Ltd. v. Seabulk Offshore, Ltd.*, 753 F.Supp. 86 (S.D.N.Y. 1990); *Ferrucci v. McLaughlin, Piven, Vogel Securities, Inc.*, 67 A.D.3d 405 (1st Dep't 2006) (handled by Claimant's counsel Malecki Law through appeal).

Claimants sufficiently alleged consumer-oriented misconduct. *See Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 N.Y.2d 20, 24-27 (N.Y. 1995); *see also, Gaidon v Guardian Life Ins. Co.*, 94 N.Y.2d 330, 344-345 (N.Y. 1999); *New York Univ. v Continental Ins. Co.*, 87 N.Y.2d

---

[10] Claimant reserves the right to amend the damages if the facts warrant during discovery and at hearing.

308, 320 (N.Y. 1995). Given **G.B.L.** § 349(b)'s explicit prohibition of any **firm's** "acts or practices stated to be unlawful" and the New York Court of Appeals' characterization of the statute as "applying to virtually all economic activity," *see Small v. Lorillard Tobacco Co.*, **94** N.Y.2d 43, 55 (N.Y. 1999), there is **no** basis for invoking any blanket exception under the statute **for** securities transactions, *see, Breakwaters Townhomes Assn. of Buffalo v Breakwaters of Buffalo*, 207 A.D.2d 963 (4th Dep't 1994) or for limiting the statute's applicability to the **sale** of "goods." *See Scalp and Blade v. Advest et al.*, 2001 N.Y. App. Div. LEXIS 2746 (4th Dept. 2001).

Further, as described above, SEC Regulation **S-ID,** 17 CFR 248.201(d)(2), requires firms **to** assist the customer by mitigating the misconduct. Respondents in fact did the opposite of mitigation by failing to take a **single** step to rectify his situation and make **him** whole. Claimants certainly did his part through taking comprehensive and substantial steps to mitigate his losses. But Respondents took no such steps, which caused Claimants to incur *more losses* by forcing him to hire **his** own legal counsel **to** break through Respondents' stonewall of "the lawyers are handling it now."

In calculating **the** amount of the attorney's fees award, the Panel may simply award **a** percent of the amount recovered. **It** is not necessary for counsel to submit a statement setting forth the hours spent and rate of compensation. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).

## **III.**   **INTEREST IS APPROPRIATE**

Claimants should be awarded **a fair** rate of interest **on the net** loss at the legal rate **of** 9% compounded. *See* N.Y. C.P.L.R. §§ 5001-5004. Money verdicts, breach of contract, interference with possession or enjoyment of property, include interest at the legal rate from the date the cause of action first existed or the date the damage was incurred. *Id*. This case is no different from the types of cases in which interest is awarded in the state "in which pre-verdict interest has been held to be recoverable as a matter of right." *DeLong Corp. v. Morrison-Knudsen Coo.*, 14 **N.Y.2d 346,** 348 (N.Y. 1964).

**WHEREFORE**, as a direct **and** proximate result **of** the forgoing conduct **of** Respondents, Claimants has been injured and seeks compensatory in the amount of not less than $2,386,453, plus statutory interest at 9% from the date of filing this claim, punitive damages, lost bond interest on the stolen bonds, attorneys' fees and costs.

**Dated:** New York, New York
August 7, 2018

*Respectfully submitted.*

**MALECKI LAW**

By: *Janice L. Malecki*

Jenice L. Malecki, Esq.
Darryl J. Bouganim, Esq.
*Attorneys for Claimants*
11 Broadway, Suite 715
New York, New York 10004
(212) 943-1233 Telephone

30

# EXHIBIT A

**BUSINESS INSIDER**

TECH   FINANCE   POLITICS   STRATEGY   LIFE   INTELLIGENCE   ALL





# Deutsche Bank report reveals shortcomings in its screening process, raises anti-money laundering concerns

 Edward Taylor, Tom Sims, John O'Donnell, Reuters Aug. 3, 2018, 6:40 PM





A statue in front of the former headquarters of Germany's largest business bank, Deutsche Bank in Frankfurt, January 28, 2013. REUTERS/Kai Pfaffenbach

- Deutsche Bank has uncovered shortcomings in its ability to fully identify clients and the source of their wealth.
- The bank was previously fined nearly $700 million for allowing money laundering.
- Sample tests of investment bank customer files from several countries, including Russia, revealed gaps in the bank's screening process.

1

○ Deutsche Bank is under pressure after three consecutive years of losses, and it agreed to pay a $7.2 billion settlement with the US for its sale of toxic mortgage securities in the run-up to the 2008 financial crisis.

FRANKFURT (Reuters) - Deutsche Bank has uncovered shortcomings in its ability to fully identify clients and the source of their wealth, internal documents seen by Reuters show, more than a year after it was fined nearly $700 million for allowing money laundering.

In two confidential reviews, dated June 5 and July 9, Germany's biggest lender detailed the results of tests on a sample of investment bank customer files in several countries, including Russia.

Both reviews found gaps in Deutsche's screening process, which aims to meet so-called "Know Your Customer" (KYC) requirements that are a cornerstone of global anti-money laundering controls.

Regulators around the world require banks to vet customers so that criminals cannot mask their identity through complex company and ownership structures to launder money or sidestep international sanctions.

The two recent reviews show how the bank is still grappling with procedures to ensure it knows who it is dealing with, in part because of staff turnover.

In the 13-page June report, which was shared with the European Central Bank (ECB), Deutsche Bank found a pass rate of zero percent in countries such as Russia, Ireland, Spain, Italy and South Africa when it checked how client files had been processed.

The pass rate measures the percentage of files that meet the bank's own "Know Your Customer" standards. Deutsche Bank strives for 95 percent, according to the documents.

Hui Chen, a former compliance expert with the US justice department, said that this target was roughly in line with other global banks.

The bank told Reuters that the reviews showed its processes were too complex, but said it was making improvements and that overall controls to prevent crimes such as money laundering were effective.

"We still need to improve in terms of internal processes," it said, when presented with the findings of the reviews.

"What the documents show is that our internal processes are still too complicated," it said. "So it is not about effectiveness, but about the efficiency of our processes."

2

Deutsche executives met with the ECB, the euro zone's banking supervisor, in late July, to discuss its control procedures, according to one source with knowledge of the matter. The ECB and Germany's regulator BaFin declined to comment.

Banks have been fined billions of dollars for lax oversight, including the failure to identify customers.

In January 2017, Deutsche Bank agreed to pay US and UK regulators $630 million in fines over artificial trades between Moscow, London and New York that authorities said were used to launder $10 billion out of Russia.

The US Federal Reserve fined the bank an additional $41 million for failing to ensure its systems would detect money laundering in May 2017.



Workers sweep leaves outside Deutsche Bank offices in London, December 5, 2013. REUTERS/Luke MacGregor

## Under pressure

Deutsche Bank is under pressure after three consecutive years of losses, and it agreed to pay a $7.2 billion settlement with US authorities last year over its sale of toxic mortgage securities in the run-up to the 2008 financial crisis.

The bank has also undergone management changes and a recent strategic overhaul that includes thousands of job cuts and scaling back its global investment bank.

In Russia, the June report outlined problems including a "lack of verification of client address and existence" and a "lack of verification to be able to make an assessment of the client's source of funds".

It also identified a lack of investigation into whether a client was a "politically exposed person" (PEP).

Rules to fight financial crime require banks to identify such people because they present a higher risk of bribery or corruption by virtue of their position. These political figures could also be the target of international sanctions.

In their 2017 ruling against Deutsche Bank for 'mirror' trades, New York financial regulators criticized the lender for "widespread and well-known weaknesses in its KYC processes", singling out its Russia operations for shoddy standards.

The issue remains sensitive because an investigation by the US Department of Justice into the case is ongoing.

In a written response to Reuters, Deutsche Bank said: "We are not struggling with procedures designed to help prevent criminals from money laundering and other criminal action.

"Our procedures to identify potential anti-money laundering and KYC risks are very effective," it said of group-wide controls.

The bank has multiple layers of defense to spot crime, such as monitoring fund movements for suspicious transactions, a person close to the matter said.

4



Deutsche Bank CEO Christian Sewing. Reuters/Kai Pfaffenbach

## Backlog

Christian Sewing, who became the bank's chief executive in April after a management shake-up, has vowed to address weaknesses in the bank's controls.

In June, he said the weaknesses had "arisen over many years ... We're not yet where we want to be, but we're steadily getting there."

Deutsche plans to work with regulators on deadlines for improving its procedures, the person with direct knowledge of the matter said.

The internal documents show the scale of the challenge and highlight practical difficulties that arise as a result of staff changes in the United States and Ireland.

"This is a new team," the June report said, referring to Spain. For the US, it wrote: "US has experienced high attrition rates and teams are still maturing in terms of capability against a backdrop of backlogs."

Deutsche said it was "not constrained by headcount", that it had increased the number of staff involved in KYC and that staff turnover was not above average.

It has also made improvements. The July report showed the pass rate in Russia improving to 67 percent after it hired auditors to help with customer checks.

5

But additional shortcomings emerged elsewhere. Reviews of the KYC procedures in the document resulted in lower pass rates in six of 14 locations highlighted, including in the Netherlands and the United States.

Additional reporting by Arno Schuetze and Andreas Framke in Frankfurt and Jesus Aguado Gonzalez in Madrid; editing by Silvia Aloisi and Mike Collett-White

Source: https://www.businessinsider.com/deutsche-bank-anti-money-laundering-report-2018-8?utm_source=copy-link&utm_medium=referral&utm_content=topbar&utm_term=desktop

(Last visited August 7, 2018).

6

# EXHIBIT B

NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

In the Matter of

DEUTSCHE BANK AG and
DEUTSCHE BANK AG NEW YORK BRANCH

## CONSENT ORDER UNDER
## NEW YORK BANKING LAW §§ 39, 44 and 44-a

The New York State Department of Financial Services (the "Department"),
Deutsche Bank AG and Deutsche Bank AG New York Branch (the "New York Branch"),
(together, "Deutsche Bank," or the "Bank"), agree:

### Introduction

### The Culture of Compliance in the Age of Risk

1.      Global financial institutions serve as the first line of defense against illegal
financial transactions in today's fast-paced, interconnected financial network. New York
and federal law require these institutions to design, implement, and execute policies and
systems to prevent and detect illegal financial transactions. The Bank Secrecy Act
("BSA"), for example, requires these institutions to report suspicious transactions (via
"Suspicious Activity Reports" or "SARs") to the U.S. Treasury Department's Financial
Crimes Enforcement Network ("FinCEN"), enabling law enforcement to conduct
investigations that result in the future interdiction of these transactions and, ultimately,
prosecution or the blocking of bad actors. The BSA likewise requires financial institutions
to have adequate anti-money laundering ("AML") systems in place.

1

2.     New York law imposes these same requirements on its regulated financial institutions.[1] Specifically, the law obligates financial institutions to devise and implement systems reasonably designed to identify and block suspicious activity and transactions prohibited by law.  Each institution is expected to configure a system based on the particular risks faced by the institution, considering such factors as its size, geographical reach, and specific lines of business.  Moreover, the institution must employ or engage sufficient numbers of trained compliance professionals to ensure that its systems run properly.

3.     To strengthen anti-money laundering efforts, New York law imposes additional requirements on regulated institutions, obligating them to maintain effective programs to monitor and filter transactions to screen for money laundering and bar transactions with sanctioned entities.[2]  Additionally, to both protect consumers and the safety and soundness of financial institutions, the Department has proposed regulations requiring regulated entities to adopt a series of measures to prevent against cyber attacks.[3]

4.     Ultimate responsibility for design and implementation of such policies and systems belongs at the institution's top echelon.  The board of directors and senior management must devote careful study to the design of the anti-money laundering and other compliance systems that lie at the core of this first line of defense, and must ensure sufficient resources to undergird these systems and structures.  Adequate staffing must be put in place, and training must be ongoing.

---

[1] *See, e.g.*, Part 115 of the Superintendent's Regulations (3 NYCRR 115), Part 116 (3 NYCRR 116), Part 416 (3 NYCRR 416) and Part 417 (3 NYCRR 417).

[2] *See* Part 504 of the Superintendent's Regulations (3 NYCRR 504).

[3] *See* Part 500 of Title 23 of the Superintendent's Regulations (23 NYCRR 500 eff. March 1, 2017).

2

5. <u>Summary of Findings</u>: As set forth more fully below, this Consent Order addresses serious compliance deficiencies identified in the Department's investigation that spanned Deutsche Bank's global enterprise. These flaws allowed a corrupt group of bank traders and offshore entities to improperly and covertly transfer more than $10 billion out of Russia, by conscripting Deutsche Bank operations in Moscow, London and New York to their improper purpose.

6. The suspicious security trading schemes identified – termed "mirror trades" – permitted this corrupt consortium to move very large sums of money out of Russia under the radar and without the scrutiny of Deutsche Bank's compliance function. By converting rubles into dollars through security trades that had no discernible economic purpose, the scheme was a means for bad actors within a financial institution to achieve improper ends while evading compliance with applicable laws.

7. Afflicted with inadequate AML control policies, procedures, and structures, Deutsche Bank missed several key opportunities to identify and interdict this scheme. Moreover, the suspicious mirror-trading machinations occurred at a time Deutsche Bank was on clear notice of numerous deficiencies in its BSA/AML systems and management, and yet the steps it took to remediate the situation proved seriously inadequate.

8. For these reasons, the Department has entered into this Consent Order with the consent and agreement of Deutsche Bank to resolve this matter as set forth below and without further proceedings.

## Factual Findings

### The Mirror-Trading Scheme at Deutsche Bank's
### Moscow, London and New York Offices

9.     The "Mirror-Trading" Scheme: The "mirror trading" scheme at issue here was simple and effective. Deutsche Bank Trust Company of the Americas ("DBTCA"), an entity located at 60 Wall Street, New York, New York which is licensed and supervised by the Department, was the entity through which the U.S. dollar payments flowed to the suspicious entities involved here.

10.     Operating through the securities desk at Deutsche Bank's Moscow affiliate ("DB-Moscow"), certain companies that were clients of that desk routinely issued orders to purchase Russian blue chip stocks, always paying in rubles. The size of the typical order ranged in value from $2 to $3 million.

11.     Shortly thereafter – indeed, sometimes the very same day – a related counterparty would sell the identical Russian blue chip stock in the same quantity and at the same price through Deutsche Bank's London branch ("DB-London"). The counterparties to the trade were actually closely related on both sides, such as through common ownership.

12.     None of these "mirror trades" demonstrated any legitimate economic rationale. The counterparties frequently lost money on these trades, due to fees and commissions that were substantially credited to DB-Moscow by Deutsche Bank pursuant to the brokerage arrangements between Moscow and London.

13.     For example, typically, it made no difference to the counterparties the particular security to be bought or sold. All that mattered was that there was a matching trade available. In one instance, a counterparty representative, who was buying shares for

4

one counterparty and selling the identical shares for a related counterparty, told a DB-Moscow trader, "*I have a billion rouble today . . . . Will you be able to find a security for this size?*"

14.    In another case, a counterparty representative, when told by a DB-Moscow trader there were no Sberbank Russian shares available for a mirror trade, immediately switched the order to Gazprom Russian shares. No rationale for this switch was apparent; no trading hypothesis was offered.

15.    Moreover, a number of the selling counterparties were registered in offshore territories, like Cyprus or the British Virgin Islands.[4] The seller would be paid for its shares in U.S. dollars, which were routinely cleared through DBTCA. Thus, by virtue of this scheme, the counterparties were able to surreptitiously convert rubles into U.S. dollars using Deutsche Bank.

16.    While offsetting trades are not inherently illegal, where – as here – they lack obvious economic purpose and could be used to facilitate money laundering or other illicit conduct, they are highly suggestive of financial crime.

17.    The scheme was well-developed, running between 2011 and early 2015. At least 12 entities were involved in these suspicious trading activities, and the entities were

---

[4] Conducting business with counterparties registered in offshore territories can be risky, and offshore registration may, in and of itself, warrant enhanced due diligence measures. In general, offshore financial centers are lightly regulated, are historically reputed to be "tax havens," and permit customers a far greater amount of confidentiality than financial institutions in onshore jurisdictions, especially as to the identity of ultimate beneficial owners. Thus, offshore financial centers often have been associated with illegal money laundering activity and typically warrant higher levels of scrutiny. *See, e.g.,* Department of the Treasury, *National Money Laundering Risk Assessment* (2015), https://www.treasury.gov/resource-center/terrorist-illicit-finance/Documents/National%20Money%20Laundering%20Risk%20Assessment%20%E2%80%93%2006-12-2015.pdf; U.S. Department of State's International Narcotics Control Strategy Report, *Money Laundering and Financial Crimes* (Mar. 1, 2001), https://www.state.gov/j/inl/rls/nrcrpt/2000/959.htm.

closely related, linked, for example, by common beneficial owners, management, or agents. Certain individuals were employed by several of the different counterparties. For example, one person was the chairman of the Board of Directors of one entity, as well as the beneficial owner of another entity – which was itself the 100 percent shareholder of the first counterparty. Similarly, several counterparties were registered at the same address.

18.     "One-Legged" Trades: The DB-Moscow securities desk also facilitated a second type of suspicious trading activity with the same suspect counterparties -- trades that appeared to be one leg of a mirror trade that may have involved a second (unidentified) financial institution to execute the other leg ("one-legged trades"). These trades were almost entirely buy transactions involving the same counterparties involved in the mirror trades.

19.     Roughly the same group of traders involved with the DB-Moscow securities desk also performed these one-legged trades. Moreover, the payments made by Deutsche Bank for these counterparties – which likewise flowed through DBTCA – were made almost entirely to accounts at banks outside of Russia and the U.K.

20.     Active Facilitation by DB-Moscow Traders: The evidence is clear that DB-Moscow traders knowingly and actively facilitated both of these trading schemes.

21.     For example, most of the subject trades were placed by a single trader representing both sides of the transaction. The DB-Moscow trader would execute the sell side of the trade, helping the suspicious Russian counterparty acquire Russian securities, settled in rubles. The same DB-Moscow trader then would buy the identical quantity of the same stock from DB-London's customer as an over-the-counter trade, settled in U.S.

dollars. The DB-Moscow trader would directly book the trade to the DB-London trading book via a remote booking function.

22. This "remote-booking" feature was central to the scheme, permitting the Moscow traders to carry out the mirror trades without any effective supervision or compliance review in London. This way, the scheme stayed under the radar.

23. Traders on the DB-Moscow desk sometimes would go to significant lengths to facilitate the suspicious trades. When Deutsche Bank suspended one of the counterparties involved in the scheme, for example, DB-Moscow traders continued to effectuate the mirror trades by pre-arranging the timing of the bid and offers with the suspended counterparty on the Russian Moscow Exchange (MICEX).

24. When one trader on the Moscow desk expressed concern about the lack of any economic rationale behind these numerous trades, colleagues on the desk assured the concerned trader that these trades had been sanctioned by a supervisor. When other traders raised similar issues about the suspicious trading activity, the supervisor was dismissive of their concerns.

25. **Greed and Corruption Motivated the DB-Moscow Traders**: In 2006 and 2007, the yearly revenues generated for Deutsche Bank by the Russian business line at issue here approximated €169 million and €123 million, respectively. Following the global financial crisis in 2008 and Deutsche Bank's internal restructuring, that profit decreased at least by half, putting pressure on traders to increase revenue.

26. An easy commission scheme was attractive for the traders on the Moscow securities desk. Traders conceded they did not forcefully question these suspicious trades, because they were earning commissions at a time when trading had dramatically slowed.

7

One trader admitted that the trader was largely "focused on [] commission" during this time of "slow markets" and continued conducting these trades despite misgivings because they generated a "good commission."

27.     Furthermore, a supervisor on the Moscow desk appears to have been paid a bribe or other undisclosed compensation to facilitate the schemes. The supervisor's close relative, who apparently had a background in historical art, and not finance, was also the apparent beneficial owner of two offshore companies, one each located in the British Virgin Islands and Cyprus (both high-risk jurisdictions for money laundering). In April and again in June 2015, one of the key counterparties involved in the mirror-trading scheme made payments totaling $250,000 to one of the companies owned by this close relative, allegedly pursuant to a "consulting agreement." Payments to one of these two companies, totaling approximately $3.8 million, were almost exclusively identified for the purported purpose of "financial consulting," and largely originated from two companies registered in Belize.

28.     These suspicious payments, too, were cleared through DBTCA in New York.

29.     The above demonstrates that a corporate culture that allows for short-term profiteering through improper conduct, at the expense of robust compliance, turns out to be much more expensive in the long run to an institution in regulatory, reputational, and other costs.

## In Excess of $10 Billion of Scheme Proceeds Flowed Through New York

30.     As noted above, DBTCA is a U.S. subsidiary of Deutsche Bank located on Wall Street that, among other things, conducts correspondent banking and U.S. dollar

clearing activity for customers of the Bank, including other financial institutions.[5] DBTCA is chartered pursuant to Article III of the New York Banking Law and subject to the supervision and regulation by the Department.

31.     Every single one of the U.S. dollar payments involved in the mirror trading and one-legged trading activity discussed above flowed through DBTCA. *In total, payments exceeding $10 billion were transmitted from London and through New York as a result of the trading conduct facilitated by the scheme.*

32.     Deutsche Bank thus caused New York State to become a key conduit in a long-running artifice involving highly suspicious financial activity. Deutsche Bank has represented that it has been unable to identify the actual purpose behind this scheme. It is obvious, though, that the scheme could have facilitated capital flight, tax evasion, or other potentially illegal objectives.

### Deutsche Bank Missed Repeated Opportunities to Detect the Long-Running Mirror-Trading Scheme

33.     Deutsche Bank missed a number of key opportunities to detect and interdict the mirror-trading scheme (both one and two-legged). These chances arose early on in the scheme and continued until Deutsche Bank's discovery of this scheme in February 2015. The failure to detect or escalate this misconduct reflects pervasive deficiencies at each level of the Bank's compliance function.

34.     For example, a first opportunity arose in November 2011. DB-Moscow entered a 900 million ruble trade on behalf of DB-London with one of the suspect

---

[5] Correspondent banking involving U.S. dollar clearing is the process by which U.S. dollar-denominated transactions are satisfied between counterparties through a U.S. bank. While it is essential to bank customers engaged in international commerce, U.S. dollar clearing may be a potentially high-risk business line for many banks, as it may be used by bad actors to launder money or facilitate terrorist transactions.

counterparties ("Counterparty A") that failed to settle because the Russian Federal Service for Financial Markets ("FSFM") had suspended Counterparty A's license to operate. Although a well-established red flag, no AML review or escalation occurred.

35.     A second and strikingly clear warning arose shortly thereafter in November 2011, when a mainstream Russian-language business journal noted that the FSFM had suspended the operating licenses of several financial firms for engaging in suspicious trading. The article described an artifice very similar to the instant mirror trade scheme:

> *According to an intelligence officer, the scheme operated as follows:  a client wishing to move the money transferred the funds to a brokerage firm which then bought blue chips . . . . Then the shares were sold in favor of a company-non-resident . . . which then sold the securities on the market and transferred the money minus the commission fee to the client abroad.  The law enforcement authorities believe that approximately 100 billion rubles were siphoned abroad in this manner this year.*

Notably, Counterparty A was identified in the article.

36.     The business journal article led to an e-mail circulated to several members of management, in both Moscow and London, requesting that certain trading accounts be suspended.  The e-mail also contained a link to the article, and its recipients included a senior compliance staffer in London, along with several chief operating officers for various interested divisions.  Numerous responsible managers were thus on notice of this serious AML controls issue.

37.     Further, senior Deutsche Bank employees continued to discuss, for several months, how to obtain payment for the failed trades involving the suspended counterparty, which apparently cost the bank about $1.5 million in profit.  Despite these conversations, at no time did anyone at the Bank undertake to escalate or investigate the basis for the revocation of a customer's operating license, or its connection to the money laundering scheme specified in the article.

10

38.    Yet a third opportunity to detect the suspicious mirror trading activity occurred in January 2014, when a European financial institution (the "European Bank") sent a Request for Assistance ("RFA") to DB-London. The European Bank had been prompted to send the RFA after reviewing 20 transactions originating with Deutsche Bank and involving another of the suspicious counterparties ("Counterparty B"). Seeking more information about the relationship between and transactions involving DB-London and Counterparty B, the European Bank specifically asked whether DB-London had *"any reason to believe that the transactions [with Counterparty B] are in any way of a suspicious nature."*

39.    Upon receiving no response, the European Bank sent several reminders to DB-London. Eventually, the DB-Moscow supervisor (the one whose close relative received substantial undisclosed and suspicious payments) responded by reassuring the European Bank that Counterparty B *"ha[s] passed through our KYC [know-your-customer] procedures"* and that *Deutsche Bank "see[s] no reason for concern here."* Not a single Deutsche Bank compliance staffer was ever involved in the response to this RFA provided by the corrupt supervisor to the European Bank.

40.    Notably, only days before this response was sent to the European Bank by the supervisor at DB-Moscow, DBTCA's AML Compliance unit sent its own RFA to the European Bank inquiring about Counterparty B. DBTCA's information request had been spurred by an alert generated by a transaction monitoring system located at DBTCA.[6]

---

[6] "Transaction monitoring" is the process by which an institution monitors financial transactions after their execution for potential BSA/AML violations and Suspicious Activity Reporting. While this process may be carried out manually, larger institutions such as Deutsche Bank often employ electronic systems using advanced software to monitor transactions and, in the first instance, screen them even before execution for possible violations of federal sanctions laws. *See* Part 504 of the Superintendent's Regulations, 3 NYCRR § 504.

Based on the DB-Moscow supervisor's assurances, the European Bank relayed back to DBTCA that it had no adverse information about Counterparty B.

41.     Subsequently, in light of the contradictory information about Counterparty B received from two different components of Deutsche Bank (which did not communicate with each other), the European Bank contacted a senior Anti-Financial Crime ("AFC") employee at DBTCA who supervised special investigations, in an attempt to reconcile these concerns. The senior compliance employee never responded to the European Bank. Nor did the employee take any steps to investigate the basis for the European Bank's inquiry, later explaining this omission on the ground that *the employee had "too many jobs" and "had to deal with many things and had to prioritize."*

42.     Just as troubling, through a leak apparently originating with Deutsche Bank, Counterparty B was informed of the European Bank's RFA. This was a very serious breach of anti-money laundering and corruption policies and practices. Yet when the leak came to the attention of senior DB-Moscow management, no action to investigate the leak was taken.

43.     A fourth opportunity to detect the mirror-trading scheme occurred several months later. In approximately April 2014, Deutsche Bank identified problematic trading involving another of the counterparties ("Counterparty C"). About the same time, Deutsche Bank received information from a Russian regulator that Counterparty C was involved in a money laundering and tax evasion scheme. Trading with Counterparty C was suspended, and some preliminary investigation identified suspicious trading with additional counterparties. However, no further escalation occurred, despite the emergence of an unmistakable pattern of suspicious trading at the securities desk at DB-Moscow.

44.     Subsequently, between April and September 2014, DB-Moscow identified additional suspicious mirror trading activity involving several other counterparties ("Counterparties D and E"). Although DB-Moscow suspended trading with Counterparties D and E, and a certain level of escalation occurred involving the AFC Unit at DB-London, Deutsche Bank again failed at the time to conduct a broader investigation that would have uncovered the entirety of the scheme.[7]

**Numerous Compliance Deficiencies Allowed for the**
**Mirror-Trading Scheme to Flourish at Deutsche Bank**

45.     Numerous compliance failures at Deutsche Bank allowed for the mirror-trading scheme to flourish. The deficiencies are extensive and are catalogued only generally below.

46.     <u>Flaws in KYC Policies and Procedures</u>:  During the relevant period Deutsche Bank suffered from widespread and well-known weaknesses in its KYC processes for onboarding new clients. KYC procedures were manual and functioned merely as a checklist, with employees mechanically focused on ensuring documentation was collected, rather than shining a critical light on information provided by potential customers.

47.     Even so, inadequate documentation typically characterized many of the onboarding files at DB-Moscow's securities desk. Nor were any steps taken to periodically review and verify clients once brought in. Notably, Deutsche Bank's Russia operations

---

[7] In addition to the missed opportunities delineated above, certain systems at Deutsche Bank had the capacity to detect the mirror trading activity but were not oriented to do so. For example, "dbCAT," a reporting tool that collects and displays a wide array of trade data, could have identified both legs of the mirror trades had the proper filters been applied.

scored the worst out of 28 countries whose KYC procedures were reviewed by Deutsche Bank in an internal report released to senior management in early 2014.

48.     Virtually all of the KYC files for the counterparties implicated here were insufficient.  Moreover, because no central repository for KYC information existed at Deutsche Bank, when the Bank suspended a counterparty for suspicious trading, a related counterparty was able to get onboarded and resume trading activity without raising any red flags.

49.     Further, the Moscow supervisor who oversaw the mirror trading was actively involved in the onboarding and KYC documentation of counterparties involved in the scheme.  Bank onboarding staff experienced hostility and threats from the supervisor on several occasions when it appeared they had not moved quickly enough to facilitate transactions.

50.     Distressingly, this was a fact about which senior management at DB-Moscow was aware, yet management's response was inadequate.  Indeed, although deficiencies in KYC policies and procedures were well known for many years, Deutsche Bank did not take sufficient action to implement genuine reform until 2016.

51.     **Flaws in the AML Risk Rating System**:  Deutsche Bank failed to accurately rate its AML country and client risks throughout the relevant time period.  The Bank lacked a global policy benchmarking its risk appetite, resulting in material inconsistencies and no methodology for updating the ratings.  Nor was Deutsche Bank in line with peer banks, which rated Russia as high risk well before Deutsche Bank did in late 2014.

14

52.     Although Deutsche Bank Group Audit specifically identified deficiencies in the Bank's risk rating methodology in a Global Anti-Money Laundering Report prepared in 2012, DB-Moscow resisted adopting modified risk rating procedures because most of their clients would be re-classified as high risk, and the office lacked the operational resources required to handle the increased compliance workload.

53.     <u>Inadequate Compliance and Internal Audit Resources</u>:     These deficiencies were exacerbated by Deutsche Bank's ineffective and understaffed AFC, AML, and Compliance Units. At a time that it was increasing risk in various business segments, the Bank's intense focus on headcount reduction between 2010 and 2012 prevented the AFC and Compliance units in DB-Moscow and elsewhere from being staffed with the resources necessary to function effectively.

54.     A senior compliance staffer repeatedly stated that he had to "beg, borrow, and steal" to receive the appropriate resources, leaving existing personnel scrambling to perform multiple roles. Similarly, at one point in time, a single attorney who lacked any compliance background served as DB-Moscow's Head of Compliance, Head of Legal, and as its AML Officer – all at the same time. And a number of employees with leadership positions in the AFC, AML, and Compliance groups lacked necessary experience or training.

55.     Nor did Deutsche Bank have an automated system to monitor suspicious securities transactions, which added to the risks of utilizing the remote booking model. Moreover, Deutsche Bank's Group Audit also lacked in a number of ways that prevented it from fulfilling its key role as a third line of defense behind the business and compliance units.

15

56.    <u>Flaws in Corporate Structure and Organization</u>:  Also responsible for the breakdown in compliance here is Deutsche Bank's decentralized AML framework, which caused confusion in policies, roles, and responsibilities.  This decentralized model caused AML policies to be set at the regional, rather than global, level, resulting in the inconsistent formulation and application of policies and procedures.

57.    As relevant here, DB-Moscow management focused primarily on local regulatory requirements imposed by Russian authorities.  Little or no attention was paid to the implementation or adherence to controls designed to comply with international or other country requirements.  And where such policies did exist, they were frequently ill designed and insufficient to meet the demands of the business lines involved.

58.    Additionally, a dual reporting structure and lack of clarity in job responsibilities led to an over-reliance upon the supervisor for management of trading activity on the DB-Moscow securities desk.  A number of trading employees directly reported to this supervisor, and while the trading employees also had dotted line reporting to individuals at DB-London, no concerns relevant to the suspicious trading activities were ever escalated out of Moscow.

59.    Nor was there any effective oversight of the Moscow securities supervisor.  His local manager, who was assigned to a different business group, did not understand such oversight to be part of his responsibilities.  Moreover, the Moscow supervisor's direct supervisor in London failed to exercise any reasonable oversight over the Moscow supervisor; compliance topics generally were not discussed during regular business calls or meetings, and the Moscow supervisor's superiors failed to review reports with an eye towards non-compliant or suspicious activity.

60.     Indeed, the supervisor's direct manager praised the work of the supervisor for engaging local clients with global products – creating the pernicious culture that gave rise to the improper trading scheme and permitted it to continue uninterrupted for a five-year stretch.  In short, Deutsche Bank's AML control failures were longstanding and enterprise-wide, enabling the mirror trade scheme to flourish and persist.

### Deutsche Bank's Substantial History of Regulatory Violations Placed It On Firm Notice That Schemes Like Mirror Trading Might Occur

61.     Deutsche Bank has a substantial history of regulatory violations over the last decade – one that placed it squarely on notice of the need to address potential compliance issues that permitted the mirror-trading scheme to fester.

62.     In October 2005, DBTCA entered into a Written Agreement with the Department (via its predecessor agency) after anti-money laundering and compliance programs related to its correspondent banking and dollar-clearing services were found to be substantially deficient.  Deutsche Bank agreed to make a variety of reforms designed to create an effective control environment for these business lines.

63.     In April 2015, Deutsche Bank entered into a Consent Order with the Department arising out of its failure to employ relevant and specific systems and controls to prevent manipulation of the LIBOR and IBOR rate-setting process.  The conduct at issue occurred for the time period 2005 through 2009 – right after entry of DBTCA's Written Agreement with the Department – and was systemic.  The LIBOR manipulation issues had been known to the Bank from at least 2008, and even after being placed on notice, the Bank failed to address the absence of relevant systems and controls.  The Bank paid a penalty of $600 million to the Department, and agreed to install an independent monitor to recommend and implement important compliance reforms.

17

64.     On November 3, 2015, the Bank entered into another Consent Order with the Department, arising out of the Bank's use of non-transparent methods and practices to conduct nearly $11 billion in dollar-clearing transactions on behalf of Iranian, Libyan, Syrian, Burmese, and Sudan financial institutions and other entities subject to U.S. economic sanctions. The conduct at issue occurred during the time period 1999 through 2006. One of the main purposes of the non-transparent practices at issue was to keep the Bank's U.S. staff in the dark about sanctions connections of the payments they were processing through New York. The Bank paid a penalty of $200 million to the Department, and again agreed to engage an independent monitor to "conduct a comprehensive review of the Bank's existing BSA/AML and OFAC sanctions compliance programs, policies, and procedures in place at the Bank that pertain to or affect activities conducted by or through Deutsche Bank New York"; which included a review of the "thoroughness and comprehensiveness of the Bank's current global BSA/AML and OFAC compliance program."

65.     In light of this regulatory history, the suspicious mirror trading activity, which commenced in 2011 and continued until as recently as February 2015, occurred after the Bank was on clear notice of serious and widespread compliance issues dating back a decade.

66.     Once the mirror trade scheme became sufficiently elevated within Deutsche Bank's investigation function (in March 2015), the Bank commenced an internal investigation designed to identify the background of the suspicious trades, as well as understand to what extent Bank employees were aware of these activities and its associated risks.

18

67.     The Bank timely self-reported its initial assessment of the internal investigation to the Department.  Since then, it appears to the Department that the Bank has conducted an internal investigation consistent with the stated mission, and has done so in a serious manner and timely fashion, keeping the Department informed of its findings. While much more remains to be done, the Bank has taken certain necessary steps toward remediation.

68.     In setting forth the violations and remedies below, the Department recognizes and credits the forthright manner in which Deutsche Bank performed its internal investigation, and its timely communications with the Department.

## Violations of Law and Regulation

69.     Deutsche Bank has conducted its banking business in an unsafe and unsound manner, in violation of New York Banking Law §§ 44, 44-a.

70.     Deutsche Bank failed to maintain an effective and compliant anti-money laundering program, in violation of 3 N.Y.C.R.R. § 116.2.

71.     Deutsche Bank failed to maintain and make available true and accurate books, accounts and records reflecting all transactions and actions, in violation of New York Banking Law § 200-c.

## Settlement Provisions

### Monetary Payment

72.     Deutsche Bank shall pay a civil monetary penalty pursuant to Banking Law §§ 39, 44 and 44-a to the Department in the amount of $425,000,000 as a result of the conduct and violations set forth above.  The Bank shall pay the entire amount within ten (10) days of executing this Consent Order.  Deutsche Bank agrees that it will not claim,

19

assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the civil monetary penalty paid pursuant to this Consent Order.

## Independent Monitor

73.     Within sixty (60) days of this Order, Deutsche Bank, DBTCA and the New York Branch shall engage an independent monitor (the "Independent Monitor") to: conduct a comprehensive review of the Bank's existing BSA/AML compliance programs, policies and procedures in place at the Bank that pertain to or affect activities conducted by or through (a) DBTCA and (b) the New York Branch.

74.     The Independent Monitor will be selected by the Department in the exercise of its sole discretion, and will report directly to the Department. The term of the Independent Monitor will be up to two years. The Department will consider whether one of the two existing independent monitors currently in place at Deutsche Bank may expand its assignment to include the work contemplated in this Order; provided, however, that nothing herein shall so require the Department to expand any such assignment of any other independent monitor, and the Department reserves the right in its sole discretion to require engagement of an additional independent monitor.

75.     Within thirty (30) days of the selection of the Independent Monitor, Deutsche Bank, DBTCA and the New York Branch shall jointly submit to the Department for approval an engagement letter that provides, at a minimum, for the Independent Monitor to review and report on:

> a.    The elements of the Bank's corporate governance that contributed to or facilitated the improper conduct discussed in this Consent Order and

20

that permitted it to go on, relevant changes or reforms to corporate governance that the Bank has made since the time of the conduct discussed in this Consent Order, and whether those changes or reforms are likely to significantly enhance the Bank's BSA/AML compliance going forward;

b.  The thoroughness and comprehensiveness of the Bank's current global BSA/AML compliance programs, including, but not limited to, compliance programs designed to address the conduct discussed in this Consent Order;

c.  The organizational structure, management oversight, and reporting lines that are relevant to BSA/AML compliance, and an assessment of the staffing of the BSA/AML compliance teams globally, including the duties, responsibilities, authority, and competence of officers or employees responsible for the Bank's compliance with laws and regulations pertaining to BSA/AML compliance;

d.  The propriety, reasonableness and adequacy of any proposed, planned, or recently-instituted changes to the Bank's BSA/AML compliance programs; and

e.  Any corrective measures necessary to address identified weaknesses or deficiencies in the Bank's corporate governance or its global BSA/AML compliance programs.

21

76.     On a date to be agreed upon in the engagement letter, the Independent Monitor shall submit to the Bank a written report on its findings and recommendations (the "AML Compliance Report").

77.     Within sixty (60) days of receiving the AML Compliance Report, the Bank will submit to the Department a written plan to improve and enhance the current global BSA/AML compliance programs that pertain to or affect activities conducted by or through DBTCA and the New York Branch, including, but not limited to, activities of the kind discussed in this Consent Order (the "Action Plan").

78.     The Action Plan will provide recommendations for enhanced internal controls and updates or revisions to current policies, procedures, and processes in order to ensure full compliance with all applicable provisions of the BSA, related rules and regulations, and applicable New York law and regulations, and the provisions of this Consent Order, incorporating the corrective measures identified in the AML Compliance Report.

79.     The Action Plan shall also provide recommendations to improve and enhance management oversight of BSA/AML compliance programs, policies, and procedures now in place at the Bank, to provide a sustainable management oversight framework, incorporating the corrective measures identified in the AML Compliance Report.

80.     Should the Bank take the position that any of the corrective measures identified by the Independent Monitor should not be adopted by the Bank, the Bank shall, within forty-five (45) days of receiving the Compliance Report, so notify the Independent Monitor and the Department, specifying in writing the grounds for this position.

22

81.     In consultation with the Independent Monitor, the Department will review and determine, in its sole discretion, whether to require the Bank to adopt the recommendations to which the Bank has objected, whether to agree with the Bank, and/or whether some other action should be taken by the Bank to achieve the remediation contemplated by this Consent Order.

82.     The Independent Monitor will thereafter oversee the implementation of any corrective measures undertaken pursuant to the AML Compliance Report and/or plans discussed above in Paragraphs 73 through 81.

83.     The Independent Monitor will assess the Bank's compliance with its corrective measures and will submit subsequent progress reports and a final report to the Department and the Bank, as determined by the Department in its sole discretion.  The Department may, in its sole discretion, extend any reporting deadline set forth in this Order.

84.     The term of the Independent Monitor's engagement will extend for up to two years from the date of its formal engagement by the Bank; provided, however, that the term may be extended further, in the Department's sole discretion, if Deutsche Bank fails to cooperate.

85.     Any dispute as to the scope of the Independent Monitor's authority or mandate will be resolved by the Department in the exercise of its sole discretion, after consultation with the Bank and the Independent Monitor.

## Full and Complete Cooperation of Deutsche Bank

86.     Deutsche Bank and the New York Branch each agree that they will fully cooperate with the Independent Monitor and Department, and support the Independent Monitor's work by, among other things, providing it with access to all relevant personnel,

consultants and third-party service providers, files, reports, or records, wherever located, consistent with applicable law.

## Breach of Consent Order

87.     In the event that the Department believes the Bank to be in material breach of the Consent Order, the Department will provide written notice to the Bank and the Bank must, within ten business days of receiving such notice, or on a later date if so determined in the Department's sole discretion, appear before the Department to demonstrate that no material breach has occurred or, to the extent pertinent, that the breach is not material or has been cured.

88.     The parties understand and agree that the Bank's failure to make the required showing within the designated time period shall be presumptive evidence of the Bank's breach.  Upon a finding that the Bank has breached this Consent Order, the Department retains all remedies and relief available to it under the New York Banking and Financial Services Laws, and may use any evidence available to the Department in any ensuing orders, hearings or notices.

## Waiver of Rights

89.     The parties understand and agree that no provision of this Consent Order is subject to review in any court or tribunal outside the Department.

## Parties Bound by the Consent Order

90.     This Consent Order is binding on the Department and Deutsche Bank and the New York Branch, as well as any successors and assigns that are under the Department's supervisory authority.  This Consent Order does not bind any federal or other state agency or law enforcement authority.

91.     No further action will be taken by the Department against Deutsche Bank for the specific conduct set forth in this Order, provided that the Bank fully complies with the terms of this Order.  Notwithstanding the foregoing or any other provision in this Consent Order, however, the Department may undertake additional action against the Bank for transactions or conduct of which Deutsche Bank had knowledge prior to the execution of this Consent Order, but that Deutsche Bank did not disclose to the Department in the written materials Deutsche Bank submitted to the Department in connection with this matter.

## Notices

92.     All notices or communications regarding this Consent Order shall be sent to:

> For the Department:
>
> Terri-Anne Caplan
> Assistant Deputy Superintendent
>   for Enforcement
> One State Street
> New York, NY 10004
>
> Christine Tsai
> Attorney
> One State Street
> New York, NY 10004
>
> For Deutsche Bank:
>
> Christof von Dryander
> Co-General Counsel
> Deutsche Bank AG
> Taunusanlage 12
> 60325 Frankfurt am Main, Germany

25

Dr. Mathias Otto
Co-General Counsel Germany
Deutsche Bank AG
Taunusanlage 12
60325 Frankfurt am Main, Germany

Samuel W. Seymour
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

Miscellaneous

93.     Each provision of this Consent Order shall remain effective and enforceable until stayed, modified, suspended, or terminated by the Department.

94.     No promise, assurance, representation, or understanding other than those contained in this Consent Order has been made to induce any party to agree to the provisions of the Consent Order.

[*Remainder of page intentionally left blank*]

26

IN WITNESS WHEREOF, the parties have caused this Consent Order to be signed this 30th day of January, 2017.

DEUTSCHE BANK

By: _____
CHRISTOF VON DRYANDER
Co-General Counsel

By: _____
DR. MATHIAS OTTO
Co-General Counsel Germany

NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

By: _____
MARIA T. VULLO
Superintendent of Financial Services

By: _____
MATTHEW L. LEVINE
Executive Deputy Superintendent of Enforcement

DEUTSCHE BANK, NEW YORK BRANCH

By: _____
STEVEN REICH
General Counsel — Americas

By: _____
JOSEPH SALAMA
Managing Director, Legal

27

IN WITNESS WHEREOF, the parties have caused this Consent Order to be signed this 30th day of January, 2017.

DEUTSCHE BANK

By: _____
CHRISTOF VON DRYANDER
Co-General Counsel

By: _____
DR. MATHIAS OTTO
Co-General Counsel Germany

DEUTSCHE BANK, NEW YORK BRANCH

By: _____
STEVEN REICH
General Counsel — Americas

By: _____
JOSEPH SALAMA
Managing Director, Legal

NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES

By: _____
MARIA T. VULLO
Superintendent of Financial Services

By: _____
MATTHEW L. LEVINE
Executive Deputy Superintendent of
Enforcement

27

**IN WITNESS WHEREOF,** the parties have caused this Consent Order to be signed this 30th day of January, 2017.

DEUTSCHE BANK

By: _____
CHRISTOF VON DRYANDER
Co-General Counsel

By: _____
DR. MATHIAS OTTO
Co-General Counsel Germany

NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES

By: _____
MARIA T. VULLO
Superintendent of Financial Services

By: _____
MATTHEW L. LEVINE
Executive Deputy Superintendent of
Enforcement

DEUTSCHE BANK, NEW YORK BRANCH

By: _____
STEVEN REICH
General Counsel — Americas

By: _____
JOSEPH SALAMA
Managing Director, Legal

27

# EXHIBIT C

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of<br><br>DEUTSCHE BANK AG<br>Frankfurt, Germany<br><br>DEUTSCHE BANK AG NEW YORK BRANCH<br>New York, New York<br><br>DB USA CORPORATION<br>New York, New York<br><br>and<br><br>DEUTSCHE BANK TRUST<br>COMPANY AMERICAS<br>New York, New York | Docket Nos.  17-009-B-FB<br>17-009-B-FBR<br>17-009-B-HC<br>17-009-B-SMB<br>17-009-CMP-FB<br>17-009-CMP-FBR<br>17-009-CMP-HC<br>17-009-CMP-SMB<br><br>Order to Cease and Desist and Order<br>of Assessment of a Civil Money<br>Penalty Issued Upon Consent,<br>Pursuant to the Federal Deposit<br>Insurance Act, as Amended |

WHEREAS, Deutsche Bank AG, Frankfurt, Germany ("Deutsche Bank") is a foreign bank as defined in section 1(b)(7) of the International Banking Act (12 U.S.C. § 3101(7)) that controls a large complex financial organization that consists of a number of separate business lines and legal entities in many countries around the world;

WHEREAS, Deutsche Bank conducts operations in the United States through its U.S. bank holding company, DB USA Corporation, New York, New York ("DB USA") that owns and controls Deutsche Bank Trust Company Americas, New York, New York ("DBTCA"), a state-chartered bank that is a member of the Federal Reserve System; Deutsche Bank's branch office located in New York, New York (the "Branch"); and various other offices and subsidiaries (the "U.S. Operations");

WHEREAS, the Board of Governors of the Federal Reserve System (the "Board of Governors") is the appropriate federal supervisor in the United States for DB USA, DBTCA, and the Branch;

WHEREAS, Deutsche Bank has adopted a firmwide risk management program for the U.S. Operations that is designed to identify and manage compliance risks related to compliance with all applicable laws, rules, and regulations relating to anti-money laundering ("AML") compliance, including the Bank Secrecy Act ("BSA") (31 U.S.C. § 5311 *et seq.*); the rules and regulations issued thereunder by the U.S. Department of the Treasury (31 C.F.R. Chapter X); and the AML regulations issued by the appropriate federal supervisors for DB USA, DBTCA, and the Branch, including, but not limited to: (i) with respect to DB USA and DBTCA, Regulations H and Y of the Board of Governors (12 C.F.R. § 208.62 *et seq.* and § 225.4(f)), and (ii) with respect to the Branch, Regulation K of the Board of Governors (12 C.F.R. §§ 211.24(f) and 211.24(j)) (collectively, the "BSA/AML Requirements");

WHEREAS, DB USA oversees compliance and risk management procedures for entities within the U.S. Operations;

WHEREAS, DBTCA and the Branch are required to maintain programs reasonably designed to ensure compliance with applicable BSA/AML Requirements;

WHEREAS, this Order to Cease and Desist and Order of Assessment of a Civil Money Penalty (the "Order") is issued with respect to the following:

A.     The most recent examination of the BSA/AML program at DBTCA and the Branch conducted by the Federal Reserve Bank of New York (the "Reserve Bank") identified significant deficiencies in DBTCA's and the Branch's risk management and compliance with the

BSA/AML Requirements that have resulted in a violation of the regulatory compliance program requirement; and

     B.    Deficiencies in DBTCA's transaction monitoring capabilities prevented DBTCA from properly assessing BSA/AML risk for billions of dollars in potentially suspicious transactions processed between 2011 and 2015 for certain DBTCA affiliates in Europe for which the affiliates failed to provide sufficiently accurate and complete information.

WHEREAS, Deutsche Bank's U.S. Operations are one of the largest U.S. dollar processors and pose a high degree of BSA/AML risk;

WHEREAS, it is the common goal of the Board of Governors, the Reserve Bank, and Deutsche Bank that Deutsche Bank maintains effective corporate governance and oversight over the U.S. Operations, including the establishment and maintenance of robust risk management and compliance programs on a consolidated basis;

WHEREAS, it is the common goal of the Board of Governors, the Reserve Bank, Deutsche Bank, DB USA, and DBTCA that DB USA and DBTCA operate in compliance with all applicable federal laws, rules, and regulations;

WHEREAS, it is the common goal of the Board of Governors, the Reserve Bank, Deutsche Bank, and the Branch that the Branch operates in compliance with all applicable federal laws, rules, and regulations; and

WHEREAS, Deutsche Bank's Management Board, at a duly constituted meeting, authorized Deutsche Bank to enter into this Order, and whereas pursuant to delegated authority, the undersigned signatories for Deutsche Bank, DB USA, DBTCA, and the Branch are authorized to enter into this Order on behalf of Deutsche Bank, DB USA, DBTCA, or the Branch, respectively, and consent to compliance with each and every provision of this Order by

Deutsche Bank, DB USA, DBTCA and the Branch, respectively, and to waive any and all rights that each may have pursuant to section 8 of the Federal Deposit Insurance Act, as amended (the "FDI Act") (12 U.S.C. § 1818), including, but not limited to: (i) the issuance of a notice of charges on any matters set forth in this Order; (ii) a hearing for the purpose of taking evidence on any matters set forth in this Order; (iii) judicial review of this Order; and (iv) challenge or contest, in any manner, the basis, issuance, validity, terms, effectiveness or enforceability of the Order or any provision hereof.

NOW, THEREFORE, it is hereby ordered that, before the filing of any notices, or taking of any testimony or adjudication of or finding on any issues of fact or law herein, and solely for the purpose of settling this matter without a formal proceeding being filed and without the necessity for protracted or extended hearings or testimony, pursuant to sections 8(b)(1), (3), and (4) of the FDI Act (12 U.S.C. §§ 1818(b)(1), 1818(b)(3), and 1818(b)(4)), Deutsche Bank, DB USA, DBTCA, and the Branch, shall cease and desist and take affirmative action as follows:

**Corporate Governance and Management Oversight of the U.S. Operations**

1.      Within 60 days of this Order, Deutsche Bank's Management Board and DB USA's U.S. Risk Committee ("U.S. Risk Committee") shall jointly submit a written plan to strengthen their respective oversight of BSA/AML compliance across the U.S. Operations on a consolidated basis acceptable to the Reserve Bank. The plan shall provide for a sustainable governance framework that, at a minimum, addresses, considers, and includes:

(a)      actions to improve the consolidated framework for BSA/AML compliance across the U.S. Operations, including, but not limited to, maintenance of effective control over, and supervision of the implementation of the BSA/AML compliance program by U.S. senior management;

4

(b)     actions to improve compliance risk management with regard to DBTCA's and the Branch's compliance with the applicable BSA/AML Requirements;

(c)     measures to ensure that the persons or groups charged with carrying out BSA/AML compliance across the U.S. Operations possess appropriate subject matter expertise and are actively involved in carrying out their responsibilities, and procedures to require the escalation of significant matters related to compliance risks to U.S. senior management;

(d)     adequate resources for the persons or groups charged with carrying out BSA/AML compliance across the U.S. Operations;

(e)     a description of the information and reports related to BSA/AML compliance across the U.S. Operations that will be regularly reviewed by Deutsche Bank's Management Board, the U.S. Risk Committee, and U.S. senior management; and

(f)     measures to improve the management information systems reporting of BSA/AML compliance programs to ensure effective oversight by Deutsche Bank's Management Board, the U.S. Risk Committee, and U.S. senior management of BSA/AML compliance across the U.S. Operations.

## Compliance Risk Management Program for the U.S. Operations

2.     Within 60 days of completion of the review required by paragraph 3 of this Order, Deutsche Bank's Management Board and the U.S. Risk Committee shall jointly submit a written plan to improve the firmwide compliance risk management program for the U.S. Operations with regard to the applicable BSA/AML Requirements acceptable to the Reserve Bank. The plan shall, at a minimum, address, consider, and include:

(a)     the scope and frequency of the BSA/AML compliance risk assessments;

5

(b)     comprehensive BSA/AML risk assessment processes, including clearly defined parameters regarding acceptable risks associated with specific types of customers or businesses;

(c)     identification of all business lines, activities, and products to ensure that such business lines, activities, and products are appropriately risk-rated and included in the BSA/AML risk assessments;

(d)     enhanced BSA/AML-related written policies, procedures, and compliance risk management standards;

(e)     the duties and responsibilities of compliance personnel for each business line and legal entity regarding BSA/AML compliance functions, including the reporting lines within DBTCA and the Branch;

(f)     measures to ensure BSA/AML compliance and improve BSA/AML-related accountability within all business lines and legal entities and their respective BSA/AML compliance functions;

(g)     procedures for the periodic testing of the effectiveness of the BSA/AML compliance risk management program;

(h)     interim measures to monitor and control BSA/AML-related risk until the improved compliance risk management program is fully implemented; and

(i)     measures to ensure that payment messages for cross-border funds transfers to and from the United States comply with applicable international and interagency standards for cross-border payments, including appropriate risk-based monitoring processes to identify improper payment messages.

6

**DBTCA BSA/AML Compliance Review**

3.       Within 30 days of this Order, DBTCA shall retain an independent third party
acceptable to the Reserve Bank to: (i) conduct a comprehensive review of DBTCA's compliance
with the applicable BSA/AML Requirements (the "BSA/AML Compliance Review") and (ii)
prepare a written report of findings, conclusions, and recommendations (the "BSA/AML
Compliance Report").

4.       Within 10 days of the engagement of the independent third party, but prior to the
BSA/AML Compliance Review, DBTCA shall submit to the Reserve Bank for approval an
engagement letter that provides, at a minimum, for the independent third party to:

(a)       identify all DBTCA's business lines, activities, and products, to ensure
that such business lines, activities, and products are included in the BSA/AML risk assessment
methodology and that the risk assessments are appropriately integrated into DBTCA's
BSA/AML compliance program, policies, and procedures;

(b)       conduct a comprehensive assessment of DBTCA's BSA/AML compliance
program, policies, and procedures, including procedures for identifying and reporting suspicious
activity;

(c)       complete the BSA/AML Compliance Review within 60 days of the
Reserve Bank's approval of the engagement letter;

(d)       provide to the Reserve Bank a copy of the BSA/AML Compliance Report
at the same time that the report is provided to DBTCA; and

(e)       commit that any and all interim reports, drafts, workpapers, or other
supporting materials associated with the BSA/AML Compliance Review will be made available
to the Reserve Bank upon request.

**DBTCA Transaction Review**

5.      Within 30 days of this Order, DBTCA shall engage an independent third party, acceptable to the Reserve Bank, to conduct a review of DBTCA's foreign correspondent banking activity conducted at, by, or through DBTCA from July 1, 2016 to December 31, 2016 to determine whether suspicious activity involving transactions at, by, or through DBTCA was properly identified and reported in accordance with applicable suspicious activity reporting regulations (the "Transaction Review") and to prepare a written report detailing the independent third party's findings (the "Transaction Review Report").

6.      Based on the Reserve Bank's evaluation of the results of the Transaction Review and the Transaction Review Report, the Reserve Bank may direct DBTCA to engage the independent third party to conduct a review for additional time periods and for additional business activities.

7.      Within 10 days of engagement of the independent third party, but prior to the commencement of the Transaction Review, DBTCA shall submit to the Reserve Bank for approval an engagement letter that sets forth:

(a)      the scope of the Transaction Review;

(b)      the methodology for conducting the Transaction Review, including any sampling procedures to be followed;

(c)      the expertise and resources to be dedicated to the Transaction Review;

(d)      the anticipated date of completion of the Transaction Review and the Transaction Review Report;

(e)      a commitment to provide a copy of the Transaction Review Report to the Reserve Bank at the same time that the report is provided to DBTCA; and

8

(f)    a commitment that any and all interim reports, drafts, workpapers, or other supporting material associated with the Transaction Review will be made available to the Reserve Bank upon request.

8.    Throughout the Transaction Review, DBTCA shall ensure that all matters or transactions required to be reported that have not previously been reported are reported in accordance with applicable rules and regulations.

## BSA/AML Compliance Program for DBTCA and the Branch

9.    Within 60 days of the submission of the BSA/AML Compliance Report, DBTCA and the Branch shall submit a revised written BSA/AML compliance program acceptable to the Reserve Bank. At a minimum, the program shall address the findings and recommendations of the BSA/AML Compliance Report and provide for:

(a)    a system of internal controls designed to ensure compliance with the applicable BSA/AML Requirements;

(b)    comprehensive BSA/AML risk assessment processes, including clearly defined parameters regarding scope, frequency, and acceptable risks associated with specific types of customers or businesses;

(c)    a comprehensive BSA/AML risk assessment that appropriately identifies and considers all products and services, customer types and geographic risks, as appropriate, in determining inherent and residual risks;

(d)    identification of the management information systems used to achieve compliance with the applicable BSA/AML Requirements and a timeline to review key systems to ensure they are configured to mitigate BSA/AML risks;

9

(e)     improved independent testing procedures and quality assurance controls to evaluate DBTCA's and the Branch's compliance with the applicable BSA/AML Requirements;

(f)     enhanced written policies, procedures, and compliance risk management standards, including specifications concerning the duties, responsibilities, and accountability, including reporting lines, of each business line, legal entity, and respective compliance functions regarding BSA/AML compliance;

(g)     management of the BSA/AML program by a qualified officer, with requisite authority, who is responsible for implementing and maintaining a program that is commensurate with the organization's size and risk profile;

(h)     allocation of adequate staffing levels and resources to ensure compliance with this Order and the applicable BSA/AML Requirements; and

(i)     effective training for all appropriate personnel, including appropriate personnel of affiliates that perform BSA/AML compliance-related functions in all aspects of the applicable BSA/AML Requirements and internal policies and procedures.

**Customer Due Diligence**

10.     Within 60 days of submission of the BSA/AML Compliance Report, DBTCA and the Branch shall submit a revised written customer due diligence program acceptable to the Reserve Bank. At a minimum, the program shall address the findings and recommendations of the BSA/AML Compliance Report, and include:

(a)     policies, procedures, and controls to ensure that DBTCA and the Branch collect, analyze, and retain complete and accurate customer information for all account holders, including, but not limited to, affiliates;

10

    **(b)**    a plan, with timelines, to remediate deficient due diligence for existing customers accounts;

    **(c)**    a revised methodology for assigning risk ratings to account holders that considers factors such as type of customer, type of products and services, and geographic location;

    **(d)**    policies, procedures and controls to ensure that foreign correspondent accounts are accorded the appropriate due diligence, and where necessary, enhanced due diligence;

    **(e)**    for each customer whose transactions require enhanced due diligence, procedures to:

    **(i)**    determine the appropriate documentation necessary to verify the identity and business activities, including typical and expected transactions, of the customer; and

    **(ii)**    determine the frequency of monitoring to understand if any changes occur with the typical and expected transactions of the customer;

    **(f)**    procedures to ensure periodic reviews and evaluations are conducted and documented for all account holders.

## Suspicious Activity Monitoring and Reporting

11.    Within 60 days of submission of the BSA/AML Compliance Report, DBTCA and the Branch shall submit a written program acceptable to the Reserve Bank to reasonably ensure the identification and timely, accurate, and complete reporting by DBTCA and the Branch of all known or suspected violations of law or suspicious transactions to law enforcement and supervisory authorities, as required by applicable suspicious activity reporting laws and

11

regulations.  At a minimum, the program shall address the findings and recommendations of the BSA/AML Compliance Report and include:

(a)  a well-documented methodology for establishing monitoring rules and thresholds appropriate for DBTCA's and the Branch's profiles, which consider factors such as type of customer, type of product or service, geographic location, and foreign correspondent banking activities, including U.S. dollar clearing activities;

(b)  policies and procedures for analyzing, testing, and documenting changes to monitoring rules and thresholds;

(c)  enhanced monitoring and investigation criteria and procedures to ensure the timely detection, investigation, and reporting of all known or suspected violations of law and suspicious transactions, including, but not limited to:

(i)  effective monitoring of customer accounts and transactions, including but not limited to, transactions conducted through foreign correspondent accounts;

(ii)  appropriate allocation of resources to manage alert and case inventory;

(iii)  adequate escalation of information about potentially suspicious activity through appropriate levels of management;

(iv)  maintenance of sufficient documentation with respect to the investigation and analysis of potentially suspicious activity, including the resolution and escalation of concerns; and

(v)  maintenance of accurate and comprehensive customer and transactional data and ensuring that it is applied to DBTCA's and the Branch's compliance programs;

12

(d)     controls to ensure that transaction monitoring systems and associated automated processes are subject to periodic reviews and timely updates.

**Transaction Monitoring System**

12.     Within 60 days of this Order, DBTCA and the Branch shall submit a written plan acceptable to the Reserve Bank, including a timetable, for the enhancement of DBTCA's and the Branch's transaction monitoring system. The plan shall also include a methodology and target date for determining that the transaction monitoring system is effective.

13.     Within 30 days of this Order, DBTCA and the Branch shall submit a written interim transaction monitoring plan for foreign correspondent banking activity acceptable to the Reserve Bank that shall remain in effect until the transaction monitoring system described in paragraph 12 of this Order is deemed to be fully effective. This interim plan shall be designed to monitor transactions at, by, or through DBTCA and the Branch so that they can comply with applicable suspicious activity reporting requirements.

**Assessment of Civil Money Penalty**

14.     The Board of Governors hereby assesses Deutsche Bank a civil money penalty in the amount of $41 million which shall be paid upon the execution of this Order by Fedwire transfer of immediately available funds to the Federal Reserve Bank of Richmond, ABA No. 051000033, beneficiary, Board of Governors of the Federal Reserve System. This penalty is a penalty paid to a government agency for a violation of law for purposes of 26 U.S.C. § 162(f) and 26 C.F.R. § 1.162-21. The Federal Reserve Bank of Richmond, on behalf of the Board of Governors, shall distribute this sum to the U.S. Department of the Treasury, pursuant to section 8(i) of the FDI Act (12 U.S.C. § 1818(i)).

13

## Approval, Implementation, and Progress Reports

15.      (a)      Deutsche Bank's Management Board, the U.S. Risk Committee, DBTCA, and the Branch, as applicable, shall submit the written plans, programs, and engagement letters that are acceptable to the Reserve Bank within the applicable time periods set forth in paragraphs 1-5, 7, and 9-13 of this Order.  Each plan or program shall contain a timeline for full implementation of the plan or program with specific deadlines for the completion of each component of the plan or program.  Independent third parties acceptable to the Reserve Bank shall be retained by DBTCA within the time period set forth in paragraphs 3 and 5 of this Order.

(b)      Within 10 days of acceptance by the Reserve Bank, Deutsche Bank's Management Board, the U.S. Risk Committee, DBTCA, and the Branch, as applicable, shall adopt the plans and programs.  Upon adoption, Deutsche Bank's Management Board, the U.S. Risk Committee, DBTCA, and the Branch, as applicable, shall implement the plans and programs and thereafter fully comply with them.

(c)      During the term of this Order, the approved plans, programs, and engagement letters shall not be amended or rescinded without the prior written approval of the Reserve Bank.

16.      Within 30 days after the end of each calendar quarter following the date of this Order, Deutsche Bank's Management Board, the U.S. Risk Committee, DBTCA, and the Branch shall submit to the Reserve Bank consolidated written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof.  The Reserve Bank may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

14

Notices

17. All communications regarding this Order shall be sent to:

    (a)  Vandana Sharma
         Vice President
         Federal Reserve Bank of New York
         33 Liberty Street
         New York, New York 10045

    (b)  Richard M. Ashton
         Deputy General Counsel
         Board of Governors of the Federal Reserve System
         Washington, D.C. 20551

    (c)  John Cryan
         Chief Executive Officer
         Deutsche Bank AG
         Taunusanlage 12, Floor A 32
         Frankfurt am Main
         Germany 60262

    (d)  Stuart Clarke
         Chief Operating Officer Americas
         DB USA Corporation
         60 Wall Street
         New York, New York 10005

    (e)  Steven Reich
         General Counsel Americas
         Deutsche Bank Trust Company Americas
         60 Wall Street
         New York, New York 10005

    (f)  Joseph Salama
         Global Head of Litigation and Regulatory Enforcement
         Deutsche Bank AG
         New York Branch
         60 Wall Street
         New York, New York 10065

**Miscellaneous**

18.     Notwithstanding any provision of this Order to the contrary, the Reserve Bank may, in its sole discretion, grant written extensions of time to Deutsche Bank, DB USA, DBTCA, and the Branch to comply with any provision of this Order.

19.     The provisions of this Order shall be binding on Deutsche Bank, DB USA, DBTCA, and the Branch, and each of their institution-affiliated parties, as defined in sections 3(u) and 8(b)(3) and (4) of the FDI Act (12 U.S.C. §§ 1813(u) and 1818(b)(3) and 1818(b)(4)), in their capacities as such, and their successors and assigns.

20.     Each provision of this Order shall remain effective and enforceable until stayed, modified, terminated, or suspended in writing by the Reserve Bank.

21.     The Board of Governors hereby agrees not to initiate any further enforcement actions, including for civil money penalties, against Deutsche Bank and its affiliates, successors and assigns, with respect to the conduct described in the WHEREAS clauses of this Order to the extent known by the Board of Governors as of the effective date of this Order.  This release and discharge shall not preclude or affect (i) any right of the Board of Governors to determine and ensure compliance with this Order, (ii) any proceedings brought by the Board of Governors to enforce the terms of this Order, or (iii) any proceedings brought by the Board of Governors against individuals who are or were institution-affiliated parties of Deutsche Bank and its affiliates.

22.     Except as provided in paragraph 21, the provisions of this Order shall not bar, estop, or otherwise prevent the Board of Governors, the Reserve Bank, or any other federal or state agency from taking any other action affecting Deutsche Bank, DB USA, DBTCA, or the

Branch, any of their subsidiaries, or any of their current or former institution-affiliated parties and their successors and assigns.

By order of the Board of Governors of the Federal Reserve System effective this 26th day of May, 2017.

DEUTSCHE BANK AG

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

By: ____/s/ Christof von Dryander_____
     Christof von Dryander
     Co-General Counsel

By: ____/s/ Ann E. Misback_____
     Ann E. Misback
     Secretary of the Board

By: ____/s/ Mathias Otto_____
     Mathias Otto
     Co-General Counsel Germany

DEUTSCHE BANK AG
NEW YORK BRANCH

By: ____/s/ Steven Reich_____
     Steven Reich
     General Counsel Americas

By: ____/s/ Joseph Salama_____
     Joseph Salama
     Global Head of Litigation
     and Regulatory Enforcement

DB USA CORPORATION

By: ____/s/ Stuart Clarke_____
     Stuart Clarke
     Chief Operating Officer Americas

By: ____/s/ Carol A. Saracco_____
     Carol A. Saracco
     Head of Regional Corporate
     Governance Americas

17

DEUTSCHE BANK TRUST
COMPANY AMERICAS

By: ____/s/ Steven Reich____
      Steven Reich
      General Counsel Americas


By: ____/s/ Joseph Salama____
      Joseph Salama
      Global Head of Litigation
        and Regulatory Enforcement

18

# EXHIBIT D

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Release No. 4399 / May 27, 2016

INVESTMENT COMPANY ACT OF 1940
Release No. 32130 / May 27, 2016

ADMINISTRATIVE PROCEEDING
File No. 3-17263

| | |
|---|---|
| In the Matter of<br><br>**BISCAYNE CAPITAL<br>INTERNATIONAL, LLC,<br>ROBERTO G. CORTES,<br>ERNESTO H. WEISSON,<br>JUAN CARLOS CORTES, and<br>FRANK R. CHATBURN**<br><br>Respondents. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTIONS 203(e), 203(f) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act") against Biscayne Capital International, LLC, Roberto G. Cortes, Ernesto H. Weisson, Juan Carlos Cortes, and Frank R. Chatburn ("Respondents").

II.

In anticipation of the institution of these proceedings, each Respondent has submitted an Offer of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940, and Section 9(b) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

### Summary

1.     These proceedings arise out of the failure of Biscayne Capital International, LLC ("BCI"), formerly a U.S. registered investment adviser, to disclose facts giving rise to multiple conflicts of interest and other material information under the Investment Advisers Act of 1940 (the "Advisers Act") in connection with the recommendation and sale of securities issued by private offshore investment companies under common beneficial ownership with BCI (hereinafter "Proprietary Products") to non-U.S. clients between August 2010 and March 2012 (the "Relevant Period").  Three BCI principals – Roberto G. Cortes ("Roberto Cortes"), Ernesto H. Weisson ("Weisson") and Juan C. Cortes ("Juan Cortes") (collectively "the Primary BCI Principals"[2]) – formed entities that issued the Proprietary Products primarily for the purpose of financing South Bay Holdings, LLC ("South Bay"), a Florida-based residential real estate developer, which itself was beneficially owned by Roberto Cortes and Weisson.  In turn, South Bay was the majority beneficial owner of BCI during the Relevant Period.

2.     BCI failed to disclose, among other things, the Primary BCI Principals' beneficial ownership interest and role in the creation of the Proprietary Products issuers.  Further, BCI failed to disclose additional material information under the Advisers Act concerning South Bay's financial condition, including that, both preceding and during the Relevant Period, South Bay failed to generate enough revenue or operating cash flow to meet maturing debt, or sustain operations absent obtaining the additional financing generated by the sale of Proprietary Products, and was required to renegotiate several past-due financial obligations.  By doing so, BCI willfully violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940.

3.     Roberto Cortes, Weisson, and Juan Cortes created BCI and several affiliated non-U.S. financial services entities, all operating under the Biscayne Capital name, and marketed the Proprietary Products through their financial advisors, five of whom, including Frank Chatburn, they knew were employed by both BCI and the affiliated non-U.S. financial services entities.

4.     Roberto Cortes, Weisson and Juan Cortes each willfully aided and abetted and caused BCI's violations of Section 206(2) of the Advisers Act by failing to prohibit the sales of the Proprietary Products through the U.S.-based BCI or, in the alternative, by failing to train BCI investment adviser representatives to make adequate disclosures under the Advisers Act concerning the conflicts of  interest and South Bay's financial condition, when recommending Proprietary Products to BCI clients.[3]

---

[1] The findings herein are made pursuant to each Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2] Other individuals, including Frank Chatburn, had a beneficial ownership interest in and were principals of BCI.

[3] A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)).

5.      Frank Chatburn ("Chatburn"), who was both an investment adviser representative for BCI as well as an investment adviser for the non-U.S. financial services entities, willfully aided and abetted and caused BCI's violations of Section 206(1) and 206(2) of the Advisers Act by recommending and selling approximately $3.49 million in Proprietary Products to 29 non-U.S. BCI clients without making adequate disclosures under the Advisers Act. He failed to conduct a "fundamental analysis" of the Proprietary Products in contravention of representations in BCI's Form ADV; and failed to conduct an investigation or inquiry into, *inter alia*, the ownership or operation of Proprietary Product issuers or into South Bay's financial condition notwithstanding red flags concerning these entities. Chatburn also failed to disclose that he had a personal conflict of interest when recommending the Proprietary Products to BCI clients based on his beneficial ownership interest in BCI and the non-U.S. Biscayne Capital financial services entities as well as undisclosed compensation he received in connection with his recommendation and sale of the Proprietary Products to BCI clients.

6.      Additionally, BCI willfully failed, and Juan Cortes willfully aided and abetted and caused BCI's failure, to design and implement policies and procedures reasonably designed to prevent violations of the Advisers Act. BCI also willfully made, and Roberto Cortes and Juan Cortes willfully aided and abetted and caused BCI to make, material misrepresentations in Form ADV. Additionally, during the Relevant Period, BCI, Roberto Cortes, and Juan Cortes each failed reasonably to supervise Chatburn.

<u>Respondents</u>

7.      **Biscayne Capital International, LLC ("BCI")**, formerly a Florida limited liability company headquartered in Miami, Florida, was an investment adviser registered with the Commission between October 14, 2008 and June 26, 2012. BCI provided discretionary and non-discretionary advisory services primarily to Latin American individuals and entities. BCI had approximately $12.8 million in assets under management ("AUM") as of December 31, 2011.

8.      **Roberto G. Cortes ("Roberto Cortes")**, age 49, of Miami, Florida, was a co-founder and beneficial owner of BCI during the Relevant Period as well as its Chief Executive Officer. He also is a beneficial owner of, and directly or indirectly controls, South Bay Holdings, LLC, the Proprietary Products issuers, and the affiliated non-U.S. financial services entities.

9.      **Ernesto H. Weisson ("Weisson")**, age 47, of Miami, Florida, was a co-founder and beneficial owner of BCI during the Relevant Period. He also is a beneficial owner of, and directly or indirectly controls, South Bay Holdings, LLC, the Proprietary Products issuers, and the affiliated non-U.S. financial services entities.

10.     **Juan Carlos Cortes ("Juan Cortes")**, age, 37, an Ecuadorian citizen and permanent resident of the United States residing in Miami, Florida, was a co-founder and beneficial owner of BCI during the Relevant Period as well as its Chief Operating Officer. Juan Cortes also served as BCI's Chief Compliance Officer until late 2011. Juan Cortes is a beneficial owner of, and directly or indirectly controls, the Proprietary Products issuers, and the affiliated non-U.S. financial services entities. He also is Roberto Cortes' brother.

11.     **Frank R. Chatburn ("Chatburn")**, age 37, a dual United States and Ecuadorian citizen residing in Miami, Florida, was a beneficial owner of BCI as well as an investment adviser representative of BCI during the Relevant Period.  He also is a beneficial owner and financial adviser for the affiliated non-U.S. financial services entities.  Chatburn is Roberto Cortes' cousin.

## Other Relevant Individuals and Entities

12.     **South Bay Holdings, LLC ("South Bay")**, a Florida limited liability company headquartered in Miami, Florida, is a private real estate development company that concentrates on residential real estate in South Florida.  South Bay is beneficially owned by Roberto Cortes and Weisson.

13.     **Sentinel Investment Fund, Ltd. ("Sentinel")**, a Proprietary Products issuer, is, according to private placement memoranda, "an exempted limited liability company of unlimited duration registered as a Segregated Portfolio Company" in the Cayman Islands.  Sentinel was formed primarily for the purpose of financing the activities of South Bay through the sale of preferred shares to non-U.S. investors.  Roberto Cortes, Weisson, and Juan Cortes are directors and beneficial owners of Sentinel.

14.     **Spyglass Investment Management, Ltd. ("Spyglass")** is, according to the Sentinel private placement memoranda, "a company limited by shares" incorporated in the British Virgin Islands.  Spyglass served as the investment adviser to Sentinel and certain of the other Proprietary Products issuers during the Relevant Period.  Spyglass delegated all of its responsibilities to Roberto Cortes during the Relevant Period.  Roberto Cortes, Weisson and Juan Cortes beneficially own Spyglass.  Spyglass has never been registered with the Commission.

15.     **SG Strategic Income, Ltd. ("SG Strategic")**, a Proprietary Products issuer, is, according to private placement memoranda, a "private closed-ended investment exempt company incorporated in the Cayman Islands" that issued four series of notes to non-U.S. investors during the Relevant Period.  SG Strategic primarily invested in "non[-]registered private mortgage backed notes" issued by South Bay through Sentinel and in membership interests issued by South Bay.  Roberto Cortes, Weisson and Juan Cortes beneficially own SG Strategic.

16.     **GMS Global Step Up Note, Ltd. ("GMS")**, a Proprietary Products issuer, is, according to private placement memoranda, a "private closed-ended investment exempt company incorporated in the Cayman Islands" that issued three series of notes to non-U.S. investors during the Relevant Period.  GMS primarily invested in "non-registered private mortgage backed notes" issued by South Bay.  Roberto Cortes, Weisson and Juan Cortes beneficially own GMS.

## Facts

A. **The Common Beneficial Ownership and Effective Control of BCI, the Proprietary Products Issuers and South Bay Created a Conflict of Interest for BCI.**

17.     Roberto Cortes and Weisson formed and began operating South Bay, a residential real estate development company, in approximately 1999.  Between 1999 and approximately 2005, South Bay concentrated on residential real estate development in Key Biscayne, Florida.  South

Bay's business activities expanded significantly in 2006 and 2007 when South Bay acquired 29 lots and associated club memberships in an exclusive resort in South Florida (the "Resort"). Until approximately 2007, South Bay's business activities were financed primarily through commercial bank loans and investments from friends and family.

18.     The Primary BCI Principals and a related individual formed Sentinel, the first of the Proprietary Products issuers, in approximately 2006 for the primary purpose of financing South Bay's activities through the issuance of preferred shares to non-U.S. investors. Starting in 2010, they formed additional Proprietary Products issuers, including SG Strategic and GMS, for the purpose of financing South Bay's activities through the issuance of notes to non-U.S. investors. During the Relevant Period, Roberto Cortes and Weisson each beneficially owned 40 percent of the Proprietary Products issuers and Juan Cortes beneficially owned 10 percent. These three principals were also directors of Sentinel during the Relevant Period. An affiliated entity under the effective control of the beneficial owners provided administrative and accounting support to the Proprietary Products issuers. The Primary BCI Principals, as the beneficial equity owners of the Proprietary Products issuers, stood to receive any profits generated by those entities. The basic beneficial ownership structure of the Proprietary Products is as follows:[4]



19.     Generally, the Proprietary Products issuers invested the proceeds of the notes sold to non-U.S. investors in promissory notes issued by South Bay backed by non-registered mortgages,[5] although certain Proprietary Products issuers invested in membership certificates issued by South Bay.

20.     The Primary BCI Principals, and a related individual, also beneficially owned Spyglass, an offshore investment adviser to certain of the Proprietary Products issuers. Spyglass delegated all of its responsibilities to Roberto Cortes during the Relevant Period, including responsibility for valuing the investments that certain of the Proprietary Products issuers made in South Bay.

---

[4] The Proprietary Products issuers were beneficially owned by these individuals through a holding company that is not represented in this chart. None of the Proprietary Products' offerings was registered under the Securities Act of 1933 and, under the terms of the offering memoranda, the securities were prohibited from sale to U.S. persons.

[5] The non-registered mortgages executed by South Bay in favor of the Proprietary Products issuers were not recorded in Florida. Any recorded mortgages on the properties at issue would have priority over non-registered mortgages.

21.     Starting in approximately 2005, Roberto Cortes, Weisson, and Juan Cortes formed several non-U.S. financial services entities operating under the Biscayne Capital name. Together with Chatburn, they formed BCI in 2008. Roberto Cortes and Weisson beneficially owned through South Bay approximately 61 percent of BCI and the affiliated non-U.S. financial services entities during the Relevant Period. Juan Cortes and Chatburn each beneficially owned between 8 and 9 percent of BCI and the affiliated non-U.S. financial services entities during the Relevant Period. The basic beneficial ownership structure of the Biscayne Capital entities is as follows:[6]



22.     As the majority beneficial owner of the Biscayne Capital entities, South Bay invested millions of dollars in capital contributions for the benefit of those entities during the Relevant Period.

23.     The common beneficial ownership and effective control of BCI, the Proprietary Products Issuers and South Bay created a conflict of interest that, under the Advisers Act, should have been disclosed when BCI recommended and sold the Proprietary Products to BCI clients.

**B.  South Bay's Financial Condition During the Relevant Period Created a Conflict of Interest for BCI.**

24.     By 2009, the combination of the global financial crisis, the accompanying disruption of the South Florida real estate market, and numerous development delays relating to the Resort caused financial difficulties for South Bay.

25.     Between approximately 2007 and late 2009, Weisson and Roberto Cortes, the co-owners of South Bay, spent significant time and resources drafting development plans, seeking permits, and making preparations to develop 17 contiguous lots of the 29 total Resort lots as a single project. One plan involved developing fractional ownership units. Another plan involved developing a luxury retirement community. However, the single project development plans ultimately did not move forward for various reasons. Consequently, in 2010, South Bay began drafting new development plans to build single family homes on the lots over a six-year period, with rental income starting in late 2012 and home sales starting in 2013 and continuing through

---

[6] The Biscayne Capital entities were beneficially owned by these individuals and entities through a holding company that is not represented in this chart.

2016. The development delays stretched into the heart of the financial crisis, leaving South Bay with little revenue and increasing carrying costs.[7]

26.     As later reported in its audited financials, throughout the Relevant Period, South Bay failed to generate enough revenue or operating cash flows to pay off maturing debt, sustain its operations or fund its development plans without obtaining additional financing. Audits completed subsequent to the Relevant Period showed that South Bay had significant net negative cash flows from operations in 2010, 2011 and 2012. During this period, its annual interest costs rose to approximately $12.6 million in 2010, $10.7 million in 2011, and $11.5 million in 2012.[8]   South Bay was also required to renegotiate certain past due financial obligations prior to and during the Relevant Period.[9]

27.     South Bay's financial condition during this period created a conflict of interest for BCI under the Advisers Act, and, thus, should have been disclosed when it recommended and sold the Proprietary Products to BCI clients.

## C. BCI's Dependence on South Bay for Financial Support During the Relevant Period Created a Conflict of Interest for BCI.

28.     BCI did not generate revenues sufficient to sustain operations during the Relevant Period without obtaining additional funding.

29.     South Bay, as the majority beneficial owner of BCI, provided capital contributions to BCI necessary to support its operations during the Relevant Period.

30.     BCI's dependence on South Bay for capital contributions during the Relevant Period created a conflict of interest for BCI that, under the Advisers Act, should have been disclosed in connection with the recommendation and sale of Proprietary Products to BCI clients.

## D. Roberto Cortes, Weisson and Juan Cortes Developed, Marketed, and Sold Proprietary Products to Finance South Bay's Operations.

31.     In 2010 and 2011, while South Bay was struggling to service its existing debt obligations and repay maturing debt to Sentinel, the Primary BCI Principals formed Proprietary Products issuers for the primary purpose of raising additional investor funds to sustain South Bay's operations, meet its existing loan obligations and finance its new real estate development plans.

---

[7] In contrast to the six-year single family home development plan for the Resort lots, South Bay had previously expected all of the homes in the luxury retirement community project to be sold in advance of construction with construction financed by the individuals who purchased the homes and to take 12 to 15 months to complete.

[8] This includes interest incurred and charged to operations as well as interest incurred and capitalized.

[9] The largest past-due obligations concerned loans made by Sentinel to South Bay between 2007 and 2010. The past-due obligations, which exceeded $41 million by September 2010, were renegotiated on several occasions, each time with Roberto Cortes acting on behalf of Spyglass and Sentinel, and Weisson acting on behalf of South Bay.

32.     The Primary BCI Principals formed SG Strategic in the Cayman Islands in March 2010 and issued its first series of notes – Sentinel Investment Fund SPC Linked Series 7.3 Notes ("SG Series 7.3") – to non-U.S. investors starting in July 2010.  SG Strategic invested the proceeds from the first series of notes in preferred shares of Sentinel.  BCI, through Chatburn, recommended and sold SG Series 7.3 Notes to non-U.S. BCI clients without disclosing various conflicts of interest or material information under the Advisers Act related to South Bay's financial condition.

33.     SG Strategic issued three additional series of notes in June 2011: (1) SBH Diversified Preferred Income 2014 (offering commenced in June 2011 and matured in May 2014); (2) SBH Diversified Preferred Income 2016 (offering commenced June 2011 and matures in May 2016); and (3) SBH Diversified Preferred Income 2018 (offering commenced in June 2011 and matures in May 2018) ("SBH 2014," "SBH 2016," and "SBH 2018," respectively).  SG Strategic invested the proceeds from those three series directly in membership certificates issued by South Bay.  South Bay treated the investment as an equity investment for purposes of its financial statements.  BCI, through Chatburn, recommended and sold SBH 2016 and SBH 2018 to its non-U.S. clients without disclosing various conflicts of interest or material information under the Advisers Act related to South Bay's financial condition.

34.     The Primary BCI Principals also formed GMS, which issued three series of notes in December 2011.  The proceeds of these note issuances primarily were invested in Sentinel and in non-registered private mortgage backed notes issued by South Bay.  BCI, through Chatburn, recommended and sold GSM Global Step Up Note, Ltd. Series 3 ("GMS Series 3") to its non-U.S. clients without disclosing various conflicts of interest or material information under the Advisers Act related to South Bay's financial condition.

### E.  BCI Willfully Breached its Fiduciary Duty Under the Advisers Act By Failing to Disclose Conflicts of Interest and Material Information Concerning South Bay's Financial Condition When Recommending to Its Clients the Proprietary Products.

35.     Chatburn, a BCI investment adviser representative, exercised his discretionary authority to purchase[10] or otherwise recommended the purchase of approximately $3.49 million in Proprietary Products in 29 separate BCI client accounts between August 30, 2010 and March 27, 2012.  Chatburn also recommended that certain BCI client accounts sell approximately $104,000 in Proprietary Products during that period.  Chatburn's recommendations to BCI clients related to four Proprietary Products: (1) SG Series 7.3 Notes; (2) SBH 2016; (3) SBH 2018; and (4) GMS Series 3.

36.     As a U.S. investment adviser, BCI had a fiduciary duty under the Advisers Act to exercise the utmost good faith in dealing with clients – including to fully and fairly disclose all material information which might incline an investment adviser consciously or unconsciously to render advice which is not disinterested and to employ reasonable care to avoid misleading clients.  As a BCI investment adviser representative, Chatburn had the same fiduciary duty to his and BCI's clients.  It is the client, not the investment adviser, who is entitled to determine whether a conflict

---

[10] Chatburn had discretion over most of his clients' accounts.

of interest might cause an investment adviser – consciously or unconsciously – to render advice that is not disinterested.

37.     In recommending to its clients the Proprietary Products described above, BCI failed to disclose the previously articulated conflicts of interest relating to the Proprietary Products as well as material information concerning South Bay's financial condition. In doing so, BCI breached its fiduciary duty under the Advisers Act to those clients.

38.     All the Proprietary Products' offering memoranda during the Relevant Period were silent as to BCI's conflicts of interest and South Bay's financial condition. Chatburn failed to disclose to clients various conflicts of interest, such as South Bay's financial condition or the fact that the Proprietary Products issuers were formed and beneficially owned and controlled by the Primary BCI Principals. Similarly, Chatburn failed to disclose that Roberto Cortes and Weisson were responsible for determining the value of certain of the Proprietary Products issuers' investments in South Bay. Further, Chatburn failed to disclose that the Primary BCI Principals owned Spyglass or that Spyglass had delegated its responsibilities to Roberto Cortes during most of the Relevant Period.

39.     Chatburn also failed to disclose material information under the Advisers Act relating to South Bay's financial condition to BCI clients who purchased the Proprietary Products.

**F.  Roberto Cortes, Weisson, and Juan Cortes Willfully Aided and Abetted and Caused BCI's Failure to Disclose Conflicts of Interest and Material Information Under the Advisers Act Regarding South Bay's Financial Condition.**

40.     Roberto Cortes, Weisson, and Juan Cortes developed the Proprietary Products to finance South Bay's real estate operations. An essential component of their effort was to sell the Proprietary Products through their financial advisers, five of whom, including Chatburn, they knew were employed by both BCI and the affiliated non-U.S. Biscayne Capital financial services entities. Roberto Cortes, Weisson, and Juan Cortes encouraged the sale of Proprietary Products by providing these financial advisers offering memoranda, term sheets and presentations concerning South Bay. However, Roberto Cortes, Weisson, and Juan Cortes failed to take steps to ensure that the Proprietary Products were not sold through BCI or, in the alternative, to train BCI investment adviser representatives to make adequate disclosures under the Advisers Act in connection with any such BCI sales. For example, they failed to take steps to inform BCI investment adviser representatives that Proprietary Products sales should be made only through the affiliated non-U.S. financial services entities and no recommendations or sales should be made through BCI. Nor did they take steps to prevent trade tickets relating to Proprietary Products from being entered for BCI or to monitor BCI for Proprietary Product sales. They failed to provide training to BCI's investment adviser representatives to highlight regulatory differences between recommending Proprietary Products through their affiliated non-U.S. financial services entities and those required when recommending and selling through BCI, a U.S. registered investment adviser. Further, they knew that BCI's compliance manual was silent as to the sale of Proprietary Products through BCI.

41.     Roberto Cortes, Weisson and Juan Cortes failed to detect that Chatburn engaged in Proprietary Product sales through BCI client accounts during a period of more than 18 months

even though they knew that, at least as of July 30, 2010, Chatburn's assets under management at BCI amounted to more than half of BCI's total assets under management at that time and even though Roberto Cortes and Juan Cortes were designated as his supervisors at BCI. They also knew that Chatburn had a significant portion of clients' assets invested in Proprietary Products during the Relevant Period. Nonetheless, they did not review or otherwise direct that a review be conducted of Chatburn's BCI accounts to ensure that no Proprietary Products were being sold through BCI.

G. **Chatburn Willfully Aided and Abetted and Caused BCI's Failure to Disclose Conflicts of Interest and Material Information Under the Advisers Act Concerning South Bay by Failing to Conduct a Fundamental Analysis or Reasonable Due Diligence Concerning the Proprietary Products.**

42.     Chatburn knew or was reckless in not knowing that BCI failed to disclose conflicts of interest and material information under the Advisers Act concerning South Bay's financial condition when recommending Proprietary Products to BCI's non-U.S. clients.

43.     Chatburn knowingly or recklessly failed to conduct a "fundamental analysis" or reasonable due diligence under the Advisers Act of the Proprietary Products before recommending them to BCI clients, in contravention of BCI's affirmative disclosures in its Form ADV. Part 2A of BCI's Form ADV dated March 2011, which was delivered to clients, stated that BCI's "Financial Advisors conduct fundamental analysis on all securities recommended for client accounts." In the case of stocks and bonds, BCI's Form ADV represented that the analysis generally included a review of the issuer's management, the amount and volatility of past profits or losses, the issuer's assets and liabilities, as well as any material changes from historical norms, prospects for the issuer's industry, as well as the issuer's competitive position within the industry, and any other factors considered relevant. Chatburn took no steps to review similar information relating to the Proprietary Products issuers.

44.     Aside from having knowledge of the coupon rate, the maturity term, and the fact that the Proprietary Products invested in some form in South Bay, Chatburn failed to conduct a "fundamental analysis" of essential features of those products, before recommending them to BCI clients. For example, even though the Proprietary Products notes issued to investors were unsecured debt obligations of the Proprietary Products issuers, Chatburn had an insufficient understanding that BCI's clients had credit risk with respect to the Proprietary Products issuers. Additionally, Chatburn had no understanding as to who owned and managed the Proprietary Products issuers, or the role of Spyglass, the investment adviser to several of the Proprietary Products issuers. Similarly, Chatburn had an insufficient understanding as to the nature of the investments that the Proprietary Products issuers made in South Bay, and did not understand or inquire about the meaning of basic terms in the offering memoranda describing such investments, such as "non-registered private mortgage-backed notes," which was the primary investment made by the Proprietary Products issuers in South Bay. Chatburn also had no understanding as to what rights or recourse, if any, the Proprietary Products issuers had against the underlying assets of South Bay in the event of default (*i.e.*, whether the Proprietary Products issuers had obtained collateral or whether other persons or entities had priority rights to the collateral over the Proprietary Products issuers). Instead, Chatburn relied on his personal relationship with Roberto

Cortes and Weisson, his personal belief that they would be successful in South Bay, and the fact that he visited and observed the South Bay construction sites.

45.     Further, Chatburn knowingly or recklessly ignored information available to him that should have caused him – in exercising his fiduciary duty of care under the Advisers Act as an investment adviser representative – to conduct heightened due diligence on the Proprietary Products that he recommended to BCI clients.  That information included, but is not limited to the following: (1) the Proprietary Products issuers were newly formed small private issuers with no operating history; (2) Spyglass, the investment adviser to several of the Proprietary Products issuers, also was a newly formed company at the time that Sentinel commenced, with no operating history; (3) the investment funds raised by these newly formed Proprietary Products issuers were to be invested in South Bay, a privately owned real estate business that Chatburn knew to be under common beneficial ownership and control with BCI; (4) several of the offering memoranda prior to June 2012 failed to mention South Bay, even though Chatburn knew that to be the primary, if not exclusive, investment being made by the Proprietary Products issuers; and (5) the Proprietary Product offering memoranda indicated that the issuers would not be audited.  Chatburn also had no understanding as to South Bay's underlying financial condition, its profitability, or its creditworthiness, and conducted no investigation or inquiry of South Bay's finances despite the severe real estate crisis in South Florida during the Relevant Period.  Notwithstanding those red flags, Chatburn failed to conduct any investigation relating to the Proprietary Products issuers before recommending Proprietary Products to BCI clients.

46.     In making his recommendations to BCI clients concerning the Proprietary Products, neither Chatburn nor BCI disclosed Chatburn's personal conflicts of interest arising from his beneficial ownership interest in BCI.  Chatburn knew that he had some beneficial ownership interest in BCI.  He also knew that South Bay invested in BCI and that the Proprietary Products that he recommended to non-U.S. BCI clients financed South Bay.  Further, Chatburn failed to disclose that he received additional compensation from one of the affiliated non-U.S. Biscayne Capital financial services entities beyond his share of the disclosed BCI investment management fees charged to BCI clients in connection with the recommendation of Proprietary Products to BCI clients.  Chatburn breached his fiduciary duty under the Advisers Act to those clients in failing to disclose information regarding his personal conflicts of interest.

## H.  Failure to Supervise Frank Chatburn.

47.     As a result of the conduct described above, BCI, Roberto Cortes, and Juan Cortes failed reasonably to supervise, with a view to preventing violations of the Advisers Act, the activities of Frank Chatburn during the Relevant Period.  Both Roberto Cortes, in his capacity as CEO, and Juan Cortes, in his capacity as CCO, were designated by BCI as supervisors of Frank Chatburn.

48.     Between August 2010 and March 2012, Chatburn recommended and sold approximately $3.49 million in Proprietary Products to approximately 29 non-U.S. BCI client accounts.  As previously discussed, BCI established no procedures relating to the sale of Proprietary Products through BCI and had no system for applying such procedures that would reasonably be expected to prevent and detect, insofar as practicable, violations relating to the sale

of Proprietary Products. With respect to Form ADV representations concerning the monitoring and review of BCI accounts, neither Roberto Cortes nor Juan Cortes took adequate steps to conduct such monitoring and reviews with a view to preventing violations of the securities laws.

I. **BCI Failed to Adopt and Implement Written Policies and Procedures Reasonably Designed to Prevent Violations of the Investment Advisers Act.**

49.     BCI failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Investment Advisers Act.

50.     Juan Cortes was responsible for developing a compliance program for BCI and operated as its Chief Compliance Officer until late 2011. However, he had no specific training as a compliance officer. BCI's compliance manual provided that the Chief Compliance Officer was responsible for the successful implementation of the policies and procedures contained in the manual as well as for training employees on compliances issues, ensuring that employees with specific compliance responsibilities competently performed their jobs, and ensuring the timely review of compliance issues. The Compliance Manual further provided that the Chief Compliance Officer was responsible for ensuring that BCI's compliance program remained "robust, comprehensive, and current, and reasonably designed to identify conflicts of interest and other areas that may expose [BCI] to increased regulatory and compliance risk." Nonetheless, Juan Cortes failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder, especially surrounding the sale of products in which BCI or its principals had a financial interest.

51.     Further, BCI's compliance manual – purchased off-the-shelf from a third party – was not reasonably tailored to BCI's business practices until 2012 and BCI did not have any written policies and procedures regarding the recommendation of Proprietary Products through BCI.

J. **BCI Made Material Misstatements in Form ADV.**

52.     BCI made material misstatements in Form ADV during the Relevant Period. Roberto Cortes signed BCI's Form ADV filings. Juan Cortes was primarily responsible for preparing BCI's Form ADV filings and provided factual information as requested to a third party consultant for the purpose of completing BCI's Form ADV filings.

53.     For example, BCI misrepresented in Item 8 of Part 1A of Form ADV as filed with the Commission on July 21, 2011 that neither BCI nor any "any *related person* … recommends securities (or other investment products) in which [BCI] or any *related person* has some proprietary (ownership) interest …."[11] Chatburn had recommended securities issued by the Proprietary Products issuers, which were beneficially owned by the other BCI principals, to BCI clients prior to July 21, 2011 and continued to recommend them after that date.

---

[11] The instructions to Form ADV define related person as any advisory affiliate and any person that is under common control with the firm. Advisory affiliates are defined as (1) all of the adviser's officers, partners, or directors or any persons performing similar functions; (2) all persons directly or indirectly controlling or controlled by the adviser; and (3) all of the adviser's current employees.

54.     BCI misrepresented that it had $150 million in AUM in its March 2011 Form ADV Part 2A based on sub-advisory agreements with certain of the affiliated non-U.S. Biscayne Capital financial services entities and in its July 21, 2011 Form ADV even though BCI never actually provided such services.

55.     BCI also misrepresented the assets managed by Frank Chatburn in prior jobs in Part 2B of Form ADV.  Form ADV represented that Chatburn managed "a $200 million book of business" at Wachovia.  In reality, Chatburn only managed approximately $50-60 million at Wachovia and never reviewed his biographical information in Form ADV.

56.     BCI misrepresented in Part 2A of Form ADV that BCI's investment adviser representatives "conduct fundamental analysis on all securities recommended for client accounts." Chatburn did not conduct a fundamental analysis of the Proprietary Products or the Proprietary Products issuers.  Rather, he visited South Bay's development sites and trusted that South Bay would be successful based on his relationship with Roberto Cortes and Weisson.

57.     BCI misrepresented that "[a]ccounts under Biscayne Capital's management are monitored on an ongoing basis by the Management members and the Compliance Department" when in reality BCI did not have a functioning compliance department and did not adequately monitor BCI's accounts on an ongoing basis.

58.     BCI misrepresented that Roberto Cortes was the Chief Compliance Officer in the Form ADV from 2008 until July 2011, when in fact Juan Cortes was the Chief Compliance Officer.

## Violations

59.     As a result of the conduct described above, BCI willfully violated Sections 206(1) and 206(2) of the Advisers Act, which make it unlawful for any investment adviser, directly or indirectly, to (1) "employ any device, scheme, or artifice to defraud any client or prospective client" or (2) "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."  Also as a result of the conduct described above, Frank R. Chatburn willfully aided and abetted and caused BCI's violations of Sections 206(1) and 206(2) of the Advisers Act.  Roberto G. Cortes, Ernesto H. Weisson, and Juan Carlos Cortes willfully aided and abetted and caused BCI's violations of Section 206(2) of the Advisers Act.

60.     As a result of the conduct described above, BCI willfully violated, and Roberto G. Cortes and Juan Carlos Cortes willfully aided and abetted and caused BCI's violations of, Section 207 of the Advisers Act, which makes it "unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission … or willfully to omit to state in any such application or report any material fact which is required to be stated therein."

61.     As a result of the conduct described above, BCI willfully violated, and Juan Carlos Cortes willfully aided and abetted and caused BCI's violations of, Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder, which require investment advisers to, among other things, adopt

and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act and its rules.

62.     As a result of the conduct described above, BCI, Roberto G. Cortes, and Juan Carlos Cortes failed reasonably to supervise Chatburn, with a view to preventing violations of the federal securities laws, while Chatburn was subject to their supervision, within the meaning of Section 203(e)(6) of the Advisers Act.

IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Sections 203(e), 203(f) and 203(k) of the Advisers Act, and Section 9(b) of the Investment Company Act, it is hereby ORDERED that:

A.     Respondent BCI cease and desist from committing or causing any violations and any future violations of Sections 206(1), 206(2), 206(4) and 207 of the Advisers Act and Rule 206(4)-7 promulgated thereunder.

B.     Respondent BCI is censured.

C.     Respondent Frank R. Chatburn cease and desist from committing or causing any violations and any future violations of Sections 206(1) and 206(2) of the Advisers Act.

D.     Respondent Frank R. Chatburn be, and hereby is:

> barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; and
>
> prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter,

with the right to apply for reentry after four (4) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

E.     Respondent Roberto G. Cortes cease and desist from committing or causing any violations and any future violations of Sections 206(2), and 207 of the Advisers Act.

F.     Respondent Roberto G. Cortes be, and hereby is:

> barred from association with any broker, dealer, investment adviser,
> municipal securities dealer, municipal advisor, transfer agent, or nationally
> recognized statistical rating organization; and
>
> prohibited from serving or acting as an employee, officer, director, member
> of an advisory board, investment adviser or depositor of, or principal
> underwriter for, a registered investment company or affiliated person of such
> investment adviser, depositor, or principal underwriter,

with the right to apply for reentry after three (3) years to the appropriate self-regulatory
organization, or if there is none, to the Commission.

     G.     Respondent Juan Carlos Cortes cease and desist from committing or causing any
violations and any future violations of Sections 206(2), 206(4) and 207 of the Advisers Act and
Rule 206(4)-7 promulgated thereunder.

     H.     Respondent Juan Carlos Cortes be, and hereby is:

> barred from association with any broker, dealer, investment adviser,
> municipal securities dealer, municipal advisor, transfer agent, or nationally
> recognized statistical rating organization; and
>
> prohibited from serving or acting as an employee, officer, director, member
> of an advisory board, investment adviser or depositor of, or principal
> underwriter for, a registered investment company or affiliated person of such
> investment adviser, depositor, or principal underwriter,

with the right to apply for reentry after three (3) years to the appropriate self-regulatory
organization, or if there is none, to the Commission

     I.     Respondent Ernesto H. Weisson cease and desist from committing or causing any
violations and any future violations of Section 206(2) of the Advisers Act.

     J.     Respondent Ernesto H. Weisson be, and hereby is:

> barred from association with any broker, dealer, investment adviser,
> municipal securities dealer, municipal advisor, transfer agent, or nationally
> recognized statistical rating organization; and
>
> prohibited from serving or acting as an employee, officer, director, member
> of an advisory board, investment adviser or depositor of, or principal
> underwriter for, a registered investment company or affiliated person of such
> investment adviser, depositor, or principal underwriter,

with the right to apply for reentry after three (3) years to the appropriate self-regulatory
organization, or if there is none, to the Commission.

K.      Any reapplication for association by Respondents Frank R. Chatburn, Roberto G. Cortes, Juan Carlos Cortes, and Ernesto H. Weisson will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, the satisfaction of any or all of the following: (a) any disgorgement ordered against the Respondent, whether or not the Commission has fully or partially waived payment of such disgorgement; (b) any arbitration award related to the conduct that served as the basis for the Commission order; (c) any self-regulatory organization arbitration award to a customer, whether or not related to the conduct that served as the basis for the Commission order; and (d) any restitution order by a self-regulatory organization, whether or not related to the conduct that served as the basis for the Commission order.

L.      Respondent BCI shall, within ten (10) days of the entry of this Order, pay disgorgement of $30,024 and prejudgment interest of $3,063 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.

M.      Respondent Frank R. Chatburn shall, within ten (10) days of the entry of this Order, pay disgorgement of $78,924 and prejudgment interest of $8,052 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.

N.      Respondent BCI shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $125,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

O.      Respondent Frank R. Chatburn shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $100,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

P.      Respondents Roberto G. Cortes, Juan Carlos Cortes, and Ernesto H. Weisson shall each, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $50,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

Q.      Payment must be made in one of the following ways:

        (1)     Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     Respondents may make direct payment from a bank account via Pay.gov
through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondents may pay by certified check, bank cashier's check, or United
States postal money order, made payable to the Securities and Exchange
Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying BCI,
Roberto G. Cortes, Juan Carlos Cortes, Ernesto H. Weisson, or Frank R. Chatburn as a Respondent
in these proceedings, and the file number of these proceedings; a copy of the cover letter and check
or money order must be sent to Michael J. Osnato, Chief, Complex Financial Instrument Unit,
Division of Enforcement, Securities and Exchange Commission, 200 Vesey Street, Suite 4000,
New York, New York 10281.

R.     Amounts ordered to be paid as civil money penalties pursuant to this Order shall be
treated as penalties paid to the government for all purposes, including all tax purposes.  To
preserve the deterrent effect of the civil penalty, Respondents BCI, Frank R. Chatburn, Roberto G.
Cortes, Juan C. Cortes and Ernesto H. Weisson agree that in any Related Investor Action, they
shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award
of compensatory damages by the amount of any part of their payment of a civil penalty in this
action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset,
Respondents BCI, Frank R. Chatburn, Roberto G. Cortes, Juan C. Cortes and Ernesto H. Weisson
agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify
the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities
and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and
shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For
purposes of this paragraph, a "Related Investor Action" means a private damages action brought
against Respondents by or on behalf of one or more investors based on substantially the same facts
as alleged in the Order instituted by the Commission in this proceeding.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondent, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Brent J. Fields
Secretary

# EXHIBIT E

## Ross Greenspan

| | |
|---|---|
| **From:** | Dhimitri Agolli |
| **Sent:** | Friday, March 16, 2018 10:17 AM |
| **To:** | Ross Greenspan |
| **Cc:** | James Gaafar |
| **Subject:** | FW: Free delivery |
| **Attachments:** | IMG_4613.PNG; ATT00001.txt |

Hi Ross,

Carlos just sent me the below e-mail in which he wants me to go ahead with those two free deliveries (█████ ▓450 &
█████ ▓933 - for which you advised that we would only process a free delivery of all assets + close acct.). Also, please
see attachment.

Best,

-----Original Message-----
From: Carlos Legaspy
Sent: Friday, March 16, 2018 10:08 AM
To: Dhimitri Agolli <dagolli@insightamericas.net>
Subject: Free delivery

I authorize the delivery of the positions for these accounts

1

Marzo 15, 2018

Sres. Insight

Por medio de la presente solicito enviar desde la cuenta ████ 3450, la siguiente posición desde mi cuenta con ustedes:

| Isin | Monto | Descripcion |
|------|-------|-------------|
| CH0244767585 | 22,145.00 | UBS GROUP AG SHS ISIN#CH0244767585 |
| USP989MJBE04 | 200,000.00 | YPF SOCIEDAD ANONIMA SR NT REG S 8.500% 07/28/25 |
| US71647NAF89 | 200,000.00 | PETROBRAS GLOBAL FIN BV 4.375% 05/20/23 |
| US172967GF21 | 127,000.00 | CITIGROUP INC NTS 5.900% 09/09/88 |
| U3P1330HBF03 | 200,000.00 | BANCO HIPOTECARIO SA ARGENTINA NT SER 29 REG S 9.750% 11/30/20 |
| USC10802AW79 | 120,000.00 | BOMBARDIER INC SR NT REG S 6.125% 01/15/23 |
| XS1433314314 | 150,000.00 | PROVINCE OF BUENOS AIRES SHORT TERM NTS 7.875% 06/15/27 REG |
| XS1496112407 | 150,000.00 | MUNICIPALIDAD DE LA CIUDAD DE CORDOBA USD REG S 7.875% 09/29/24 |

A las siguientes instrucciones:

EC ████ 82

DTC: DTC# 587 FFC: ID 60 FOR A/C#:GLOBAL PLUS ACCT

FFC Bralisol Associates Ltd Y cuent ████ 25

TD 15/3/18

SD 16/3/18

Favor contactar a contact   madisonadvisor.com para detalles.

Sin otro particular saludo atte.

# EXHIBIT F

8/7/2018
Case 1:18-cv-06768-DLC   Document 39-7   Filed 12/21/18   Page 115 of 146
E*Trade Units Fined $1 Million for Inadequate Anti-Money Laundering Program | FINRA.org
Case 1:18-cv-10191   Document 11-1   Filed 11/02/18   Page 111 of 142



<span style="color:red">**News Release**</span>

**For Release:**     Friday, January 2, 2009

**Contact(s):**     Nancy Condon (202) 728-8379
                    Brendan Intindola (646) 315-7277

# E*Trade Units Fined $1 Million for Inadequate Anti-Money Laundering Program

## Firms Failed To Adequately Monitor For Suspicious Trading Activity

**Washington, D.C.** — The Financial Industry Regulatory Authority (FINRA) announced today that it has imposed a $1 million fine against E*Trade Securities, LLC and E*Trade Clearing, LLC, collectively, for failing to establish and implement anti-money laundering (AML) policies and procedures that could reasonably be expected to detect and cause the reporting of suspicious securities transactions.

"Brokerage firms' AML programs must be tailored to their business models," said Susan L. Merrill, Executive Vice President and Chief of Enforcement. "In this case, while E*Trade provides its customers with on-line, self-directed electronic access to the securities markets, its AML program lacked automated electronic systems specifically designed to detect potentially manipulative trading activity in customer accounts."

FINRA requires brokerage firms to establish and implement AML procedures that address a number of areas, including monitoring the trading in customer accounts as well as the flow of money into and out of these accounts. Firms are required to monitor trading in customers' accounts for certain types of suspicious trading activity and file with Department of Treasury's Financial Crimes Enforcement Network (FinCEN) "a report of any suspicious transaction relevant to a possible violation of law or regulation."

FINRA has further instructed each broker/dealer that its AML program must be tailored to its business. A firm needs to consider factors such as its size, location, business activities, the types of accounts it maintains and the types of transactions in which its customers engage. One of the factors that brokerage firms are instructed to consider generally is the technological environment in which the firm operates. On-line firms such as E*Trade specifically have been instructed to "consider conducting computerized surveillance of account activity to detect suspicious transactions and activity."

FINRA found that between Jan.1, 2003 and May 31, 2007, E*Trade did not have an adequate AML program based upon its business model. Because E*Trade did not have separate and distinct monitoring procedures for suspicious trading activity in the absence of money movement, its AML policies and procedures could not reasonably be expected to detect and cause the reporting of suspicious securities transactions. The firm relied on its analysts and other employees to manually monitor for and detect suspicious trading activity without providing them with sufficient automated tools. FINRA determined that this approach to suspicious activity detection was unreasonable given E*Trade's business model.

In concluding this settlement, E*Trade neither admitted nor denied the charges, but consented to the entry of FINRA's findings.

Investors can obtain more information about, and the disciplinary record of, any FINRA-registered broker or brokerage firm by using FINRA's BrokerCheck. FINRA makes BrokerCheck available at no charge. In 2007, members of the public

8/7/2018
E*Trade Units Fined $1 Million for Inadequate Anti-Money Laundering Program | FINRA.org

Case 1:18-cv-06768-DLC   Document 39-7   Filed 12/21/18   Page 116 of 146
Case 1:18-cv-10191   Document 11-1   Filed 11/02/18   Page 112 of 142

used this service to conduct 6.7 million reviews of broker or firm records. Investors can access BrokerCheck at www.finra.org/brokercheck or by calling (800) 289-9999.

FINRA, the Financial Industry Regulatory Authority, is the largest non-governmental regulator for all securities firms doing business in the United States. FINRA is dedicated to investor protection and market integrity through effective and efficient regulation and complementary compliance and technology-based services. FINRA touches virtually every aspect of the securities business—from registering and educating all industry participants to examining securities firms; writing and enforcing rules and the federal securities laws; informing and educating the investing public; providing trade reporting and other industry utilities; and administering the largest dispute resolution forum for investors and registered firms. For more information, please visit our Web site at www.finra.org.

Sitemap  |  Privacy  |  Legal

©2018 FINRA. All rights reserved.

# EXHIBIT G

8/7/2018　　Case 1:18-cv-06768-DLC　Document 39-7　Filed 12/21/18　Page 118 of 146
FINRA Fines Aegis Capital Corp. $550,000 for Anti-Money Laundering and Supervision Rule Violations | FINRA.org
Case 1:18-cv-10191　Document 11-1　Filed 11/02/18　Page 114 of 142



## News Release

**For Release:**　　Wednesday, March 28, 2018
**Contact(s):**　　Michelle Ong (202) 728-8464

## FINRA Fines Aegis Capital Corp. $550,000 for Anti-Money Laundering and Supervision Rule Violations

WASHINGTON — The Financial Industry Regulatory Authority (FINRA) announced today that it has fined Aegis Capital Corp. $550,000 for failing to have adequate supervisory and anti-money laundering (AML) programs tailored to detect "red flags" or suspicious activity connected to its sale of low-priced securities.

FINRA found that Aegis' supervisory system for trading in delivery versus payment (DVP) accounts was not reasonably designed to satisfy its obligation to monitor and investigate trading in DVP accounts, particularly in low-priced securities transactions. In a DVP account, customers buy and sell securities that are not held at the brokerage firm executing the trades, and the purchases and sales of those shares are then effected through the brokerage firm. During its investigation, FINRA found that Aegis failed to adequately monitor or investigate the trading in seven DVP customer accounts that liquidated billions of shares of low-priced securities, generating millions of dollars in proceeds for its customers. Several of these customers were foreign financial institutions that effected transactions on behalf of their underlying customers, all of whom were unknown to Aegis. The firm did not identify these trades as suspicious even after its clearing firm alerted Aegis to AML red flags and specific suspicious low-priced securities transactions. These violations were accompanied by a failure to implement an adequate AML program tailored to detect red flags associated with these sales.

"It's critical that firms have effective AML systems in place so that they can comply with their obligations to review suspicious transactions, including those involving trading in low-priced securities," said Susan Schroeder, FINRA's Executive Vice President, Department of Enforcement. "The AML and supervision rules are important components of investor protection and market integrity, and member firms must have reasonably designed systems to ensure these rules are effectively implemented."

In settling this matter, Aegis neither admitted nor denied the charges, but consented to the entry of FINRA's findings.

In its 2018 Regulatory and Examination Priorities Letter, FINRA highlighted AML as an area of concern and noted it will assess the adequacy of firms' AML programs and their policies and procedures to detect and report suspicious transactions. Firms can also review FINRA's Examination Findings Report to understand FINRA's areas of concern and observations on effective practices related to AML.

The Securities and Exchange Commission (SEC) also announced today that Aegis agreed to pay a $750,000 penalty in a separate action involving anti-money laundering violations by the firm. FINRA appreciates the assistance of the SEC and FinCEN.

Investors can obtain more information about, and the disciplinary record of, any FINRA-registered broker or brokerage firm by using FINRA's BrokerCheck. FINRA makes BrokerCheck available at no charge. Investors can access BrokerCheck at www.finra.org/brokercheck or by calling (800) 289-9999. Investors may find copies of this disciplinary action as well as other disciplinary documents in FINRA's Disciplinary Actions Online database. Investors can also call FINRA's Securities Helpline for Seniors at (844) 57-HELPS for assistance or to raise concerns about issues they have with their brokerage accounts and investments.

FINRA is dedicated to investor protection and market integrity. It regulates one critical part of the securities industry — brokerage firms doing business with the public in the United States. FINRA, overseen by the SEC, writes rules, examines

8/7/2018

Case 1:18-cv-06768-DLC   Document 39-7   Filed 12/21/18   Page 119 of 146
Case 1:18-cv-10191   Document 11-1   Filed 11/02/18   Page 115 of 142

for and enforces compliance with FINRA rules and federal securities laws, registers broker-dealer personnel and offers them education and training, and informs the investing public. In addition, FINRA provides surveillance and other regulatory services for equities and options markets, as well as trade reporting and other industry utilities. FINRA also administers a dispute resolution forum for investors and brokerage firms and their registered employees. For more information, visit www.finra.org.

Sitemap | Privacy | Legal

©2018 FINRA. All rights reserved.

# EXHIBIT H

**Dhimitri Agolli**

| | |
|---|---|
| **From:** | ProAdvisors Backoffice <backoffice@pro-advisors.net> |
| **Sent:** | Friday, March 16, 2018 1:31 PM |
| **To:** | Dhimitri Agolli |
| **Cc:** | Larry Rozas; Jennifer Mayer; ProAdvisors Backoffice |
| **Subject:** | RE: ████ 6933 - FREE DELIVERY AP2426 |

BANK OF NEW YORK

MADISON ADVISORS

BACKOFFICE PRO ADVISORS LLC

---

**De:** Dhimitri Agolli [mailto:dagolli@insightamericas.net]
**Enviado el:** Friday, March 16, 2018 3:16 PM
**Para:** ProAdvisors Backoffice
**CC:** Larry Rozas; Jennifer Mayer
**Asunto:** RE: ████ 6933 - FREE DELIVERY AP2426
    6

Please provide the name of the receiving Financial Institution/Bank this transfer is intended for, also.

Thank you,

---

**From:** ProAdvisors Backoffice [mailto:backoffice@pro-advisors.net]
**Sent:** Friday, March 16, 2018 8:58 AM
**To:** Dhimitri Agolli <dagolli@insightamericas.net>
**Cc:** Larry Rozas <lrozas@insightamericas.net>; Jennifer Mayer <JMayer@insightamericas.net>; ProAdvisors Backoffice
<backoffice@pro-advisors.net>
**Subject:** RE: ████ 6933 - FREE DELIVERY AP2426

During the following 30 days the client will be transferring out remaining holdings

Thanks,

BACKOFFICE PRO ADVISORS LLC

**De:** Dhimitri Agolli [mailto:dagolli@insightamericas.net]
**Enviado el:** Friday, March 16, 2018 10:06 AM
**Para:** ProAdvisors Backoffice
**CC:** Larry Rozas; Jennifer Mayer
**Asunto:** RE: ████ 6933 - FREE DELIVERY AP2426

Hello,

I see that this is a partial transfer also. When are the rest of the assets going to be transferred out of the account?

1

Thank you,
Dhimitri

---

**From:** ProAdvisors Backoffice [mailto:backoffice@pro-advisors.net]
**Sent:** Thursday, March 15, 2018 4:24 PM
**To:** Dhimitri Agolli <dagolli@insightamericas.net>; Jennifer Mayer <JMayer@insightamericas.net>
**Cc:** ProAdvisors Backoffice <backoffice@pro-advisors.net>; Larry Rozas <lrozas@insightamericas.net>
**Subject:** ███████5933 - FREE DELIVERY AP2426

Team

Please set up to Deliver Free of Payment:

Td: 03/15/2018
Sd: 03/16/2018

| | | | |
|---|---|---|---|
| US71647NAK54 | 71647NAK5 | 185,000.0000 | PETROBRAS GLOBAL FIN BV GTD NT ISIN#US71647NAK54 7.250% 03/17/44 B/E DTD 03/17/14 N/C - DTC |
| US71645WAH43 | 71645WAH4 | 44,000.0000 | PETROBRAS INTL FIN CO GLOBAL NTS ISIN#US71645WAH43 8.375% 12/10/18 B/E DTD 12/10/03 N/C - DTC |
| US4042807036 | 404280703 | 3,476.0000 | HSBC HLDGS PLC PERPETUAL SUB CAP SEC CPN 8.125% CPN FREQ QRTLY PERP MATY CALL ANYTIME W/30 DAY NOTICE 4/15/13 - DTC |
| XS1496112407 | P6S94ZAB5 | 150,000.0000 | MUNICIPALIDAD DE LA CIUDAD DECORDOBA USD GLOBAL NT REG S ISIN# XS1496112407 7.875% 09/29/24 REG DTD 09/29/16 CLB CALLABLE - EUROCLEAR |
| USP25619AB67 | P25619AB6 | 150,000.0000 | CHUBUT PROV SECD AMORTIZING NT REG S ISIN#USP25619AB67 7.750% 07/26/26 B/E DTD 07/26/16 N/C - DTC |
| US040114HL72 | 040114HL7 | 80,000.0000 | ARGENTINE REPUBLIC ISIN#US040114HL72 6.875% 01/26/27 B/E DTD 01/26/17 N/C - DTC. |
| USP04808AN44 | P04808AN4 | 75,000.0000 | ARGENTINA REP BD REGS ISIN#USP04808AN44 7.125% 06/28/17 B/E DTD 06/28/17 N/C - DTC |

**Our REF:**
DTC: 0443
Beneficiary: Pershing LLC

Agent Bank: Euroclear
BIC Code 1: MGTCBEBEECL
Account Name: Pershing LLC
Account #: ███46

**CP REF:**
DTC 0987
FFC BJ 60 FOR A/C GLOBAL PLUS ACCT
FFC M APARAIN BORJA ███426

ECL 44382

Thanks,


BACKOFFICE PRO ADVISORS LLC

**De:** Madison Advisor Contact [mailto:contact@madisonadvisor.com]
**Enviado el:** Thursday, March 15, 2018 5:07 PM
**Para:** ProAdvisors Backoffice
**Asunto:** RE: FREE DELIVERY AP2426 Our Ref ████ 933 DTC/ECL

Confirmed and agreed.

Rgds

MADISON ADVISORS

**From:** ProAdvisors Backoffice <backoffice@pro-advisors.net>
**Sent:** Thursday, March 15, 2018 3:38 PM
**To:** Madison Advisor Contact <contact@madisonadvisor.com>
**Cc:** ProAdvisors Backoffice <backoffice@pro-advisors.net>
**Subject:** FREE DELIVERY AP2426 Our Ref ████ 933 DTC/ECL

Team

We have instructions to deliver Free of Payment:

Td: 03/15/2018
Sd: 03/16/2018

| | | | |
|---|---|---|---|
| US71647NAK54 | 71647NAK5 | 185,000.0000 | PETROBRAS GLOBAL FIN BV GTD NT ISIN#US71647NAK54 7.250% 03/17/44 B/E DTD 03/17/14 N/C - **DTC** |
| US71645WAH43 | 71645WAH4 | 44,000.0000 | PETROBRAS INTL FIN CO GLOBAL NTS ISIN#US71645WAH43 8.375% 12/10/18 B/E DTD 12/10/03 N/C - **DTC** |
| US4042807036 | 404280703 | 3,476.0000 | HSBC HLDGS PLC PERPETUAL SUB CAP SEC CPN 8.125% CPN FREQ QRTLY PERP MATY CALL ANYTIME W/30 DAY NOTICE 4/15/13 - **DTC** |
| XS1496112407 | P6S94ZAB5 | 150,000.0000 | MUNICIPALIDAD DE LA CIUDAD DECORDOBA USD GLOBAL NT REG S ISIN# XS1496112407 7.875% 09/29/24 REG DTD 09/29/16 CLB CALLABLE - **EUROCLEAR** |
| USP25619AB67 | P25619AB6 | 150,000.0000 | CHUBUT PROV SECD AMORTIZING NT REG S ISIN#USP25619AB67 7.750% 07/26/26 B/E DTD 07/26/16 N/C - **DTC** |
| US040114HL72 | 040114HL7 | 80,000.0000 | ARGENTINE REPUBLIC ISIN#US040114HL72 6.875% 01/26/27 B/E DTD 01/26/17 N/C - **DTC** |

USP04808AN44  P04808AN4  75,000.0000  ARGENTINA REP BD REGS ISIN#USP04808AN44 7.125% 06/28/17 B/E DTD 06/28/17 N/C - DTC

**Our REF:**
DTC: 0443
Beneficiary: Pershing LLC

Agent Bank: Euroclear
BIC Code 1: MGTCBEBEECL
Account Name: Pershing LLC
Account #: ▮46

**Your REF:**
DTC 0987
FFC BJ 60 FOR A/C GLOBAL PLUS ACCT
FFC M APARAIN BORJA ▮26

ECL 44382

Pls confirm if you agree with proposed TD and SD

Thanks

Insight Securities, Inc. Member FINRA | SIPC | MSRB Insight Securities, Inc. does not accept orders or instructions without verbal confirmation and is not responsible for any recommendation, solicitation, offer or agreement or any information about any transaction, customer account or account activity contained in this communication. This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading, disseminating, distributing or copying this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the message and any attachments from your system.
Insight Securities, Inc. Member FINRA | SIPC | MSRB Insight Securities, Inc. does not accept orders or instructions without verbal confirmation and is not responsible for any recommendation, solicitation, offer or agreement or any information about any transaction, customer account or account activity contained in this communication. This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading, disseminating, distributing or copying this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the message and any attachments from your system.

Marzo 15, 2018

Por este medio solicito transferir de mi cuenta ▮▮▮▮▮▮933 lo siguiente:

| | | |
|---|---|---|
| US71647NAK54 | 165,000.00 | PETROBRAS GLOBAL FIN BV GTD NT 7.250% 03/17/44 B/E DTD 03/17/14 N/C |
| US71645WAH43 | 44,000.00 | PETROBRAS INTL FIN CO GLOBAL 6.375% 12/10/18 B/E DTD 12/10/03 N/C |
| US4042807036 | 3,476.00 | HSBC HLDGS PLC PERPETUAL SUB CAP SEC CPN 8.125% |
| XS1496112407 | 150,000.00 | MUNICIPALIDAD DE LA CIUDAD DECORDOBA USD GLOBAL NT REG S 7.875% 09/29/24 |
| USP25619AB67 | 150,000.00 | CHUBUT PROV SECD AMORTIZING NT REG S 7.750% 07/26/26 |
| US040114HL72 | 80,000.00 | ARGENTINE REPUBLIC 6.875% 01/26/27 B/E DTD 01/26/17 N/C |
| USP04808AN44 | 75,000.00 | ARGENTINA REP BD REGS 7.125% 06/28/17 B/E DTD 06/28/17 N/C |

A las siguientes instrucciones:

EC 44382

DTC: DTC# 987 FFC: BJ 60

FFC 'M Abascam Borjas' ; # ▮▮▮26

TD 15/3/18

SD 16/3/18

Favor contactar a contact@madisonadvisor.com para detalles.

Gracias, cordialmente

# EXHIBIT I

**Dhimitri Agolli**

| | |
|---|---|
| **From:** | ProAdvisors Backoffice <backoffice@pro-advisors.net> |
| **Sent:** | Friday, March 16, 2018 1:31 PM |
| **To:** | Dhimitri Agolli |
| **Cc:** | Larry Rozas; Jennifer Mayer; ProAdvisors Backoffice |
| **Subject:** | RE: ▆▆▆ 3450 - FREE DELIVERY AP2425 |

BANK OF NEW YORK

MADISON ADVISORS

BACKOFFICE PRO ADVISORS LLC

**De:** Dhimitri Agolli [mailto:dagolli@insightamericas.net]
**Enviado el:** Friday, March 16, 2018 3:14 PM
**Para:** ProAdvisors Backoffice
**CC:** Larry Rozas; Jennifer Mayer
**Asunto:** RE: ▆▆▆3450 - FREE DELIVERY AP2425

Hello,

Can you provide the name of the receiving Financial Institution/Bank this transfer is intended for?

Thank you,

**From:** ProAdvisors Backoffice [mailto:backoffice@pro-advisors.net]
**Sent:** Friday, March 16, 2018 8:58 AM
**To:** Dhimitri Agolli <dagolli@insightamericas.net>
**Cc:** Larry Rozas <lrozas@insightamericas.net>; Jennifer Mayer <JMayer@insightamericas.net>; ProAdvisors Backoffice <backoffice@pro-advisors.net>
**Subject:** RE: ▆▆▆3450 - FREE DELIVERY AP2425

During the following 30 days the client will be transferring out remaining holdings

Thanks,

BACKOFFICE PRO ADVISORS LLC

**De:** Dhimitri Agolli [mailto:dagolli@insightamericas.net]
**Enviado el:** Friday, March 16, 2018 10:06 AM
**Para:** ProAdvisors Backoffice
**CC:** Larry Rozas; Jennifer Mayer
**Asunto:** RE: ▆▆▆3450 - FREE DELIVERY AP2425

Hello,

I see that this is a partial transfer. When are the rest of the assets going to be transferred out of the account?

1

Thank you,
Dhimitri

---

**From:** ProAdvisors Backoffice [mailto:backoffice@pro-advisors.net]
**Sent:** Thursday, March 15, 2018 4:23 PM
**To:** Dhimitri Agolli <dagolli@insightamericas.net>; Jennifer Mayer <JMayer@insightamericas.net>
**Cc:** Larry Rozas <lrozas@insightamericas.net>; ProAdvisors Backoffice <backoffice@pro-advisors.net>
**Subject:** ▮▮▮▮33450 - FREE DELIVERY AP2425

Team

Pls set up to Deliver Free of Payment

Td: 03/15/2018
Sd: 03/16/2018

| | | | |
|---|---|---|---|
| CH0244767585 | H42097107 | 22,145.0000 | UBS GROUP AG SHS ISIN#CH0244767585 - DTC |
| USP989MJBE04 | P989MJBE0 | 200,000.0000 | YPF SOCIEDAD ANONIMA SR NT REG S ISIN#USP989MJBE04 8.500% 07/28/25 B/E DTD 04/28/15 N/C - DTC |
| US71647NAF69 | 71647NAF6 | 200,000.0000 | PETROBRAS GLOBAL FIN BV ISIN#US71647NAF69 4.375%05/20/23 B/E DTD 05/20/13 N/C - DTC |
| US172967GF21 | 172967GF2 | 127,000.0000 | CITIGROUP INC NTS 5.900% 09/09/88 B/E DTD 12/13/12 N/C - DTC |
| USP1330HBF03 | P1330HBF0 | 200,000.0000 | BANCO HIPOTECARIO SA ARGENTINA NT SER 29 REG S ISIN#USP1330HBF03 9.750% 11/30/20 B/E DTD 11/30/15 N/C - DTC |
| USC10602AW79 | C10602AW7 | 120,000.0000 | BOMBARDIER INC SR NT REG S ISIN#USC10602AW79 - DTC 6.125% 01/15/23 B/E DTD 01/14/13 N/C |
| XS1433314314 | P1910WMG1 | 150,000.0000 | PROVINCE OF BUENOS AIRES SHORT TERM NTS ISIN#XS1433314314 7.875% 06/15/27 REG DTD 06/15/16 N/C - EUROCLEAR |
| XS1496112407 | P6S94ZAB5 | 150,000.0000 | MUNICIPALIDAD DE LA CIUDAD DECORDOBA USD GLOBAL NT REG S ISIN# XS1496112407 7.875% 09/29/24 REG DTD 09/29/16 CLB CALLABLE - EUROCLEAR |

**Our REF:**
DTC: 0443
Beneficiary: Pershing LLC

Agent Bank: Euroclear
BIC Code 1: MGTCBEBEECL
Account Name: Pershing LLC
Account #:▮▮▮▮46

**CP REF:**
DTC 0987
FFC BJ 60 FOR A/C GLOBAL PLUS ACCT
FFC BRALISOL ASSOCIATES LTD AP2425

2

ECL 44382

BACKOFFICE PRO ADVISORS LLC

**De:** Madison Advisor Contact [mailto:contact@madisonadvisor.com]
**Enviado el:** Thursday, March 15, 2018 5:06 PM
**Para:** ProAdvisors Backoffice
**Asunto:** RE: FREE DELIVERY AP245 Our Ref ▇▇▇▇B450 DTC/ECL

Confirmed and agreed.

Rgds

MADISON ADVISORS

**From:** ProAdvisors Backoffice <backoffice@pro-advisors.net>
**Sent:** Thursday, March 15, 2018 3:31 PM
**To:** Madison Advisor Contact <contact@madisonadvisor.com>
**Cc:** ProAdvisors Backoffice <backoffice@pro-advisors.net>
**Subject:** FREE DELIVERY AP245 Our Ref ▇▇▇▇B450 DTC/ECL

Team

We have instructions to deliver Free of Payment:

Td: 03/15/2018
Sd: 03/16/2018

| | | | |
|---|---|---|---|
| CH0244767585 | H42097107 | 22,145.0000 | UBS GROUP AG SHS ISIN#CH0244767585 - DTC |
| USP989MJBE04 | P989MJBE0 | 200,000.0000 | YPF SOCIEDAD ANONIMA SR NT REG S ISIN#USP989MJBE04 8.500% 07/28/25 B/E DTD 04/28/15 N/C - DTC |
| US71647NAF69 | 71647NAF6 | 200,000.0000 | PETROBRAS GLOBAL FIN BV ISIN#US71647NAF69 4.375% 05/20/23 B/E DTD 05/20/13 N/C - DTC |
| US172967GF21 | 172967GF2 | 127,000.0000 | CITIGROUP INC NTS 5.900% 09/09/88 B/E DTD 12/13/12 N/C - DTC |
| USP1330HBF03 | P1330HBF0 | 200,000.0000 | BANCO HIPOTECARIO SA ARGENTINA NT SER 29 REG S ISIN#USP1330HBF03 9.750% 11/30/20 B/E DTD 11/30/15 N/C - DTC |
| USC10602AW79 | C10602AW7 | 120,000.0000 | BOMBARDIER INC SR NT REG S ISIN#USC10602AW79 - DTC 6.125% 01/15/23 B/E DTD 01/14/13 N/C |
| XS1433314314 | P1910WMG1 | 150,000.0000 | PROVINCE OF BUENOS AIRES SHORT TERM NTS ISIN#XS1433314314 7.875% 06/15/27 REG DTD 06/15/16 N/C - EUROCLEAR |

MUNICIPALIDAD DE LA CIUDAD DECORDOBA USD
XS1496112407    P6S94ZAB5    150,000.0000 GLOBAL NT REG S ISIN# XS1496112407 7.875% 09/29/24
REG DTD 09/29/16 CLB CALLABLE - EUROCLEAR

Our REF:
DTC: 0443
Beneficiary: Pershing LLC

Agent Bank: Euroclear
BIC Code 1: MGTCBEBEECL
Account Name: Pershing LLC
Account #: ███ 46

Your REF:
DTC 0987
FFC BJ 60 FOR A/C GLOBAL PLUS ACCT
FFC BRALISOL ASSOCIATES LTD  AP2425

ECL 44382

Pls confirm if you agree with proposed TD and SD

Thanks

Insight Securities, Inc. Member FINRA | SIPC | MSRB Insight Securities, Inc. does not accept orders or instructions without verbal confirmation and is not responsible for any recommendation, solicitation, offer or agreement or any information about any transaction, customer account or account activity contained in this communication. This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading, disseminating, distributing or copying this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the message and any attachments from your system.
Insight Securities, Inc. Member FINRA | SIPC | MSRB Insight Securities, Inc. does not accept orders or instructions without verbal confirmation and is not responsible for any recommendation, solicitation, offer or agreement or any information about any transaction, customer account or account activity contained in this communication. This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading, disseminating, distributing or copying this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the message and any attachments from your system.

Marzo 15, 2018

Sres. Insight

Por medio de la presente solicito enviar desde la cuenta ███████ 3450, la siguiente posición desde mi cuenta con ustedes:

| Isin | Monto | Descripcion |
|------|-------|-------------|
| CH0244767585 | 22,146.00 | UBS GROUP AG SHS ISIN#CH0244767585 |
| USP989MJBE04 | 200,000.00 | YPF SOCIEDAD ANONIMA SR NT REG S  8.500% 07/28/25 |
| US71647NAF66 | 200,000.00 | PETROBRAS GLOBAL FIN BV 4.375% 05/20/23 |
| US172967GF21 | 127,000.00 | CITIGROUP INC NTS 5.900% 09/09/86 |
| USP1330HBF03 | 200,000.00 | BANCO HIPOTECARIO SA ARGENTINA NT SER 29 REG S  9.750% 11/30/20 |
| USC10602AW79 | 120,000.00 | BOMBARDIER INC SR NT REG S  8.125% 01/15/23 |
| XS1433314314 | 160,000.00 | PROVINCE OF BUENOS AIRES SHORT TERM NTS 7.875% 06/15/27 REG |
| XS1496112407 | 150,000.00 | MUNICIPALIDAD DE LA CIUDAD DE CORDOBA USD  REG S  7.875% 09/29/24 |

A las siguientes instrucciones:

EC 44382

DTC: DTC# 987 FFC: 30 60 FOR A/C#:GLOBAL PLUS ACCT

FFC Brallsol Associates Ltd. cuenta ███████ 425

TD 15/3/18

SD 16/3/18

Favor contactar a contact@madisonadvisor.com para detalles.

Sin otro particular saludo atte.

# EXHIBIT  J

03/16/2018
Veronica harbide
Caerlos, good morning. We have sent 2 partial transfers to the accounts ████ 450
and $#@ Dhimitri is indicating that they can't do it unless the client withdraws all
funds | 9:54am

Fernando haberer
They're two Argentinean brothers without "props" of mine. They are opening other
accounts that's why is partial. Please approve. Thank you. | 9:57am
Carlos? | 10:18am

Carlos legaspy
Approved | 10:18am

Fernando haberer
Thank you! | 10:18am

Veronica Harbide

Carlos buenos días. Hemos enviado 2 transferencias parciales de las cuentas $450 y [redacted] y Dhimitri nos indica que no pueden hacerlas a menos que el cliente retire todos los fondos
9:54 AM

Fernando Haberer

Son dos hermanos cuenta de argentinos sin props mías. Estan abriendo otras cuentas por eso es parcial. Por favor aprobar. Gracias
9:57 AM

Carlos?   10:18 AM

Fernando Haberer   10:18 AM
Gracias!

Brasil

3/16/2018

**Veronica Harbide**

Carlos buenos días, Hemos enviado 2 transferencias parciales de las cuentas y ████8933 y Dhimitri nos indica que no pueden hacerlas a menos que el cliente retire todos los fondos    9:54 AM

**Fernando Haberer**

Son dos hermanos cuenta de argentinos sin props mías. Están abriendo otras cuentas por eso es parcial. Por favor aprobar. Gracias    9:57 AM

Carlos?    10:18 AM

**Fernando Haberer**
Gracias!    10:18 AM

Aprobadas.    10:38 AM

Aproin

# EXHIBIT  K

<u>English Translation from Spanish Original</u>

From: Carlos Legaspy <carlos@intelligenicsinc.com>
Date: Sunday, October 30, 2016 at 10:16 PM
To: Fernando Haberer <fhb@pbadvisor.net>, "'Gustavo Trujillo F '" <gtf@totaladvisorsgroup.com>
Subject: Situations

Sirs:

I am writing to you through this email because the other one is monitored. These two cases are serious since they erode trust. The I describe below:

Devonshire Holdings International Ltd. ▆▆▆▆0506 received two transfers for 250 thousand each from Credit Suisse from a account in the name of Irene and Ernesto Anahuati. In support we were presented with a contract between "Devonshire Holdings Limited "and the Anahuati. Ignore for a moment that he missed the "International", indicates in the "Exhibit A" that for services related to a renewable energy project will be paid $ 700 thousand USD in three payments of $ 250 thousand (over 50 thousand). We are presents a website for Devonshire Holdings which is a word by word clone from the site of Bizcayne Capital where it is said that it offers private banking services, not advice for energy projects. To aggravate the matter further, signatures they are a coarse copy paste.

Another similar case but now for an outflow of resources is the account ▆▆▆▆6983 Felix London. The signatures are obviously extracted from another document.

I ask you please inform your FAs that this behavior is not acceptable, we are not new to this, and I do not want to have to resort to "call backs" to the direct client to verify movements of assets. If we discover it, the regulators can do it too.

We talk tomorrow.

Carlos

**From:** Carlos Legaspy <carlos@intelligenicsinc.com>
**Date:** Sunday, October 30, 2016 at 10:16 PM
**To:** Fernando Haberer <fhb@pbadvisor.net>, "'Gustavo Trujillo F '" <gtf@totaladvisorsgroup.com>
**Subject:** Situaciones

Señores:

Les escribo por este correo porque el otro es monitoreado. Estos dos casos son serios puesto que erosionan la confianza. Los describo a continuación:

Devonshire Holdings International Ltd. ████ 0506 recibió dos transferencias por 250 mil cada una de Credit Suisse de una cuenta a nombre de Irene y Ernesto Anahuati. Como respaldo se nos presentó un contrato entre "Devonshire Holdings Limited" y los Anahuati. Ignoremos por un momento que le faltó el "International", indica en el "Exhibit A" que por servicios relacionados a un proyecto de energía renovable se pagarán $700 mil USD en tres pagos de $250 mil (sobrando 50 mil). Se nos presenta un sitio de internet para Devonshire Holdings que es un clon palabra por palabra del sitio de Bizcayne Capital donde se dice que ofrece servicios de banca privada, no asesoría para proyectos de energía. Para agravar el asunto aun mas, las firmas son un "copy paste" burdo.

Otro caso similar pero ahora para una salida de recursos es la cuenta ████ 6983 Felix London. Las firmas son obviamente extraídas de otro documento.

Les pido por favor informen a sus FAs que este comportamiento no es aceptable, no somos nuevos en esto, y no quisiera que tengamos que recurrir a "call backs" al cliente directo para verificar movimientos de activos. Si nosotros lo descubrimos los reguladores lo pueden hacer también.

Hablamos mañana.

Carlos

# EXHIBIT L

EMAIL SENT TO DIEGO ROMAY WITH BRALISOL'S ACCOUNT INFO!

**De From:** Carlos Legaspy <carlos@intelligenicsinc.com>
**Enviado Sent:** miércoles, 30 de mayo de 2018 13:41 wednesday, may 30, 2018
**Para For:** 'diego roma'
**Asunto Subject:** Bralisol LOA

Esas instrucciones son de Deutschebank
Those instructions are from Deutschebank

FILE ATTACHED: bralisol_loa

EMAIL SENT TO DIEGO ROMAY WITH MARIA'S ACCOUNT INFO!

**De From:** Carlos Legaspy <carlos@intelligenicsinc.com>
**Enviado Sent:** miércoles, 30 de mayo de 2018 13:41 wednesday, may 30
**Para For:** 'diego roma'
**Asunto Subject:** aparain LOA

SEE FILE: aparain_LOA (1).pdf

---

**De:** Carlos Legaspy <carlos@intelligenicsinc.com>
**Enviado:** miércoles, 30 de mayo de 2018 13:41
**Para:** 'diego roma'
**Asunto:** aparain

Mismo lugar en Deutsche

Same place at Deutsche

SEE FILE: aparain_LOA (1).pdf

# EXHIBIT  M



**InSight**
**SECURITIES**

3RD PARTY TRANSFER REQUEST

COMPLIANCE REVIEW

Account Number                                    3450

|  | Y | N |
|---|---|---|
| Letter of Authorization | ✓ | ☐ |
| 3rd Party Transfer Request Exp. Form | ✓ | ☐ |
| Completed Satisfactorily | ✓ | ☐ |
| Amount requested Matches | ✓ | ☐ |
| Signature Authenticated | ✓ | ☐ |

Receiving Bank                       Scotiabank Uruguay

|  | ☐ | ✓ |
|---|---|---|
| Supporting documentation received | ☐ | ✓ |
| World Check | ☐ | ✓ |
| News | ☐ | ✓ |
| Notes | | |

_____                    4-24-18
COMPLIANCE SIGNATURE                           DATE

BY SIGNING ABOVE AS COMPLIANCE, I CONFIRM THAT THIS TRANSFER AND HANDLING OF SUCH
REQUEST ADHERES TO THE FIRM'S ANTI-MONEY LAUNDERING POLICIES & PROCEDURES.

REJECTION EXPLANATION



**InSight SECURITIES**

3RD PARTY TRANSFER REQUEST

EXPLANATION FORM

Required with

- Customer Written and Signed Letter of Authorization (LoA)
- Supporting Due Diligence documentation

U.S. Treasury Department Policies require the identification of both the sender and receiver of funds transferred throughout the Federal Reserve System.

☑ Wire  ☐ Check  ☐ Journal  ☐ Other:_____

| | |
|---|---|
| Account Number | ███ 3450 |
| Rep Number | T09 |
| Account Title | BRALISOL ASSOCIATED LTD |
| | |
| Amount Requested | USD 1,404 |
| 3rd Party Name | ONINSUR SA |
| Relation to Account Owner(s) | CORPORATE SERVICES PROVIDER |
| Purpose and Use of Transfer | REF A236 |

VERBAL CUSTOMER CONFIRMATION OF REQUEST VERIFIED BY _____   12:30 04/24/2018

Initials   Time / Date

REPRESENTATIVE SIGNATURE   4/24/2018
DATE

PRINCIPAL SIGNATURE   05/24/2018
DATE

BY SIGNING ABOVE AS PRINCIPAL, I CONFIRM THAT THIS TRANSFER AND HANDLING OF SUCH REQUEST ADHERES TO THE FIRM'S ANTI-MONEY LAUNDERING POLICIES, SUPERVISORY CONTROL PROCEDURES, AND WRITTEN SUPRVISORY PROCEDURES

ALL 3RD PARTY TRANSFER REQUESTS ARE SUBJECT TO FURTHER REVIEW BY COMPLIANCE PERSONNEL.

3PEF — JK 06-2015 V1.1

**LITWAK & PARTNERS**
International Lawyers

Oninsur S.A.
Ruta 8 km 17.500 Beta 4 of 106
Montevideo
Tel.: 25183448

| RUC EMISOR | | TIPO DE DOCUMENTO | |
|---|---|---|---|
| 217014180011 | | e-Ticket | |
| SERIE | NUMERO | FORMA DE PAGO | VENCIMIENTO |
| A | 236 | Crédito | 23/04/2018 |
| CONSUMO FINAL | | IDENTIFICADOR DE COMPRA | |
| Otro 1927865 VG | | | |
| NOMBRE | | DOMICILIO | |
| BRALISOL ASSOCIATES LTD. | | PO Box 3483, RG Hodge Plaza,, Road Town, Tortola, Exterior | |
| FECHA DE DOCUMENTO | | MONEDA | |
| 23/04/2018 | | USD | |

| Descripción | Uni | * | P. Unitario US$ | Desc | Rec | Cantidad | Importe US$ |
|---|---|---|---|---|---|---|---|
| Annual maintenance fees | UNI | 1 | 1.350,00 | 0,00 | 0,00 | 1,000 | 1.350,00 |
| Administrative expenses 4% | UNI | 1 | 54,00 | 0,00 | 0,00 | 1,000 | 54,00 |
| Penalties | UNI | 1 | 250,00 | 0,00 | 0,00 | 1,000 | 250,00 |

Subtotal no grv.: 1.654,00

**TOTAL A PAGAR** 1.654,00



Res. Nro. 6461/2017
Puede verificar comprobante en
I.V.A al día
Nro. de CAE 90180033005
Rango de CAE: Serie A Nº 1 al 600

Fecha de Vencimiento:
22/01/2020

Página 1 de 1

Código de seguridad:  fY+8+a

ADENDA:

* 1- No gravado, 2- IVA tasa mín, 3- IVA tasa básica, 5- Entrega gratuita, 6- No facturable, 7- No facturable negativo, 10- Exportación y asim.

# LITWAK & PARTNERS
### International Lawyers

## WIRE TRANSFER INSTRUCTIONS

**Currency:**          Dollars

**Intermediary bank:**     Wells Fargo Bank N.A.
City: New York
Swift Code: ▮▮▮▮▮NNYC
ABA: ▮▮▮▮5092

**Beneficiary bank:**      Scotiabank Uruguay S.A.
Swift Code: ▮▮▮▮UYMM
Final beneficiary: Oninsur S.A.
Account number ▮▮▮▮5901
Address: Av. Luis A. De Herrera 1248/31
(Montevideo, Uruguay)

Important:

Please attach your payment receipt to this email in order to allow us to set
the payment process as completed.

If the payment is not made or identified, Litwak & Partners will not take
responsibilities in any penalties that might incur.