**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEUTSCHE BANK SECURITIES, INC.,<br>                    Plaintiff,<br><br>              v.<br><br>RADO LIMITED PARTNERSHIP,<br>                         Defendants. | Case No.: 18-cv-06768 (DLC) |

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
## <u>MOTION TO DISMISS AMENDED COUNTERCLAIMS</u>

Jenice L. Malecki, Esq.
**MALECKI LAW**
11 Broadway, Suite 715
New York, NY 10004
(212) 943-1233
*Attorney for Defendant*
*Rado Limited Partnership*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT   …………………………………………………   1

STATEMENT OF FACTS   …...……………………………………………………   2

LEGAL STANDARDS   …………………………………………………………   3

   I.    Standard on Motion To Dismiss   …………………………………...   3

ARGUMENT   …………………………………………………………………   4

   I.      RADO'S STATE LAW CLAIMS SHOULD NOT BE DISMISSED ………   4

      A. Rado Has Met or Exceed its Applicable Pleading Standard for Breach of Contract …………………………………………………………..…………   4

      B. DB's Narrow Interpretation of the Custody Agreement is Disingenuous ...…   5

      C. DB Was Grossly Negligent in Its Performance of Duty's Owed to Rado.…………………………………………………………………………   10

          1.  DB's Wanton Disregard and Operational Support of Irregular Activity ……………………………………………………………   12

          2.  DB's Reckless Disregard of Industry Rules and Regulations ...……………………………………………………..   12

      D. Economic Loss Doctrine Does Not Bar Rado's Gross Negligence Claims …   13

   II.    DB'S MOTION SHOULD BE DENIED BECAUSE RADO ADEQUATELY ALLEGED ITS CLAIM THAT DB AIDED AND ABETTED THE BREACH OF A FIDUCIARY DUTY TO RADO ………..   13

      A. Breach by a Fiduciary to Another: Fernando Haberer and Biscayne Knowingly Breached Their Fiduciary Duties to Rado ………………………   14

          1.  Biscayne and Haberer Were Fiduciaries …………………………..   14

          2.  Biscayne and Haberer Breached Their Fiduciary Duties to Rado …...   15

          3.  Biscayne and Haberer Breached Their Fiduciary Duties Knowingly …………………………………………………………...   15

          4.  DB Knowingly Induced or Participated in the Breach Because It Provided Substantial Assistance to Biscayne and Haberer ………………………………………………………………   16

5.   Rado Suffered Damages as a Result of The Breach ………………….. 21

III.   DB'S MOTION SHOULD BE DENIED BECAUSE RADO
ADEQUATELY ALLEGED ITS CLAIM THAT DB AIDED AND
ABETTED A FRAUD ……………………………………………………… 22

A.  Existence of the Primary Fraud: Fernando Haberer and Biscayne Committed
a Fraud Against Rado …………………………………………………….. 22

B.  DB Had Knowledge of the Primary Fraud Committed by Biscayne and
Haberer Against Rado ……………...…………………………………... 23

C.  DB Substantially Assisted Biscayne and Haberer in the Fraud They
Committed Against Rado …….…………………………………………... 24

CONCLUSION   …………………………………………………………………... 25

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

*American Tel. & Tel. Co. v. City of N.Y.*,
    83 F.3d 549 (2d Cir. 1996)……………………………………………..………...11

*American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*,
    351 F. Supp. 2d 79 (S.D.N.Y.2004)…………..………...…………………………11

*Anwar v. Fairfield Greenwich, Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010)………………………………………17, 20

*Armstrong v. McAlpin*,
    699 F.2d 79, 91 (2d Cir. 1983)……………………………………………………...25

*Ashcroft v. Iqbal*,
    556 U.S. 662, (2009) …………………………………………………..………..3

*Banc of Am. Sec. LLC v. Solow Bldg. Co. II, L.L.C.*,
    47 A.D.3d 239 (1st Dept. 2007) …………………………………………….... 11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................... 3

*Bischoff v. Yorkville Bank*,
    218 N.Y. 106 (1916)………………………………………...……...18, 20

*Brass v. American Film Technologies, Inc.*,
    987 F.2d 142 (2d Cir. 1993) …………………………………………………3

Brown v. Lockwood,
    76 A.D.2d 721 (2d Dept 1980) ...................................................... 22

*Cromer Fin. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001) …………………………………………..14

*Delton v. Educational Testing Serv.*,
    87 N.Y.2d 384 (1995) ………………………………………………………….7

*Dreieck Finanz Ag v. Sun*,
    1990 U.S. Dist. LEXIS 1438, at *7 (S.D.N.Y. Feb. 9, 1990)........................... 23

*Flaum v. Birnbaum,*
      508 N.Y.S.2d 115 (4th Dep't 1986) …………………………………………………..14

*Food Pageant, Inc. v Consolidated Edison Co., Inc.*,
      54 NY2d 167 (1981) …………………………………………………...…………………..11

*Grund v. Del. Charter Guar. & Trust Co*.,
      788 F. Supp. 2d 226 (S.D.N.Y. May 25, 2011) …………………………………………13

*Home Sav. of Am., FSB v. Amoros*,
      233 A.D.2d 35 (1st Dept. 1997) ……………………………………………………………...5

*IIT v. Cornfeld,*
      619 F.2d 909, 921-22 (2d Cir. 1980) …………………………………………………………24

*In re WorldCom, Inc. ERISA Litig*.,
      339 F. Supp. 2d 561 (S.D.N.Y. 2004) ……………………………………………………12

*Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Trust Co.*,
      261 A.D.2d 117 (N.Y. App. Div 1999) …………………………………………………10

*JP Morgan Chase Bank v. Winnick,*
      406 F. Supp. 2d 247 (S.D.N.Y. 2005) …………………………………………….....22, 25

*Kaufman v. Cohen,*
      307 A.D.2d 113 (1st Dept. 2003) …………………………………………………………..17

*Kolbeck v. LIT Am.*,
      939 F. Supp. 240 (S.D.N.Y. 1996) …………………………………………………...16

*Koppel v. 4987 Corp.*,
      2001 US Dist LEXIS 377 (S.D.N.Y. Jan. 17, 2001) …………………………………………14

*Lerner v. Fleet Bank, N.A.*,
      459 F.3d 273 (2d Cir. 2006) ……..…………………………………14, 16, 17, 18, 19, 20, 21

*Levinson v. PSCC Srvs., Inc.,*
      2010 U.S. Dist. LEXIS 137537 (D. Conn. Dec. 29, 2010) …………………………………..10

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.,*
      244 F.R.D. 204 (S.D.N.Y. 2007) …………………………………………………………..13

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*,
   392 F.3d 520 (2d Cir. 2004) …………………………………………………………5

*New York Univ. v. Cont'l Ins. Co.*,
   87 N.Y.2d 308 (1995) ……………………………………………………………...13

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*,
   172 F. Supp. 3d 700 (S.D.NY. 2016) …………………………………………………3

*Primavera Familienstiftung v. Askin*,
   130 F. Supp. 2d 450 (S.D.N.Y. 2001) …………………………..……21, 22, 23, 24, 25

*Prudential Inv. Mgmt. Servs. LLC v. Forde*,
   2013 U.S. Dist. LEXIS 89190 (S.D.N.Y. June 24, 2013) ………………………………12

*Renner v. Chase Manhattan Bank*,
   1999 U.S. Dist. LEXIS 978 (S.D.N.Y. Feb. 2, 1999) ………..…………………………19
   9

*RIJ Pharm. Corp. v. Ivax Pharms.*,
   Inc., 322 F. Supp. 2d 406 (S.D.N.Y. 2004) ………………………………………………4

*Rolf v. Blyth, Easton Dillon & Co.*,
   570 F.2d 38 (2d Cir. 1978) …………………………………………………………..21

*Ruso v. Morrison*,
   695 F. Supp. 2d 33 (S.D.N.Y. 2010) ……………………………………………………14

*Scutti Enters., LLC. v. Park Place Entm't Corp.*,
   322 F.3d 211, 214 (2d Cir. 2003) ………………………………………..………………3

*Swierkiewicz v. Sorema N.A.*,
   524 U.S. 506, 512 (2002) …………………………………………………………………3

*Szulik v. State St. Bank & Trust*.
   935 F. Supp 2d 240 (D. Mass 2013)   10, 11 ……………………………...9, 10, 11, 12, 13

## Statutes

12 CFR 220 ...................................................................................................... 8

12 CFR 221 ...................................................................................................... 8

**Other Authorities**

Comptroller of the Currency, *Custody Services (Comptroller's Handbook)*, (2002), available at
https://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/custody-
services/pub-ch-custody-services.pdf (last visited Dec. 20, 2018)...........................................7

**Rules**

Fed. R. Civ. P. 8(a) ...........................................................................................................................3

Fed. R. Civ. P. 8(a)(3)......................................................................................................................12

Fed. R. Civ. P. 8(d)(3)......................................................................................................................12

Fed. R. Civ. P. 12(b)(6).....................................................................................................................3

Rado Limited Partnership ("Rado") respectfully submits this Memorandum of Law in Opposition to Plaintiff Deutsche Bank Trust Company Americas' ("DB") Motion to Dismiss the Amended Counterclaims ("Motion" or "Motion to Dismiss").

## PRELIMINARY STATEMENT

DB's Motion to Dismiss reads like a summary judgment motion, challenging what we would be able to prove at page 10, underscoring its defects. Essentially raising its potential affirmative defenses as alleged fact-less matters of law, there are many questions of fact for the trier of fact to decide. Under DB's theories, it has no duty of care and only DB may avail itself of a breach of contract action. In DB's world, Rado is a captive, handcuffed and voiceless detainee of Francisco Haberer ("Haberer") only. Noticeably, though, DB mostly shies away from strong arguments on gross negligence and commercially unreasonable conduct, trying to pigeonhole the case into a frame that does not fit. Although DB won the race to the courthouse, this case is about DB's substantial assistance to a fraudster, SEC sanctioned entity and Madison Assets, all of whom DB had a longstanding, rocky relationship with contemporaneously.

On May 27, 2016, Biscayne Capital International, LLC ("Biscayne")[1] was sanctioned in an SEC Cease-And-Desist Proceedings for its role in owning, creating and improperly selling what are now essentially worthless proprietary products, including SG Strategic Income, Ltd. and GMS Global Market Step Up Note, Ltd, some of the same securities at issue herein. Malecki Decl., Ex. A. (*"SEC Cease-and-Desist-Related Notes"* and "SEC Order"). DB had intimate knowledge of what was going on: it was Biscayne's brokerage firm until the SEC Order issued Am. Answer at

---

[1] It is of public record that a web of related Biscayne entities controlled by the same directors (including at times Haberer) shared addresses with related companies. Biscayne acted through several corporate entities, including Biscayne Capital Ltd., currently in liquidation, and Biscayne Capital International, LLC ("BCI"), now a defunct Florida company (collectively "Biscayne"). Deutsche Bank had to know this in knowing its customer. Haberer was also behind Madison Assets, the *SEC Cease-and-Desist-Related Notes* and the financial advisor. Affidavit of Gustavo Trujillo, Malecki Decl. Ex. F.

¶¶ 85-93; it took over customer accounts maintained by Biscayne and knew the many co-owned affiliated entities through which Biscayne worked, *id.*, it maintained custody and clearing accounts for the manager (Madison Assets LLC) of the *SEC Cease-and-Desist-Related Notes,* Malecki Decl. Ex. B*,* and witnessed the *SEC Cease-and-Desist-Related Notes* collapse on multiple sides of the equation as sales failed in the Rado account, for which Biscayne and Madison were counter-parties and clients/relationships of DB, relationships no other financial institution wanted. Am. Answer at ¶ 79.

Notwithstanding its knowledge, DB issued $12MM of overdraft funds in the roughly $8MM Rado account in an approximate 2 month period, without any commercially reasonable inquiry, safeguards or limitations, let alone a care about the illegality of the transactions.  Am. Answer at ¶¶ 103-117.  DB saw these *SEC Cease-and-Desist-Related Notes* were failing from the many sides of the transaction they were on, causing the wipe out of the Rado account. DB would never "keep and protect" its own assets that way. Moreover, DB's contract with Rado was not unfettered, it could "effect orders to buy or sell securities, other financial instruments or foreign currencies for the [Rado] Account in any <u>commercially reasonable manner</u> the Bank deems appropriate." Complaint Ex. A at 8 (emphasis added)("Custody Agreement"). DB also exceeded its contractual authority.

## STATEMENT OF FACTS

The facts underlying the dispute are detailed in the Amended Answer, Affirmative Defenses and Counterclaims ("Counterclaims"). Malecki Decl., Exh. C; Am. Answer at ¶ 59-139. These factual recitations are incorporated by reference as if fully set forth at length herein, as supported by incorporated and supplementary materials including the Affidavit of Gustavo Trujillo and a Declaration of counsel for Rado.  It is clear that DB's motion must fail.

2

## LEGAL STANDARDS

### A. STANDARD ON MOTION TO DISMISS

Fed. R. Civ. P 8(a) only requires notice pleading to "give the defendant a fair notice of the plaintiff's claims and the grounds on which it rests." *Swierkiewicz v. Sorema N.A.*, 524 U.S. 506, 512 (2002). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (citation omitted). In a Fed. R. Civ. P. 12(b)(6) motion, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 583 (2007) (internal quotation marks and citation omitted). "The court may not dismiss a complaint unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Scutti Enters., LLC. v. Park Place Entm't Corp.*, 322 F.3d 211, 214 (2d Cir. 2003).

On a motion to dismiss, the Court may consider "the factual allegations in plaintiffs' amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

At this stage of litigation, in a case where there was a hidden fraud and layers of relationships between the parties and third-parties, much information is solely in the possession of DB, Rado need only satisfy its plausibility burden leading to a reasonable expectation that discovery will reveal evidence proving its claim. *See Phoenix Light SF Ltd. v. DB Nat'l Trust Co.,* 172 F. Supp. 3d 700, 713 (S.D.NY. 2016).

**ARGUMENT**

This case involves preventable theft and money laundering, like many cases involving DB. Am. Answer at ¶¶ 70-74. DB's Motion to Dismiss must fail, as it misses the point of the Counterclaims in *at least* three essential ways:

(1) Counterclaimant's claims for breach of contract citing to industry rules and laws violated by DB in the transactions at issue are not an attempt (as DB misleadingly alleges to this Court, Motion at 10) to create "a private right of action" for those violations, but simply to show that DB breached its direct and implied contractual obligations and duties of care, while acting in a grossly negligent and commercially unreasonable manner inapposite to the mandates of the Custody Agreement and law applicable between the parties;

(2) DB's implications that there are limitations in liability for grossly negligent and commercially unreasonable conduct, which is specifically excluded from limitations on liability spelled out in the contract, are false and would be disallowed by operation of law; and

(3) Rado had the right to reasonably expect in law and in contract that DB would not allow and facilitate its unregistered fiduciary investment advisor to (a) openly and notoriously violate its duties, (b) engage in fraud and (c) violate the law, and that (d) any such violations would be stopped and either reported to the beneficial owner or refused to be executed or reversed. Instead, DB knowingly and/or substantially aided in the breaches of fiduciary duties and a fraud.

**I.      RADO'S STATE LAW CLAIMS SHOULD NOT BE DISMISSED**

**A.  Rado has Met or Exceed its Applicable Pleading Standard for Breach of Contract**

Rado has made a plausible claim for breach of contract. Rado need only allege "(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525, (2d Cir. 2004) (quoting *RIJ Pharm.*

*Corp. v. Ivax Pharms.*, Inc., 322 F. Supp. 2d 406, 412 (S.D.N.Y. 2004). All parties to this litigation have stipulated the existence of a contract, the Custody Agreement. See, Complaint. ¶ 14, Am. Answer ¶ 94. Rado has alleged several plausible theories of breach of the Custody Agreement, Am. Answer ¶ 162-174, resulting in damages. Am. Answer ¶ 182.

### B.   DB's Narrow Interpretation of the Custody Agreement is Disingenuous

DB failed to follow industry standards of care and applicable laws, rules and regulations. Rado's breach of contract claim involves amongst other things contractual provisions that the "bank will keep and protect, in the same manner as the Bank keeps and protects its own" similar property (securities, cash or other assets) and "effect orders to buy or sell securities, other financial instruments or foreign currencies for the [Rado] Account in any <u>commercially reasonable manner</u> the Bank deems appropriate." Complaint Ex. A (Custody Agreement) at 6 (emphasis added).

The Rado account held trust assets managed by a fiduciary, who misappropriated Rado's assets. In a similar case involving an attorney trust account overdrafts and fiduciary duties to similarly entrusted funds, New York courts have held that "neither a large bank nor a small bank may urge that it is ignorant of facts clearly disclosed in the transactions of its customers with the bank ….. insufficiency [overdrafts] must rank very highly, revealing as it does a telling disparity between entrusted funds and fiduciary expenditures." *Home Sav. of Am., FSB v. Amoros*, 233 A.D.2d 35, 41 (1st Dept. 1997). In this case, as in *Amoros*, funds misappropriated from others as part of the scheme.  DB provided substantial assistance to its other clients and relationships in creating. "Facts sufficient to cause a reasonable person to suspect that trust funds are being misappropriated will trigger a duty of inquiry on the part of a depository bank….and a bank's failure to conduct a reasonable inquiry when the obligation to do so arises will result in the bank being charged with such knowledge as inquiry would have disclosed."  *Amoros, supra,* at 39.

DB's interpretation also completely ignores the provisions of the Custody Agreement which bestow decision making power upon it:

> The Bank may decline to execute or settle a purchase order if the Bank is not satisfied, in the Bank's sole judgment, that you will have sufficient available funds or credit in your Account and in the required currency to pay for the transaction when payment is due.

Complaint Ex. A (Custody Agreement) at 6 [herein the "Available Funds" clause]. There was a good reason for this provision in the contract, that can be relied on by both parties. How transactions are handled in a commercially reasonable manner has an identifiable baseline. Per the Office of the Comptroller of the Currency's ("OCC") Handbook for Custody Services (January 2002), Comptroller of the Currency, *Custody Services (Comptroller's Handbook)*, (2002), *available* at https://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/custody-services/pub-ch-custody-services.pdf (last visited Dec. 20, 2018), ("Comptrollers Handbook"), which is intended as specific guidance for this specialized asset management business (which is not simply a banking relationship). The OCC Handbook is clear on trade compliance being an important part of being a custodian and the industry standards are set out, including reversals of transactions that are not funded:

> Trade compliance is the internal control process used by custodians to manage trade transactions. In this process, the custodian determines that the customer's account has the securities on hand to deliver for sales, that the customer's account has adequate cash or forecasted cash for purchases, that trades are properly matched or DK'd, and that the depository's settlement instructions agree with the custodian's SMAC system. A national bank using a properly executed trade compliance system may prevent failed trades and needless reversals of transactions. *OCC Handbook,* at 19.

> \* \* \* \*
> Contract provisions should provide for reversal of the transaction if the trade fails or a specified amount of time passes. *Id.*, at 14.
> \* \* \* \*
> Contractual Settlement
> An arrangement whereby the customer is credited with the sale proceeds on the contractual settlement date regardless of whether the proceeds have been received. In the case of purchases, the customer's account will be debited on the contractual

settlement date regardless of whether the securities have been received. If the securities or proceeds have not been received by an agreed upon date, the transaction typically will be reversed…. *Id.*, at 14.

DB acted in a commercially unreasonable manner and was grossly negligent and reckless, further breaching its duties of care and covenants of good faith and fair dealing implicit in all contracts. *Delton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389 (1995). This implied obligation includes any promise a reasonable person would understand to be included.  In the banking context, that would include an expectation by the depositor of commercial reasonableness and laws applicable to the banking industry would be followed.   They were not.

 Systems should prevent the situation that occurred here. The Securities Movement and Control (SMAC) system mentioned above is critical, as according to the *OCC Handbook*, it is:

> A written or computerized set of rules designed to ensure the safe movement of certificates or book-entry securities. Computerized SMAC systems are used as a control for book-entry securities and to monitor the purchases and sales of physical securities from the time a trade is executed until the securities arrive at the bank or leave it, or until the securities are transferred on the books of the depository. SMAC systems will generally contain security master files and client master files.

*OCC Handbook,* at 84 (emphasis added). In determining commercial reasonableness and gross negligence, one must consider if these systems were adequate and in place, that can only happen after discovery. Rado alleges that DB's trade compliance and SMAC were grossly negligent. DB did not have an adequate control process for failed trades, which were not appropriately processed and monitored and the facts bear out this as a fact.

Another reason for Available Funds clauses is the free-riding schemes and related rules. If money is not in the account when the securities are delivered in a Delivery Versus Payment (DVP) transaction, the bank that completes the transaction creates a temporary overdraft and an extension of credit that is subject to the margin requirements in Regulation U (12 CFR 221); *OCC Handbook,* pp. 12, 19, 53, 76 and 103.

DB breached its duty of care and the contract when it violated freeriding rules, Regulation T (12 CFR 220); *OCC Handbook,* pp. 12 and 19.  Credit lines should be considered for any account that engages in this activity, but there were no credit lines for the Rado account, no credit limits, no rational plan, strategy or agreement for the extension of such a large amount of credit. The overdraft process at a bank must consider free riding and a process for identifying credit limits for overdrafts, not done here.

There is no exemption in Regulation U for trust activities in a bank or other financial institution. Any extension of credit in the course of settling customer securities transactions must comply with all of the provisions of Regulation U. This includes the requirement that all extensions of credit that are secured by marginable stock be within the 50% margin limit set by Regulation U.  In the Rado account, the extension of credit was 143% of the value of the account.  *OCC Handbook,* at 12.  This overdraft lending is massive compared to the account's net asset value.

The Rado account had a rough average balance of $8.5 million during the contemporaneous relevant time period in 2017 and 2018. Am. Answer ¶ 104. At least as early as December 29, 2017, DB knew that sales in the *SEC Cease-and-Desist-Related Notes* in the Rado trust account were failing. Am. Answer ¶ 106. Despite that knowledge and knowledge of additional failed sales thereafter, in a grossly negligent, commercially unreasonable manner, while exceeding its authority and breaching its duties of care, DB kept on clearing purchases and disbursing funds the client did not have available. Am. Answer ¶ 110-117; Malecki Decl.., Ex. D. (Account Statement). In January 2018, several unfunded, large purchases of $12 million of *SEC Cease-and-Desist-Related Notes* in the Rado account caused a substantial overdraft and debit, initially over $12 million. Am. Answer ¶ 105.  The Counterclaims are very detailed.

Instead of reversing the first $5.5 million of purchases for which all of the corresponding

sales had failed in December 2017, on January 11, 2018, DB executes more than double the amount of new purchases despite no cleared sales and no money in or coming into the account. Am. Answer ¶ 116-117. Thirteen calendar days/eight business days after the first $3 million in failed sales transactions and six calendar days/four business days after the second set of $3 million of failed sales transactions, DB doubles down and executes roughly $7 million in additional purchases of *SEC Cease-and-Desist-Related Notes* in the Rado account. *Id.*

As a result of the events between December 29 and January 16, 2018, the Rado account, previously worth about $8.5 million is $12 million in deficit, owning $20.5 million in *SEC Cease-and-Desist-Related Notes* tied to Biscayne was wiped out.

*Szulik v. State St. Bank & Trust Co*., 935 F. Supp 2d 240 (D. Mass 2013) (in part applying New York law and cited by DB), was a case similarly situated to this case but not identical.  It involved "custody accounts for the purpose of holding and disposing of cash and investments…to conduct certain transactions in accordance with instructions from the plaintiff's investment advisor, who defrauded the Szuliks out of millions of dollars by liquidating their conservative investments in high-quality stocks and bonds, and investing their funds in suspicious, high-risk and illiquid securities" as well as other investments."  *Id. p. 245-246.*  Just as in this case, the investments at issue in the Szulik account were securities "being held by TAG, entities associated with TAG, or others who were not independent of TAG."  *Id. p. 250-251.*  Also in that case, contract claims against the custodian survived because the court found that it "exceeded its authority or otherwise breached its contractual obligations by accepting obviously defective and valueless securities in lieu of legitimate assets", while it "continued to disburse the plaintiffs' funds in exchange for obviously defective securities."  *Id. p. 259-260.*  Rado's case is stronger, because the custodian was not just disbursing funds, the custodian with notice of failing cleared sales on

same-kind securities as being purchased, wildly extended credit of 143% above the account's net asset value.   As is the case with DB, the custodian, in *Szulik*,  had "specific authority to reject securities that were not in good form", *id*., and DB had the authority to reject securities orders for which there was no funds to secure the purchase under the Funds Availability clause.

Here, both purchases and failed sales involved Biscayne-related *SEC Cease-and-Desist-Related Notes* securities. A custodian bank's actions could be the proximate cause of losses if it is alleged, as it is here, that misconduct facilitated the fraud perpetrated by a third party and the fraud was a foreseeable risk to the custodian's actions. *Levinson v. PSCC Srvs., Inc.,* 2010 U.S. Dist. LEXIS 137537, at \*16 (D. Conn. Dec. 29, 2010). With no funds to pay for the securities being purchased, the failures of sales in those securities, the loss was inevitable, but purchases continued long after the sales started failing, and in fact increased in magnitude by more than double.

In March 2018, through Madison Assets, Haberer arranged to transfer millions of dollars in cash and securities from several unwitting other clients that had no responsibilities or desire to cover the overdraft in any way. Malecki Decl. Exh. G. DB had an obligation under Anti-Money Laundering laws, rules and regulations, referenced in the contracts between the parties, to know the sources of funds coming into the account, but failed to do so.

## C. DB Was Grossly Negligent in Its Performance of Duty's Owed to Rado.

"Where the inquiry is to the existence or nonexistence of gross negligence, the ultimate standard of care is different [from ordinary negligence], but the question nevertheless remains a matter for jury determination" *Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Trust Co.*, 261 A.D.2d 117, 123 (N.Y. App. Div 1999) (quoting *Food Pageant, Inc. v Consolidated Edison Co., Inc.*, 54 NY2d 167, 172-173 (1981)).

Be it part of the contract claim or gross negligence claim, in order to state a claim for gross negligence the pleading party must plead negligence and also allege "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *American Tel. & Tel. Co. v. City of N.Y.*, 83 F.3d 549, 556 (2d Cir. 1996) (quotations omitted).  DB's actions and inactions set out on the preceding pages and in the Counterclaims and incorporated documents show in detail the gross negligence.

DB's acts of gross negligence are excluded from any limitation of liability or hold harmless provisions prescribed by the Custody Agreement. Complaint Ex. A at 8 (LIABILITY AND INDEMNIFICATION §1, 5).

> The common business practice of limiting liability by restricting or barring recovery by means of an exculpatory provision, although disfavored by the law and closely scrutinized by the courts…is accorded judicial recognition when it does not offend public policy….however, that policy does not extend to acts that are either willful or grossly negligent….Enforcement of such a provision is precluded when…. as in gross negligence it betokens reckless indifference to the rights of others.  (citations omitted)  *Banc of Am. Sec. LLC v. Solow Bldg. Co. II, L.L.C.*,47 A.D.3d 239, 244-45 (1st Dept. 2007)

Further, "[t]he contention of a waiver of a right to recover money damages under the limitation on recovery provision is an affirmative defense." *Id*. at 245. In *Szulik*, *supra* at 268-269, a similar claim was deemed a question of fact for the trier of fact, not ripe for dismissal.

New York law and public policy void contractual rights to indemnification in the face of gross negligence. See, *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp*., 351 F. Supp. 2d 79, 99 (S.D.N.Y. 2004) (contractual right to indemnity for acts constituting gross negligence or willful misconduct is void as against public policy, under New York law); *In re WorldCom, Inc. ERISA Litig*., 339 F. Supp. 2d 561, 566 (S.D.N.Y. 2004) (party had "no right to indemnification under the terms of the contract if it engaged in willful misconduct or gross negligence").

### 1.  DB's Wanton Disregard and Operational Support of Irregular Activity

DB owed Rado a distinct duty of care as the custodian. See *Prudential Inv. Mgmt. Servs. LLC v. Forde*, 2013 U.S. Dist. LEXIS 89190 (S.D.N.Y. June 24, 2013) ("Prudential owes a duty of care to the Fordes as a custodian of the IRA"). This duty was breached when DB unreasonably and in the absence of good faith effort allowed the Rado account to go into a multimillion-dollar deficit amidst a highly irregular and highly suspicious string of buys, sells, reversed sales, failed sales, sales with no funds to cover in proprietary notes related to known highly suspect entities. Am. Answer ¶ 103-117.

The irregular, excessive and unfunded trading activity in the Rado account carried out by DB's custodial and related clearing operations for Madison Assets smacks of a reckless disregard for the Rado account, conflicts of interest, and is contradictory to a custodians role to "keep and protect".

## 2. DB's Reckless Disregard of Industry Rules and Regulations

DB incorrectly contends Rado's gross negligence claims are duplicative of its breach of contract claims. Motion at 18. In *Szulik, supra*, gross negligence claims survived the motion completely.  Like DB in this case, the defense argued that negligence claims were duplicative of contract claims.  The court determined that "[a]t this stage of the litigation, alternative pleading is entirely permissible….In fact, the Federal Rules of Civil Procedure expressly allow it. *See* Fed. R. Civ. 8(a)(3) and 8(d)(3)….As the exculpatory provisions of the parties' contracts demonstrate, State Street unambiguously accepted liability for its own negligence under the Joint Account Agreement, and for its own gross negligence under the remaining Agreements.  Even if the plaintiffs are unable to show that State Street's conduct amounted to a failure to perform a contractual duty, they may be able to show that State Street breached the duty of care that it owed to the Szuliks in the course of carrying out its custodial duties." *Szulik, supra,* p. 83-84

## D.    Economic Loss Doctrine Does Not Bar Rado's Gross Negligence Claims

DB argues that Rado's claim for gross negligence is barred by New York's economic loss rule. Motion at 18. Relying on, *Manhattan Motorcars, Inc. v. Automobili Lamborghini*, S.p.A., 244 F.R.D. 204, 220 (S.D.N.Y. 2007) ("economic loss" rule provides that "[i]f the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort"), Motion at 18, DB insincrely ignores that a party may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations. *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316 (1995).

DB's argument snubs the intent of the economic loss doctrine, which allows parties to allocate risk by contract. See *Grund v. Del. Charter Guar. & Trust Co.*, 788 F. Supp. 2d 226, 247 (S.D.N.Y. May 25, 2011). DB, the drafter of the Custody Agreement, and Rado agreed that DB would be liable for its gross negligence, Complaint Ex. A at 8 (LIABILITY AND INDEMNIFICATION §1, 5). (See *Grund* at 247)(Negligence claim was not barred by the economic loss doctrine when parties specifically agreed on liability for negligence). DB should not be allowed to hide from its gross negligence, a liability it drafted into the Custody Agreement.

## II.     DB'S MOTION SHOULD BE DENIED BECAUSE RADO ADEQUATELY ALLEGED ITS CLAIM THAT DB AIDED AND ABETTED THE BREACH OF A FIDUCIARY DUTY TO RADO.

Rado properly alleged that DB aided and abetted Biscayne's and Fernando Haberer's breach of fiduciary duties to Rado.  "A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006).

### A. Breach by a Fiduciary to Another: Fernando Haberer and Biscayne Knowingly Breached Their Fiduciary Duties to Rado

The first element of aiding and abetting breach of fiduciary duty is the breach by a fiduciary of obligations to another party. *Id.* The elements for aiding and abetting a breach of fiduciary duty under New York law are: "(1) a breach by a fiduciary of obligations to another, and (2) that the defendant knowingly induced or participated in the breach." *Cromer Fin. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001).

### 1.   Biscayne and Haberer Were Fiduciaries

"The general rule is that a written power of attorney creates a principal/agent relationship, which gives rise to a fiduciary duty." *Ruso v. Morrison*, 695 F. Supp. 2d 33, 39 (S.D.N.Y. 2010). New York courts have repeatedly recognized that:

> one of the most stringent precepts in the law is that a fiduciary shall not engage in self-dealing and when he is so charged, his actions will be scrutinized most carefully. **When a fiduciary engages in self-dealing, there is inevitably a conflict of interest**: as fiduciary he is bound to secure the greatest advantage for the beneficiaries; yet to do so might work to his personal disadvantage. Because of the conflict inherent in such transaction, it is voidable by the beneficiaries unless they have consented. Even then, it is voidable if the fiduciary fails to disclose material facts which he knew or should have known, if he used the influence of his position to induce the consent or if the transaction was not in all respects fair and reasonable."

*Koppel v. 4987 Corp.*, 2001 US Dist LEXIS 377, at *21(S.D.N.Y. Jan. 17, 2001) (*quoting Flaum v. Birnbaum,* 508 N.Y.S.2d 115, 122 (4th Dep't 1986). (Emphasis added).

DB does not contest that a fiduciary duty was owed by Mr. Haberer and Biscayne to Rado, and in fact acknowledges the following in its Complaint. ¶ 19.  This written power of attorney on its own is enough to establish the fiduciary duty existed.

### 2.   Biscayne and Haberer Breached Their Fiduciary Duties to Rado

The Amended Answer properly alleged that Mr. Haberer and Biscayne breached their fiduciary duties to Rado by causing Rado in 2018 to invest millions of dollars in SEC Cease-and-

14

Desist Related Notes, despite the account holding a conservative investment portfolio. Am. Answer ¶ 101. This is borne out by the failed sales of these notes and the debit balance created: "As a result of the events between December 29 and January 16, 2018, the Rado account, previously worth $8.5 million is $12 million in deficit, owning $20.5 million in SEC Cease-and-Desist-Related Notes tied to Biscayne was wiped out." *Id.* ¶ 117.

> Rado's pleadings further alleged facts concerning conflicts of interest and self-dealing – hallmarks of a breached fiduciary duty – involving Biscayne and the illiquid securities at issue: On May 27, 2016, Biscayne was the subject of an SEC Order and Cease-And-Desist Proceedings relating to its role in owning, creating and improperly selling what are now essentially worthless proprietary products, including SG Strategic Income, Ltd. And GMS Global Market Step Up Note, Ltd, some of the same securities at issue herein.

*Id.* ¶ 78. Rado pled additional facts to show that Biscayne violated its role as a fiduciary in keeping this information from Rado when it made the unauthorized trades in the Rado account: "Biscayne did not cease and desist from the conduct described in the SEC Order and failed to disclose conflicts of interest and the nature of the SEC Cease-and-Desist-Related Notes it was peddling." *Id.* ¶ 100. Biscayne, through its agent Fernando Haberer, breached its fiduciary duties to Rado.

### 3. <u>Biscayne and Haberer Breached Their Fiduciary Duties Knowingly</u>

Haberer and Biscayne breached their fiduciary duties to Rado knowingly and openly, issued fictitious statements that omitted the notes, as it was public knowledge that these notes were problematic. Am. Answer ¶¶ 139. While DB dismissively argues in a footnote of its Motion that "[n]otably, however, Haberer was neither a subject of or even mentioned anywhere in the SEC Order" (Motion p. 6, note 7), it fails to acknowledge that Biscayne was a named in the SEC Order, as were the very same *SEC-Cease-and-Desist-Related* securities traded in the Rado account and the Madison accounts at DB, with Biscayne as the counterparty. Malecki Decl., Ex. A (SEC Order).

Biscayne's misconduct, as described in the 2016 SEC Order and clearly persisting two years later in the Rado account through its South American offshoot (Biscayne Capital S.A., the signatory on the 2012 POA), could only have been carried out with Biscayne's knowledge given its admission on the first page of the SEC Order: "In anticipation of the institution of these proceedings, each Respondent has submitted an Offer of Settlement (the "Offers") which the Commission has determined to accept…[and that] the subject matter of these proceedings, which are admitted…Respondents consent to the entry of this Order." Malecki Decl., Ex. A (SEC Order). Biscayne, through Haberer, breached its fiduciary duties to Rado *knowingly* as the conduct, entities, and securities in the SEC Order are near-identical to what is alleged in Rado's pleadings.

### 4. DB Knowingly Induced or Participated in the Breach Because It Provided Substantial Assistance to Biscayne and Haberer.

The second element of aiding and abetting breach of fiduciary duty is that the defendant knowingly induced or participated in the breach. *Lerner*, 459 F.3d 273, 294 (2d Cir. 2006). A defendant knowingly participates in a breach of fiduciary duty "only when he or she provides 'substantial assistance' to the primary violator." *Id.* at 295 (*quoting Kaufman v. Cohen*, 307 A.D.2d 113, 126 (1st Dept. 2003)). "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Id.*

A plaintiff is not required to allege that the aider and abettor had an intent to harm but "there must be an allegation that such defendant had actual knowledge of the breach of duty." *Id.* at 294. Proving this element "does not depend on such knowledge of outright theft." *Id.* "In the context of a claim for aiding and abetting a breach of fiduciary duty, the actual knowledge prong is not identical to the scienter required for the underlying fraud. Plaintiffs must allege a strong inference of actual knowledge or conscious avoidance." *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010). "The court will not spare a putative aider and abettor who

16

consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers." *Id.* at 442-43.

In connection with the Bernie Madoff Ponzi scheme, this Court in *Anwar* denied the Citco defendants' motion to dismiss with respect to plaintiffs' claim for aiding and abetting breach of fiduciary duty because they consciously avoided red flags. *Id.* at 392.  The Citco Defendants were a group of financial services companies contracted to, *inter alia*, provide custodian services, like DB in this matter.  *Id.* at 387.  The *Anwar* Court found that the Citco defendants had sufficient information constituting "knowledge" and their failure to act on these red flags satisfied the substantial assistance element:

> The Court finds, however, that Plaintiffs' allegations support a strong inference of conscious avoidance on the part of the Citco Defendants, which is sufficient to satisfy the knowledge requirement of these two causes of action. Specifically, as already detailed above, Plaintiffs allege that the Citco Defendants were aware of the roles consolidated in Madoff, the lack of transparency into his operations, his family members' involvement in key positions at his firm, his lack of segregation of important functions, his use of an unknown auditing firm, his use of paper trading records, and his implausibly consistent investment returns.  Given the Citco Defendants' familiarity with the Funds, as well as their general experience in providing financial services to funds, and their knowledge of these red flags, the Court finds that Plaintiffs allege a strong inference that the Citco Defendants "consciously avoid[ed] confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor [they] substantially further[ed]."

*Id.* at 443.  Similarly, in *Lerner*, the Second Circuit found that the substantial assistance element was met when it vacated, in relevant part, the judgement of the Eastern District of New York, which dismissed the plaintiff investors' claim for abetting breach of fiduciary duty as alleged against the banks in which those investors' funds were deposited. *Lerner*, 459 F. 3d at 278.  The investors were defrauded by lawyer, David Schick, as part of his multi-million-dollar Ponzi scheme, whereby the plaintiffs alleged that the defendant banks assisted Schick by, in part, failing to report his overdrafts on attorney trust accounts to the state bar for disciplinary action, per the

17

bank's reporting requirements under New York's attorney Disciplinary Code, N.Y. Comp. Codes R. & Regs. Tit. 22 § 1200.46(b)(1). *Id.* The defendant banks claimed they did not owe a fiduciary duty to the investors and that their failure to comply with the Disciplinary Code's legal reporting requirements could not, on its own, amount to substantial assistance:

> The defendants argue that they could not have given "substantial assistance" if they did no more than passively fail to report Schick's bounced checks because they owed no independent fiduciary duty to Schick's clients. But as discussed above with regard to the plaintiffs' negligence claim, **banks do have a duty to safeguard trust funds deposited with them when confronted with clear evidence indicating that those funds are being mishandled.** "Neither a large bank nor a small bank may urge that it is ignorant of facts clearly disclosed in the transactions of its customers with the bank . . . nor may a bank close its eyes to the clear implications of such facts." [….] As in Bischoff, the plaintiffs here allege that the banks had sufficient information to place them "under the duty to make reasonable inquiry and endeavor to prevent a diversion."

*Lerner*, 459 F3d at 295 (*quoting Bischoff v. Yorkville Bank*, 218 N.Y. 106, 114). (Citations omitted; emphasis added). Likewise, as is the case with major financial institutions like DB. The US Financial Crimes Enforcement Network ("FinCen") requires that suspicious activity be reported. Here, entities were in the Caymen Islands, Switzerland and the Bahamas just to name a few, and sold *SEC Cease-and-Desist-Related Notes* with had suspicious transfers and trading. *See* 12 CFR 21.11, 12 CFR 21.21.

Moreover, as this Court has astutely noted, "[i]n those instances in which New York courts have found that a bank has received adequate notice of a fraud, either the bank has accepted money from a fiduciary account in order to satisfy the fiduciary's personal debt to the bank, *see Bischoff v. Yorkville Bank*, 218 N.Y. 106, 112 N.E. 759 (N.Y. 1916); *In re Knox*, 64 N.Y.2d 434, 488 N.Y.S.2d 146, 477 N.E.2d 448, or there is a history of overdrafts in the fiduciary account. *Home Savings of America*, N.Y.S.2d at 637." *Renner v. Chase Manhattan Bank*, 1999 U.S. Dist. LEXIS

978, at *43 (S.D.N.Y. Feb. 2, 1999, 98 Civ. 926 (CSH)).  As alleged in the Rado pleadings, DB's misconduct falls into both categories.  Am. Answer ¶¶ 94, 105, 146.

As defendants were found to have sufficient information to constitute "knowing participation" and "substantial assistance" in *Anwar* and *Lerner*, this Court should find the same as far Rado's allegations against DB.

First, Rado clearly alleged that DB had the institutional knowledge about Biscayne, evidenced by the informed decision of its Swiss parent company, DB AG, which "gave Biscayne until the end of October 2016 to close the accounts and migrate them out of DB." Am. Answer ¶90, Malecki Decl. Ex. E.  In spite of this knowledge, DB looked the other way and the Biscayne accounts were permitted to stay open with DB in the US.  *Id.*  Rado's allegations are not conclusory, but rather supported by fact whereby "Pablo L. Perrotta of Biscayne emailed Reynaldo Figueredo, of DB, as well as Fernando Haberer and others in May 2016 to coordinate with him relating to a letter Biscayne received from DB Switzerland that requested a forced closing date for accounts of October 30. 2016." *Id.*  Rado has thus alleged a strong inference that DB was acting on actual knowledge given that the timing of this May 2016 exchange occurred right around the release of the SEC Order, which is dated May 27, 2016.[2]

Second, it can't be ignored that DB's *own documents* and transaction statements for the Rado account demonstrate that DB had actual knowledge that Haberer was trading in the exact same securities cited in the SEC Order, "including SG Strategic Income, Ltd. and GMS Global Market Step Up Note, Ltd." Am. Answer ¶ 78. *See also* Malecki Decl., Ex. D (account statements).

Third, and just like in *Lerner*, where the defendant banks aided and abetted Schick to run up overdrafts in attorney trust accounts, DB witnessed the clear breach by the fiduciaries, Biscayne

---

[2] It is more than likely that Deutsche Bank would have had even earlier knowledge concerning Biscayne, as the SEC would have likely issued subpoenas to Deutsche Bank in connection with its investigation of Biscayne.

and Haberer, by virtue of the massive debit balance it permitted in a conservative trust account. "Banks do have a duty to safeguard trust funds deposited with them when confronted with clear evidence indicating that those funds are being mishandled." *Lerner*, 459 F3d at 295.

Fourth, like the *Lerner* defendants' legal obligations to report Schick under New York's attorney Disciplinary Code, DB duties and regulatory obligations "to make reasonable inquiry and endeavor to prevent a diversion." *Id.* (*quoting Bischoff* 218 N.Y. at 114). This duty arose under the various securities and regulatory rules as alleged in the Amended Answer, including but not limited to the *OCC Handbook* regulatory guidance which sets industry standards for trade compliance in custodial accounts, Am. Answer ¶ 119, as well as . in FinCen SARS reporting detailed above. This case involves theft and money laundering.

And Fifth, like in *Anwar*, whose Citco defendants were also providing custodial account services like DB in this instance, Rado alleged a strong inference that DB "consciously avoid[ed] confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor [they] substantially further[ed]." *Anwar*, 728 F. Supp. 2d at 443. Like the Citco defendants who had "familiarity with the Funds, as well as their general experience in providing financial services to funds, and their knowledge of these red flags," so was the case with DB in its familiarity with servicing the Rado trust account, including its conservative objectives since the account's inception in 2011. Am. Answer ¶¶ 94 and 101. DB was further familiar that it was unusual for the Rado account to accumulate significant debits (e.g., $15,000 in April of 2017), much less the gargantuan $12 million overdraft that it incurred in January of 2018. *Id.* ¶ 105. And DB was institutionally aware of its conflicts of interest with the relevant arties and the conflicts of interest spelled out in the SEC Order concerning Biscayne and the same notes that it traded in the Rado account. *Id.* ¶ 78. Another such conflict, among others alleged, was that "DB knew that Biscayne,

its client at or about that time,  was on both sides of the Rado transactions, acting on the one hand with Mr. Haberer as investment advisor to order trades and on the other hand with Biscayne as a counterparty to the trades, just as in the SEC Order." *Id.* ¶155.

### 5.  Rado Suffered Damages as a Result of The Breach.

The third and final element of aiding and abetting breach of fiduciary duty is that the plaintiff suffered damage as a result of the breach. *Lerner*, 459 F.3d at 294.  "[A]iding and abetting liability arises only when plaintiffs' injury was 'a direct or reasonably foreseeable result' of the complained-of conduct…. 'But-for causation does not suffice; the breach must proximately cause the loss." *Kolbeck v. LIT Am.*, 939 F. Supp. 240, 249 (S.D.N.Y. 1996).  "Banks' alleged breaches of their duty to investigate and, if necessary, safeguard the funds in its trust account, would qualify as a proximate cause of the clients' losses." *Lerner* 459 F.3d at 278.

DB incorrectly proclaims that it owed no duty to Rado, casting itself as a mere "order taker" when it argues that a bank, while conducting "usual banking services" and "who merely executes an investment manager's orders" cannot be held liable as an aider and abettor of the investment manager.  Motion pp. 16-17.  But "[s]ubstantial assistance can take many forms….  Executing transactions, even ordinary course transactions, can constitute substantial assistance…." *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 511 (S.D.N.Y. 2001) (*citing Rolf v. Blyth, Easton Dillon & Co.*, 570 F.2d at 48: "Substantial assistance might include…executing transactions or investing proceeds, or perhaps…financing transactions.").  "**The critical test is not…whether the alleged aiding and abetting conduct was routine, but whether it made a substantial contribution to the perpetration of the fraud.**" *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005).  (Emphasis added).

"The facts are such that it should have put a reasonable manager, supervisor or compliance person at DB on inquiry, and required him or her to make an investigation, the result of which would have revealed the true situation of converted funds."  Am. Answer ¶ 135.  DB had a duty to investigate and make reasonable inquiry to safeguard the funds in Rado's trust account.  Its failure to do so had everything to do with Rado's losses.

III.   **DB'S MOTION SHOULD BE DENIED BECAUSE RADO ADEQUATELY ALLEGED ITS CLAIM THAT DB AIDED AND ABETTED A FRAUD**

Rado properly alleged that DB aided and abetted Biscayne's and Fernando Haberer's fraud. "[Defendants] may be held liable for aiding and abetting the primary fraud if they knew of the fraud and rendered substantial assistance to its achievement."  *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 507 (S.D.N.Y. 2001).  To prevail, a plaintiff must properly allege and prove: "(1) the existence of the primary fraud, (2) the aider and abettor's knowledge of the fraud, and (3) substantial assistance by the aider and abettor."  *Id.* at 488.

A.   **Existence of the Primary Fraud: Fernando Haberer and Biscayne Committed a Fraud Against Rado**

The first element of aiding and abetting fraud is the existence of the underlying fraud.  *Id.* The elements for a common law fraud claim under New York law are "(1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury (24 N.Y.Jur., Fraud and Deceit, s 14; 37 C.J.S. Fraud s 3)."  *Brown v. Lockwood*, 76 A.D.2d 721, 730 [2d Dept 1980]. It is thus evident that there exists a primary fraud, which was committed by Biscayne and Haberer against Rado, as the complete pilfering of Rado's $8.5 million account by use of fraudulent monthly statements speaks for itself.

**B. DB Had Knowledge of the Primary Fraud Committed by Biscayne and Haberer Against Rado.**

The second element of aiding and abetting fraud is the aider and abettor's knowledge of the primary fraud. *Primavera* 130 F. Supp. 2d at 507. "[K]nowledge or scienter need not be pleaded with particularity, although it does require allegations "that provide at least a minimal factual basis for . . . conclusory allegations of scienter." *Dreieck Finanz Ag v. Sun*, 1990 U.S. Dist. LEXIS 1438, at *7 (S.D.N.Y. Feb. 9, 1990, No. 89 Civ. 4347 (MBM)). Knowledge may in fact "be averred generally," however, "to plead knowledge sufficiently, plaintiff must plead facts that support a 'strong inference' that defendant possessed the requisite fraudulent intent." *Id.* at 7-8.

Here, Rado too has alleged facts that demonstrate the knowledge of others within DB, specifically the emailed communications during the very same month as the May 2016 SEC Order between "Pablo L. Perrotta of Biscayne [and] Reynaldo Figueredo, of DB, as well as Fernando Haberer and others in May 2016 to coordinate with him relating to a letter Biscayne received from DB Switzerland that requested a forced closing date for accounts of October 30. 2016." Am. Answer ¶¶ 90-91. *See also* Malecki Decl., Ex. E. Like *Primavera*, Rado has thus alleged facts of conscious behavior and, thus, scienter, indicating that DB was acting on actual knowledge in its attempt to terminate its relationship with Biscayne. Moreover, the questionable timing of these May 2016 communications, as well as DB's decision to continue servicing Biscayne accounts in the United States (Am. Answer ¶ 90), and the substantial fees and commissions it had an incentive to receive from the illicit trading (Am. Answer ¶¶ 72, 90-91) creates a strong inference that DB had the requisite fraudulent state of mind.

Rado's allegations of facts, at least at this stage of the pleadings, creates a strong inference that DB *actually* knew its customer, given that Rado held its conservative investment portfolio and custodial trust account with DB going all the way back to 2011. Am. Answer ¶ 94, 101. This

unquestionably serves as a minimal factual basis for Rado's conclusory allegation of scienter and fraudulent intent, which is that DB actually knew its customer, yet brazenly "*failed to follow* basic know your customer [protocol and regulations]" and "looked the other way." *Id.* ¶ 172, 187. (Emphasis added).    Rado's factual pleadings in fact provide no shortage of what DB actually knew about Biscayne's, Madison Asset's and Haberer's fraudulent actions.

### C. DB Substantially Assisted Biscayne and Haberer in the Fraud Against Rado.

The third and final element of aiding and abetting fraud is that the aider and abettor substantially assisted the primary fraud. *Primavera* 130 F. Supp. 2d at 507. "Substantial assistance can take many forms," including executing transactions, and even ordinary course transactions, which "can constitute substantial assistance under some circumstances, such as where there is an extraordinary economic motivation to aid in the fraud." *Id.* at 511. (*citing Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) ("broker's processing of transactions with knowledge of fraudulent nature to generate commissions"); *IIT v. Cornfeld*, 619 F.2d 909, 921-22, 926-27 (2d Cir. 1980) ("performing challenged transaction knowing it violated client's policy, with heightened economic motive to do so"). Malecki Decl., Ex. E.

"The substantial assistance element has been construed as a causation concept, requiring that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated." *Id.* at 510. This Court has some doubt about whether "substantial assistance" can be equated with proximate cause. This Court has speculated that a lesser showing of causation could be considered on the element of substantial assistance in aiding and abetting claims:

> A person can make a meaningful contribution to a fraudulent scheme without being understood to have legally "caused" the scheme or its results. In the criminal law usage from which the concept is derived, for example, one may be guilty of aiding and abetting based on conduct that would not likely be sufficient to constitute a proximate cause of the criminal result; an accomplice to murder could rarely be found guilty as a principal who himself proximately caused the victim's death.

*JP Morgan Chase Bank*, 406 F. Supp. 2d at 256, n. 6 (S.D.N.Y. 2005).  Nonetheless, "proximate cause" remains the standard in the context of aiding and abetting securities fraud.  *Id.*

In *Primavera*, a brokerage firm denied giving substantial assistance by rubber-stamping requests to revise the fund valuations, yet the Court found "sufficient evidence  to the contrary" in its evaluation of recording that could be "reasonably be interested as expressing awareness that the revised marks did not accurately reflect such value."  *Primavera,* 130 F. Supp. 2d at 510.

Rado, in its allegations against DB, similarly makes the claim that DB did not properly vet the securities or transactions at issue and being willfully blind by avoiding the confirmation of whether the transaction order was legitimate.  ¶¶ 98, 186.  Documents produced in early discovery after the filing of the Counterclaims that DB even failed to perform simple signature verifications, and its own

In *Primavera,* the Court further found it material to the element of substantial assistance that defendant Broker "Kidder reaped huge profits" and that the DLJ salesperson "[Betsy] Comerford also had economic incentives to sell high-risk securities to the Funds."  *Primavera,* 130 F. Supp. 2d at 512. Similarly, Rado's allegations are material and indicative that DB had similar incentive to engage in the fraud because of the substantial fees and commissions it earned.  Am. Answer ¶¶ 72, 90-91.

WHEREFORE, the Court should deny DB's Fed. R. Civ. Pro. 12(b)(6) motion to dismiss the Counterclaims in its entirety, and should grant Rado all such other relief this Court deems just.

Dated:   December 21, 2018               **MALECKI LAW**
         New York, NY

                                         */s/ Jenice L. Malecki*
                                         Jenice L. Malecki, Esq.
                                         11 Broadway, Suite 715
                                         New York, NY 10004
                                         (212) 943-1233
                                         *Attorney for Defendant/Counterclaimant*
                                         *Rado Limited Partnership*