UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEUTSCHE BANK TRUST COMPANY AMERICAS,<br><br>                    Plaintiff,<br><br>     v.<br><br>RADO LIMITED PARTNERSHIP,<br><br>                    Defendant. | Case No. 1:18-cv-06768 (DLC) |

# REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF/COUNTERCLAIM DEFENDANT'S MOTION TO DISMISS AMENDED COUNTERCLAIMS

CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Plaintiff and Counterclaim Defendant Deutsche Bank Trust Company Americas*

Of Counsel:

David G. Januszewski
Sesi V. Garimella

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...................................................................................................................................2

I. THE PLAIN LANGUAGE OF THE CUSTODY AGREEMENT PRECLUDES THE BREACH OF CONTRACT CLAIM ..............................................................................2

II. RADO'S GROSS NEGLIGENCE CLAIM FAILS AS A MATTER OF LAW ....................5

 A. Rado's Gross Negligence Claim Fails on its Merits ............................................... 5

 B. Rado's Gross Negligence Claim is Duplicative of its Breach of Contract Claim ................................................................................................... 7

III. RADO'S AIDING AND ABETTING CLAIMS FAIL .........................................................9

CONCLUSION ...............................................................................................................................10

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*In re Agape Litigation*,
   681 F. Supp. 2d 352 (E.D.N.Y. 2010) ..................................................................................6n

*Alitalia Linee Aeree Italiane, S.p.A.* v. *Airline Tariff Publ'g Co.*,
   580 F.Supp.2d 285 (S.D.N.Y. 2008)......................................................................................5n

*American Automobile Insurance Co.* v. *Rest Assured Alarm System, Inc.*,
   786 F. Supp. 2d 798 (S.D.N.Y. 2011).....................................................................................2

*Anwar* v. *Fairfield Greenwich, Ltd.*,
   728 F. Supp. 2d 372 (S.D.N.Y. 2010)..................................................................................10n

*Berman* v. *Morgan Keegan & Co.*,
   455 Fed.Appx. 92 (2d Cir. 2012).........................................................................................10n

*Bilello* v. *JPMorgan Chase Retirement Plan*,
   607 F. Supp. 2d 586 (S.D.N.Y. 2009).....................................................................................3

*Black Radio Network, Inc.* v. *NYNEX Corp.*,
   2000 WL 64874 (S.D.N.Y. Jan. 25, 2000) .............................................................................8

*BlackRock Allocation Target Shares: Series South Portfolio* v. *Wells Fargo Bank, National Association*,
   247 F. Supp. 3d 377 (S.D.N.Y. 2017).....................................................................................4n

*BNP Paribas Mortgage Corp.* v. *Bank of America, N.A.*,
   949 F. Supp. 2d 486 (S.D.N.Y. 2013).....................................................................................8

*Bracken* v. *MH Pillars Inc.*,
   290 F. Supp. 3d 258 (S.D.N.Y. 2017).....................................................................................8

*Faulkner* v. *Beer*,
   463 F.3d 130 (2d Cir. 2006)...................................................................................................9n

*Grund* v. *Delaware Charter Guaranty & Trust Co.*,
   788 F. Supp. 2d 226 (S.D.N.Y. 2011).....................................................................................9n

*Home Savings of America, FSB* v. *Amoros*,
   233 A.D.2d 35 (1997) ......................................................................................................... 5-6

*Industrial Risk Insurers* v. *Port Authority of New York and New Jersey*,
   387 F. Supp. 2d 299 (S.D.N.Y. 2005).....................................................................................5n

| | **Page(s)** |
|---|---|

*Lerner* v. *Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006) ...................................................................................................10

*Madu, Edozie & Madu, P.C.* v. *SocketWorks Ltd. Nigeria*,
   265 F.R.D. 106 (S.D.N.Y. 2010) ................................................................................................9

*Musalli Factory For Gold & Jewellry* v. *JPMorgan Chase Bank*, N.A.,
   261 F.R.D. 13 (S.D.N.Y. 2009) ................................................................................................10

*Negrete* v. *Citibank, N.A.*,
   187 F. Supp. 3d 454, 472 (S.D.N.Y. 2016), aff'd,
   2019 WL 80773 (2d Cir. Jan. 3, 2019) ...............................................................................8, 10n

*Prudential Investment Management Services LLC* v. *Forde*,
   2013 WL 3199098 (S.D.N.Y. June 25, 2013) ...........................................................................7

*Rosner* v. *Bank of China*,
   2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008) ...........................................................................9

*Szulik* v. *State Street Bank & Trust Co.*,
   935 F. Supp. 2d 240 (D. Mass. 2013) ........................................................................................4

Plaintiff/Counterclaim-Defendant Deutsche Bank Trust Company Americas ("DBTCA") respectfully submits this reply memorandum of law in support of its motion to dismiss the Amended Counterclaims of Rado Limited Partnership ("Rado") (Dkt. 35).

## PRELIMINARY STATEMENT[1]

Throughout its Amended Counterclaims and now its Memorandum of Law in Opposition to Plaintiff's Motion to Dismiss (Dkt. 40) ("Opp. Br."), Rado complains that it has been the victim of fraud committed by its trusted investment advisor Fernando Haberer. Members of the Romay family, the ultimate beneficiaries behind Rado, selected and trusted Haberer because he was related by marriage to the Romays. With their trust now shown to have been misplaced, the Romays search for others to blame. Focusing its sights on DBTCA, Rado disregards the plain language of the Custody Agreement, which defined DBTCA's limited duties as a custodian bank for Rado's trading activities. Instead, Rado, with the benefit of hindsight, seeks to impose on DBTCA a barrage of duties that it contends might have protected Rado from its own designated investment advisor.[2] Rado contends that DBTCA should have closely monitored Rado's transactions, refused to extend credit to the account, rejected Haberer's instructions to buy and sell certain specific securities, and even imposed large margin requirements. None of this has any support in the Custody Agreement governing the parties' relationship or in applicable law. DBTCA fully complied with its obligations under the Custody Agreement and the law, and Rado's attempts to lay off responsibility for its own misguided decisions should be rejected.

---

[1] Capitalized terms used and not defined here have the meaning ascribed in the Deutsche Bank's Moving Brief (Dkt. 36) ("Moving Br.").

[2] The Romays have already commenced a separate action against the investment advisor and related entities in Florida State Court. *Diego Romay (Guardian of His Minor) et al.* v. *South Bay Holding LLC et al.*, 2018-035014-CA-01 (Fla. Miami-Dade County Ct.), which seeks damages in excess of $40 million for Haberer's wrongdoing, including the conduct alleged here.

**ARGUMENT**

I. **THE PLAIN LANGUAGE OF THE CUSTODY AGREEMENT PRECLUDES THE BREACH OF CONTRACT CLAIM**

Burying the Court with facts concerning the fraud apparently committed by Haberer against the Romays and others, Rado hopes the issues between DBTCA and Rado will seem more appropriate for resolution at the summary judgment stage. Opp. Br. at 1. But DBTCA's motion is based on the unambiguous text of the Custody Agreement, text that Rado cannot now change, much as it would like to. Dismissal of breach of contract claims is appropriate at the pleading stage under these circumstances. *See, e.g., American Automobile Insurance Co.* v. *Rest Assured Alarm System, Inc.*, 786 F. Supp. 2d 798, 803 (S.D.N.Y. 2011) ("Because contract interpretation is generally a question of law, it is suitable for disposition on a motion to dismiss."). Here, the unambiguous terms of the Custody Agreement disclaimed any obligation by DBTCA to monitor, supervise, or advise Rado concerning its investments. *See* Moving Br. at 9-10. Indeed, the Custody Agreement affirmatively authorized DBTCA to rely upon Haberer's instructions, based upon Rado's independent decision to give Haberer unfettered discretion with respect to the Custody Account. *See id.* at 10.

Rado makes no attempt to reckon with these limitations on DBTCA's contractual duties, opting instead to contort inapplicable Office of the Comptroller of the Currency ("OCC") Guidelines into some independent obligation of DBTCA to limit the credit extended to the Custody Account. *See* Opp. Br. at 6-8. As set forth in DBTCA's moving brief, however, the OCC Handbook cannot plausibly inform the scope of DBTCA's contractual duties in light of the

Custody Agreement's merger clause and the OCC Handbook's own concession that "[c]ustody relationships are contractual in nature." OCC Handbook at 8[3]; *see also* Moving Br. at 12.[4]

Regardless, nowhere does Rado allege any conduct by DBTCA that ran afoul of the OCC Handbook. For instance, the very portions of the Handbook that Rado cites explain that as part of its trade compliance process, a custodian may determine that a customer's account either has "adequate cash *or forecasted cash* for purchases." Opp. Br. at 6 (emphasis added). Rado concedes that the overdraft at issue here was accrued as part of offsetting trades in the Rado Account, which fall within the ambit of the guidelines cited here. ACC ¶¶ 105-107. Further, while the Handbook contemplates that certain transactions may be reversed in the event that a trade fails, it goes on to explain that "*[c]ontract provisions* should provide for [such] reversal[s]." Opp. Br. at 6-7 (emphasis added). Rado can point to nothing in the Custody Agreement that required DBTCA to reverse the trades at issue.[5] Finally, Rado's conclusory allegation that DBTCA's Securities Movement and Control (SMAC) system (*i.e.* trade booking system) must have somehow been deficient is inadequate. *See* ACC ¶ 121; Opp. Br. at 7. Neither the counterclaims nor Rado's opposition papers make any attempt to describe how the SMAC system was deficient, or, if so, how such a deficiency would be relevant to its claims here. *See* Opp. Br. at 7 (supporting allegation that SMAC system failed merely because "the

---

[3]  *See* https://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/custody-services/pub-ch-custody-services.pdf.

[4]  Despite heavily relying on the OCC Handbook, Rado fails to set forth any basis for construing the handbook as legal authority. As the Handbook's cover letter explains, the Handbook is merely a "booklet describ[ing] the securities custody business and the primary risks associated with it." https://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/custody-services/cover-custody-service.pdf.

[5]  Rado's halfhearted attempt to point to language in the Custody Agreement which explains that DBTCA "*may* decline to execute or settle a purchase order" (*see* Opp. Br. at 6) plainly cannot bridge this gap, as the clause does not provide any basis for mandatory reversal.

facts bear out this as a fact."); *see also Bilello* v. *JPMorgan Chase Retirement Plan*, 607 F. Supp. 2d 586, 591 (S.D.N.Y. 2009) (Cote, J.) (citation omitted) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss.").

In an attempt to save its fatally flawed breach of contract claim, Rado relies on but misreads the decision in *Szulik* v. *State Street Bank & Trust Co.*, 935 F. Supp. 2d 240 (D. Mass. 2013). The portion of the opinion on which Rado relies describes a bank's decision to accept "unsigned and otherwise defective promissory notes that amounted to worthless pieces of paper rather than legitimate securities or other forms of property." *Id.* at 260. In light of that bank's contractual obligation to receive securities in accordance with the customer's instructions, it was unclear whether accepting facially defective notes breached the operative custody agreement. *Id.* Here, there is no allegation that the notes delivered to the Rado Account were unsigned or otherwise in invalid form. The relevant portion of *Szulik*, moreover, explains that the bank's decision to disburse funds, even for use in irregular transactions, could not support a breach of contract claim because the bank had no obligation to inquire as to the legitimacy of the transaction. *Id.* ("[P]laintiff's assertion that State Street was obligated to question or investigate such transactions before disbursing the plaintiffs' funds is belied by the express language of the Custody Account Agreements," which authorized the independent investment advisor to make all investment decisions for their accounts).[6]

---

[6] Failing to identify any provision of the contract or applicable rule or regulation that DBTCA breached, Rado makes a half-hearted attempt to invoke the implied covenant of good faith and fair dealing. Opp. Br. at 7. As an initial matter, Rado's counterclaims assert no such cause of action. But even if they did, "New York law. . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris* v. *Provident Life & Accident Insurance Co.*, 310 F.3d 73, 81 (2d Cir. 2002).

## II.     RADO'S GROSS NEGLIGENCE CLAIM FAILS AS A MATTER OF LAW

### A. Rado's Gross Negligence Claim Fails on its Merits

Rado concedes that, to state a claim for gross negligence, the facts alleged must demonstrate "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing."  Opp. Br. at 11.[7]  Rado summarily declares that "DB's actions and inactions set out on the preceding pages and in the Counterclaims and incorporated documents show in detail the gross negligence."  *Id.*  But these allegations, which are coextensive with the allegations supporting Rado's deficient breach of contract claim, demonstrate at most that DBTCA did not monitor the Rado Account and instead honored the instructions of Rado's independent investment advisor by extending credit.  Noticeably absent are any facts to show why extending credit to the Rado Account (conduct expressly contemplated by the Custody Agreement) reflects either "reckless disregard" or "intentional wrongdoing."[8]

Rado's reliance on *Home Savings of America, FSB* v. *Amoros*, 233 A.D.2d 35 (1997), does not bridge this gap.  That case explicitly stated that a bank ordinarily "has no duty to monitor fiduciary accounts maintained at its branches to safeguard the funds in those accounts from fiduciary misappropriation."  *Id.* at 38; *see also id.* ("[I]n general, a bank may assume that a

---

[7]    "Courts apply a 'more exacting standard of gross negligence' where sophisticated parties have entered into limitation of liability agreements than in other contexts.  *Alitalia Linee Aeree Italiane, S.p.A.* v. *Airline Tariff Publ'g Co.*, 580 F.Supp.2d 285, 294 (S.D.N.Y. 2008); *Industrial Risk Insurers* v. *Port Authority of New York and New Jersey*, 387 F. Supp. 2d 299, 307 (S.D.N.Y. 2005) ("[H]igher standard of 'reckless disregard' [applies] in cases where a party seeks to pursue a claim of gross negligence despite a release of liability").

[8]    Even the OCC Handbook on which Rado relies so heavily contemplates that a custodian may extend credit, such as where certain trades do not settle "delivery versus payment," which may cause the custodian to deliver securities without receiving an offsetting payment.  OCC Handbook at 4; *see also* OCC Handbook at 11 (contemplating that a custodial bank may extend credit and describing recordkeeping requirements for doing so).  Similarly, Rado's continued invocation of Regulation T and Regulation U simply ignores the fact that neither provision is applicable to the securities purchases that gave rise to the overdraft.  *See* Moving Br. at 11 n.3.

person acting as a fiduciary will apply entrusted funds to the proper purposes . . . .") (citation omitted). The decision in *Home Savings* relied on a narrow exception to this rule, which provides that a bank may be liable for the misappropriation of funds from a fiduciary account "if the bank, *with knowledge* of the fiduciary's diversion of trust funds, accepts such funds in payment of a personal obligation owed by the fiduciary to the bank" or "the bank otherwise has *actual knowledge* or notice that a diversion is to occur or is ongoing." *Id.* (emphasis added). But Rado has not adequately alleged that DBTCA had actual knowledge of Haberer's misconduct. *See* Moving Br. at 14-15; *see also infra* Part III. Nor can Rado plausibly allege that DBTCA had any duty to inquire into the details of Haberer's transactions on behalf of the Rado Account.[9] Unlike the Rado Account, which was a custodial account, the *Home Savings* Account was an attorney trust account, which the Court took special note of in considering whether the depository bank had any duty to inquire into the circumstances of the account's chronic insufficiency. *Id.* at *41 (explaining that depository banks are required to "make a dishonored check report to the Lawyers' Fund for Client Protection" where a check bounces against a lawyer's trust account). The knowledge element notwithstanding, however, the *Home Savings* Court plainly explained that "the mere transfer of trust funds between accounts at the depositary bank and/or *disbursement of funds by authorized signatories* of accounts at the depositary bank, are not, without more, sufficient grounds for bank liability." *Id.* (emphasis added).[10]

---

[9] While it is not necessary to reach the issue of breach at this point, DBTCA's immediate and persistent efforts to resolve the overdraft by contacting Rado's authorized account representative, Haberer, discharged any duty to inquire. Compl. ¶¶ 29-31.

[10] To the extent Rado relies on allegations that DBTCA violated some industry rule or regulation as the basis for its gross negligence claim, this too fails. Even if Rado could plausibly allege such a violation, which it cannot (*see supra* Section I), Rado has identified no basis for construing such rule or regulation as extending a duty towards Rado itself. *See, e.g., In re Agape Litigation*, 681 F. Supp. 2d 352, 361 (E.D.N.Y. 2010) (because federal statute did not create a private right of

-7-

### B. Rado's Gross Negligence Claim is Duplicative of its Breach of Contract Claim

Rado's opposition only underscores that its claim for gross negligence must be dismissed as duplicative of its defective breach of contract claim. Courts routinely apply the economic loss doctrine to dismiss gross negligence claims where, as here, (i) the parties' relationship is exclusively contractual in nature, and (ii) only economic harm is alleged. Moving Br. at 18-19. In seeking to distinguish between its contract and gross negligence claims, Rado relies upon the decision in *Prudential Investment Management Services LLC* v. *Forde*, 2013 WL 3199098, at *4 (S.D.N.Y. June 25, 2013) (*see* Opp. Br. at 12), as a basis for arguing that a custodian owes extra-contractual duties that form the basis of Rado's tort claims here. But the language that Rado quotes from *Prudential* in fact refers to an allegation from the counterclaim plaintiff's complaint and does not reflect *Prudential's* holding. Indeed, the *Prudential* Court dismissed negligence claims brought against the custodian of an IRA as duplicative of the existing breach of contract claim. *Id.* ("Prudential is a custodian of the IRA pursuant to their customer agreement with the Fordes, and thus any 'duty' imposed as custodian is a contractual one. . . . Thus, the Fordes fail to assert a source of their injuries independent from one that arises out of Prudential's contractual obligations, and the tort claims must be dismissed."). Here too, Rado's failure to identify any duty separate and apart from DBTCA's contractual obligations is fatal to its gross negligence claim.

Indeed, Rado's opposition persistently conflates the bases for its breach of contract and gross negligence claims, further highlighting their duplicative natures. *See, e.g.*, Opp. Br. at 7 (arguing that DBTCA breached the Custody Agreement by acting in a "grossly negligent and

---

action, court could "perceive no sound reason to recognize a duty of care that is predicated upon the statute's monitoring requirements."); *see also* Moving Br. at 11.

reckless" manner); Opp. Br. at 8 (alleging that DBTCA breached the Custody Agreement because its "trade compliance and SMAC were grossly negligent").[11]  "[M]erely charging a breach of a duty of care" does not, without more, "transform a simple breach of contract into a tort claim." *Bracken* v. *MH Pillars Inc.*, 290 F. Supp. 3d 258, 265 (S.D.N.Y. 2017) (citation omitted).  While Rado insists that it may plead its tort and contract claims as alternative causes of action, it offers no theory by which it could prevail on the tort claim if the contract claim failed. *BNP Paribas Mortgage Corp.* v. *Bank of America, N.A.*, 949 F. Supp. 2d 486, 508 (S.D.N.Y. 2013) (dismissing negligence claim where plaintiff failed to identify an independent duty aside from those in the contract).

Despite Rado's suggestion to the contrary (Opp. Br. at 13), the Custody Agreement's exculpatory provisions do not alter the analysis above.  *See Negrete* v. *Citibank, N.A.*, 187 F. Supp. 3d 454, 472 (S.D.N.Y. 2016) (dismissing negligence claims pursuant to economic loss rule notwithstanding presence of limitation on liability provision in contract), aff'd, 2019 WL 80773 (2d Cir. Jan. 3, 2019).  The Custody Agreement expressly provides that DBTCA's sole responsibilities were to "receive, keep and protect" the securities, cash or other financial assets held in the Rado Account; "as custodian, to maintain financial assets (within the meaning of the New York Uniform Commercial Code)"; and to provide certain execution services in connection with the Account.  Moving Br. at 2.  The exculpatory clause reflects the parties' allocation of risk with respect to potential liability resulting from any breaches.  This is precisely the type of private contractual arrangement that the economic loss rule is intended to protect.  *Black Radio*

---

[11]   If these allegations are meant to suggest a claim for negligent performance of the Custody Agreement, Rado's opposition also ignores that New York recognizes no such claim.  Moving Br. at 19.

-8-

*Network, Inc.* v. *NYNEX Corp.*, 2000 WL 64874, at *3 (S.D.N.Y. Jan. 25, 2000) (economic loss rule restricts plaintiffs "to an action for the benefits of their bargains").[12]

### III. RADO'S AIDING AND ABETTING CLAIMS FAIL

Rado's opposition attempts to bolster its deficient allegations concerning its aiding and abetting claims by reference to a variety of extrinsic documents, including email communications, account statements and an affidavit. *See, e.g.*, Malecki Decl. Exs. B, D, E, and F.[13] Consideration of these documents is improper at the motion to dismiss stage, and they should be disregarded. *Madu, Edozie & Madu, P.C.* v. *SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010) ("Courts in this Circuit have made clear that a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss.").

Regardless, Rado's aiding and abetting claims fall far short of the standard required to plead actual knowledge of the underlying fraud or breach of fiduciary duty. *Rosner* v. *Bank of China*, 2008 WL 5416380, at *5-11 (S.D.N.Y. Dec. 18, 2008) (dismissing aiding and abetting fraud claim because allegations of red flags and defendant's long-term relationship with and knowledge of purported fraudster were insufficient to establish defendant's actual knowledge of underlying fraud); *see also* Moving Br. at 14-15. At best, Rado continues to assert that a

---

[12]   *Grund* v. *Delaware Charter Guaranty & Trust Co.*, 788 F. Supp. 2d 226 (S.D.N.Y. 2011), cited by Rado (Opp. Br. at 13), is not to the contrary. Rather, *Grund* explicitly recognized that, like here, "where a party is merely seeking to enforce its bargain, a tort claim will not lie." *Id.*

[13]   While some of the material submitted by Rado has been produced by DBTCA, Rado has also attached various documents from unknown sources. Because Rado itself has alleged that it received fictitious documents from Haberer and Biscayne (Opp. Br. at 15), DBTCA reserves the right to challenge the authenticity of these documents should they be deemed relevant. *Faulkner* v. *Beer*, 463 F.3d 130, 134 (2d Cir. 2006) ("Even if a document meets the twin requirements of integrity—reliance and notice—a court still may not consider it on a motion to dismiss if there is a dispute 'regarding the authenticity or accuracy of the document.'").

*different* Deutsche Bank entity was aware that a *different* Biscayne entity had been subject to an SEC Cease-and-Desist Order. This amounts to nothing more than an allegation of constructive knowledge, which is insufficient. *See* Moving Br. at 15.[14] Moreover, while Rado alleges that DBTCA failed to "properly vet the securities or transactions at issue[,]" Rado's own authority demonstrates that such conduct cannot support the substantial assistance prong required to plead aiding and abetting liability. *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006) ("[M]ere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.") (internal quotation mark omitted); *see also Musalli Factory For Gold & Jewellry* v. *JPMorgan Chase Bank*, N.A., 261 F.R.D. 13, 25 (S.D.N.Y. 2009) ("[T]o the extent that [plaintiff] bases its aiding and abetting claim on JPMorgan's failure to prevent the diversion [of plaintiff's investment funds] by failing to shut down the account or to inform [plaintiff] of the account withdrawals, these omissions. . . do not rise to the level of substantial assistance because there was no fiduciary relationship between the bank and [plaintiff]."). There was no fiduciary relationship between DBTCA and Rado, nor does Rado allege any.[15]

## CONCLUSION

Rado's Amended Counterclaims should be dismissed.

---

[14] Similarly, Rado's assertion that DBTCA's "know your customer" guidelines support an inference of actual knowledge is incorrect. *See Berman* v. *Morgan Keegan & Co.*, 455 Fed.Appx. 92, 95-96 (2d Cir. 2012) ("'Know Your Customer' obligations are, standing alone, far from sufficient to support a strong inference that [the defendant] had actual knowledge of [the] fraud.").

[15] Rado's attempt to liken the instant facts to some of the most notorious Ponzi schemes in recent history falls flat. First, Rado alleges none of the "red flags" that formed the basis of the decision in *Anwar* v. *Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010); *see* Opp. Br. at 17. In addition, *Lerner*, involved irregularity with an attorney trust fund, which accounts, as discussed above, are subject to special reporting requirements inapplicable here. 459 F.3d at 294; *see also supra* Part II.A.

Dated: January 15, 2019
New York, New York

                Cahill Gordon & Reindel llp

                By: /s/ David G. Januszewski
                   David G. Januszewski
                   Sesi V. Garimella

                80 Pine Street
                New York, New York 10005
                (212) 701-3000

                *Attorneys for Plaintiff and Counterclaim Defendant Deutsche Bank Trust Company Americas*