UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                           :      18cv6768(DLC)

DEUTSCHE BANK TRUST COMPANY AMERICAS,  :

                                           :    OPINION AND ORDER

                       Plaintiff,  :

        -v-                 :

RADO LIMITED PARTNERSHIP,          :

                    Defendant.  :

----------------------------------------X
                                           :

RADO LIMITED PARTNERSHIP,          :

                   Counterclaimant,  :

        -v-                 :

DEUTSCHE BANK TRUST COMPANY AMERICAS,  :

                  Counterdefendant.  :

----------------------------------------X

APPEARANCES

For the plaintiff and counter-defendant:
David G. Januszewski
Sesi V. Garimella
Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005
(212) 701-3073

For the defendant and counter-claimant:
Jenice L. Malecki
Malecki Law
11 Broadway, Suite 715
New York, New York 10004
(212) 943-1233

DENISE COTE, District Judge:

Defendant Rado Limited Partnership ("Rado") held a nondiscretionary custody account ("Custody Account") at Deutsche Bank Trust Company Americas ("DBTCA") and gave Fernando Haberer ("Haberer") authority to direct the trading in the Custody Account.  Haberer was related by marriage to the beneficial owners of the Rado funds and securities managed by Haberer. Haberer's relatives now contend Haberer defrauded them through a series of investment decisions that resulted in, among other things, an overdraft in the Custody Account.  In opposition to DBTCA's efforts to collect on the overdraft in the Custody Account, Rado has filed four counterclaims ("Claims"), which in essence argue that DBTCA should have done more to protect Rado from Haberer and his investment decisions.  DBTCA's motion to dismiss Rado's Claims is granted.

## Background

The following facts are taken from Rado's Claims and documents integral to those Claims.  Those documents include the 2011 Worldwide Custody Account Agreement ("Custody Agreement") and Rado's 2012 and 2016 agreements granting Haberer a power of attorney (the "2012 POA" and the "2016 POA").

DBTCA is a New York banking corporation that is a subsidiary of Deutsche Bank AG, a Swiss entity.  Rado is a limited partnership organized under the laws of New Zealand.

2

Rado is wholly owned by the Diego Trust, a trust established to benefit Diego Romay and his family.

The Custody Agreement

In March of 2011, Rado opened the Custody Account with DBTCA, which was governed by a Custody Agreement.  Under the terms of the Custody Agreement, DBTCA agreed to "keep and protect, in the same manner as the Bank keeps and protects its own similar property, the securities, cash or other financial assets [Rado] deposit[s] in [its] Account(s)" in exchange for monthly fees based on the value of the property held by the DTBCA.  DBTCA also agreed that, "[u]pon instructions from [Rado] or [its] Advisor, the Bank will buy or sell, for [Rado's] Account and at [Rado's] sole risk, securities or other financial instruments and any foreign currency needed to complete these transactions."  Although Rado or its advisor was responsible for placing orders with DBTCA, the Custody Agreement provided that "[t]he Bank may effect orders to buy or sell securities [and other investments] in any commercially reasonable manner the Bank deems appropriate."  This included, for example, DBTCA's right to "select, in the Bank's sole discretion, the brokers, dealers, counterparties or other intermediaries the Bank uses, including itself or its affiliates."

DBTCA also preserved its discretion to decline certain transactions by Rado or its advisor.  The Custody Agreement

3

provides, for example, that "[t]he Bank may decline to execute or settle a purchase order if the Bank is not satisfied, in the Bank's sole judgment, that [Rado] will have sufficient available funds or credit in [its] Account." Rado agreed "to indemnify and hold the Bank harmless for any losses, costs or expenses the Bank incurs if [Rado] fail[s] to furnish immediately available funds when required to pay for [its] transactions and expenses." Rado also agreed that any of Rado's property held by DBTCA "shall be security for . . . any loans, overdrafts or other credit extended to [Rado]."

In addition, the Custody Agreement describes the methods by which Rado and DBTCA may communicate regarding the Custody Account. For example, DBTCA agreed to provide written statements of all transactions for Rado's accounts on a monthly basis. Should there be any objections to the account statements, Rado agreed "to provide them to the Bank within thirty (30) days after the date of the Account Statement," and consented that "if [it] do[es] not do so, it will be agreed that [Rado] ha[s] no objections to the Account Statement."

Finally, the Custody Agreement enumerates the limited scope of DBTCA's duties with respect to the Custody Account. It provides that DBTCA's "sole responsibility, unless [it] expressly agrees otherwise, is to receive, keep and protect [Rado's] Property as custodian, to maintain financial assets

4

(within the meaning of the New York Uniform Commercial Code ("NY UCC")) in the Account as security entitlements in [Rado's] favor, and to provide the execution services, as described in this Agreement."  It also informed Rado that DBTCA would bear no responsibility for advising Rado on the merits of any investment decision:

> You will make your own investment decisions for the Account, based on information you obtain on your own or the advice of your Advisor or other professional advisors and experts you select.  The Bank is not responsible for advising you about securities or other investments and you will not rely on any advice or information you receive from the Bank in making your investment decisions.  The Bank also is not responsible for determining the suitability of any investment for you or the merits of any investment you make for the Account, regardless of any information the Bank has about you or the investment or its issuer.

The 2012 and 2016 POAs

Rado provided two powers of attorney to DBTCA, one in 2012 and a second in 2016, authorizing Haberer, through his company Biscayne Capital S.A. ("Biscayne"), to conduct the trading activity in the Custody Account.  Haberer was related to the Romay family by marriage.  Through the 2012 POA, Rado authorized Haberer "to buy, sell, and trade in securities" at DBTCA "for [Rado's] account and risk" and Rado agreed "to indemnify and hold [DBTCA] harmless from all claims that may arise in connection [with the 2012 POA]."  Rado further agreed in the 2012 POA "to pay [DBTCA] promptly on demand any and all losses

and liabilities arising [from the 2012 POA] or from any action taken or not taken by [Rado] in reliance [on the 2012 POA], including without limitation, any debit balance due with respect to the Account."

The 2016 POA also authorized DBTCA to accept instructions from Haberer with respect to the Custody Account.  It provided that DBTCA "may conclusively assume that all actions taken and instructions given by each of the Authorized Signer(s) [such as Haberer] have been properly taken or given pursuant to authority vested in such Authorized Signer(s) . . . ."  The 2016 POA also affirmed that Rado would "indemnify and hold the Bank harmless from all claims, liabilities, losses, costs, expenses (including attorneys' fees) related to or arising from any action or inaction by any such Authorized Signer(s)."

The Biscayne Entities

Biscayne and Haberer are associated with Biscayne Capital Holdings ("Holdings") and its affiliates.  Deutsche Bank S.A., DBTCA's parent company, had a longstanding relationship with Holdings.  DBTCA also carried accounts for some of Holdings's affiliates.  DBTCA's relationship to Holdings and its affiliates was managed by DBTCA's employee, Reynaldo Figueredo ("Figueredo").

Among Holdings's affiliates is Biscayne Capital International LLC ("LLC").  In 2016, the Securities and Exchange

6

Commission ("SEC") ordered LLC to cease and desist "owning, creating and improperly selling what are now essentially worthless proprietary products."  It is alleged that LLC and related Biscayne entities did not comply with the SEC Cease-and-Desist Order.

Following the SEC Cease-and-Desist Order, Deutsche Bank AG decided to close accounts held by affiliates of Holdings. Related accounts at DBTCA were also scrutinized but allowed to stay open.  At the request of Figueredo, certain other accounts previously held in Deutsche Bank AG were transferred to DBTCA.

Overdraft in the Custody Account

In January 2018, Haberer directed DBTCA to buy approximately $12 million in illiquid notes related to the "essentially worthless proprietary products" that were subject to the 2016 SEC Cease-and-Desist Order.[1]  DBTCA made those purchases.  Because the Custody Account did not have sufficient funds to cover these purchases, Haberer also directed DBTCA to sell approximately $12 million in notes that were also related to those subject to the 2016 SEC Cease-and-Desist Order.[2]  In

---

[1] Rado alleges that some of these notes were "issued by the same proprietary product issuers included in the 2016 SEC Cease and Desist Order."

[2] From the Claims, it appears that, as a result of Haberer's previous investments, the Custody Account already held a substantial number of securities that Rado contends were related to those subject to the 2016 Cease-and-Desist Order.

many cases, one or more entities related to Holdings was a counterparty to these transactions.  Each of the orders to sell failed, was reversed, or was cancelled.  This left an overdraft in the Rado Custody Account of approximately $12 million.  Most of the attempted sale transactions do not appear on the monthly statements for the Custody Account.[3]

In March and April 2018, Haberer transferred cash and securities into the Custody Account in order to satisfy the deficit.  These funds and assets principally belonged to third parties and other clients of Haberer.  On June 1, 2018, DBTCA sent a letter to Rado demanding payment of $2,557,262.72, the remaining cash deficiency in the Custody Account.

Procedural History

On July 27, 2018, DBTCA brought suit against Rado for breach of the Custody Agreement, seeking damages in the amount of $2,557,262.72 plus interest.  On September 12, Rado answered and brought four Claims for breach of contract, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and gross negligence.  On December 5, DTBCA moved to dismiss all of Rado's Claims.  That motion was fully submitted on January 15, 2019.

**Discussion**

---

[3] The account statements do record that one sale order entered December 22, 2017 was "reversed."

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Richards v. Direct Energy Servs., LLC, 915 F.3d 88, 105 (2d Cir. 2018) (citation omitted).  A claim to relief is plausible when the factual allegations in a complaint "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Kolbasyuk v. Capital Mgmt. Servs., LP, 918 F.3d 236, 239 (2d Cir. 2019) (citation omitted).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Carlin v. Davidson Fink LLP, 852 F.3d 207, 212 (2d Cir. 2017).  The plaintiff must plead enough facts to "nudge[] [his] claims across the line from conceivable to plausible . . . ." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), Fed. R. Civ. P., a court must "constru[e] the complaint liberally, accept[] all factual allegations as true, and draw[] all reasonable inferences in the plaintiff's favor." Coal. for Competitive Elec., Dynergy Inc. v. Zibelman, 906 F.3d 41, 48-49 (2d Cir. 2018) (citation omitted).  "A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."

Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230 (2d Cir. 2016) (citation omitted).  A court may also consider documents that are "integral to the complaint."  Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016).  "A document is integral to the complaint where the complaint relies heavily upon its terms and effect."  Id.  A court may consider "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit . . . ."  Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).  A court may also take judicial notice of "relevant matters of public record."  Giraldo v. Kessler, 694 F.3d 161, 164 (2d Cir. 2012).

Claims that sound in fraud must be plead with particularity pursuant to Fed. R. Civ. P. 9(b).  United States ex rel. Polansky v. Pfizer, Inc., 822 F.3d 613, 617-18 (2d Cir. 2016). "To satisfy this Rule, a complaint alleging fraud must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 25 (2d Cir. 2016) (citation omitted).  Although Rule 9(b) allows knowledge to be averred generally, a plaintiff must "plead facts giving rise to [a] 'strong inference' of actual knowledge" in order to survive a motion to dismiss.

Lerner v. Fleet Bank, N.A., 459 F.3d 273, 293 (2d Cir. 2006)
(citation omitted).

Rado asserts four Claims for breach of contract, aiding and
abetting fraud, aiding and abetting breach of fiduciary duty,
and gross negligence.  Each Claim is addressed in turn.

I.  Breach of Contract

"To state a claim for breach of contract under New York
law,[4] the complaint must allege: (i) the formation of a contract
between the parties; (ii) performance by the plaintiff; (iii)
failure of defendant to perform; and (iv) damages." Nick's
Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d
Cir. 2017) (citation omitted) (footnote added).

Under New York law, "a fundamental objective of contract
interpretation is to give effect to the expressed intention of
the parties." In re MPM Silicones, 874 F.3d 787, 795 (2d Cir.
2017).  If the intent of the parties is clear from the four
corners of a contract, its interpretation is a matter of law for
the court. Am. Home Assurance Co. v. Hapag Lloyd Container
Linie, GmbH, 446 F.3d 313, 316 (2d Cir. 2006).  "The initial
inquiry is whether the contractual language, without reference
to sources outside the text of the contract, is ambiguous." In
re MPM Silicones, 874 F.3d at 795.

---

[4] The Custody Agreement contains a choice of law provision
stating that it "shall be governed by and construed in
accordance with the laws of the State of New York."

> An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.

Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010) (citation omitted).  By contrast, a contract is unambiguous if its "language has a definite and precise meaning about which there is no reasonable basis for a difference of opinion."  Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 69 (2d Cir. 2014).

"If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself."  Torres v. Walker, 356 F.3d 238, 245 (2d Cir. 2004) (citation omitted).  In interpreting contracts, "words should be given the meanings ordinarily ascribed to them and absurd results should be avoided."  Mastrovincenzo v. City of New York, 435 F.3d 78, 104 (2d Cir. 2006) (citation omitted).  Additionally, "an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible."  LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted).

Rado principally claims that DBTCA breached the Custody Agreement in January 2018 by failing to cancel or reverse Haberer's orders to purchase approximately $12 million of "essentially worthless proprietary products" related to securities subject to the 2016 SEC Cease-and-Desist Order. Rado contends that, because the purchase orders resulted in a deficit in the Custody Account, DBTCA's decision to execute the orders breached its obligation to "keep and protect" Rado's assets and to "effect [Rado's] orders . . . in [a] commercially reasonable manner." In addition, Rado argues that DBTCA breached the Custody Agreement by providing Rado inaccurate account statements. Because none of these theories alleges any conduct by DBTCA contrary to the terms of the Custody Agreement, Rado's Claim for breach of contract is dismissed.

The terms of the Custody Agreement, as well as the 2012 and 2016 POAs, are plain and unambiguous. DBTCA's responsibilities with respect to the Custody Account were strictly constrained by their terms. The Custody Account was a nondiscretionary account; DBTCA expressly disclaimed any responsibility for "advising [Rado] about securities or other investments" or "determining the suitability of any investment." Rado agreed to make its own investment decisions and DBTCA agreed to execute them "at [Rado's] sole risk." Pursuant to the 2012 and 2016 POAs, DBTCA was entitled to "conclusively assume" that Haberer's

investment decisions were duly authorized.  In this context,
DBTCA's obligation to "keep and protect" Rado's assets did not
impose on DBTCA any duty to investigate or prevent the
investments that Haberer ordered in January 2018.

Nor did DBTCA breach its obligation by failing to "effect"
Haberer's orders in a "commercially reasonable manner."  That
provision of the Custody Agreement grants DBTCA discretion
regarding how it may execute Rado's orders.  It preserves
DBTCA's right to execute orders "in any commercially reasonable
manner the Bank deems appropriate," including by selecting "the
brokers, dealers, counterparties or other intermediaries the
Bank uses."  The requirement that DBTCA execute Rado's orders in
a commercially reasonable "manner" did not impose on DBTCA any
requirement to ensure that Rado's advisor selected commercially
reasonable "investments."

Rado also cannot premise its breach of contract Claim on a
theory that the Custody Agreement prohibited DBTCA from
extending a credit to the Custody Account.  Although the Custody
Agreement provides that DBTCA "may" decline to execute Rado's
purchase orders if DBTCA "is not satisfied . . . that [Rado]
will have sufficient available funds or credit in [its]
Account," it does not prohibit DBTCA from extending credit to
the account.  Instead, the Custody Agreement contemplates that
the Custody Account may be overdrawn.  It provides that Rado's

14

property "shall be security for . . . any loans, overdrafts or other credit extended to [Rado]."  It also assigns to Rado the obligation to indemnify DBTCA "for any losses, costs or expenses the Bank incurs if [Rado] fail[s] to furnish immediately available funds when required to pay for [its] transactions and expenses."

Finally, Rado's related contention that DBTCA issued "incomplete and inaccurate" account statements does not state a claim for breach of contract.  The Custody Agreement specifies that any objections to an account statement must be provided "in writing within thirty (30) days after the date of the Account Statement," or else "it will be agreed that [Rado] ha[s] no objections to the Account Statement."  Thus, none of Rado's breach of contract theories survives the plain terms of the Custody Agreement.

Rado attempts to bolster its claim for breach of contract by asserting that, through certain contract provisions and the covenant of good faith and fair dealing, the Custody Agreement incorporates various rules and laws with which DBTCA did not comply.  For example, Rado asserts that the Custody Agreement incorporates all provisions of the Handbook for Custody Services published by the Office of the Comptroller of the Currency ("OCC") in January 2002 (the "OCC Handbook").  Rado also asserts that the Custody Agreement incorporates certain "free-riding

rules," including Regulation U, 12 C.F.R. § 221, and Regulation T, 12 C.F.R. § 220.

Rado is incorrect for several reasons.  First, none of these provisions are expressly incorporated into the Custody Agreement.  Nor does the Custody Agreement even reference these provisions.  It contains an integration clause stating that the Custody Agreement "reflects the entire agreement between [Rado] and the Bank with respect to the subject matter hereof . . . ." "[B]y defining the scope of their agreement in a merger clause, [the parties] have intended to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing."  Sec. Plans, Inc. v. CUNA Mut. Ins. Soc., 769 F.3d 807, 816 (2d Cir. 2014) (citation omitted).

Second, to the extent Rado relies on the covenant of good faith and fair dealing, the covenant "can only impose an obligation consistent with other mutually agreed upon terms in [a] contract."  Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198-99 (2d Cir. 2005) (citation omitted).  "It does not add to the contract a substantive provision not included by the parties."  Id. at 199 (citation omitted).  The Custody Agreement enumerated DBTCA's obligations and expressly provided that DBTCA would not be liable for Rado's investment decisions or any resulting deficiencies in its account.  Rado cannot alter the

16

terms of the Custody Agreement by incorporating all the terms of the OCC Handbook and certain regulations through the covenant of good faith and fair dealing.

Third, to the extent Rado contends that these rules and laws explain the "reason for" certain contractual provisions, they cannot be used to create ambiguity in an otherwise unambiguous agreement. "Ambiguity is determined within the four corners of the document." Brad H. v. City of New York, 17 N.Y.3d 180, 186 (2011).[5]  A court may not reference sources outside the text of the contract when making this inquiry. In re MPM Silicones, 874 F.3d at 795.  Accordingly, Rado's Claim for breach of contract must be dismissed.

## II.  Aiding and Abetting

"Under New York law, the elements of aiding and abetting a breach of fiduciary duty . . . and aiding and abetting a fraud are substantially similar." SPV Osus Ltd. v. UBS AG, 882 F.3d 333, 345 (2d Cir. 2018) (citation omitted).  "To establish liability for aiding and abetting fraud under New York law, the

---

[5] Even if these rules and regulations were incorporated into the Custody Agreement, the provisions of the OCC Handbook to which Rado cites describe best practices as opposed to binding rules. For example, Rado cites to language in the OCC Handbook that provides:  "Contract provisions should provide for reversal of the transaction if the trade fails or a specified amount of time passes."  As the OCC Handbook expressly recognizes, "A custody relationship is contractual, and services performed for a customer may vary."

plaintiffs must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Krys v. Pigott, 749 F.3d 117, 127 (2d Cir. 2014). Similarly, "[a] claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." Lerner, 459 F.3d at 294 (citation omitted).

Under either cause of action, "[a]ctual knowledge is required to impose liability on an aider and abettor." Krys, 749 F.3d at 127 (citation omitted). Actual knowledge must be distinguished from "constructive knowledge," "which is the knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." Id. (quoting Black's Law Dictionary 950 (9th ed. 2009)). "[A] complaint adequately alleges the knowledge element of an aiding and abetting claim when it pleads not constructive knowledge, but actual knowledge of the fraud as discerned from the surrounding circumstances." Id. (citation omitted). "A company's rejection of certain transactions on the basis that they were potential vehicles for fraud does not constitute a factual basis for the assertion that the company's officials

actually knew that the fraud was, in fact, occurring."  Id. (citation omitted).

Both causes of action also require that the defendant "provide[] 'substantial assistance' to the primary violator." Lerner, 459 F.3d at 294 (defining knowing participation in a breach of fiduciary duty as "substantial assistance"). "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur."  SPV Osus Ltd., 882 F.3d at 345 (citation omitted).  "The mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff."  Id. at 346 (citation omitted).

DBTCA does not dispute the existence of an underlying fraud by Haberer or Haberer's breach of the fiduciary duty he owed to Rado.  DBTCA contends, however, that Rado has not sufficiently alleged that DBTCA either knew of or substantially assisted the underlying fraud or breach of fiduciary duty.  DBTCA is correct.

Rado does not plead facts sufficient to give rise to a "strong inference" that DBTCA had actual knowledge of Haberer's underlying fraud or breach of fiduciary duty.  See Lerner, 459 F.3d at 293.  Rado principally alleges that DBTCA had actual knowledge of Haberer's fraud based on (1) Deutsche Bank S.A. and DBTCA's prior relationship with Holdings and its affiliates; (2)

Haberer's association with one or more of these entities and his
previous interactions with DBTCA; (3) Figueredo's provision of
banking services to certain affiliates of Holdings; (4) the
SEC's issuance of a Cease-and-Desist Order to LLC; (5) Deutsche
Bank SA's decision to close certain accounts related to Holdings
and its affiliates; (6) Figueredo's request to transfer some of
these accounts to DBTCA; (7) Figueredo's management of the Rado
Custody Account at DBTCA; (8) Haberer's decision to invest in
securities related to those subject to the SEC Cease-and-Desist
Order; and (9) DBTCA's awareness that Haberer's December 2017
and January 2018 sale orders were failing at the same time that
his buy orders were executing.

    These allegations support little more than an inference
that DBTCA had constructive knowledge that Haberer was
affiliated with an entity subject to an SEC Cease-and-Desist
Order.  Rado does not allege that Haberer held himself out as an
agent of LLC, the entity subject to the SEC Cease-and-Desist
Order.  Nor does Rado allege that LLC was counterparty to any of
the purchase orders Haberer placed.  Rado also does not allege
that Haberer purchased notes that were in fact subject to the
SEC Cease-and-Desist Order; it only alleges that the securities
Haberer purchased were "related" to those notes or issued by
entities subject to the SEC Cease-and-Desist Order.  Finally,
Rado's allegations that DBTCA did not inquire into the

legitimacy of Haberer's purchase or sale orders despite knowledge of two failed sales transactions "does not constitute a factual basis for the assertion that the [DBTCA's] officials actually knew that the fraud was, in fact, occurring." Krys, 749 F.3d at 127 (citation omitted). Rado essentially admits these insufficiencies in its Claims when it argues that "inquiry notice was triggered by the first failed transactions," that DBTCA "knew or should have known" of Haberer's fraudulent scheme, and that "an investigation . . . would have revealed [to DBTCA] the true situation of the converted funds."

Rado also fails to allege that DBTCA provided "substantial assistance" to Haberer's fraud or breach of fiduciary duty. Rado principally alleges that DBTCA should have investigated or reversed Haberer's January 2018 purchase orders because Haberer's corresponding sell orders were failing to execute and, if Haberer did not execute the sales, the purchases would result in a deficit in the Custody Account. Rado does not allege, however, that DBTCA took any affirmative steps to further or conceal Haberer's fraud. Instead, it claims that Rado substantially assisted Haberer's fraud by failing to "properly monitor and oversee" Haberer's investment decisions and by executing his purchase orders in the ordinary course of business. As described above, however, "mere inaction" cannot constitute substantial assistance unless "the defendant owes a

fiduciary duty directly to the plaintiff." SPV Osus Ltd., 882
F.3d at 346 (citation omitted).  Rado does not allege -- nor
could it -- that DBTCA owes Rado any duties outside those set
forth in the Custody Agreement.  Without facts supporting the
existence of a fiduciary duty between Rado and DBTCA, Rado has
not adequately pleaded that DBTCA "substantially assisted" in
Haberer's fraud or Haberer's breach of fiduciary duty.

     Rado argues that, even if DBTCA did not have a fiduciary
duty, the Court of Appeals in Lerner has affirmed that banks
have "a duty to safeguard trust funds deposited with them when
confronted with clear evidence indicating that those funds are
being mishandled." Lerner, 459 F.3d at 295.  Rado contends that
Haberer's purchase orders -- and the failure of the first two
transactions -- placed DBTCA under a duty to make "a reasonable
inquiry and endeavor to prevent a diversion." Id. (citation
omitted).  But Lerner addressed a bank's duties with respect to
alleged trust accounts -- specifically attorney trust accounts
where banks were required by law to report overdrafts -- where
the "scale and scope" of dishonored checks exceeded a "chronic
and extremely serious insufficiency of funds." Id. at 279, 288-
90.  Rado claims that its Custody Account held by DBTCA is
"basically" or "essentially" a trust account and that DBTCA
"knew that the Rado account was a trust account with the
attendant requirements and obligations to beneficiaries."  Rado

cannot impose the additional duty described in <u>Lerner</u> based on the unsupported allegation that its Custody Account is "basically" or "essentially" a trust account.  The Custody Account is governed by a contract between DBTCA and Rado that specifically enumerated DBTCA's limited duties.  The Custody Agreement did not identify the account as a trust account.  Nor does the pattern of overdrafts created by Haberer's January 2018 orders approach the scale of deficiency required to put DBTCA on notice of any duty to investigate.

## III.  Gross Negligence

Generally, the scope of recovery in negligence actions in New York is limited by the economic loss rule.  Under this rule, a defendant is not liable to a plaintiff for the latter's economic loss in the absence of any personal injury or property damage unless there exists "a special relationship that requires the defendant to protect against the risk of [such economic] harm to the plaintiff."  <u>532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc.</u>, 96 N.Y.2d 280, 289 (2001).  "[C]ourts have applied the economic loss rule to prevent the recovery of damages that are inappropriate because they actually lie in the nature of breach of contract as opposed to tort."  <u>Hydro Investors, Inc. v. Trafalgar Power Inc.</u>, 227 F.3d 8, 16 (2d Cir. 2000).  "It is a well-established principle that a simple breach of contract is not to be considered a tort unless

a legal duty independent of the contract itself has been violated." <u>Dormitory Auth. v. Samson Construction Co.</u>, 30 N.Y.3d 704, 711 (2018) (citation omitted).

Rado's Claim for gross negligence is barred by the economic loss rule.  Rado's Claim for gross negligence turns on its allegation that DBTCA "failed to adequately monitor and respond to red flags and suspicious activity within Rado's account." Specifically, Rado contends that DBTCA was grossly negligent for failing to cancel or reverse Haberer's purchase orders when it was aware that Haberer's corresponding sell orders were failing to execute.  These allegations are substantively identical to those which underlie Rado's Claim for breach of contract.

The injuries that Rado alleges it suffered from DBTCA's gross negligence are economic in nature.  Rado's ability to recover for these injuries is limited by the terms of the Custody Agreement, which defines the scope of DBTCA's duties to Rado.  As discussed above, the Custody Agreement disclaims any duty of DBTCA to advise Rado or Haberer regarding the suitability of investment decisions "regardless of any information the Bank has about [Rado] or the investment or its issuer."  It further provides that Rado, not DBTCA, would be liable for any debit or overdraft in the Custody Account.  The 2012 and 2016 POAs affirm the limited scope of DBTCA's duties, requiring Rado to indemnify DBTCA for any losses or liabilities

arising out of any action or inaction by Haberer.  Because Rado's claims sound in contract and are governed by the terms of the Custody Agreement, DBTCA's motion to dismiss Rado's Claim for gross negligence is granted.

## Conclusion

DBTCA's December 5, 2018 motion is granted and the Claims are dismissed.

Dated:    New York, New York
          April 25, 2019

                                    _____
                                           DENISE COTE
                              United States District Judge