UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :        18cv6768(DLC)
DEUTSCHE BANK TRUST COMPANY AMERICAS,   :
                                        :        OPINION AND ORDER
                        Plaintiff,      :
            -v-                         :
                                        :
RADO LIMITED PARTNERSHIP,               :
                                        :
                        Defendant.      :
                                        :
----------------------------------------X

APPEARANCES

For the plaintiff and counter-defendant:
David G. Januszewski
Sesi V. Garimella
Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005
(212) 701-3073

For the defendant and counter-claimant:
Jenice L. Malecki
Malecki Law
11 Broadway, Suite 715
New York, New York 10004
(212) 943-1233

DENISE COTE, District Judge:

    Deutsche Bank Trust Company Americas ("DBTCA") seeks

summary judgment in this action to collect an overdraft in an

account ("Custody Account") held by defendant Rado Limited

Partnership ("Rado") at DBTCA.  For the reasons that follow,

DBTCA's motion is granted.

**Background**

The following facts are undisputed or taken in the light most favorable to Rado, unless otherwise noted. In March of 2011, Rado, a limited partnership organized under the laws of New Zealand,[1] opened the Custody Account with DBTCA, a New York banking corporation. The Custody Account is governed by a Worldwide Custody Account Agreement ("Custody Agreement").

Two trading authorizations, executed by Rado and DBTCA in 2012 ("2012 Authorization") and 2016 ("2016 Authorization"), authorized Fernando Haberer ("Haberer"), to conduct trading in the Custody Account.[2] Haberer is related by marriage to Diego Romay ("Romay") and his family, who are the ultimate beneficiaries of the assets held by Rado. The Custody Agreement and the 2012 and 2016 Authorizations were recently construed in an Opinion of April 25, 2019, see Deutsche Bank Tr. Co. Americas v. Rado Ltd. P'ship, No. 18cv6768(DLC), 2019 WL 1863272, at *1-2

---

[1] Rado is owned by three entities: a New Zealand company, Rado NZGP Limited (its general partner), and two Delaware limited liability companies, Amadeus LLC and Bellini LLC (its limited partners). These three companies are principally owned by the Diego Trust and partially owned by the Diego II Trust. The Diego Trust and the Diego II Trust are New Zealand trusts that were established for the benefit of Diego Romay and his family.

[2] In connection with its motion for summary judgment, DBTCA has submitted the Custody Agreement, the 2012 and 2016 Authorizations, and an affidavit from its employee Reynaldo Figuerdo ("Figuerdo").

(S.D.N.Y. Apr. 25, 2019).[3]  Terms from these documents that are material to this Opinion are again set forth below.

Custody Agreement

Under the terms of the Custody Agreement, DBTCA agreed to act solely as a custodian for Rado's assets.  It agreed to "keep and protect, in the same manner as the Bank keeps and protects its own similar property, the securities, cash or other financial assets [Rado] deposit[s] in [its] Account(s)" in exchange for monthly fees.  "Upon instructions from [Rado] or [its] Advisor," DBTCA agreed to "buy or sell, for [Rado's] Account and at [Rado's] sole risk, securities or other financial instruments and any foreign currency needed to complete these transactions."

DBTCA's obligations were expressly limited.  The Custody Agreement emphasizes that DBTCA's "sole responsibility, unless [it] expressly agrees otherwise, is to receive, keep and protect [Rado's] Property as custodian, to maintain financial assets (within the meaning of the New York Uniform Commercial Code ("NY UCC")) in the Account as security entitlements in [Rado's] favor, and to provide the execution services, as described in this Agreement."

---

[3] In the April 25 Opinion, the 2012 and 2016 Authorizations were referred to as "powers of attorney."

The Custody Agreement confirms that DBTCA bears no responsibility for advising Rado on the wisdom or merits of any investment:

> You will make your own investment decisions for the [Custody] Account, based on information you obtain on your own or the advice of your Advisor or other professional advisors and experts you select. [DBTCA] is not responsible for advising you about securities or other investments and you will not rely on any advice or information you receive from [DBTCA] in making your investment decisions. [DBTCA] also is not responsible for determining the suitability of any investment for you or the merits of any investment you make for the [Custody] Account, regardless of any information [DBTCA] has about you or the investment or its issuer.

The Custody Agreement includes terms specifying how DBTCA may perform its obligations to "keep and protect" Rado's assets in the Custody Account. For example, it provides that DBTCA "may effect orders to buy or sell securities [and other investments] in any commercially reasonable manner [it] deems appropriate." It further provides that DBTCA "may decline to execute or settle a purchase order if [it] is not satisfied, in [DBTCA's] sole judgment, that [Rado] will have sufficient available funds or credit in [the Custody] Account."

The Custody Agreement also indemnifies DBTCA for relying on "unauthorized" instructions, including email instructions. It acknowledges that DBTCA, at its discretion, may call to confirm email instructions:

> From time to time you may give [DBTCA] instructions
> with respect to the transfer of all or part of the
> Property or for the sale or purchase or securities in
> the [Custody] Account by telephone, facsimile or e-
> mail (collectively referred to herein as "Verbal
> Instructions").  It is understood that the risk of
> Verbal Instructions being given by person or persons
> purported to be you is your own.  You agree to
> indemnify and hold harmless DBTCA for any claims,
> losses, expenses, costs and attorneys' fees (and their
> reasonable expenses) resulting from DBTCA's acting
> upon misunderstood and/or unauthorized Verbal
> Instructions.

The Custody Agreement adds, "You understand that over certain dollar levels, DBTCA may, but shall not be required to, seek verification of your Verbal Instructions by calling you to confirm such Verbal Instructions."

Rado also agreed "to indemnify and hold [DBTCA] harmless for any losses, costs or expenses [DBTCA] incurs if [Rado] fail[s] to furnish immediately available funds when required to pay for [its] transactions and expenses."  The Custody Agreement states that all of Rado's property held by DBTCA "shall be security for . . . any loans, overdrafts or other credit extended to [Rado]."

The Custody Agreement also requires DBTCA to provide on a monthly basis written account statements describing the transactions in the Custody Account.  The Custody Agreement permits Rado to object to an account statement, but states that any objection must be made "in writing within thirty (30) days after the date of the Account Statement."  Rado agreed that, "if

[it] do[es] not do so, it will be agreed that [Rado] ha[s] no objections to the Account Statement."

The 2012 and 2016 Authorizations

Rado, through its general partner, executed two trading authorizations for the Custody Account. Each of them gave authority to Haberer to conduct transactions for Rado in the Custody Account.

In 2012, Rado's general partner executed a trading authorization that identified both Haberer and his employer, Biscayne Capital S.A. ("Biscayne"), as the persons authorized to conduct trading activity in the Custody Account. The 2012 Authorization authorized Haberer, through Biscayne, "to buy, sell, and trade in securities" at DBTCA "for [Rado's] account and risk." Pursuant to the 2012 Authorization, Rado agreed "to indemnify and hold [DBTCA] harmless from all claims that may arise in connection [with the 2012 Authorization]." Rado further agreed "to pay [DBTCA] promptly on demand any and all losses and liabilities arising [from the 2012 Authorization] or from any action taken or not taken by [Rado] in reliance [on the 2012 Authorization], including without limitation, any debit balance due with respect to the Account."

The 2016 Authorization, executed by Rado's general partner Rado NZGP Limited and two directors, grants Haberer authority to direct the "[p]urchase and disposition of all assets and

6

property" and the "[m]ovement of money between account(s) of the

[Rado] Partnership within [DBTCA], including deposit accounts."[4]

The 2016 Authorization allowed DBTCA to rely conclusively on

Haberer's authority to conduct trading in the Custody Account.

It provides,

> [DBTCA] may conclusively assume that all actions taken
> and instructions given by each of the Authorized
> Signer(s) [including Haberer] have been properly taken
> or given pursuant to authority vested in such
> Authorized Signer(s) and the [Rado] Partnership shall
> indemnify and hold [DBTCA] harmless from all claims,
> liabilities, losses, costs, expenses (including
> attorneys' fees) related to or arising from any action
> or inaction by any such Authorized Signer(s).

The 2016 Authorization further provides that DBTCA

"may rely conclusively on the instructions of the

Authorized Signer(s) in every respect unless or until

[DBTCA] receives written notification of the revocation and

has had reasonable time to act on such notice."  In

February of 2016, Rado also provided DBTCA with documents

relating to Rado's ownership.

Overdraft in the Custody Account

On January 4 and 11, 2018, Haberer instructed DBTCA to

deliver cash to settle the following purchases of approximately

$12 million worth of securities for the Custody Account:

---

[4] The 2016 Authorization certifies that Rado's general partner is
authorized to "make the representations, authorizations,
certifications and indemnifications" set forth in the 2016
Authorization.

| Purchases | |
|---|---|
| **Trade Date** | **Amount** |
| January 4, 2018 | $1,500,000.00 |
| January 4, 2018 | $1,500,000.00 |
| January 4, 2018 | $1,500,000.00 |
| January 4, 2018 | $900,000.00 |
| January 11, 2018 | $4,507,901.00 |
| January 11, 2018 | $2,231,692.00 |
| January 11, 2018 | $161,000.00 |
| **Total** | **$12,300,593.00** |

Haberer simultaneously instructed DBTCA to deliver securities to settle the following sales of approximately $12 million worth of securities from the Custody Account:

| Sales | |
|---|---|
| **Trade Date** | **Amount** |
| January 4, 2018 | $5,449,000.00 |
| January 11, 2018 | $1,500,000.00 |
| January 11, 2018 | $4,500,000.00 |
| January 11, 2018 | $900,000.00 |
| **Total** | **$12,349,000.00** |

Both the purchases and sales took place "away from" DBTCA.

The instructions to settle the January 4 and 11 trades were sent to DBTCA employees by email from the address operations@biscaynecapital.com. The January 4 email was also sent to Haberer as both a direct recipient and as a recipient of a copy; Haberer was copied on the January 11 email. Pursuant to its customary practice, and as reflected in notations on the

emails themselves, DBTCA confirmed the instructions by calling and speaking with Haberer.[5]

Pursuant to Haberer's instructions, DBTCA delivered the necessary cash and securities to settle Rado's purchase and sale transactions. But, while Rado's purchase transactions were completed successfully, DBTCA did not receive the cash originating from Rado's sale transactions. As described in DBTCA's June 1, 2018 letter to Rado, Biscayne advised DBTCA by email on January 22 that it was "attempting to chase the counterparty to settle the [sales]."[6] The letter explains that, pursuant to further instructions from Biscayne, DBTCA extended the settlement dates for Rado's sale transactions to January 29 and later to February 14. DBTCA never received payment. The failing sale transactions were cancelled on April 30 and the

---

[5] Rado submitted the emails in opposition to the motion for summary judgment. DBTCA's copies of the emails are marked with signed stamps that read "High Risk Media - Callback Verification," which reflect a callback verification procedure described in the Custody Agreement under the subheading "Telephone, E-mail, or Fax Instructions." Each callback verification stamp contains a checked box indicating that the emailed instructions were "Caller Authenticated" as opposed to "Signature Verified." Each stamp is marked with handwriting that identifies "Fernando Haberer" as the authorized signatory; next to Haberer's name is written a phone number, a date, and a time. The callback verification stamp on the January 4 email lists a date of January 5, 2018 and a time of 12:35 p.m. The callback verification stamp on the January 11 email lists a date of January 11, 2018 and a time of 3:40 p.m.

[6] Rado has relied on the DBTCA letter in opposition to this motion.

securities involved in the attempted sale were returned to the Custody Account.  This left the Custody Account with a cash deficit of approximately $12 million.

In March and April 2018, Haberer deposited cash and transferred securities into the Custody Account to reduce the deficit.  As reflected in DBTCA's June 1, 2018 letter, DBTCA liquidated the deposited securities at Haberer's request.  The April 2018 DBTCA monthly account statement for the Rado account reflects a cash deficit of $2,559,233.36.[7]  Rado did not object in writing to the accuracy of that statement within a month of its receipt.

A June 1, 2018 letter from DBTCA demanded that Rado pay a cash deficiency of $2,557,262.72.  When Rado failed to pay the cash deficiency, DBTCA filed this lawsuit.

Procedural History

On July 27, 2018, DBTCA sued Rado for breach of the Custody Agreement, seeking damages in the amount of $2,557,262.72 plus interest.  On September 12, Rado answered and filed four counterclaims for breach of contract, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and gross negligence.  An Opinion of April 25, 2019 granted DBTCA's motion

---

[7] The April account statement records a deficit that is $1,970.64 more than the amount provided in the June 1, 2018 demand letter.

to dismiss Rado's counterclaims.  See Deutsche Bank, 2019 WL
1863272.[8]

On May 24, DBTCA filed this motion for summary judgment.
Formal discovery has not occurred although the parties have
exchanged the core documents at issue in this dispute.  In
opposing the motion on July 22, Rado requested additional
discovery pursuant to Rule 56(d), Fed. R. Civ. P.  The motion
for summary judgment became fully submitted on July 12.

## Discussion

A motion for summary judgment may not be granted unless all
of the submissions taken together "show[] that there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  "A genuine issue of material fact exists if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party."  Nick's Garage, Inc. v. Progressive Cas. Ins.
Co., 875 F.3d 107, 113 (2d Cir. 2017) (citation omitted).  The
moving party bears the burden of demonstrating the absence of a
material factual question.  Gemmink v. Jay Peak Inc., 807 F.3d
46, 48 (2d Cir. 2015).  In making this determination, the court
must "view the evidence in the light most favorable to the party

---

[8] Rado's motion for reconsideration was denied on July 2.  See
Deutsche Bank Tr. Co. Americas v. Rado Ltd. P'ship, No.
18cv6768(DLC), 2019 WL 2763675 (S.D.N.Y. July 2, 2019).

opposing summary judgment" and "draw all reasonable inferences in favor of that party." Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996).

Once the moving party has asserted facts showing that the non-movant's claims or affirmative defenses cannot be sustained, the party opposing summary judgment "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

I.  Breach of Contract

It is undisputed that New York law governs DBTCA's breach of contract claim.[9]  "To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation

---

[9] The Custody Agreement states that it is governed by New York law.

12

of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (citation omitted).

Under New York law, "a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties." In re MPM Silicones, 874 F.3d 787, 795 (2d Cir. 2017). If the intent of the parties is clear from the four corners of a contract, its interpretation is a matter of law for the court. Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 316 (2d Cir. 2006). "The initial inquiry is whether the contractual language, without reference to sources outside the text of the contract, is ambiguous." In re MPM Silicones, 874 F.3d at 795.

> An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.

Law Debenture Tr. Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010) (citation omitted). By contrast, a contract is unambiguous if its "language has a definite and precise meaning about which there is no reasonable basis for a difference of opinion." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 69 (2d Cir. 2014).

"If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." Torres v. Walker, 356 F.3d 238, 245 (2d Cir. 2004) (citation omitted). In interpreting contracts, "words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." Mastrovincenzo v. City of New York, 435 F.3d 78, 104 (2d Cir. 2006) (citation omitted). Additionally, "an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted).

DBTCA is entitled to summary judgment on its sole claim of breach of contract. There is no dispute as to the formation of the Custody Agreement. The Custody Agreement set forth DBTCA's obligations, which were strictly limited by its plain and unambiguous terms. As explained in the April 25 Opinion, the Custody Agreement principally requires DBTCA to "receive, keep and protect" Rado's assets and to "effect [Rado's] orders . . . in [a] commercially reasonable manner." It expressly provides that DBTCA is not responsible for "advising [Rado] about

14

securities or other investments" or "determining the suitability of any investment."

In accordance with Haberer's instructions, on which DBTCA was entitled by the 2016 Authorization to "conclusively rely," DBTCA performed its obligations and settled Rado's January 4 and 11 purchase transactions. It is undisputed that the corresponding sale transactions failed and that Haberer deposited cash and securities into the Rado account to reduce the resulting cash deficit. When those deposited securities were sold and the cash applied to reduce the deficiency, the January 4 and 11 purchases resulted in a $2,557,262.72 cash deficit in the Custody Account. Notwithstanding Rado's obligation under the Custody Agreement "to furnish immediately available funds when required to pay for [its] transactions," Rado has failed to remit payment. Accordingly, Rado breached the Custody Agreement and DBTCA is entitled to summary judgment. See Lamm v. State St. Bank & Tr., 749 F.3d 938, 943-44 (11th Cir. 2014).

Rado's principal argument in opposition to summary judgment is that its nonperformance under the Custody Agreement should be excused because Haberer lacked authority to cause the Custody Account to incur a deficit. Rado explains that DBTCA knew that Rado is ultimately owned by trusts, including the Diego Trust. According to the Diego Trust Deeds, copies of which were given

to DBTCA in 2016, the trustee of the Diego Trust may not borrow
funds for any purpose without "the written prior or
contemporaneous consent of the Protector," Diego Romay.  From
these facts, Rado argues that DBTCA had a duty to obtain written
consent from Diego Romay, the Protector of the Diego Trust,
prior to settling Haberer's January 4 and 11 transactions to the
extent that those transactions would result in a deficit in the
Custody Account.  Rado characterizes that deficit as a loan.  As
Rado phrases it, DBTCA "did not adequately perform its duties
under the contract to follow the scope of the Authorization, as
also defined by the Trusts [sic] Deeds in DBTCA's possession."
Because DBTCA did not obtain Rado's consent, Rado argues that
DBTCA was not authorized to "extend credit" to the Custody
Account by buying the securities pursuant to Haberer's
instructions in January 2016.

This argument is meritless.  The Custody Account is a
nondiscretionary custodial account governed by the Custody
Agreement.  Although it permits DBTCA to decline to settle
Rado's purchases, it also permits DBTCA to extend credit to
Rado.[10]  It provides that Rado's property "shall be security for

---

[10] For this same reason, Rado has not shown that DBTCA breached
the Custody Agreement by stamping Haberer's January 4 and 11
email instructions with a mark that read "Verified Account has
sufficient cash."  Under the terms of the Custody Agreement, a
determination of whether the Custody Account "will have
sufficient available funds" was left to "[DBTCA's] sole

. . . any loans, overdrafts or other credit extended to [Rado]"
and it contains terms for repayment if Rado fails to furnish
immediately available funds to cover Rado's transactions.
Nothing in the Custody Agreement requires DBTCA to obtain
approval from the Protector of the Diego Trust before acting on
instructions to purchase securities.

Neither the Diego Trust Deeds, nor DBTCA's possession of
the Trust Deeds, modifies the terms of the Custody Agreement or
the 2016 Authorization.  The Custody Agreement contains a broad
integration clause.  That clause states that the Custody
Agreement "reflects the entire agreement between [Rado] and the
Bank with respect to the subject matter hereof . . . ."  Under
New York law, the inclusion of an integration clause reflects
the parties' intent "to require the full application of the
parol evidence rule in order to bar the introduction of
extrinsic evidence to alter, vary or contradict the terms of the
writing."  Sec. Plans, Inc. v. CUNA Mut. Ins. Soc., 769 F.3d
807, 816 (2d Cir. 2014) (citation omitted).  Accordingly, any
failure by Haberer or anyone else to comply with the terms of
the Diegot Trust Deeds does not excuse Rado's breach of the
Custody Agreement.

---

judgment."  DBTCA was entitled to expect that the Custody
Account would have sufficient funds for Rado's purchase
transactions based on Rado's offsetting sale transactions.

Moreover, Rado, through its general partner and two directors, executed the 2016 Authorization. That authorization allowed DBTCA to "conclusively assume" that all actions taken and instructions given by Haberer have been "properly taken or given" pursuant to authority vested in Haberer. For this additional reason, DBTCA was entitled to rely on Haberer's instructions. Even if it was up to Rado or Haberer to secure approval from the Protector of the Deigo Trust before executing the January 4 and 11 transactions or instructing DBTCA to settle those transactions, that did not impose such an obligation on DBTCA.

For these same reasons, Rado's argument that Haberer was not authorized to transfer cash and securities <u>into</u> the Custody Account in March and April 2018 is unavailing. These transfers reduced the cash deficit in the Custody Account. Even assuming Haberer lacked authority to make these transfers, Rado has not explained why DBTCA was not entitled to accept the deposits.[11]

---

[11] There are two FINRA proceedings addressed to the propriety of these transfers. The first proceeding, filed on August 7, 2018, is brought by Maria De Los Angeles Aparain Borjas and Bralison Associates Ltd. against Deutsche Bank Securities, Inc. ("DBSI"), Pershing, LLC, Insight Securities, Inc., and Insight's owner, Carlos Legaspy (the "Borjas Arbitration"). The second proceeding, filed on January 9, 2019, is brought by Clodi Holdings Ltd. against Insight, Legaspy, and Pershing (the "Clodi Arbitration"). The claimants in both the Borjas Arbitration and the Clodi Arbitration are related to Romay or owned and controlled by the Diego Trust or the Diego II Trust. They principally allege that Haberer improperly diverted assets from

Without the offset provided by these deposits, the amount Rado would owe DBTCA under the Custody Agreement would increase from somewhat less than $3 million to approximately $12 million.

To the extent Rado's arguments reflect an attempt to impose a fiduciary duty on DBTCA, that argument has been considered and rejected twice.  See Deutsche Bank, 2019 WL 1863272, at *7-8; Deutsche Bank Tr. Co. Americas v. Rado Ltd. P'ship, No. 18cv6768(DLC), 2019 WL 2763675, at *2 (S.D.N.Y. July 2, 2019) ("July 2 Opinion").  The Custody Agreement does not identify the Custody Account as a trust account and Rado is not a trust.[12] Rado's argument, if adopted, would impose significant new burdens on New York banks and vitiate the benefits of nondiscretionary accounts.  As noted already in the July 2 Opinion, courts must consider "precedential, and consequential, future effects of their rulings" in determining whether a duty exists.  In re N.Y.C. Asbestos Lit., 5 N.Y.3d 486, 493 (2005) (citation omitted).

Rado also argues that summary judgment is inappropriate because of its defense of laches.  But "laches is a defense

_____

the claimants' accounts and routed a portion of those funds to the Custody Account at DBTCA.  In a related case, the Borjas Arbitration was preliminarily enjoined as to DBSI.  See Deutsche Bank Sec., Inc. v. Borjas, No. 18cv10191, 2018 WL 6200045 (S.D.N.Y. Nov. 28, 2018).

[12] Rado's general partner, Rado NZGP Limited, is not a trust either.

developed by courts of equity," Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 678 (2014), and "laches within the term of the statute of limitations is no defense at law." Ivani Contracting Corp. v. City of New York, 103 F.3d 257, 259 (2d Cir. 1997) (citation omitted); see also Oneida Cty. v. Oneida Indian Nation of N.Y. State, 470 U.S. 226, 244 n.16 (1985) ("[A]pplication of the equitable defense of laches in an action at law would be novel indeed."). Accordingly, the doctrine of laches does not provide a defense to a claim of damages for breach of contract.

Finally, Rado contends that DBTCA failed to mitigate its damages. The failure to mitigate is an affirmative defense and Rado bears the burden of offering evidence in support of that defense. See Broadnax v. City of New Haven, 415 F.3d 265, 269 (2d Cir. 2005).

Rado contends that DBTCA failed to mitigate its damages because it amassed a $12 million debt knowing that there was no written authorization from the Trust's Protector for the purchases of securities on January 4 and 11.[13] This appears to be a restatement of the assertion that DBTCA had a duty to

---

[13] While Rado has not offered evidence regarding DBTCA's knowledge of the interactions between Rado, Haberer and the Diego Trust regarding these transactions, it is assumed for purposes of this motion that if permitted discovery Rado may be able to establish at the very least that DBTCA did not determine whether Romay had given permission for the January 4 and 11 purchases and sales of securities in the Custody Account.

contact Romay, the Protector of the Diego Trust, before acting on any instructions from Haberer.  For the reasons already explained, DBTCA had no such duty.

In a similar vein, Rado appears to suggest that DBTCA failed to mitigate its damages because it should have contacted Romay as soon as it learned that Haberer's offsetting sale transactions were failing to settle instead of waiting until May 2018 to contact him.  Again, as already explained, Rado authorized Haberer to give DBTCA instructions and DBTCA was entitled to rely on that authorization.  In any event, since the January 4 and 11 sale transactions settled promptly, Rado has not explained how any earlier notice to Romay could have reduced the deficit in the Custody Account.

II.  Additional Discovery Pursuant to Rule 56(d)

In connection with its opposition to DBTCA's motion for summary judgment, Rado has filed a declaration pursuant to Rule 56(d), Fed. R. Civ. P.  Rule 56(d) provides that where a party opposing summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:  (1) defer considering the motion or deny it; [or] (2) allow time to . . . take discovery."  Fed. R. Civ. P. 56(d).  That declaration must detail,

> (1) what facts are sought to resist the motion and how
> they are to be obtained, (2) how those facts are
> reasonably expected to create a genuine issue of
> material fact, (3) what effort affiant has made to
> obtain them, and (4) why the affiant was unsuccessful
> in those efforts.

Miller v. Wolpoff & Abramson, LLP, 321 F.3d 292, 303 (2d Cir.

2003) (citation omitted). "A party seeking to delay resolution

of a summary judgment motion on the grounds that [it] has been

deprived of certain discovery materials must show that the

material sought is germane to the defense." Alphonse Hotel

Corp. v. Tran, 828 F.3d 146, 151 (2d Cir. 2016) (citation

omitted). In addition, a court is free to reject a non-movant's

Rule 56(d) request "if the evidence sought would be cumulative

or if the request is based only on speculation as to what

potentially could be discovered; and a bare assertion that the

evidence supporting [non-movant]'s allegations is in the hands

of the moving party is insufficient to justify the denial of

summary judgment." In re Dana Corp., 574 F.3d 129, 149 (2d Cir.

2009) (citation omitted).

Rado's application for discovery pursuant to Rule 56(d) is

denied. Rado seeks discovery on issues that would have no

impact on DBTCA's right to recover under the terms of the

Custody Agreement.

Rado seeks discovery principally on whether DBTCA knew (1)

the identity of the account holders from whom the transfers came

22

in March and April of 2018 into the Custody Account, and (2)
that Haberer was acting outside of his authority under the Trust
Deeds in ordering the January 4 and 11 sales of securities or in
transferring securities and cash into the Custody Account in
March and April to reduce the account deficit.  It also seeks
discovery on whether DBTCA had commercially reasonable
procedures in place to monitor the transactions "per the
parties' agreements in line with trust mandates."

Rado has not shown how additional discovery regarding these
issues would create a genuine issue of fact that is material to
DBTCA's claim for breach of contract.  Its requests are largely
premised on the incorrect assumption that the Custody Account is
a trust account and that DBTCA was bound by the terms of the
Trust Deeds.  No additional discovery will change the terms of
the Custody Agreement.

In addition, many of Rado's discovery requests are based on
no more than speculation.  For example, Rado seeks to take
discovery to determine whether the January 4 and 11 transactions
actually occurred.  Rado has not explained why there is any
basis to doubt that the transactions occurred.  Rado waived any
objections it might have had to the accuracy of the April
account statement and has itself relied on the existence of
these transactions in its pleadings.  Discovery is not warranted

based on unsubstantiated speculation that all of the documentary
evidence is false.  See In re Dana Corp., 574 F.3d at 149.


III.  Prejudgment Interest

    DBTCA seeks prejudgment interest.  Under New York law, a
plaintiff that prevails on a claim for breach of contract is
entitled to prejudgment interest as of right.[14]  N.Y. C.P.L.R.
§ 5001(a); New England Ins. Co. v. Healthcare Underwriters Mut.
Ins. Co., 352 F.3d 599, 603 (2d Cir. 2003).  Because DBTCA has
prevailed on its sole claim for breach of contract, it is
entitled to prejudgment interest as of right.

    As a general matter, prejudgment interest in the amount of
9% per annum should be calculated "from the earliest
ascertainable date the cause of action existed."  N.Y. C.P.L.R.
§§ 5001(b), 5004.  "New York law does not permit the trial court
to exercise any discretion where a party is entitled to such
interest as a matter of right."  New England Ins. Co., 352 F.3d
at 602-03 (citation omitted).  Accordingly, DBTCA is entitled to
prejudgment interest in the amount of 9% per annum beginning
June 1, 2018, the date on which DBTCA sent Rado a demand letter.

---

[14] "In a diversity case, state law governs the award of
prejudgment interest."  Schipani v. McLeod, 541 F.3d 158, 164
(2d Cir. 2008).

IV.  Attorneys' Fees and Costs

DBTCA also seeks recovery of its attorneys' fees incurred in pursuing this action.  "Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear." NetJets Aviation, Inc. v. LHC Communications, LLC, 537 F.3d 168, 175 (2d Cir. 2008).[15]  "[C]ourts applying New York law should not infer a party's intention to provide counsel fees as damages for breach of contract unless the intention to do so is unmistakably clear from the language of the contract."  Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 177 (2d Cir. 2005) (citation omitted).

DBTCA points to two provisions of the Custody Agreement that it asserts support its application for attorneys' fees.[16] First, it points to a provision in a section titled "Our Services" that states:  "[Rado] agree[s] to indemnify and hold [DBTCA] harmless for any losses, costs or expenses [DBTCA]

---

[15] As with an award for prejudgment interest, in a diversity case "state law creates the substantive right to attorney's fees." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 177 (2d Cir. 2005) (citation omitted); see also U.S. Fidelity and Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 24, 74 (2d Cir. 2004).

[16] DBTCA's reply brief does not pursue a claim for attorneys' fees premised on the 2016 Authorization.

incurs if [Rado] fails to furnish immediately available funds
when required to pay for [Rado's] expenses."

Second, it points to a provision in a section titled
"Liability and Indemnification" that reads:

> [Rado] agree[s] that [DBTCA] . . . will not be
> responsible for, and [Rado] will indemnify and hold
> [DBTCA] harmless against, any Liabilities
> . . . resulting from . . . any act, omission or
> insolvency by [Rado] or [its] attorneys, agents,
> custodians, receivers, successors or Advisors[] . . .
> [or] any causes other than [DBTCA's] gross negligence
> or willful misconduct or breach of an express
> undertaking in [the Custody] Agreement.

It further provides:

> In the event of any dispute or conflicting claims by
> any person or persons with respect to the Securities
> or other Property held in the [Custody] Account,
> [DBTCA] shall be entitled to refuse to act until
> either:  (i) such dispute or conflicting claim shall
> have been finally determined by a court of competent
> jurisdiction or settled by agreement between
> conflicting parties, and [DBTCA] shall have received
> written evidence satisfactory to it of such
> determination or agreement, or (ii) [DBTCA] shall have
> received an indemnity, security or both, satisfactory
> to it and sufficient to hold it harmless from and
> against any and all Liabilities that [DBTCA] may incur
> as a result of taking such action.

As used in this provision, "Liabilities" are defined to include
attorneys' fees and costs.

Neither of these provisions unmistakably provides for
attorneys' fees in connection with an action by DBTCA against
the account holder to enforce its rights under the Custody
Agreement.  The first provision does not reference payment of

attorneys' fees at all.  To the extent these provisions provide for indemnification, that reference indicates that the parties were principally concerned with indemnification of DBTCA for expenses incurred due to claims brought by third parties.  See Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199-200 (2d Cir. 2003) (indemnity clause only related to third-party claims).

Neither provision, therefore, is "unequivocally referable to claims between the parties themselves" or sufficiently clear that Rado promised "to indemnify [DBTCA] for counsel fees in an action on the contract."  Id. at 200 (quoting Hooper Assoc., Ltd. V. AGS Computers, Inc., 74 N.Y.2d 487, 492 (1989)).  Accordingly, DBTCA is not entitled to recover its attorneys' fees.

## Conclusion

DBTCA's May 24, 2019 motion for summary judgment is granted.  DBTCA is entitled to judgment on its breach of contract claim, plus prejudgment interest.  DBTCA is not entitled to attorney's fees.

Dated:    New York, New York
          August 27, 2019

                                _____
                                DENISE COTE
                                United States District Judge